## PETITION FOR HABEAS CORPUS (ADDENDUM)

**A)**      **Case Background:**

In July of 2010, Petitioner and her husband, Calvin Thibodaux, met Mr. Sidney Dobronich ("Mr. Dobronich"), when they rented property next door to Mr. Dobronich's property. **Exs. "HC 1" at p.1, "HC 2" at p.3, "HC 3".** Mr. Dobronich was an elderly man who lived alone in a single family trailer on his property. ***Id.*** Mr. Dobronich was not married and did not have any children or grandchildren. ***Id.*** From 2011 through 2013, Claimant became friends with Mr. Dobronich and also began performing care-giving services for Mr. Dobronich. **Ex. "HC 3".**

Mr. Dobronich had a sizable estate which he maintained in an investment account and several bank accounts. **Ex. "HC 1" at pp. 2, 5-8, 46, 48-49, 56-59, 79-84, 173-74.** His primary concern was to be permitted to live out his life at his home on Nell Drive in Sun, Louisiana and to not be placed in a nursing home. **Ex. "HC 2" at pp. 10-11.** Consistent with this concern, from around 2009 through 2011, Mr. Dobronich attempted to form a relationship with his step grandson, Mr. Craig Burdine whereby he transferred control of all of his assets to Mr. Burdine and moved to the state of Washington to live with Mr. Burdine in return for Mr. Burdine providing care for him and allowing him to not be placed in a nursing facility. **Ex. "HC 1" at pp. 169-72, "HC 5" at p.9.** During that time, Mr. Dobronich purchased real estate for Mr. Burdine in Washington State, as well as the property located at 20127 Nell Drive, along with purchasing a trailer to be placed on the property. **Ex. "HC 14".** The arrangement with Mr. Burdine failed, and Mr. Dobronich returned to Nell Drive and removed Mr. Burdine's control of his assets. **Ex. "HC 1" at pp. 169-72.** At the time Mr. Dobronich reacquired complete control

of his assets in April of 2011, he had spent well over $300,000 of his estate during the attempted arrangement with Mr. Burdine. *See* **Ex. "HC 1" at pp. 169-72, "HC 5" at p.9, "HC 14"**.

Throughout the time that Petitioner was performing care-giving services to Mr. Dobronich, beginning in the Summer of 2012 through February of 2013, Mr. Dobronich attempted to form the same relationship with the Thibodauxs that he had previously attempted to form with Mr. Burdine. **Ex. "HC 3".** Petitioner and Mr. Dobronich had several conversations whereby Mr. Dobronich expressed a strong desire not to be placed in a nursing home and to be allowed to live out his life at his home at 29127 Nell Drive, whereby Petitioner expressed to Mr. Dobronich her intention to continue to take care of Mr. Dobronich and not to allow him to be placed in a nursing home. **Ex. "HC 2" at pp. 10-11, "HC 3".** As an incentive for them to stay in Sun, Louisiana and take care of him, Mr. Dobronich discussed with petitioner and her husband developing and managing rental property with Mr. Dobronich's financial assistance, which would include the property at Nell Drive, as well as other in the near vicinity. **Ex. "HC 3".** Mr. Dobronich would then leave all of his assets to the Thibodauxs in his will. *Id.*

In February of 2013, after suffering a heart attack for which Petitioner drove him to the hospital; Mr. Dobronich decided to enter into his previously discussed arrangement with the Thibodauxs. **Exs. "HC 2" at p.4, "HC 6" at p.11.** Mr. Dobronich executed a statutory will and a power of attorney executed in favor of Petitioner, which provided Petitioner with access to Mr. Dobronich's finances. **Exs. "HC 1" at pp. 33-37.** From February through mid-March of 2013, Petitioner, at the specific direction of Mr. Dobronich, and with the use of Mr. Dobronich's power of attorney, engaged in several transactions in connection with their arrangement:  assets were moved from Mr. Dobronich's investment account to purchase undeveloped or dilapidated real estate property within the immediate vicinity of Mr. Dobronich's and the Thibodaux's home, as

well as to purchase several items necessary to develop and renovate such property.  **Exs. "HC 1" at pp. 5-9, "HC 3".**   Mr. Dobronich also authorized the Thibodauxs to purchase vehicles and other personal items.  ***Id.***  From February through March of 2013, Mr. Dobronich specifically authorized over 30 transactions, which included purchases, cash withdrawals and transfers, totaling over $334,000. ***Id.***

On March 12, 2013, Mr. Dobronich suffered a severely fractured hip from a fall at his home.  **Ex.  "HC 2" at p.7.**  Requiring substantial rehabilitation, but not wanting to be placed in a nursing facility during his recovery, Mr. Dobronich and Petitioner decided to purchase a handicapped accessible camper, which would be placed adjoining the Thibodaux's residence to aid Petitioner in assisting with his recovery (as his residence was approximately 50 yards away from the Thibodaux's residence). **Exs. "HC 1" at p.9, "HC 2" at pp. 10-11, "HC 3".**

On or around March 15, 2013, two of Mr. Dobronich's nephews George and Forest Dobronich ("the Nephews"), were informed by Mr. Burdine (who had previously been taken off Mr. Dobronich's accounts) that their uncle had begun spending money from his retirement account.  **Ex. "HC 1" at pp. 1, 24.**  Other than a general awareness of and specific interest in Mr. Dobronich's finances, the Nephews had virtually no connection with the daily life of Mr. Dobronich:  they did not visit him on a daily basis, did not assist with cooking, cleaning, or caring for him, nor did they assist in home or property maintenance; nor did they spend holidays with him, nor invite him to spend time with them or their children. ***Id.***

On March 18, 2013, the Nephews engaged the St. Tammany Parish Sheriff's Office in an investigation of the Thibodauxs for elder exploitation. **Ex. "HC 1" at p.1.**  The investigation was conducted by Detective Stefan Montgomery.  Det. Montgomery's investigation proceeded from March 18, 2013 through April 4, 2013.  **Ex. "HC 1" at pp. 1-26.**  His investigation

involved a search of Mr. Dobronich's financial records, three interviews with Mr. Dobronich, as well as interviews with the Thibodauxs as well as representatives from various financial institutions. *Id.* Det. Montgomery also engaged the support of the United States Secret Service; and on March 27, 2013, conducted a raid of the Thibodaux residence and the residence of Mr. Dobronich (with 10 armed St. Tammany Parish Sheriff's deputies and U.S. Secret Service Agents) and seized several items from their respective residences. **Ex. "HC 1" at pp. 12-18, "HC 7" at pp. 9-16.**

Det. Montgomery attempted to create a false narrative that Mr. Dobronich had lived off of a $1,200 per month stipend from his "over $800,000.00" investment account, that he never made any other financial transactions, that the Thibodauxs had obtained a power of attorney while Mr. Dobronich was hospitalized and had used the power of attorney to spend over $300,000.00 of Mr. Dobronich's money on purely personal items without Mr. Dobronich's knowledge or consent; that this spending was brought to the attention of his concerned Nephews by Mr. Dobronich's broker and that the Nephews were the heirs to Mr. Dobronich's estate. **Ex. "HC 1" at pp. 1-10.** The evidence collected by Det. Montgomery actually established the following:

1)    The financial records uncovered by Det. Montgomery established that Mr. Dobronich maintained very complicated and convoluted financial arrangements, with several bank accounts each drawing income from different sources, as well as a large and unknown source of cash, and of which neither Det. Montgomery, nor even Mr. Dobronich's broker, Joe Romano, were fully aware. **Ex. "HC 1" at pp. 27, 46, 48-49, 56-59, 79-84, "HC 5" at pp. 11-12.** These financial arrangements involved the establishment of several bank accounts and the maintenance of a substantial, and unknown supply of cash by Mr.

4

Dobronich.  *Id.*  The evidence indicates that this complex financial arrangement was specifically intended by Mr. Dobronich in large part due to his fear of being exploited and taken away from his home by his Nephews.  *Id.*

2)   Several of the financial records obtained constituted checks that were signed by Mr. Dobronich himself.  **Ex. "HC 1" at pp. 50, 51, 52, 85, 92, 232.**  In one instance, a check for a specific transaction (purchase of a handicapped accessible camper which was to be placed adjoining Defendant's trailer to facilitate Mr. Dobronich's rehabilitation and recovery from his broken hip) was completely written by Mr. Dobronich himself and presented for payment after the initial attempted transaction was prevented due to the freezing of bank accounts by law enforcement pursuant to the investigation.  **Ex. "HC 1" at pp. 9-11, 104-112, 232.**  Additionally, the large scale transactions abruptly ceased on March 13, 2013 (one day after Mr. Dobronich was admitted to the hospital).  **Ex. "HC 1" at  pp. 5-8.**  Likewise, testimony indicated that Mr. Dobronich's broker specifically witnessed Mr. Dobronich authorize a substantially large transfer from the investment account.  **Exs. "HC 1" at pp. 27, "HC 5" at p.14.**

3)   Almost all of the purchases discovered were located on the Thibodauxs property, next door to Mr. Dobronich's property and were consistent with the maintenance and development of rental property.  **Ex. "HC 1" at pp. 5-10, 13-18.**  Likewise the real estate purchase at 29066 Ellis Drive and another attempted real estate purchase at 28529 Hall Road were all within ¼ mile of the Thibodaux/Dobronich residences and were, likewise consistent with development and maintenance of rental property and Mr. Dobronich's intent to give the Defendant and her husband a strong financial incentive to remain co-located with him at his home on Nell Drive.  *Id.*

4)      The interview with the investment broker, Mr. Joe Romano, and the March 27, 2013 raid uncovered evidence that Mr. Dobronich had previously attempted to form an arrangement, similar to the arrangement formed with the Thibodauxs, with his step grandson, Mr. Craig Burdine, executing a power of attorney in his favor, allowing him access to his finances, purchasing land for Mr. Burdine, in his name.  **Ex. "HC 1" at pp. 1-2, 13, 27-28, 168-172.**

5)      Significantly, Det. Montgomery asserted that Mr. Burdine "was notified out of concern by Joe Romano (owner)[Mr. Dobronich's broker] during a phone conversation."  **Ex. "HC 1" at p.1.**  In actuality, Mr. Romano indicated (in his statement and testimony under oath) that he was not concerned about the transactions (he carried them out); and that it was Mr. Romano who was contacted by Mr. Burdine, who indicated that he was concerned about recent transaction history.  **Ex. "HC 1" at p.27, "HC 5" at p.15.**  In fact, Mr. Romano had informed Mr. Burdine that he could not give him any information regarding the account, and did not do so until he got the Nephews in on a three way call.  ***Id.***

6)      The March 27, 2013 armed raid covered both the Thibodaux residence at 29145 Nell Drive and Mr. Dobronich's residence at 29127 Nell Drive did not uncover any instrument or testament purporting to name the Nephews as beneficiaries of Mr. Dobronich.  **Ex. "HC 1" at pp. 13-17.**  The March 27, 2013 raid did uncover the original February 14, 2013 statutory will in favor of the Thibodauxs and the power of attorney.  ***Id.***

Although Det. Montgomery was able to determine the true nature of the arrangement between Mr. Dobronich and the Thibodauxs and was specifically informed by Mr. Dobronich of the nature of the arrangement and that all transactions were specifically authorized himself (see

*infra*); Detective Montgomery assisted the Nephews in concealing Mr. Dobronich's assent to these transactions and in gaining physical control over Mr. Dobronich through an illegally obtained power of attorney which the Nephews further used to obtain exclusive physical control over Mr. Dobronich.  *See* **Ex. "HC 1" at pp. 2-10.**

Specifically, on March 28, 2013, the Nephews, with their lawyers, went to Sidney Dobronich's hospital room and coerced him into signing a general power of attorney, revoking petitioner's POA and providing the Nephew's with said general power of attorney.  **Ex. "HC 2" at p.13, "HC 4" at pp. 9-11.**  Using said power of attorney, upon his discharge from the hospital on April 2, 2013, Sidney Dobronich was taken by his nephew, Forest Dobronich, to his home in Diamondhead, Mississippi, where he was in the exclusive custody and control of his Nephews, under what was described as 24/7 supervision (until his death in March of 2014).  **Ex. "HC 9" at pp. 38, 43-44.**

Using their illegally obtained power of attorney from Mr. Dobronich, the Nephews instituted two civil actions against petitioner and her husband in the 22nd Judicial District Court. The first, entitled *Forest Dobronich and George Dobronich v. Darnay Thibodaux and Calvin Thibodaux*, No. 2013-11468, 22nd J.D.C., Div. "F", (hereinafter, "the Injunction Action"), was voluntarily dismissed shortly after filing to avoid a writ of habeas corpus filed by petitioner's previous attorney.  **Ex. "HC 4" at pp. 1-22.**  The second action, entitled, *Forest Dobronich and George Dobronich v. Darnay Thibodaux and Calvin Thibodaux*, No. 2013-11784, 22nd J.D.C., Div. "D", (hereinafter, "the Civil Revocation Action") to revoke several transactions and for return of assets.  **Ex. "HC 4" at pp. 23-32.**  Using Det. Montgomery's connections with the United States Secret Service ("USSS") as part of the USSS Financial Crimes Task Force, the Nephews and Det. Montgomery also leveraged a civil asset forfeiture proceeding, *United States*

*v. 100,641.06, et al.*, No. 13-5566, USDC EDLa, Sect. "B", to seize assets and property known by Det. Montgomery to have been rightfully obtained with Mr. Dobronich's consent.  **Ex. "HC 7".**  It is of no small significance that the Federal Civil Asset Forfeiture action not only deprived petitioner of any assests, but also involved a specific threat by the Office of the United States Attorney for the Eastern District of Louisiana that petitioner could be prosecuted for Federal crimes as well.  **Ex. "HC 7" at p.26.**  The Nephews also admitted to the seizure and acquisition by both STPSO and USSS of at least $292,000 of the $334,000 that was expended by Mr. Dobronich via Petitioner pursuant to their arrangement.  **Ex. "HC 4" at p.25.**

These efforts by Det. Montgomery and the Nephews resulted in a criminal prosecution of Petitioner and her husband, *State v. Thibodaux*, No. 534840-1, 22nd J.D.C., Div. "C" for two counts of violations of La. R.S. 14:93.4, Exploitation of the Infirmed.  **Ex. "HC 10".**  Due to involvement of a high ranking member of the St. Tammany Parish District Attorney's Office with the circumstances of the case (the illegally obtained power of attorney listed Mr. Leo Hemelt, Jr. as a witness thereto), the criminal matter was prosecuted by the Louisiana Department of Justice ( hereinafter, "LaAg").  **Ex. "HC 10" at pp. 1-2.**

During the pendency of the criminal investigation and the civil revocation action, and despite being under intense coercion and almost exclusive physical control of the Nephews, Sidney Dobronich had the opportunity to provide sworn testimony in two instances in which he attempted to state that all transactions performed by the Petitioner were specifically authorized and he did not want to prosecute the Petitioner or her husband.  On March 27, 2013, Mr. Sidney Dobronich made the following statement, duly sworn by a notary in good standing in the State of Louisiana:

Before me, Rebecca D. Crawford, Notary Public, personally appeared:

Sidney Dobronich

who being first duly sworn, states that

1) He does not want to press charges against Calvin and/or Darnay Thibodaux for acting on his behalf with a Power of Attorney he executed in the presents [sic] of a Notary Public and two witnesses;

2) Anything purchased was with his consent and were authorized with his full knowledge;

3) Items such as, Kubota Tractor, a 4-wheeler, 2001 Chevy PK, a 2013 Nissan Altima and property(s) [sic] were purchased with my knowledge; the money came from my account;

**Ex. "HC 1" at p.236.**

Admittedly, the March 27, 2013 affidavit was hand written, being generated that same day that petitioner endured the arguably frightening and intimidating raid on her home by several armed U.S. Secret Service Agents and St. Tammany Parish sheriff's deputies.  **Ex. "HC 1" at pp. 13, 20, 236.**

On April 2, 2013; Det. Montgomery interviewed Ms. Rebecca Crawford, the individual who notarized the February 14, 2013 will and power of attorney and the March 27, 2013 affidavit.  **Ex. "HC 1" at pp. 19-20.**  Det. Montgomery implicitly determined that Ms. Crawford was a notary in good standing in the State of Louisiana (and was formerly a Justice of the Peace in Pearl River).  **Ex. "HC 1" at p.19.**  Det. Montgomery also admitted that Ms. Crawford determined that Mr. Dobronich appeared competent at all times in which he executed any documents in her presence.  **Ex. "HC 1" at p.20.**  Regarding the March 27, 2013 affidavit, Det. Montgomery reported that 1) Ms. Crawford had asked Mr. Dobronich if he would be willing to sign a statement, to which he affirmatively replied; 2) that Ms. Crawford had given the affidavit to Mr. Dobronich to read; 3) that Mr. Dobronich had read the affidavit; 4) that she read off the

list of items to Mr. Dobronich and asked him if he consented to the purchases, to which he answered "yes"; and 5) that he had signed the affidavit. ***Id.***

On June 25, 2013, Mr Dobronich testified in open court in the Civil Revocation Action, as follows.

> Q.      Now, I want to show you an affidavit, sir, and this is an affidavit that I'm going to mark as Defense Exhibit Number 4.  Take your time and look at it, and it's dated March 27, 2013, affidavit, okay.   When you finish reading just acknowledge your head, okay, please.  Are you finished reading it?
> A.      Uhm-hum (Affirmative response).
> Q.      Would you look at the bottom of it.  Do you remember I pointed out Mrs. Crawford.  Do you know Rebecca Crawford?
> A.      Yeah.
> Q.      Is that her name on the bottom of it?
> A.      It is.
> Q.      And is that your signature on the bottom of it?
> A.      Yeah.
> Q.      And without going into it, it says - - and we're going to go into it - - that you gave her the power of attorney to buy a Kubota tractor, a four-wheeler, a 2001 Chevy pickup, a Nissan, other property with your full knowledge and with your account and with your consent with your money from your account.  Does it say that?  And you do not wish to pursue these people for criminal charges.  It says what it says; does it not, sir?  Yes?
> A.      Yeah.
> Q.      And whose signature is on the bottom of that affidavit?  Is that your signature on the bottom?
> A.      Yeah.

**Ex. "HC 5" at pp. 74-75.**

Again, on June 25, 2013; Mr. Dobronich specifically testified in the Civil Revocation Action, under direct questioning by the Court, as follows:

> BY THE COURT:
>         Wait.  I have a question, Mr. Burns.
> BY MR. BURNS:
>         Yes, sir, surely.
> BY THE COURT:

Why did you do this?  Did somebody ask you to do this?

BY THE WITNESS:

I don't know.

BY THE COURT:

You don't know why you did this?  You don't remember who asked you to do it?

BY THE WITNESS:

(Negative Response).

BY THE COURT:

Was it your idea? You came up with this by yourself?

BY THE WITNESS:

(Affirmative Response)

BY THE COURT:

You called up Ms. Crawford and said I want to do an affidavit?

BY THE WITNESS:

Yeah.

BY THE COURT:

You called her up?  Ms. Crawford is right there.  You called her up and said I want to do an affidavit and say that everything I did I don't want to prosecute them for and I want to give this to them?  You called them up and said that?  It was your idea?

BY THE WITNESS:

(Affirmative response).

**Ex. "HC 5" at pp. 76-77.**

In all fairness, the Court unfortunately, and erroneously, terminated Mr. Dobronich's testimony soon after that point, citing his competence; and ordered that his competency be evaluated.  **Ex. "HC 5" at p.79.**  It should be noted that Sidney Dobronich made the above independent exculpatory statements on June 25, 2013 after being in the exclusive custody and control of his Nephews, George and Forest Dobronich (hereinafter, "the Nephews"), while he stayed at the home of Forest Dobronich, in which Mr. Dobronich was under what was described as 24/7 supervision. *See* **Ex. "HC 9" at pp. 43-44.**

The third exculpatory statement was made by Mr. Dobronich to Det. Montgomery within the context of the three interviews of Mr. Dobronich by Det. Montgomery.  In the first interview,

taken on March 18, 2013, Det. Montgomery obtained search authorization for all of Mr. Dobronich's bank accounts and financial records of his broker.  **Ex. "HC 1" at pp. 3-4.**  The first interview was recorded (though, interestingly, the recording does not contain any statement by Mr. Dobronich that he wanted his nephews to be his heirs, contradicting Det. Montgomery's report on that point).  **Ex. "HC 1" at p.4.**  Between the first interview on March 18, 2013 and the second interview on March 21, 2013, Det. Montgomery obtained several of Mr. Dobronich's financial records (though the records of Mr. Dobronich's broker, or any specific mention thereof, are conspicuously absent from his report).  **Ex. "HC 1" at pp. 5-9.**  Despite having what Det. Montgomery explicitly reports as over 30 transactions totaling $334,000, Det. Montgomery only reportedly asks Mr. Dobronich vaguely about the sale of a car and a camper, to which he notes Mr. Dobronich says no.  **Ex. "HC 1" at pp. 9-10.**

The third interview, conducted on April 2, 2013, and also recorded by Det. Montgomery. is significant in its own right in that Mr. Dobronich stated that he recalled signing something but he did not know what it was.  **Ex. "HC 1" at p.19.**  Interestingly, Mr. Dobronich signed 2 things between the second and third interviews:  the March 27, 2013 affidavit, **Ex. "HC 1" at pp. 19-20, 236**, and the March 28, 2013 power of attorney revoking petitioner's prior POA in favor of the Nephews, **Exs. "HC 2" at p.13, "HC 4" at pp. 9-11**.  As mentioned above, immediately after the third interview on April 2, 2013, Det. Montgomery interviewed the notary for the March 27, 2013 affidavit, Mrs. Rebecca Crawford, who confirmed Mr. Dobronich's lucidity in executing same.  **Ex. "HC 1" at pp. 19-20.**  As per his report, Det. Montgomery did not follow up on the Nephew's March 28, 2013 POA.  Instead (again enlisting the assistance of several U.S. Secret Service Agents) Det. Montgomery turned to heavy handed intimidation tactics (and fraudulent misrepresentations regarding potential criminal exposure) directed at one of the sellers

of land to petitioner, whereby generating a potential process crime of obstruction of justice/witness tampering, from which Det. Montgomery ultimately obtained the arrest of petitioner and her husband. **Ex. "HC 1" at pp. 21-26.**

Critically, of the three interviews, only the first and third were recorded: the second interview of March 21, 2013 (the interview presumably containing the confrontation of Mr. Dobronich with all of the 30 plus transactions of over $334,000 allegedly "perpetrated" by petitioner, discovered by Det. Montgomery as per his search authorizations, and Mr. Dobronich's presumed shocked and angry response at the discovery of same) was not recorded. **Ex. "HC 1" at pp. 4, 9-10, 19, "HC 9" at p.63 ;** *see* **Ex. "HC 6" at pp. 57-60.** In fact, given the circumstances, Det. Montgomery was specifically told by Mr. Dobronich that the all of the transactions were authorized (and he probably told Det. Montgomery to leave petitioner and her husband alone, as well as other things about his nephews that Det. Montgomery did not want to hear).

In line with these instances of exculpatory testimony of Mr. Dobronich, prior to August of 2013, petitioner, through her counsel at the time, made repeated attempts within the Civil Revocation Action proceedings to obtain Mr. Dobronich's testimony in a deposition, to include filing a writ of habeas corpus in the Injunction Action, making a request for deposition, then seeking the compulsory setting of a deposition in the Civil Revocation Action. **Ex. "HC 4" at pp. 12-13, 50, 59, 60.** These efforts were consistently thwarted by the Nephews. **Ex. "HC 4" at pp. 15-22, 51-58, 61-67.** These efforts also included the filing of a rule to compel Mr. Dobronich's deposition testimony, filed on June 13, 2013, in which counsel for petitioner asserted, as follows:

> Incidental to the above captioned suit #2 the plaintiffs [Nephews] have filed
> multiple pleadings all of which are intended to keep Mr. Sidney Dobronich from

testifying truthfully about the facts that would exonerate the defendants from <u>any</u> <u>claim</u> of wrongdoing.

**Ex. "HC 4" at pp. 69-70.**

On July 9, 2013, (almost immediately after the Court's termination of Mr. Dobronich's June 25, 2013 testimony and order for his mental competency to be evaluated) the Nephews, in their capacity as agents-in-fact of Sidney Dobronich (and with a fiduciary duty to act in his interests), submitted a medical report of Dr. Paul Verrette to the Court in the Civil Revocation Action, which declared, as followed:

> Mr. Dobronich was evaluated on July 2, 2013.  He has multiple medical problems which include, hypertension, hypertensive cardiovascular disease, coronary artery disease, s/p coronary artery stent, osteoarthritis with total hip replacement of the left hip, chronic renal insufficiency and dementia.  Dementia is likely due to his history of hypertension and cerebrovascular disease.  His dementia is such that he is not able to direct his affairs concerning person or property in matters consistent with his own interest.

**Ex. "HC 4" at pp. 74-75.**

This report notwithstanding, counsel for Defendant continued to persist with obtaining a deposition of Sidney Dobronich.  **Ex. "HC 4" at pp. 77-78.**  On July 17, 2013, counsel in the Civil Revocation Action held a status conference with the Court, which counsel for Nephews summarized as follows:

> This is to confirm my conversation with you during the Status Conference with Judge Garcia wherein I informed you and the judge that we oppose the setting of Sidney Dobronich's deposition based on his incompetency and dementia.  As a result of that information, Judge Garcia has set this matter on the docket for August 27, 2013.

**Ex. "HC 4" at p.80.**

The "setting of Sidney Dobronich's deposition", as a contested matter, was set for hearing on August 27, 2013.  **Ex. "HC 4" at p.81.**  Not insignificantly, also pending was a motion for

contempt filed by the Nephews against petitioner and her husband (which was not filed in the record nor was otherwise apparent until the circulation of a proposed judgment by the Nephews' attorney on August 1, 2013) for merely exchanging pleasantries with Mr. Dobronich in the courtroom hallway coinciding with the June 25, 2013 hearing. **Exs. "HC 4" at pp. 85, 88-89, "HC 5" at p.80.**

On August 13, 2013, the Nephews send another report of Dr. Verrette, dated July 25, 2013, not only stating that Sidney Dobronich was not competent to handle his affairs, but also "that [Sidney Dobronich] is not mentally stable enough to be able to provide any competent testimony in a court of law, including a deposition." **Ex. "HC 4" at pp. 82-83.**

Prior to the August 27, 2013 hearing, counsel for petitioner, in an apparent shift in strategy (and in an apparent effort to stave off further negative consequences from the Nephews pending motion for contempt), discontinued his effort to obtain Mr. Dobronich's deposition testimony and agreed not to contest the Nephew's contentions of Mr. Dobronich's incompetence. **Ex. "HC 4" at p.90.**

On August 27, 2013, the Court in the Civil Revocation Action issued a judgment declaring Sidney Dobronich incompetent to testify at trial or deposition.  The motion for contempt of the Nephews was also dropped. ***Id.***

Petitioner acknowledges filing a motion, through her counsel at the time, with the District Court in the Criminal Proceedings seeking to exclude the testimony of Sidney Dobronich, and entering into a stipulation with the State of Louisiana to that effect on December 12, 2013. **Exs. "HC 10" at pp. 4-5, "HC 11" at pp. 7-9.**  Petitioner submits that said motion and stipulation were predicated upon the August 27, 2013 judgment declaring Sidney Dobronich incompetent to testify. **Ex. "HC 4" at p.90.**  Petitioner also was unaware that Sidney Dobronich purportedly

executed a handwritten will on July 18, 2013 (naming the Nephews as beneficiaries), nor could

she have been aware of the Nephew's attempt to probate same on August 6, 2014.  (see *infra*).

During the hearing of December 12, 2013 concerning the petitioner's Motion to Exclude

Testimony, the following statements were made in open court:

> THE COURT:
>
> Now we have the motion to exclude testimony from Sidney Dobronich.  I think we've had a discussion about that in chambers.   And there was an agreement that there would be no testimony from Sidney Dobronich, as Mr. Dobronich **has been declared incompetent.**
>
> Is that correct?
>
> MR. BLAKE:
>
> **That is correct**, your Honor.
>
> MR. BURNS:
>
> That is correct, if that's a stipulation that he is not going to testify in the court proceedings.
>
> THE COURT:
>
> I believe that's what Mr. Blake has indicated.
>
> *       *       *
>
> THE COURT:
>
> No.  That motion is denied.
>
> Now, Mr. Dobronich cannot assist the State in the presentation of their case **because he is incompetent,** so he will not be sitting at the counsel table.  But he is allowed to come into the courtroom.

**Ex. "HC 11" at pp. 7-8, 10.**

Petitioner was precluded from obtaining any potentially exculpatory testimony from

Sidney Dobronich through his death on March 24, 2014.  **Ex. "HC 8" at p.1.**

Notwithstanding the death of Mr. Dobronich in March of 2014, in August of 2014; the

Louisiana Department of Justice, which was handling the prosecution in the criminal case,

procured expert testimony from Dr. Michelle Garriga regarding a forensic psychiatric analysis of

Mr. Sidney Dobronich.  **Ex. "HC 10" at pp. 10-29.**   This expert testimony relied heavily upon

the Verrette Reports and the statements of the Nephews and concluded that Mr. Dobronich suffered from Major Neurocognitive Disorder (Dementia) and lacked the capacity to consent to any of the transactions conducted within the last 2 years of his life, including between February and March of 2013 for which petitioner was being prosecuted.

> Mr. Dobronich demonstrated confusion and memory loss, and problems with concentration, executive function, and social cognition during his court testimony on June 25, 2013. Dr. Verrette found disorientation and memory loss in his evaluation on July 2, 2013 leading to his diagnosis of dementia. Based upon his evaluation, Dr. Verrette further opined that Mr. Dobronich was "not able to direct his affairs concerning person or property in matters consistent with his own interest."
> It is my opinion that he lacked the same capacity in the months prior, i.e. during the time in question, February and March of 2014 [sic]. Dementia (except that caused by a sentinel event such as a massive stroke) has a slow, step-wise progression. It does not spontaneously appear to the degree evident in Mr. Dobronich in June and July without it having also been present in the previous months.

**Ex. "HC 10" at pp. 28-29.**

Clearly, without this expert testimony, in light of the absence of Mr. Dobronich and the two instances of sworn testimony indicating that the transactions were authorized; the State of Louisiana would not have had legal sufficiency to bring the criminal prosecution against Petitioner or her husband. More importantly, without Mr. Dobronich's availability; Petitioner was effectively required to rebut the State's evidence of the over 30 transactions of $334,000, conducted in less than one month's time with nothing but her own admittedly self serving testimony.

At around the same time that the State was procuring expert testimony regarding Mr. Dobronich's competence to authorize the transactions at issue, on August 6, 2014, the Nephews, Forest and George Dobronich, along with several other purported nieces and nephews, opened a

succession:  *Succession of Dobronich*, No. 2014-30680, 22nd J.D.C., Div "I" ("the Succession"),
in which the Nephews submitted an affidavit, dated July 16, 2014, probating a purported
olographic testament of Mr. Dobronich.  **Ex. "HC 8" at pp. 1-6.**  The purported olographic
testament was written on what appeared to be a sheet of looseleaf notebook paper, was illegible
in several areas, and the date of the purported instrument was inconsistently written.  **Ex. "HC
8" at pp. 5-6.**  The affidavit for probate provided in pertinent part:

> BEFORE ME, the undersigned authority personally came and appeared:

> FOREST DOBRONICH and GEORGE DOBRONICH

> Both persons of the full age of majority, who, after first being duly sworn,
> did depose and state:
> That Affiants are the surviving nephews of the late SIDNEY
> DOBRONICH.
> That affiants are familiar with the handwriting of SIDNEY DOBRONICH
> and that Affiants have reviewed the Last Will and Testament dated July 18, 2013,
> which appears on one sheet of paper beginning with the words, "I, SIDNEY
> DOBRONICH, being of sound mine & body" and ending in the words "would
> like to leave all my possessions at the time of mine of my death to all my nieces
> and nephews to be divided equally."

**Ex. "HC 8" at p.3.**

This purported olographic testament, purportedly dated on July 18, 2013, is bracketed by
the Nephews July 9, 2013 and August 13, 2013 submissions to the Court in the Civil Revocation
Action regarding Mr. Dobronich's ability to "direct has affairs concerning person or property in
matters consistent with his own interest."  *See* **Ex. "HC 4" at pp. 74-75, 82-83.**  The July 18,
2013 date is one day after the June 17, 2013 correspondence of the Nephew's attorney in the
civil action pertaining that day's status conference specifically noting the Nephews opposition to
the setting of a deposition of Mr. Dobronich "based on his incompetency and dementia."
***Compare***, **Ex. "HC 4" at p.80,** *with*, **Ex. "HC 8" at pp. 3, 5.**

Additionally, the sworn descriptive list filed by the Nephews in connection with the successions proceedings, when compared to the evidence collected in Det. Montgomery's investigation of Mr. Dobronich's finances, reveal that the Nephews appropriated over $200,000 of Mr. Dobronich's estated during the time they had power of attorney over Mr. Dobronich's finances. *Compare*, **Ex. "HC 1" at pp. 5-10,** *with*, **"HC 8" at p.7;** *see also*, **Ex. "HC 10" at pp. 31-37.** Further, the Nephews attempted to conceal this by improperly attributing those assets to the value of the claims in the Civil Revocation Action. **Ex. "HC 8" at p.7.**

On November 7, 2014, Petitioner filed a Petition to Annul the July 18, 2014 testament. In that Petition to Annul, Petitioner herein explicitly raised the issue of Mr. Dobronich's mental capacity to execute the July 18, 2013 hand written will based on the submission of the Verrette Reports to the Court in the Civil Revocation Action. **Ex. "HC 8" at pp. 11-13.** On November 10, 2014, AAG Blake tendered to Petitioner counsel, Mr. Roy Burns, what it identified as *Brady* material regarding the July 18, 2013 purported testament of Mr. Dobronich, indicating at least its awareness of the Nephews attempt to probated a testament in direct contravention of its key piece of evidence against Petitioner. **Ex. "HC 10" at p.30.**

Trial of the criminal matter was set for December 15, 2014. On December 3, 2014, Petitioner's Counsel in this Petition filed a Motion to Enroll in the criminal matter with Mr. Burns. **Ex. "HC 10" at pp. 39-40.** On December 9, 2014, petitioner filed a Motion to Exclude the Testimony of Dr. Garriga, based on a violation of Louisiana Rules of Evidence Rule 702 (*Daubert*), in which the Petitioner specifically contested the reliability of Dr. Garriga's testimony as to the mental competency of Mr. Dobronich. **Ex. "HC 10" at pp. 42-53.** On December 16, 2014, a hearing on the Defense Motion to Exclude Expert Testimony was held, wherein Dr.

Garriga specifically explained that Major Neurocognitive Disorder was of such a nature that Mr. Dobronich was completely mentally incompetent and did not and could not have any instances of mental capacity to conduct any transactions during the existence of the disorder.  **Ex. "HC 10" at pp. 54-55.**  In her testimony of December 16, 2014, Dr. Garriga explained the basis for her determination that Sidney Dobronich's dementia had progressed to such an extent at the time Dr. Verrette examined him on July 2, 2013, that the dementia would have had to have been present and February and March of 2013.  **Ex. "HC 10 at pp. 28-29.**  Furthermore, Dr. Garriga explicitly testified further the Sidney Dobronich could not have had any lucid moments in the timeframe of February and March of 2013, and hence could not have had any such lucid moments in July of 2013 as well.  **Ex. "HC 12" at p.171.**  The LaAG did not in any way attempt to qualify or correct this testimony; and the Court subsequently denied the Petitioner's Motion at that time.

As a result of the potential testimony of Dr. Garriga, and being functionally deprived of Mr. Dobronich's exculpatory testimony (and succumbing to a year and a half of considerable pressure from multiple lawsuits in state and Federal courts, as well as heavy handed intimidation from state and Federal law enforcement); on December 17, 2014, petitioner and her husband changed their pleas to guilty as charged.  **Ex. "HC 10" at pp. 58-60.**  The prosecution, while agreeing to a sentence of probation for Petitioner's husband Calvin Thibodaux, insisted on a pre-sentence investigation as to Petitioner.  *Id.*  The Court set the sentencing hearing for January 29, 2015. *Id.*

On January 9, 2015, petitioner filed a Motion to withdraw her guilty plea and to dismiss the indictment on the grounds that the Nephews, in coordination with the State of Louisiana, deprived her of Mr. Dobronich's favorable testimony in violation of the Compulsory Process

20

Clause of the 6th Amendment and the Due Process Clause of the 5th and 14th Amendments to the United States Constitution. **Ex. "HC 10" at pp. 62-77.** In opposition Petitioner's motion to withdraw her plea, the LaAG, in brief to the District Court, again relied on the opinion of Dr. Garriga in asserting that no Compulsory Process Clause violation occurred because the Compulsory Process Clause only applied to competent witnesses. **Ex. "HC 10" at pp. 78-85.** In making this argument, the State made this unequivocal statement:

> Mr. Sidney Dobronich had no knowledge of this transaction, had no knowledge that a check drawn on his account was used, **nor was he capable of consenting to this transaction because he was suffering from dementia** all of which is why he was not a party to the transaction.

**Ex. "HC 10" at p.83.**

On January 29, 2015, the State of Louisiana, in arguing against the petitioner's motion to Withdraw Plea/Dismiss, made the following statement in open court:

> . . .  There's no state involving here, whatsoever, with Mr. Dobronich's inability to testify.  Judge, he died.  The doctors **declared him incompetent to testify**.  He was **declared incompetent to testify**, even in the civil suit.  Judge, the State had no point in him being **declared incompetent**.  Judge Garcia saw him, questioned him, and determined, while he was testifying on June 25, 2013, that he **was incompetent to testify**, Judge.  Plain and simple.  The Judge subsequently issued an order **declaring that he was incompetent to testify**.
>
> Last year, December 12, 2013, there was a hearing based on a motion filed by Mr. Roy Burns that sought to exclude Mr. Dobronich's testimony because he was **declared incompetent**, Judge.  So that was resolved that day.  Y'all [petitioner] agreed that he was **incompetent to testify**.

**Ex. "HC 11" at pp. 49-50.**

The Court subsequently denied the petitioner's Motion to Withdraw Plea/Dismiss, making the following statement:

> The Court is familiar with this case having began [sic] a trial in this matter, **listened to the testimony of Dr. Garriga**.  The Court does believe that any

testimony that would have been favorable to the Thibodauxes is **all speculative at this point**; and, further, **he would not have been allowed to testify**.

**Ex. "HC 11" at p.51.**

Sentencing followed, wherein the Court sentenced petitioner to 10 years in prison with 5 years suspended, and 5 years probation. **Ex. "HC 10" at p.86.**

Petitioner filed her Application for Writ of Supervisory Review to the Louisiana First Circuit Court of Appeals on February 17, 2015, which application was denied on February 19, 2015. **Ex. "HC 10" at pp. 88-160.** Petitioner filed her Application for Writ of Supervisory Review to the Louisiana Supreme Court on March 9, 2015. **Ex. "HC 10 at pp. 161-189.** The State filed an opposition with the Louisiana Supreme Court in which it attached a copy of its opposition to the petitioner's motion in the District Court, containing the statements that Mr. Dobronich was not competent and was not capable of consenting to the transactions at issue. **Ex. "HC 10" at pp. 191, 201-02.** The Louisiana Supreme Court denied petitioner's writ application on May 15, 2015. **Ex. "HC 10" at p.204.**

Arguably, despite the legal arguments raised, given the discretion afforded to the District Court, the denial of writs could have been based on a finding that the District Court was within its discretion to find Mr. Dobronich incompetent as a potential witness throughout the pendency of the criminal prosecution up until his death, as there was no sworn testimony in the record to the contrary. Similarly, without sworn testimony; the State of Louisiana through the LaAg Office, argued in opposition to the Petitioner's Motions and Applications that the submission of the Garriga Report was did not constitute a knowing submission of false evidence and that the District Court's reliance on said report was within its discretion.

Subsequent to the District Court's rulings and sentence on January 29, 2015, on February 24, 2015, the Court in the Successions proceeding held a hearing on the petition to annul

testament filed by Petitioner herein.  **Exs. "HC 8" at pp. 15-16, "HC 9".**  Within that hearing, the proponents of the July 18, 2013 testament offered the sworn testimony of the Nephews, as well as Detective Stefan Montgomery of the St. Tammany Parish Sheriff's Office, that, at all times from February 2013 through his death in March of 2014, Mr. Dobronich was fully mentally competent.  **Exs. "HC 8" at pp. 15-16, "HC 9" at pp. 38-39, 62-64, 69-70, 78, 85.** Additionally, upon attempting to introduce the Verrette Report, the critical evidence supporting the State's expert testimony against Petitioner, the Nephew's through their counsel, objected to the introduction of the report on the grounds that the Verrette Reports constituted unreliable hearsay.  **Ex. "HC 9" at pp. 52-53, 86-88.**  Additionally, Forest Dobronich testified that he was certainly aware of the report and its conclusions, and stated that he "disagreed" with the conclusions.  **Ex. "HC 9" at pp. 46-52, 68.**  Pursuant to those occurrences, the Court in the successions proceedings accepted the testimony offered by the Nephews, sustained the hearsay objection as to the Verrette report, and issued a Judgment upholding Mr. Dobronich's execution of the July 18, 2013 hand written will.  **Ex. "HC 8" at pp. 15-16, 19-21.**

On May 20, 2015, trial in the Civil Revocation Action was held.  **Ex. "HC 4" at p.93.** At the conclusion of that trial, the Court held, in part, that all property subject to this *in Rem* proceeding was the property of the Nephews, as well as several other nieces and nephews of Mr. Dobronich.  **Ex. "HC 4" at pp. 93-96.**  Significantly, the Court also held that the total value of the property at issue was $304,606.46 and there was no outstanding assets of the late Mr. Dobronich that had not been recovered and either returned or held by the State of Louisiana and the Federal Government.  That ruling was set forth in a written Judgment dated June 15, 2015. *Id.*

Notwithstanding the June 15, 2015 judgment in the Civil Revocation Action, on September 21, 2015; the State of Louisiana filed a motion in the Criminal Matter seeking additional restitution from claimants herein. **Ex. "HC 10" at pp. 205-07.** The LaAG was apprised of the existence of the June 15, 2015 Judgment on September 28, 2015. **Ex. "HC 10" at p.208.** The initial setting for the hearing on the State's motion for restitution was set for October 28, 2018. The petitioner opposed the motion, citing not only the June 15, 2015 judgment in the Civil Revocation Action, but also raised the issue of the Nephew's misappropriation of approximately $200,000 of Mr. Dobronich's estate and Petitioner's intent to legitimately use that evidence to defend against the State's restitution motion. **Ex. "HC 10" at pp. 213-18.** The State successfully moved to continue the October 28, 2015 hearing date, over the petitioner's objection, which hearing date was reset for December 9, 2015. **Ex. "HC 10" at pp. 209-10.** On December 9, 2015, the State again successfully moved to continue the hearing date, again over the petitioner's objection, which hearing date was again reset for January 20, 2016. **Ex. "HC 10" at p.219.** On January 20, 2016, the State effectively withdrew its motion for restitution, and the motion was dismissed at that time. **Ex. "HC 10" at pp. 221-23.**

On July 28, 2016, petitioner filed her claims for post conviction relief. **Ex. "HC 12" at pp. 1-21.** In those claims, petitioner largely re-asserted the facts previously raised in her prior Motion to Withdraw her Guilty Plea and to Dismiss the Indictment against her as well as her unsuccessful writ applications. *Id.* The Post Conviction Relief petition was predicated largely on the new evidence, not originally before the District Court in her previous Motion to Withdraw Plea/Dismiss, containing sworn testimony of George and Forest Dobronich, Det. Montgomery and Courtney Dobronich unequivocally asserting the mental competence of Mr. Sidney Dobronich, as well as the District Court's ruling in the case of Successions Proceedings, that Mr.

24

Dobronich was mentally competent on July 18, 2013 (4 months after the transactions that are the subject of the criminal proceedings were conducted).  *Id.*   In particular, petitioner's claims consisted of the following:  1) a violation of the Due Process Clause for the knowing submission of the expert testimony of Dr. Garriga, which the State knew was false; 2) a reassertion of the compulsory process clause/due process clause violation based on the State's involvement in preventing Mr. Dobronich's favorable testimony.  *Id.*

On September 7, 2016, petitioner supplemented her initial petition with an additional claim, claiming a violation of the due process clause resulting from Det. Montgomery's failure to record the second interview of March 21, 2013, in which petitioner asserts that Sidney Dobronich told Det. Montgomery that all of the transactions of February and March of 2013 were authorized.  **Ex. "HC 12" at pp. 25-45.**

On October 27, 2016, the State of Louisiana submitted its response to petitioner's claims.  **Ex. "HC 12" at pp. 46-63.**  The State obtained and introduced various filings and the verbatim transcripts for the civil proceedings, including the February 24, 2015 hearing in the matter of Successions Proceedings as well as the May 20 hearing in the matter of *Dobronich, et al. v. Thibodaux, et al.*, No. 2013-11784, 22nd J.D.C., Div. "D", (hereinafter, "the Civil Revocation Action").  The state also introduced the entire investigation report of Det. Montgomery, with exhibits, as well as the various filings in the criminal proceedings.  **Ex. "HC 12" at pp. 64-65.**  Finally, the State of Louisiana introduced the transcripts for the petitioner's guilty plea in the criminal proceedings on December 17, 2014; the transcript of the motions and sentencing hearing on January 29, 2015.  *Id.*

Conspicuously, the State of Louisiana did not introduce any transcript of the December 16, 2014 testimony of Dr. Garriga at the hearing on petitioner's motion to exclude her testimony. *Id.*

In its response, the State of Louisiana generally asserted that the evidence was insufficient to establish any of the claims asserted by petitioner in her Petition for Post Conviction Relief. **Ex. "HC 12" at pp. 51-63.** However, in so asserting, the State of Louisiana specifically acknowledged the testimony of Forest Dobronich, quoting that "from the time he moved in [April 2, 2013] until the time he died [March 24, 2014]", that Sidney Dobronich was "in good shape mentally" and that "really he was competent". **Ex. "HC 12" at pp. 54-55.** In referring to the Verrette Report which was the primary basis for Dr. Garriga's opinion, the State of Louisiana again quoted Forest Dobronich's February 24, 2015 testimony that he disagreed with the diagnosis of "incompetency and dementia." **Ex. "HC 12" at p.55.** The State of Louisiana also referenced the testimony of Det. Montgomery's February 24, 2015 testimony that Sidney Dobronich appeared "lucid" each of the three times he interviewed him at the hospital, *id.*, as well as the March 24, 2015 testimony of George Dobronich in which he "testified that he visited Sidney Dobronich seven or eight times after his March 2013 hospitalization, and that each time he visited, Sidney Dobronich appeared to be lucid", **Ex. "HC 12" at p.56**.

The State of Louisiana's explanation for these discrepancies was not to contest the above testimony, nor did the State contest the specific instances in which these witnesses testified that he was mentally competent, leading to a finding by the Court that Sidney Dobronich was mentally competent to execute an olographic testament on July 18, 2013. The State of Louisiana explained its position as follows:

> Initially, the State never contended that Sidney Dobronich was completely mentally incompetent on a 24/7 basis. Instead, the State contended (and still

believes) that Mr. Dobronich was at times alert and oriented but could become disoriented quickly when in a foreign environment and/or exposed to psychological pressure.

**Ex. "HC 12" at p.54.**

In a supplemental response, dated October 31, 2016, the State of Louisiana elaborated:

The prosecution believes that one may both (i) suffer from dementia and (ii) from time to time experience moments of lucidity.   For that reason, the opinion of Dr. Garriga is not inconsistent with the observations of Detective Montgomery.   In any event, to the extent that the opinion of Dr. Garriga conflicts with the observations of Detective Montgomery, the prosecution was prepared to present such conflicts to the jury for the jury's consideration.

**Ex. "HC 12" at p. 67.**

On November 15, 2016, in light of the positions taken by the State of Louisiana regarding not only Dr. Garriga's testimony; but its own position regarding the mental competence of Sidney Dobronich; petitioner filed a motion to compel production of the transcript of the December 16, 2014 testimony of Dr. Garriga wherein she explicitly testified that, in her opinion, Sidney Dobronich could not have any lucid moments or moments of mental competency.  **Ex. "HC 12" at p.70.**  This motion was also accompanied by attempts by undersigned counsel, by telephone and e-mail, to procure said transcript.  **Ex. "HC 12" at pp. 71-72** (attached to First Circuit Writ Application).

In addition to the evidence submitted by the petitioner and the State of Louisiana, petitioner, on January 23, 2017; petitioner requested subpoenas be issued for several witnesses for live testimony to be given at a hearing tentatively set for March 8, 2017.  **Ex. "HC 12" at pp. 84-85.**  The requested witnesses included Joseph Romano, Mr. Dobronich's investment broker, Det. Montgomery, and, most importantly, Dr. Garriga.  ***Id.***  In response, on February 14, 2017,

the State of Louisiana filed a request for summary adjudication of the petitioner's claims, arguing for a dismissal of petitioner's claims without further proceedings. **Ex. "HC 12" at p.87.**

On February 23, 2013, the District Court granted the request of the State of Louisiana and summarily denied petitioner's claims for post conviction relief.   **Ex. "HC 12" at pp. 88-92.** Specifically, as to Claim I (knowing submission of false testimony of Dr. Garriga), the District Court accepted the State's assertion that its position was that Mr. Sidney Dobronich was both mentally incompetent but had "lucid intervals"; and that petitioner had failed to produce sufficient evidence to disprove that position. **Ex. "HC 12" at pp. 90-91.** As to Claim II (Compulsory Process Clause Violation), the District Court noted that petitioner's initial Motion to Exclude Mr. Dobronich's testimony, filed in November of 2013 and joined by the State of Louisiana in December of 2013, conspicuously omitting that not only the petitioner, but also the District Court, relied upon the State's contention that Mr. Dobronich was incompetent to testify. **Ex. "HC 12" at p.92.** As to Claim III (Spoliation of additional favorable testimony by Det. Montgomery), the District Court again simply found that petitioner failed to produce sufficient proof to support the claim. **Id.** Finally, as to Claim IV, the District Court found that the assertion as to the constitutionality of La. R.S. 14:93.4 as applied had been waived by petitioner's guilty plea of December 17, 2014. **Ex. "HC 12" at pp. 92-93.**

As to the Motion to Compel, the District Court did not explicitly make a ruling on same; though given the rulings of the District Court on all other claims; the Motion, presumably, was denied.

On May 26, 2017, petitioner filed an application for supervisory writs to the Louisiana First Circuit Court of Appeals, raising the following issues:  (1) that the District Court erred in finding insufficient evidence to support violations of the Due Process Clause and the

Compulsory Process Clause underpinning all four of petitioner's claims for post conviction relief; and (2) that the District Court erred in failing to compel production of the transcript of the testimony of Dr. Garriga. **Ex. "HC 12" at pp. 96-131.** After initially refusing consideration on technical grounds, on July 24, 2017, the Louisiana First Circuit Court of Appeals denied writs, without comment. **Ex. "HC 12" at pp.132-33.**

On August 22, 2017, petitioner filed an application for supervisory writs to the Louisiana Supreme Court raising the same issues raised previously with the Louisiana First Circuit Court of Appeals. **Ex. "HC 12" at pp. 134-165.** In particular, as in the writ application to the First Circuit Court of Appeals, petitioner specifically averred that Dr. Garriga, in her December 16, 2014 testimony, specifically stated that Mr. Dobronich was unable to have any lucid moments as a result of his major neurocognitive dementia, specifically contradicting the State's revised position that it had consistently argued intermittent incompetence with lucid moments. *Id.* This assertion by petitioner was the impetus for her argument that she was entitled to production of the transcript of Dr. Garriga's December 16, 2014 testimony. *Id.*

During the pendency of the petitioner's Louisiana Supreme Court writ application, on April 6, 2018, the State provided petitioner with a copy of what it purported is a transcript of the testimony of Dr. Michelle Garriga, given on December 16, 2014. **Ex. "HC 13".** The transcript provided was materially inaccurate in that it falsely reflected that Dr. Garriga testified in the affirmative that an "individual could have [major] neurocognitive dementia and still have capacity". **Exs. "HC 12" at pp. 174-75, "HC 13" at p.32.** Additionally, the transcript omitted at least one follow up question where Dr. Garriga actually confirmed that an individual with "[major] neurocognitive dementia" could not have any testimonial or transactional mental capacity. *Id.* The transcript certificate was also defective in that it was prepared by a court

29

reporter who did not conduct the actual recording and was not certified in the method used to record the testimony on December 16, 2014.  **Exs. "HC 12" at p.174, "HC 13" at p.50.** Additionally, the transcript was prepared by having the court reporter, who was not present at the hearing, simply listen to the backup audio of the proceedings.  ***Id.***

On April 12, 2018, petitioner filed a supplemental brief in support of her writ application to the Louisiana Supreme Court.  **Ex. "HC 12" at pp. 170-181.**  In that supplemental brief, petitioner noted the tender of the purported December 16, 2014 transcript of Dr. Garriga's testimony, noted the material discrepancies of same, objected to the form and content of the transcript, and reiterated her argument that she was entitled to the raw audio recording of the testimony.  ***Id.***

Despite the petitioner's supplemental brief regarding the inaccurate transcript of Dr. Garriga's testimony, the Louisiana Supreme Court denied petitioner's writ application without any mention of this issue.  **Ex. "HC 12" at pp.182-83.**  In its denial of writs, the Louisiana Supreme Court simply stated that all non jurisdictional defects were waived by petitioner's guilty plea.  ***Id.***  The Louisiana Supreme Court also explicitly stated that petitioner "fully litigated her application for post conviction relief in state court."  ***Id.***

This Petition for Federal Habeas Corpus relief under 28 U.S.C. §2244, *et seq.* follows.

**B)**     **Jurisdictional Predicate for Relief:**

On January 29, 2015, petitioner was sentenced to ten (10) years incarceration at hard labor, with five years suspended, plus five years probation upon her release.  **Ex. "HC 10" at pp.86-87.**  At this time, petitioner is currently on probation for the sentence imposed on January 29, 2015.  ***Id.***

**C)** **Ground No. 1:  Petitioner Is Actually Innocent of all Charges in this Matter to which She Has Pled Guilty:**

At the outset, it is important to note that petitioner has never been found guilty of the crimes for which she has been convicted (as she has sought to withdraw from what she avers is an unconstitutionally coerced plea of guilty on December 17, 2014).  In any event, the evidence establishes her innocence.  The evidence in this matter is clear and convincing that all purchases and money transfers executed by petitioner on behalf of Mr. Dobronich were made with Mr. Dobronich's specific knowledge and consent.  Specifically, the purchases and transfers were made either for, or to facilitate, the acquisition, development, and management of rental property within the close proximity of Mr. Dobronich's home.  Petitioner and her husband would ultimately inherit Mr. Dobronich's property.  In return, petitioner and her husband would provide in home nursing and end of life care for Mr. Dobronich.  As such, the money transfers and purchases were made pursuant to Mr. Dobronich's specific plan and design to facilitate his in home care by having the rental property development and management occur within such close proximity to his home.

The ultimate pleas of guilty to the charges (evidence notwithstanding) were coerced by the almost 2 years of consistent and pervasive weaponization not only of the state criminal justice process, but the state civil court procedure, Federal civil asset forfeiture procedure (with the added threat of Federal criminal prosecution).  This weaponization was specifically perpetrated by Mr. Dobronich's nephews with active participation of St. Tammany Parish Sheriff's Office deputy Det. Montgomery in the falsification and concealment of evidence, coercion and exploitation of Mr. Dobronich, and improper leveraging of the full power of state and Federal law enforcement assets against petitioner and her husband, to include the St. Tammany Parish Sheriff's Office and the U.S. Secret Service.

In line with the above, the evidence clearly establishes as follows:  1) all expenditures noted in Det. Montgomery's investigation were consistent with the above noted arrangement regarding the procurement, development and management of rental properties to facilitate petitioner and her husband providing in home nursing and end of life care for Mr. Dobronich, **Ex. "HC 1" at pp. 5-10, 13-18**; 2)  Mr. Dobronich's actual financial history (conspicuously ignored by Det. Montgomery, but evident in his report and the testimony of his broker) shows not only complex financial transactions that pre-date petitioner's involvement, but also shows Mr. Dobronich's unsuccessful prior attempt to form a similar arrangement with his step grandson, **Ex. "HC 1" at pp. 1-2, 27-28, 46, 48-49, 56-59, 79-84, 168-172, "HC 5" at pp. 11-12** ; 3) any inculpatory statements were made in the presence of the nephews or Det. Montgomery and were shown to be clearly coerced in the weaponized investigation and subsequent prosecution, **Ex. "HC 1" at pp. 3-4, 9-10, 19, 24-28, Ex. "HC 2" at p.13, "HC 4" at p.11**.

Most significantly, the evidence contains AT LEAST two specific sworn statements by Mr. Dobronich that are circumstantially conclusive the he fully authorized all purchases and transfers made by petitioner in February and March of 2013.  **Exs. "HC 1" at p.236, "HC 5" at pp. 75-77.**  By virtue of the State's own admissions on October 29 and October 31, 2016 (and concurrent acknowledgement of the validity of Mr. Dobronich's July 18, 2013 hand written will) that Mr. Dobronich was, at least, intermittently competent, **Ex. "HC 12" at pp. 54-56**; those sworn statements must be accorded their proper weight and are, by themselves, clear and convincing evidence of petitioner's innocence.

As such, petitioner can establish by clear and convincing evidence that she is actually innocent of the charges to which she pled guilty on December 17, 2014.

D)   **Ground No. 2:   Violation of 5th and 14th Amendments Due Process Clauses:   Petitioner's Guilty Plea Was Unconstitutionally Coerced by State's Submission of False Evidence and Testimony Pertaining to Purported Victim's Transactional and Testimonial Mental Competence.**

Based on the totality of the evidence set forth, much of which was obtained after the fact, it is clear that both the Expert Report of Dr. Garriga regarding Mr. Dobronich's purported mental incompetency in February and March of 2013, was patently false.   ***Compare***, **Exs. "HC 10" at pp. 28-29, 82-84, "HC 11" at pp. 7-8, 10, 49-50,** *with*, **Exs. "HC 8" at pp. 1-6, 15-16, "HC 9" at pp. 38-39, 62-64, 69-70, 78, 85, "HC 12 at pp. 54-55.**   More disturbingly, the evidence overwhelmingly supports the conclusion that the Louisiana Department of Justice, as the prosecutor in the case, was not only aware that Garriga Report was patently false, but that it was submitted to the Court with the specific malicious intent to wrongfully benefit the Nephews of Mr. Dobronich in their attempt to acquire ownership of Mr. Dobronich's estate in the concurrent civil proceedings.   *See id.*   The false Garriga Report and accompanying testimony was critical for the prosecution of Petitioner, as the prosecution could not have been maintained against petitioner without it.   The submission of the Garriga Report and testimony violated Petitioner's due process rights under the Fifth and Fourteenth Amendments to be free from the knowing submission of false material evidence in a criminal prosecution against her (which right not only confers a non-waivable duty upon the prosecutor not to knowingly offer false material evidence, but an equally affirmative non-waivable duty to correct such an error when discovered).   *See U.S. v. Mason*, 293 F.3d 826 (5th Cir. 2002).

E)   **Ground No. 3:  Violation of 6th Amendment Compulsory Process Clause:  Petitioner's Guilty Plea Was Unconstitutionally Coerced by the State's False Assertion that the Purported Victim Was Not Mentally Competent to Testify on Petitioner's Behalf, thereby Depriving Petitioner of His Favorable Testimony:**

As mentioned before, petitioner was unduly penalized for Mr. Dobronich's lack of availability.  Not only was he not available for testimony, having been prevented from providing favorable testimony by the actions of the Nephews in preventing him from testifying and having him declared incompetent; but Petitioner was effectively forced to rebut the State's evidence of the over 30 transactions of $334,000, conducted in less than one month's time with nothing but her own self serving testimony, and under a prejudicial cloud of expert testimony of Dr. Garriga as to Mr. Dobronich's lack of mental capacity.

Furthermore, while petitioner admittedly submitted, on December 12, 2013, a joint motion with the State to the effect that Mr. Dobronich was incompetent to testify in the criminal proceedings, **Exs. "HC 10" at pp. 4-5, "HC 11" at pp. 7-9**, that consent was improperly obtained through the consistent pressure and control of the Nephews over the physical person of Mr. Dobronich.   That pressure and control included simply preventing Mr. Dobronich's testimony, despite several attempts to obtain same by petitioner, **Ex. "HC4" at pp. 12-13, 15-22, 50-70**; as well as the wrongful, yet successful, attempts to have Mr. Dobronich declared incompetent to testify (by 2 separate divisions of the Louisiana 22nd Judicial District Court), **Exs. "HC 4" at pp. 74-80, 82-83, 90, "HC 11" at pp. 7-8, 10**.  The State's participation in said declaration by the Louisiana 22nd Judicial District Court on December 12, 2013 was conclusively established to constitute fraud by omission by virtue of the State's own admissions of October 28 and 31, 2016.

As such, the actions of the State of Louisiana in obtaining a guilty plea in this case amounts to unlawful coercion in violations of petitioner's rights under the Compulsory Process

Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments.

**F)     Ground No. 4:    Violation of 5th and 14th Amendments Due Process Clauses:   False Assertion By State, During Post Conviction Relief Proceedings, that Its Position Throughout the Criminal Proceedings Had Been that the Purported Victim Was Only Intermittently Incompetent (Incompetent with "Lucid Intervals"):**

On October 29 and 31, 2016, the State, in the face of overwhelming evidence submitted by the petitioner, took the position that Mr. Dobronich was only intermittently incompetent (essentially mentally incompetent, but with "lucid intervals").  **Ex. "HC 12" at pp. 54, 67.**  A necessary predicate to the State's position is that the so called "lucid interval" was sufficient to support the legal validity of a July 18, 2013 hand written will purportedly executed by Mr. Dobronich (under frighteningly suspicious circumstances, i.e., while under "24-7 supervision" of the Nephews, calling into serious question whether it was done so against his will; and which execution was incidentally performed at the same time these nephews were actually advocating the position to the Louisiana 22nd Judicial District Court that Mr. Dobronich was incompetent to provide testimony).

Additionally, this patently intellectually dishonest and absurd position was the only way for the State to salvage the validity of the prosecution and subsequent conviction of petitioner. Specifically, applying the State's intermittent incompetence theory, Mr. Dobronich was mentally incompetent, but had "lucid intervals", as follows:  1) "lucid interval" on March 18, 2013, when Mr. Dobronich executed search authorizations at the behest of Det. Montgomery, **Ex. "HC 1" at p.4**, but not on March 16, 2013, when he told his broker that a $179,000 transfer was specifically authorized, **Exs. "HC 1" at p.27, "HC 5" at p.4**; 2) "lucid interval" on March 28, 2013 when he executed a power of attorney in favor of his nephews, **Ex. "HC 2" at p.13, "HC 4" at pp. 9-11**, but not on March 27, 2013, when he executed an affidavit stating that all transactions performed by petitioner on his behalf were authorized, **"HC 1" at pp. 19-21, 236**; 3) "lucid interval" on July 18, 2013, when Mr. Dobronich executed a hand written will leaving all of his property to

"his nieces and nephews", **Ex. "HC 8" at pp. 1-6**, but not on July 17, 2013, when the same nephew's attorney was asserting that he could not give a deposition due to "his incompetency and dementia", **Ex. "HC 4" at p.80**; 4) "lucid interval" on June 25, 2013 when he testified on direct examination that petitioner's transactions, performed on his behalf in February and March of 2013 were not authorized, **Ex. "HC 5" at pp. 55-65**, but not on June 25, 2013, when he testified that the transactions were authorized, **Ex. "HC 5" at pp. 74-77**. The State's position, asserted during the pendency of petitioner's post conviction relief proceedings, was, in and of itself, patently false.

More specifically for this particular Ground for Habeas Corpus Relief herein, the State asserted on October 28 and 31, 2016, that its position of Mr. Dobronich's intermittent incompetence was actually consistent throughout the criminal proceedings and consistent with its specifically proffered testimony of Dr. Garriga. **Ex. "HC 12" at pp. 54, 67.** Aside from the utter absurdity of the State's position, the assertion that the position of Mr. Dobronich's intermitted incompetence was the State's position throughout the proceedings is, likewise in and of itself, patently false and directly contradicted not only by Dr. Garriga's testimony, but also by several assertions by the State made in pleadings and statements in open court both the Louisiana 22nd Judicial District Court and the Louisiana Supreme Court. ***Compare***, **Ex. "HC 12" at pp. 54, 67, *with*, "HC 10" at pp. 81-82, 83, "HC 11" at pp. 7-8, 10.**

The State's position of Mr. Dobronich's intermittent incompetence, its assertion that such position was consistent throughout the criminal proceedings, and, with utmost respect, the uncritical acceptance of said positions by the Louisiana 22nd Judicial District Court, the Louisiana First Circuit Court of Appeals, and the Louisiana Supreme Court; defy logic, reason and common sense to such an extent that any semblance of petitioner's rights to due process

protected by the Due Process Clauses of the Fifth and Fourteenth Amendments are clearly violated.

**G)**   **Ground No. 5:  Violation of 5th and 14th Amendments Due Process Clauses:  Once the Question of the Purported Victim's Intermittent Incompetent (Incompetent with "Lucid Intervals") Was Placed at Issue in Petitioner's Post Conviction Relief Petition; Petitioner Was Denied Adequate and Meaningful Appellate Review of those Proceedings by the State's Failure to Produce an Accurate Transcript of Dr. Garriga's December 16, 2014 Testimony and to Provide the Backup Audio and Notes of Said Testimony:**

When the State asserted for the first time on October 28, 2016 that it was asserting that Mr. Dobronich was intermittently incompetent (incompetent with "lucid intervals"), the transcript of Dr. Garriga's December 16, 2014 testimony became particularly relevant.  While the State had, in several instances, directly contradicted the later assertion of intermittent incompetence of Mr. Dobronich in pleadings and open court statements to the Louisiana 22nd Judicial District Court and the Louisiana Supreme Court; Dr. Garriga's December 16, 2014 testimony was particularly pointed in that regard.  ***See* Ex. "HC 12" at p.175.**  As Dr. Garriga had explicitly and unequivocally testified (in response to an initial question and follow up question) that Mr. Dobronich could not have had mental "capacity" to conduct transactions or testify (and, hence, was not able to have a "lucid moment", as defined by the State); petitioner filed a motion to compel the State to produce both the transcript of Dr. Garriga's December 16, 2014 testimony and the raw audio thereof.  **Ex. "HC 12" at p.70.**

On April 6, 2018 (during the pendency of petitioner's writ application to the Louisiana Supreme Court as to her petition for post conviction relief), the State provided what was purported to be the transcript of Dr. Garriga's December 16, 2014 testimony.  **Ex. "HC 12" at pp. 174-75, "HC 13".**  The transcript was materially inaccurate in that it erroneously reflected that Dr. Garriga testified that Mr. Dobronich could have "capacity" (with no follow up question to confirm that critical point).  ***Id.***  The transcript was prepared by a court reporter who did not prepare the recording of testimony, who was not present at the hearing, and was not certified in the transcription method in which the testimony was originally recorded.  **Exs. "HC 12" at**

**p.174, "HC 13" at p.50.**   Petitioner duly noted her objections as such with the Louisiana Supreme Court.  **Ex. "HC 12" at p.175.**

The State's failure to produce to the petitioner the raw audio (for validation of the transcript, and for forensic inspection as to whether the audio had been improperly altered) constitutes a violation of petitioner's due process rights under the Fifth and Fourteenth Amendments to an adequate and meaningful opportunity for appellate review.

**H)** **Ground No. 6:  Violation of 5th and 14th Amendments Due Process Clauses:  Destruction and Concealment of March 21, 2013 Exculpatory Statement of Purported Victim by the State of Louisiana:**

As confirmed by the February 24, 2015 hearing in the Successions Proceeding, whereby the Nephews and Det. Montgomery completely disavowed the State's contention that Mr. Dobronich was mentally incompetent; the evidence in this case supports the contention that Mr. Dobronich specifically told Det. Montgomery on March 21, 2013 that all transactions that were made by Petitioner on Mr. Dobronich's behalf were specifically authorized and that any allegations of the Nephews to the contrary were maliciously baseless.   The evidence also supports the contention that Mr. Dobronich's statement to Det. Montgomery was recorded by Det. Montgomery, which recording was either subsequently destroyed by Det. Montgomery, or not recorded at all, as it did not fit his false narrative against Petitioner and her husband.  ***See*, Ex. "HC 1" at pp. 4, 9-10, 19, "HC 9" at p.63 ;** *see* **Ex. "HC 6" at pp. 57-60.**   As such, Det. Montgomery's destruction of this recording, and/or his falsification of the substance of the March 21, 2013 interview with Mr. Dobronich, constitutes bad faith spoliation of evidence in violation of petitioner's due process rights under the Fifth and Fourteenth Amendments.

**I)**      **Timeliness of Petition under 28 U.S.C. §2244(d):**

Due to her guilty plea, petitioner's conviction became final on December 17, 2014. Petitioner's post conviction relief petition, filed timely under La. C. Cr. P. Articles 926, *et seq.*, was filed timely on July 27, 2016.  The post conviction relief petition was pending through January 28, 2019.  Despite being more than one year between December 17, 2014 and the July 27, 2016 filing of the post conviction relief petition, petitioner's *habeas corpus* relief petition is not barred by 28 U.S.C. §2244(d), for the following reasons:

     1)      Ground No. 1 (all other Grounds by Implication):  Actual Innocence Claim not Barred under *McQuiggin v. Perkins*, 569 U.S. 383 (2013):

Ground No. 1 is predicated on the actual innocence of the petitioner and is, therefore, not barred as per the holding of the United States Supreme Court case of *McQuiggin v. Perkins*, 569 U.S. 383 (2013).  Petitioner further avers that all other Grounds contained within her petition are implicitly predicated on actual innocence and are, likewise, not barred under *McQuiggin*.

     2)      Grounds Nos. 2, 3, and 6:  Not Barred Due to the Application of the Doctrine of Equitable Tolling (*Contra Non Valentem* in Louisiana):

Grounds Nos. 2, 3, and 6 are not barred by 28 U.S.C. §2244(d) due to the application of the Equitable Tolling Doctrine (as well as the Louisiana doctrine of *Contra Non Valentem*, equally applicable here), based on the following circumstances.  As mentioned above, the criminal matter was prosecuted against petitioner in conjunction with several other state and Federal civil actions specifically designed to weaponize the process against her in favor of her opponents in what was essentially a civil dispute over property and inheritance rights.  ***See* Exs. "HC 1"** (Det. Montgomery's criminal investigation)**, "HC 4"** (the Civil Revocation Action)**, "HC 7"** (the Federal Civil Asset Forfeiture Proceedings)**, "HC 10"** (the Criminal Proceedings)**.** In the Civil Revocation Action, by judgment dated June 15, 2015, the Court found that all

property allegedly taken by petitioner was within the possession of the State of Louisiana and the Federal government (necessarily finding by implication that no restitution was owed by petitioner). **Ex. "HC 4" at pp.93-96.** Despite being specifically aware of this judgment, on September 21, 2015, the State of Louisiana, pursuant to the sentence imposed upon petitioner, filed a motion for restitution against petitioner (which motion was filed within the 1 year limitation period for 28 U.S.C. §2244(d). **Ex. "HC 10" at pp. 86, 205-08.** This motion was of considerable concern to petitioner and her husband because the Nephews in the Civil Revocation Action had asserted the value of the property allegedly taken by petitioner to be as high as $437,800, **Ex. "HC 6" at p.35**; with the disputed value being as high as $500,000 by the Nephews in the Successions Proceedings, **Ex. "HC 8" at p.7**, leaving a potential exposure for petitioner of $130,000 to $200,000 at a restitution hearing (given the prior history of this case, the concepts of *res judicata* and collateral estoppel offered little comfort to petitioner). This motion, initially set for hearing on October 28, 2015 (again, within the 1 year limitation period of 28 U.S.C. §2244(d), was continued twice by the State over the specific objections of plaintiff, until it was set for January 20, 2016 (a date outside of the 1 year limitation period). **Ex. "HC 10" at pp. 208-211, 219.** At that time, the State agreed to voluntarily dismiss the motion for restitution. **Ex. "HC 10" at pp. 221-223.** Petitioner avers that, under the circumstances, the State of Louisiana knowingly filed and prosecuted a baseless restitution motion for the specific purpose of intimidating the petitioner from seeking post conviction relief within the 1 year limitation period for Federal *habeas corpus* relief. As such, the Federal doctrine of Equitable Tolling, as well as the corresponding Louisiana Doctrine of *Contra Non Valentem*, apply, and the statute of limitations did not begin to run against petitioner until January 20, 2016. As her post

conviction relief petition was pending from July 27, 2016 through January 28, 2019, this petition for Federal *habeas corpus* relief is timely.

       3)    <u>Grounds Nos. 4 and 5:   Not Barred under the Application of 18 U.S.C. §2244(d)(1)(D)</u>:

Grounds Nos. 4 and 5 are not barred by 28 U.S.C. §2244(d) because they essentially did not arise until during the pendency of the state post conviction relief proceedings.  Specifically, the first time the State of Louisiana had asserted that its position was that the purported victim was only intermittently incompetent (incompetent with "lucid" intervals) was October 27, 2016, in its answer to petitioner's initial petition for post conviction relief.  **Ex. "HC 12" at p.54.** Prior to that time, the State had unequivocally asserted that the purported victim was totally incompetent, lacking any capacity, whatsoever, to either give testimony or to authorize relevant transactions.  **"HC 10" at pp. 81-82, 83, "HC 11" at pp. 7-8, 10.**  As such, the petitioner was effectively unable to address the State's new position, thereby being prevented from discovery as per 28 U.S.C. §2244(d)(1)(D).

**J)**   **Exhibits:**

HC 1:   Det. Montgomery Investigation;

HC 2:   S. Dobronich Medical Record Excerpts;

HC 3:   D. Thibodaux Affidavit;

HC 4:   Civil Revocation Action:  Relevant Pleadings and Correspondence;

HC 5:   Civil Revocation Action:  June 25, 2013 Transcript;

HC 6:   Civil Revocation Action:  May 20, 2015 Hearing Transcript;

HC 7:   Federal Civil Asset Forfeiture Proceedings:  Relevant Pleadings and Correspondence;

HC 8:   Successions Proceedings:  Relevant Pleadings and Correspondence;

HC 9:   Successions Proceedings:  February 24, 2015 Hearing Transcript;

HC 10:  Criminal Proceedings:  Relevant Pleadings, Correspondence, and Minutes;

HC 11:  Criminal Proceedings:  Transcripts of December 13, 2013, December 17, 2014, January 29, 2015 Hearings;

HC 12:  Post Conviction Relief Proceedings:  Relevant Pleadings and Correspondence;

HC 13:  Criminal Proceedings:  Purported December 16, 2014 Testimony of Dr. Garriga;

HC 14:  Relevant Burdine Documents.