1           TWENTY-SECOND JUDICIAL DISTRICT COURT

2                  PARISH OF ST. TAMMANY

3                    STATE OF LOUISIANA

4

5    FOREST DOBRONICH, ET AL

6

7    VERSUS                              NO. 2013-11784

8    DARNAY THIBODAUX, ET AL             COPY

9

10

11   * * * * * * * * * * * * * * * * * * * * * * * *

12

13

14        TRANSCRIPT OF PROCEEDINGS taken before the
     Honorable Peter J. Garcia, Judge Presiding, Division
15   "D", Twenty-Second Judicial District Court, Parish of
     St. Tammany, State of Louisiana, on Tuesday, June 25,
16   2013, in Covington, Louisiana.

17

18

19   APPEARANCES:

20        PEGGY G. VALLEJO, ESQ.
          (ATTORNEY FOR PLAINTIFF)
21
          ROY K. BURNS, JR., ESQ.
22        (ATTORNEY FOR DEFENDANT)

23

24

25

26

27

28   REPORTED BY:

29        Elizabeth L. Cannon, CCR
          Official Court Reporter
30        Certificate No. 91330

31

32

VALLEJO LAW FIRM
JUN 22 2013
RECEIVED

                              1

HC 5

```
 1                    INDEX

 2    JOSEPH P. ROMANO                        7
      DIRECT EXAMINATION BY MS. VALLEJO       7
 3    CROSS-EXAMINATION BY MR. BURNS          22
      REDIRECT EXAMINATION BY MS. VALLEJO     33
 4
      DETECTIVE STEFAN MONTGOMERY             34
 5    DIRECT EXAMINATION BY MS. VALLEJO       34

 6    SIDNEY DOBRONICH                        55
      DIRECT EXAMINATION BY MS. VALLEJO       55
 7    CROSS-EXAMINATION BY MR. BURNS          65

 8    DETECTIVE STEFAN MONTGOMERY             80
      DIRECT EXAMINATION BY MS. VALLEJO       80
 9    CROSS-EXAMINATION BY MR. BURNS          92

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32
```

2

```
1      BY THE COURT:
2               Dobronich.  All right.  Counsel,
3          make your appearances for the record,
4          please.
5      BY MS. VALLEJO:
6               Peggy Vallejo on behalf of Forest
7          Dobronich, George Dobronich, and on behalf
8          of Sidney Dobronich.
9      BY MR. BURNS:
10              Roy K. Burns, Jr., on behalf of the
11         defendants in this matter, Darnay and
12         Calvin Thibodaux, who are present in open
13         court.  May it please the Court, I'd just
14         like to outline I think there are five or
15         six things pending before the Court.
16              The first one would be brought by
17         the plaintiff, which would be a request
18         for sequestration of two parcels of
19         property.  In connection with an answer,
20         I've brought a rule to dissolve the writ
21         of provisional sequestration that was
22         signed.  We object to the continuation of
23         that particular matter.  As part of that,
24         we're praying for damages and attorney's
25         fees.
26              I think the third thing before the
27         Court is that there's a return request on
28         a subpoena duces tecum.  I filed not
29         only -- that is, they've asked me to
30         produce certain documents dealing with my
31         attorney's fees.  I filed an objection to
32         that particular matter, however, I think
```

3

1   there's probably some way we can handle
2   that very quickly.
3       The next thing that was brought
4   before the Court was a petition for a
5   temporary restraining order, a preliminary
6   injunction and permanent injunction
7   brought on behalf of the plaintiffs.  I
8   filed an answer and an objection to that,
9   a request to dissolve the temporary
10  restraining order, a request for
11  attorney's fees and damages associated
12  with that, and all those requests are
13  statutorily provided for.
14      And then in addition to that, Judge,
15  I've brought a rule to show cause why I
16  should not be allowed to take
17  Mr. Dobronich's deposition in anticipation
18  of trying to get some discovery done for
19  this particular case.  I sent a notice of
20  deposition in that matter, and I want you
21  to know it was opposed all the way through
22  my request.
23      I did it professionally.  I said,
24  I'd like to take your client's deposition.
25  No, you're not going to do that.  I said,
26  I'm going to set it then, so I set it.
27  They came before you, Judge, and submitted
28  an ex parte court order cancelling my
29  deposition on whatever they say they did
30  it on.
31      I've brought a rule to ask that we
32  be allowed to take Mr. Sidney's

4

```
 1            deposition, Judge, and if they're unable
 2            to allow me to do that, that their
 3            petition be dismissed, and that's before
 4            the Court today.
 5      BY MS. VALLEJO:
 6            Your Honor, in addition to our
 7            petition for writ of sequestration and the
 8            subpoena duces tecum that was served upon
 9            Mr. Roy Burns for any and all funds and/or
10            property transferred and/or promised to
11            him, we requested the Court find the
12            defendants, Darnay and Calvin Thibodaux,
13            in contempt of the temporary restraining
14            order that is presently in effect against
15            them from any contact whatsoever with Mr.
16            Dobronich.
17            Paragraph D of the temporary
18            restraining order that was signed on
19            May 23rd, 2013, specifically says that it
20            is ordered that defendants Darnay and
21            Calvin Thibodaux, their agents, their
22            assigns, and their relatives are
23            prohibited from any and all contact
24            whatsoever with Sidney Dobronich or any of
25            his relatives, associates, employers,
26            employees, agents, or assigns.
27            Outside of this courtroom, Your
28            Honor, they purposely waved for Mr.
29            Dobronich to come to the courtroom door.
30            They attempted to approach him and speak
31            to him and hug him and call him paw-paw
32            and said to come home with them.  I
```

5

1    informed them that they had a temporary
2    restraining order against them.  They
3    informed me that their attorney told them
4    that no such order existed and they can do
5    what they wanted.
6         Your Honor, I ask that this Court
7    find them in contempt and fine them.
8    BY MR. BURNS:
9         I have two responses to that, Judge.
10   The first one is I'm entitled to at least
11   some written notice and have that matter
12   set before the Court, and so I'm not going
13   to get into the merits of the case unless
14   you really want to.
15        Then I would have a statutory
16   defense to the thing, and one of my
17   complaints about my clients' rights are is
18   that under the injunction articles of the
19   Code of Civil Procedure 3501 through 36,
20   et cetera, in order to get a temporary
21   restraining order, the defendants have to
22   seek a bond in that particular matter.
23        They have not provided any bond in
24   this particular case, and in addition to
25   that, Judge, in order for you to get a
26   temporary restraining order, they have to
27   give me an opportunity to come before you
28   at the time that they're seeking the
29   temporary restraining order to have some
30   say in the matter, and so we have not only
31   a factual dispute but two statutory
32   defenses.

6

JOSEPH P. ROMANO

```
1                We're entitled to notice, which is
2           not set before the Court, and they don't
3           even have a valid temporary restraining
4           order.
5      BY THE COURT:
6                We'll set it for my next rule date,
7           the hearing on contempt.
8      BY MS. VALLEJO:
9                Thank you, Your Honor.
10     BY THE COURT:
11               Let's proceed with the temporary
12          injunction, the permanent injunction.
13     BY MS. VALLEJO:
14               May I call my first witness?
15     BY THE COURT:
16               Yes, ma'am.
17     BY MS. VALLEJO:
18               I call Joe Romano to the stand.
19               (JOSEPH P. ROMANO, after having been
20          first duly sworn under oath, did testify
21          as follows:)
22  DIRECT EXAMINATION BY MS. VALLEJO:
23  Q.    Mr. Romano, can you please state your full
24  name for the record and your address, please.
25  A.    Joseph Paul Romano, 20534 Highway 439,
26  Franklinton, Louisiana.
27       BY THE COURT:
28               What's your first name again?
29       BY THE WITNESS:
30               Joseph.
31  EXAMINATION BY MS. VALLEJO:
32  Q.    Mr. Romano, are you employed?
```

7

JOSEPH P. ROMANO

1  A.      I'm the owner of Romano Insurance and

2  Investment Group, and my business is done through LPL

3  Financial.

4          BY MR. BURNS:

5                  Judge, might I just make an

6                  objection, because I'm not sure I'm

7                  understanding what the Court directed us

8                  to do at this point.  I think that you

9                  asked -- and again, I'll apologize to Ms.

10                 Vallejo -- but unless I'm wrong, you said

11                 you wanted to proceed under the

12                 preliminary injunction because we're not

13                 stipulating that we're entering into a

14                 permanent injunction hearing at the

15                 moment, but that you're asking for a

16                 preliminary injunction, and that's having

17                 to deal with asking our clients not to

18                 even talk to Mr. Dobronich.

19                 That's what I thought I heard the

20                 Court instructed us in terms of the order

21                 of the case on the injunction, and I would

22                 say to -- I'd offer a stipulation that

23                 this man has nothing to do with the

24                 injunction.

25         BY MS. VALLEJO:

26                 Your Honor, I understood we were

27                 proceeding on the sequestration.

28         BY THE COURT:

29                 I did say injunction, but I'm

30                 proceeding with the sequestration at the

31                 same time, but I think his testimony would

32                 be relative to the injunction also.

JOSEPH P. ROMANO

```
 1        BY MS. VALLEJO:
 2                  . Yes, I agree, Your Honor.  Thank
 3            you.
 4   EXAMINATION BY MS. VALLEJO:
 5   Q.    Mr. Romano, you said that you are
 6   self-employed with investments with LPL Investments;
 7   is that correct?
 8   A.    That's correct.
 9   Q.    Do you know Mr. Sidney Dobronich?
10   A.    Yes, I do.
11   Q.    How long have you known Mr. Dobronich?
12   A.    Mr. Dobronich is a client from 2004 to 2009,
13   and he had moved away for a while.  In May of 2011,
14   Mr. Dobronich came into my office and asked me that
15   he'd like to move all his investments back to me, and
16   he's been back with me since May 2011, so I've known
17   Mr. Dobronich since 2004.
18   Q.    You've known him, and do you see him in your
19   office from time to time?
20   A.    Yes, I do.
21   Q.    Before today, when was the last time you saw
22   Mr. Dobronich?
23   A.    It's been about three weeks ago.  We had an
24   appointment at the home that he's staying with Forest
25   Dobronich.
26   Q.    Prior to that, when was the last time?
27   A.    Prior to that, it was back in the fall, about
28   September.
29   Q.    Okay, September.  On what occasions would you
30   see Mr. Dobronich?
31   A.    Mr. Dobronich, he would stop in at least two
32   or three times a year.  I require everyone to have at
```

JOSEPH P. ROMANO

1  least an annual review, and I review all accounts
2  once a month anyway, but Mr. Dobronich was one of
3  those guys that his account is mostly bonds and bond
4  funds, so there was really not much managing, so it
5  was just whenever he felt like stopping in.  It was
6  usually at least two or three times a year.
7  Q.    When he would stop in, would he be driven by
8  someone or how would he arrive?
9  A.    Oh, no, he drove himself.
10 Q.    Did you know Mr. Dobronich to be clearheaded
11 and healthy and able to take care of his own affairs?
12 A.    Yes.
13 Q.    Do you know Darnay Thibodaux?
14 A.    The first time I spoke with Darnay Thibodaux
15 was on February 13th.
16 Q.    Can you explain to the Court what that
17 occasion was.
18 A.    Yes, ma'am.  On February 13th, I received a
19 phone call from Darnay Thibodaux, and she informed me
20 that she was Mr. Sidney Dobronich's caretaker and
21 neighbor, and that they were in St. Tammany hospital
22 and that they were going to need some funds
23 transferred to his account before he left the
24 hospital.  I told her that I would need to speak to
25 him.
26      At that time, she told me she had power of
27 attorney, and that he wanted her to take care of his
28 affairs.  I explained to her that I'd still have to
29 talk to him until I had a copy of the power of
30 attorney.  I spoke to Mr. Dobronich, and he informed
31 me that he was in the hospital, and we did talk about
32 his account.

10

JOSEPH P. ROMANO

```
 1        He did not know how much he needed, and I
 2   asked him if he would be calling me back, and he said
 3   he would have her call me back with the amount before
 4   they left the hospital.
 5   Q.    So Darnay called you for funds?
 6   A.    Right.
 7   Q.    And you spoke with Mr. Dobronich?
 8   A.    I did.
 9   Q.    He did not know how many funds were needed?
10   A.    He did not.  When she called back that
11   afternoon, she told me they needed 30,000 and that
12   she'd asked which account we could transfer it to,
13   and she asked to transfer it to his checking.
14        I told her unfortunately we were set up just
15   to send funds to his savings account, and if we
16   changed it, he would have to sign a new authorization
17   and give me voided check.  She said that would be
18   okay, so we sent $30,000 to his savings account at
19   Capital One bank.
20   Q.    Prior to this $30,000 transfer in February of
21   2013, would Mr. Dobronich call you from time to time
22   to transfer money out of his account?
23   A.    No.  Mr. Dobronich never transferred any
24   funds.  We had him set up on a $1,200 a month ACH
25   directed to his bank account.  That's the only funds
26   he'd ever take out of his account.
27   Q.    In February 2013, do you know how much money
28   Mr. Dobronich had invested with your firm?
29   A.    Approximately 950,000.
30   Q.    And the $1,200 per month would come out of
31   that investment account?
32   A.    Right.  It was dividends, which the dividends
```

JOSEPH P. ROMANO

1  was producing more than 1,200, so the account was

2  growing.

3  Q.    He wasn't even taking out the dividends?

4  A.    Right.  He was not taking out all of his

5  dividends.

6  Q.    When was the next occasion that you spoke to

7  Darnay, if you did speak to her again?

8  A.    On February 20th, she had an appointment.  She

9  had scheduled an appointment on the 19th with my

10 assistant to meet with me on the 20th at 9 o'clock in

11 the morning.  At that time, she brought a will and a

12 power of attorney in and she told me that --

13        BY THE COURT:

14              I'm sorry.  Who did this?

15        BY THE WITNESS:

16              Darnay Thibodaux at 9 o'clock on

17              February 20th.  She came into my office

18              with a will and a power of attorney and

19              told me that Mr. Dobronich was leaving

20              everything to her, and she left me a copy

21              of the will, and that he also wanted her

22              to take care of his financial affairs, and

23              she left me a copy of the power of

24              attorney.

25              At that time, I told her that we

26              also needed a trading authorization, and

27              that's just my requirement.  It's just

28              another way to kind of cover.  In my

29              business you have to be very careful, and

30              I told her that I would need a trading

31              authorization and it would have to be

32              signed by a notary and had to be signed by

12

JOSEPH P. ROMANO

1           Mr. Sidney in front of a notary.  She told
2       me that was no problem; there was a notary
3       close by.
4           So, at that time, she took the form
5       to get that signed.  On that afternoon,
6       she called me and told me that more doctor
7       bills had come in and they needed another
8       $30,000 transferred to his account.  This
9       was a second time there was a transaction
10      was made on February 20th for $30,000.
11  EXAMINATION BY MS. VALLEJO:
12  Q.      Was that transfer made?
13  A.      Yes, ma'am.
14  Q.      So at that point as of February 20, $60,000
15  had been transferred out of Mr. Dobronich's
16  investment accounts for medical bills?
17  A.      That's correct.
18  Q.      Did you have another occasion to speak to
19  Ms. Darnay Thibodaux again?
20  A.      Yes, ma'am.  On March 4th, Ms. Darnay called.
21  Darnay Thibodaux called my office, and at that time,
22  she requested $179,000.  At this point, I become a
23  little alarmed, and I asked her what was the reason,
24  and she said they were buying a home.  I said,
25  Mr. Sidney would like to buy a home?  And she
26  replied, absolutely.
27      I told her at that time that I'm going to have
28  to speak to Mr. Sidney, and she told me then that I
29  have power of attorney and trading authority so I
30  don't know why you need to talk to him.  I said,
31  well, I'd just like to talk to him about the
32  transaction.

JOSEPH P. ROMANO

1          She informed me that he was in the shower and
2     would call back, which they did about 30 minutes
3     later, and she put Mr. Dobronich on the phone.  I
4     said, Sidney, are you wanting to buy a home?  He
5     said, well, we might be Joe.  I said, do you need the
6     money now or you may need the money.  He said, well,
7     we might need it; we're looking at one.  So I said,
8     you don't need me to transfer the funds today.
9          I heard Darnay in the background telling him,
10    well, he can go ahead and transfer the funds, and
11    Mr. Sidney told me on the phone, he said, yeah, Joe,
12    she said go ahead, so go ahead.  So at that point, I
13    transferred the $179,000.
14    Q.    This was for the purpose of buying a house?
15    A.    Yes, ma'am.
16    Q.    Did you know whether Mr. Dobronich owned a
17    house already?
18    A.    I knew he had his place, his normal home, yes.
19    Q.    Did you hear from Ms. Darnay again?
20    A.    Yes, ma'am.  On March 11th, I received a call,
21    and Ms. Darnay Thibodaux told me at that time they
22    needed 95,000, that the house was going to closing
23    and there were more expenses, and so at this point, I
24    transferred another 95,000.
25         This was March 11th.  At this point, I'm a
26    little concerned about the money in the account.  I
27    actually mentioned to Darnay that if they keep taking
28    money out, the dividends -- the account was not going
29    to produce the 1,200 a month.
30         So the only relative I knew of Mr. Sidney at
31    the time was a man in the Washington area named
32    Craig, and I was going to attempt to contact him, and

14

JOSEPH P. ROMANO

1   the only person I knew would help me get the number
2   was off that week.  And fortunately on March 15th, I
3   received a call from Craig.
4        I don't know how he knew what was going on,
5   but he asked me if everything was okay with Sidney's
6   account, and I said, well, I can't give you any
7   information, you're not on the account, but it would
8   be good if someone would go check on him.  At that
9   point, he got nervous and told me that he understood
10  something was going on.
11        I said, all I can tell you is someone else has
12  trading authority on the account and someone needs to
13  check on him.  At that point, Craig told me that
14  Forest and George Dobronich were supposed to be the
15  heirs to Mr. Sidney's account, and he would have one
16  of them contact me.
17        That afternoon, I received a call from Craig,
18  and he had George Dobronich on a three-way call.  He
19  introduced his self to me, we talked, and he told me
20  that Mr. Sidney was back in the hospital and that he
21  and his brother Forest was going the next morning to
22  go check on him.
23        I told him at that time that I'm not in my
24  office on Saturday mornings.  I gave them my cell
25  number and asked them if they would, I'd like to
26  speak to Mr. Sidney when he's not in the presence of
27  anyone else.
28  Q.    Why is that?
29  A.    I was a little concerned.  On the day Darnay
30  Thibodaux asked for the 179, I just felt like she may
31  have been coaching him when I had him on the phone.
32        BY MR. BURNS:

15

JOSEPH P. ROMANO

```
 1              Let me just object.  That's just an
 2         opinion.
 3      BY THE COURT:
 4              Overruled.
 5      BY THE WITNESS:
 6              So I gave George Thibodaux my cell
 7         phone number and I told them when they --
 8  EXAMINATION BY MS. VALLEJO:
 9  Q.     George Dobronich?
10  A.     I'm sorry.  I'm sorry.  Excuse me.  George
11  Dobronich my phone number.  I told him Saturday
12  morning when you meet with Mr. Dobronich, if no one
13  is around, I'd like to speak to him.  On Saturday
14  morning on March 16th, I received a phone call from
15  the hospital from Mr. Dobronich, and actually George
16  called and he put Mr. Dobronich on the phone, and I
17  asked him, Mr. Dobronich, how he was doing and made
18  small talk.  I said, Mr. Dobronich, did you want
19  anyone else on my account.  He said --
20      BY MR. BURNS:
21              Judge, let me object.  That's
22         hearsay.
23      BY THE COURT:
24              Overruled.
25      BY THE WITNESS:
26              I asked Mr. Dobronich would he like
27         anyone else on the account, and he said
28         no, and I said, Mr. Dobronich, do you
29         remember telling me that, did you know --
30         did you remember telling me to let the
31         money go to your bank, and he said, no,
32         Joe, I don't want any money to leave my
```

16

JOSEPH P. ROMANO

1                account.

2                     I said, did you want Darnay

3                Thibodaux to have trading authority?  He

4                said no, I don't trust her.  He said, I

5                don't want anybody to have trading

6                authority on my account.

7                     I said, so you're telling me to

8                cancel trading authority on this account,

9                and he said absolutely.  So, at that

10               point, Monday morning on the 18th, I

11               canceled trading authority on the account,

12               and then on the 18th, I received a call

13               from Forest Dobronich from the St. Tammany

14               Sheriff's Department, and he was there and

15               told me that they were in the process of

16               having an investigation made, and I'd be

17               contacted by the St. Tammany Sheriff's

18               Department.

19                    So later that morning I was, and

20               then I had one final conversation with

21               Darnay.  She called that day.  Darnay

22               called on Monday the 18th and asked me if

23               I had spoken to Mr. Dobronich, and I told

24               her I had, and that he requested I cancel

25               her trading authority.  And she told me at

26               that time, she said, did you talk to him

27               or the boys.  I said, no, I talked to him.

28                   And she said, well, when you talked

29               to Mr. Dobronich when I was with him, he

30               was not on medication, but he was on

31               medication Saturday morning when you

32               talked to him.  I told her I'm sorry, I

JOSEPH P. ROMANO

```
 1          talked to him, and he told me to remove
 2          trading authority.  That's the last
 3          contact I've had with Darnay Thibodaux.
 4               I did receive a call from Detective
 5          Stefan Montgomery requesting information
 6          on the account, and I explained to him
 7          that I would have to -- I do have a series
 8          24 license, which is a supervisor's
 9          license, but I choose not to supervise
10          myself just in the event something like
11          this happens, so I called my office, the
12          supervisory jurisdiction, and asked them
13          what legally I could do and they informed
14          me to have the detective type up a
15          statement requesting information and have
16          Mr. Dobronich sign.
17               The detective furnished me with
18          that, and I furnished him with a copy of
19          each transaction that was ACH'd out and a
20          little synopsis of everything I just told
21          this Court.
22      BY MS. VALLEJO:
23               Your Honor, may I approach?
24      BY THE COURT:
25               Yes, ma'am.
26  EXAMINATION BY MS. VALLEJO:
27  Q.    Mr. Romano, is this the statement that was
28  typed up on your behalf, or did you type that up?
29  I'm sorry.
30  A.    Yes, ma'am, and there is a couple of mistakes.
31  I typed this myself for the purpose that I did not
32  want either one of my assistants involved in anything
```

18

JOSEPH P. ROMANO

1   like this, so I handled it all myself.  I know that I
2   think on the date on one of them which should have
3   been March 15th, it's March 5th.  There's a couple of
4   places where dates I typed in wrong, but this is my
5   statement, and I typed it.
6   Q.      Let me tell you what page it is.  I'm sorry,
7   Roy.  It's page four in that file.  Can you make a
8   correction on the date, please?
9   A.      Yes, ma'am.  On March 15th was when I was
10  contacted by Craig, and then on March 4th instead of
11  March 5th in the middle of page is when I received
12  the call requesting 179,000.  I believe that was only
13  two dates I had made a typo on.
14  Q.      You have a copy of this?
15  A.      Yes, ma'am, I do.
16  Q.      And that report is accurate?
17  A.      Yes, ma'am.
18  Q.      And the third page, page six of this report of
19  this document, is that an accurate reflection of the
20  transactions that took place?
21  A.      Yes, ma'am.  This is a copy of all
22  transactions from January of this year through
23  March 11th, and it shows some of the 1,200 monthly,
24  and then the total sum of 334,000 of the other
25  transactions.
26          BY MS. VALLEJO:
27                  I'd like to offer, file, and
28              introduce this document, Your Honor, as
29              Petitioner's Number One.
30          BY THE COURT:
31                  Any objection?
32          BY MR. BURNS:

JOSEPH P. ROMANO

```
 1              Might I see it?  Yes, Judge, I just
 2         have an objection to it.  The statement is
 3         this matter is being tried not on the
 4         petition.  This is being tried on a case
 5         for a sequestration on an injunction and
 6         for anything that gets outside of the
 7         issues dealing with sequestration or
 8         dealing with the injunctive relief, I
 9         object to.
10    BY THE COURT:
11              It's certainly within the context of
12         the request for injunctive relief, so I
13         overrule the objection and let it be
14         received.
15    BY MS. VALLEJO:
16              Thank you, Your Honor.
17    BY MR. BURNS:
18              Judge, can I make one comment about
19         that?  Can I qualify that?
20    BY THE COURT:
21              Sure.
22    BY MR. BURNS:
23              If you look at the petition for
24         injunctive relief, her pleadings only say
25         that she greeted him out in the hall the
26         day we were having court here.  That's
27         allowing them to expand the pleadings.
28         The only thing they have alleged in their
29         injunctive petition is that she greeted
30         him in the hall of the Justice Center
31         prior to us being here on May 14th, and
32         that allows an expansion of the pleadings
```

20

JOSEPH P. ROMANO

```
 1           that I'm not interested in.
 2       BY MS. VALLEJO:
 3               Your Honor, I'm introducing this
 4           with regard to the sequestration.
 5       BY THE COURT:
 6               I'm going to allow it.
 7       BY MR. BURNS:
 8               Note my objection for the record.
 9   EXAMINATION BY MS. VALLEJO:
10   Q.    Mr. Romano, have you had any further contact
11   with Darnay Thibodaux since that last conversation
12   you just elicited to?
13   A.    No.  Monday the 18th was the last contact I've
14   had with Darnay Thibodaux.
15   Q.    That was?
16   A.    Monday, March 18th.
17   Q.    March 18th, okay.  Do you have anything else
18   to add --
19       BY MR. BURNS:
20               Object to the form of the question.
21       BY MS. VALLEJO:
22               -- to your prior testimony?
23       BY THE WITNESS:
24               No.
25       BY THE COURT:
26               Overruled.
27       BY MS. VALLEJO:
28               That's all the questions I have.
29       BY THE COURT:
30               Answer Mr. Burns' questions.
31       BY MR. BURNS:
32               May I approach the witness, please?
```

JOSEPH P. ROMANO

1        BY THE COURT:
2                  Yes, sir.
3    CROSS-EXAMINATION BY MR. BURNS:
4    Q.     I show you what is in the record for a second
5    attached to the petition in this matter called
6    Exhibit Number 1, and that's a power of attorney?
7    A.     Yes, it is.
8    Q.     And would you look on the back of that,
9    meaning page number two, page three.  Do you
10   recognize Mr. Sidney's signature on that?
11   A.     I do.
12   Q.     And is it notarized in the presence of two
13   people?
14   A.     Yes, it is.
15   Q.     Now, I want to talk about you have some
16   long-term relationship with him that is built on a
17   profit.  You have a profit motive for you in his
18   banking account; you make a fee?
19   A.     You're not going to like this answer.  I do
20   not charge him.  I do not charge him an annual
21   management fee.
22   Q.     Do you ever make any money on his account?
23   A.     I make a quarter of a percent a year.
24   Q.     Okay.
25   A.     Because he has mutual funds that were
26   purchased elsewhere, and I just transferred them in.
27   I didn't want to change them because they were okay,
28   and I get 86 and a half percent of a quarter of a
29   percent.
30   Q.     Of the amount of money that's in his account?
31   A.     That's right.
32   Q.     So the more money in his account, the more

22

JOSEPH P. ROMANO

1   money you make?

2   A.      Right.

3   Q.      And so to the extent that his account gets

4   diminished or changed, you lose money --

5   A.      That's correct.

6   Q.      And as part of his contract that you have with

7   him --

8          BY THE COURT:

9                  You get 86 percent of .25?

10         BY THE WITNESS:

11                 Of .25, that's correct.

12         BY THE COURT:

13                 86 of .25?

14         BY THE WITNESS:

15                 Yes, sir, 86.5 of .25.

16         BY THE COURT:

17                 When his account was at its maximum,

18            what does that amount to?

19         BY THE WITNESS:

20                 I don't know.  His account maximum

21            was over nine hundred thousand, so a

22            quarter of a percent of nine hundred

23            thousand.

24   EXAMINATION BY MR. BURNS:

25   Q.      So the real answer is you and maybe your

26   company make a fee off of him?

27   A.      That's correct.

28   Q.      And the more money in the account, the more

29   money that you make?

30   A.      That's right.

31   Q.      And as that money goes down from the

32   standpoint is that's the less money you make?

23

JOSEPH P. ROMANO

1   A.      That's correct.

2   Q.      And if Mr. Dobronich or whoever his agent is

3   changes it from you, you make no money?

4   A.      That's correct.

5   Q.      So you don't want his account to either go

6   down or leave you; is that correct?

7   A.      That's correct.

8   Q.      Now, in terms of let's talk about Mr.

9   Dobronich for a question.  Generally, you deal with

10  powers of attorneys all the time, right?

11  A.      Not all the time, but I've dealt with them,

12  yes.

13  Q.      That's a legitimate tool of the trade --

14  A.      Yes.

15  Q.      -- that a person gives authority to someone

16  else?

17  A.      That's correct.  That's correct.

18  Q.      And there are such things as limited powers of

19  attorney, which is the trading authority?

20  A.      That's correct.

21  Q.      That's limited?

22  A.      Absolutely.

23  Q.      And his power of attorney here is for

24  everything?

25  A.      Right.

26  Q.      So he has he signed a general power of

27  attorney to Darnay; is that correct?

28  A.      Yes.

29  Q.      You've seen it?

30  A.      Yes.

31  Q.      As Exhibit Number 1 in the petition?

32  A.      Right.

24

JOSEPH P. ROMANO

1        BY MR. BURNS:

2              At this time, I'd like to offer,

3        file, and introduce into evidence as

4        Defendant's Exhibit Number 1 the power of

5        attorney from Mr. Sidney to Darnay

6        Thibodaux dated February 14, 2013.

7     BY THE COURT:

8              Any objection?

9     BY MS. VALLEJO:

10             No objection, Your Honor.

11    BY THE COURT:

12             Let it be received.

13  EXAMINATION BY MR. BURNS:

14  Q.    Now, in addition to that, for your own

15  protection that you talked about is you asked that

16  Darnay provide a trading authority that had

17  Mr. Sidney's signature on it?

18  A.    That's correct.

19  Q.    Was that provided to you?

20  A.    Yes, it was.

21  Q.    That's a legitimate limited power of attorney?

22  A.    Right.

23  Q.    Now, during this period of time, you did have

24  an opportunity to speak with Mr. Dobronich?

25  A.    That's correct.

26  Q.    Personally?

27  A.    Yes.

28  Q.    And he understood you, he understood the

29  English language?

30  A.    Yes.  Yes.  That's a question I guess.

31        BY MR. BURNS:

32              I offer a stipulation to Ms. Vallejo

25

JOSEPH P. ROMANO

1          that on the date the trading authority was
2          signed as well as the power of attorney
3          that Mr. Sidney was competent.  I offer
4          that to you.
5      BY MS. VALLEJO:
6              I'm not stipulating to anything
7          right now, Your Honor.
8  EXAMINATION BY MR. BURNS:
9  Q.     The question is do you believe people have the
10 capacity, the legal capacity to sign power of
11 attorneys?  Do you believe that?
12 A.     Yes.
13 Q.     And do you believe that people --
14     BY THE COURT:
15             In general does anybody have the
16         authority?  Is that what you're asking?
17     BY MR. BURNS:
18             Any person who is of full age of
19         majority, is competent, and has capacity
20         to sign legal documents as set forth in
21         the civil code.
22     BY THE COURT:
23             How would he know that?
24     BY THE WITNESS:
25             Thank you, Judge.
26 EXAMINATION BY MR. BURNS:
27 Q.     Did you have an opportunity to judge his
28 capacity on the times that you spoke with him?
29 A.     Over the phone, I did, yes.
30 Q.     And he had full capacity; is that correct?
31 A.     He did.  I felt like he understood.
32 Q.     He understood, and he was competent?

26

JOSEPH P. ROMANO

```
1   A.      Right.
2   Q.      And that's throughout the period of time that
3   you've been talking to him?
4   A.      Right.
5   Q.      Now, as early as -- you say your last time
6   that you spoke with Mr. Sidney was three weeks ago?
7   A.      That's correct.
8   Q.      Did you talk to him?
9   A.      Yes.
10  Q.      Did he generally understand you?
11  A.      Yes.
12  Q.      So you had no concern as late as three weeks
13  ago that he is competent?
14  A.      Three weeks ago he was not as competent as
15  he's been.  He was not.
16  Q.      Again, I know what you answered.  The question
17  is three weeks ago was he competent and understood
18  what you were talking about?
19  A.      Yes, yes.
20  Q.      And you were talking about financial affairs?
21  A.      Right.
22  Q.      And then there was a period of time that you
23  spoke to him in the hospital?
24  A.      That's correct.
25  Q.      On those occasions or some of those occasions,
26  he was competent; is that correct?
27  A.      Yes.
28  Q.      All right.  And as part of the conversation
29  there he knew about Darnay?
30  A.      That's correct.
31  Q.      And he gave you, yes, she wants to do
32  something, do it.  He authorized you to do what
```

27

JOSEPH P. ROMANO

1   Darnay wanted, including withdrawing $179,000?

2   A.      That's right.

3   Q.      And so he knew about that and he was

4   competent.  Do you have a problem with that?

5   A.      I did when I talked to him and he told me he

6   did not remember allowing telling me all that.  I

7   did.

8   Q.      I understand, but at the time you talked to

9   him on those occasions, he appeared to be competent

10  and lucid and understood everything that he was

11  talking about?

12  A.      I had a problem when I felt like he was being

13  coached out of $179,000.

14  Q.      What's that?

15  A.      I did have a problem on the 179,000.

16  Q.      Did it make sense that Darnay said -- now, he

17  has no children; is that correct?

18  A.      Yes.

19  Q.      And you know Darnay as his caregiver?

20  A.      Right.

21          BY MR. BURNS:

22                  May I approach the witness?

23          BY THE COURT:

24                  Yes, sir.

25  EXAMINATION BY MR. BURNS:

26  Q.      Do you believe in estate planning?

27  A.      Yes.

28  Q.      Do you believe that people who have capacity

29  can give away by last will and testament anything

30  they want?

31  A.      Yes.

32  Q.      And you have talked to Christian?  Let's talk

28

JOSEPH P. ROMANO

```
1    about Christian.  Is his name Christian?  The first
2    person that you called -- I'm sorry if I don't have
3    the name right.  The first person that you called
4    when you had concern was a fellow up in Washington
5    DC?
6    A.    I never called him.
7    Q.    Well, you wanted to call him?
8    A.    A man named Craig called me.
9    Q.    Craig?
10   A.    Right.
11   Q.    Craig identified himself as what?
12   A.    He's a relative.
13   Q.    Okay.  And from the standpoint of Craig, do
14   you have the transaction where Craig got -- that
15   Mr. Darnay approved a $200,000 transaction to Craig
16   to pay a debt; are you aware of that?
17   A.    No, I'm not.
18   Q.    So let's go again.  Going here to estate
19   planning, you are in the financial business; is that
20   correct?
21   A.    That's correct.
22   Q.    And financial planning is a good thing to
23   avoid taxes and probate?
24   A.    That's correct.
25   Q.    And part of estate planning is to do powers of
26   attorney, yes?
27   A.    A power of attorney for estate planning?
28   Q.    Right.  If you're incompetent, you don't think
29   it's a good tool for a person to have a power of
30   attorney?
31   A.    For certain people.  Not for everyone, no, not
32   a power of attorney.
```

29

JOSEPH P. ROMANO

1   Q.    Last wills and testaments?

2   A.    Yes.

3   Q.    That's an estate planning tool, right?

4   A.    Yes.

5   Q.    And he has no children?

6   A.    That's correct.

7   Q.    And do you know who the closest people in the

8   world to him were for the last period of time?

9   A.    I just know Craig was real close to him at one

10  time when we were clients at Edwards Jones.

11  Q.    Again, you don't know who his -- and let's use

12  the broad definition of relative and who loves him in

13  terms of do you know who had the most time, spent the

14  most time care giving him?

15  A.    I do not.

16  Q.    Now, let's talk about influence and undue

17  influence.  Everybody influences people, right?

18  You're here to influence, I'm here to influence,

19  Peggy is here to influence, right?

20  A.    I'm here just to --

21        BY THE COURT:

22              Ask questions, Mr. Burns.  There's

23        no jury sitting over here.  I'm sitting

24        here.  Ask relevant questions and let's do

25        it quickly.  I don't need lectures.

26  EXAMINATION BY MR. BURNS:

27  Q.    Now, do you believe that caregivers can buy

28  groceries?

29  A.    Yes.

30  Q.    Do you have any idea whether this lady right

31  here, Darnay, and her husband provided groceries for

32  him?

30

JOSEPH P. ROMANO

```
 1  A.     I don't.  I do not know that.
 2  Q.     Let's talk about an automobile, okay.  Do you
 3  know that if they bought an automobile with money
 4  that was provided by Mr. Sidney, that they were
 5  taking him to the hospital?  Do you know that?
 6         BY MS. VALLEJO:
 7               Your Honor, I'm going to object.
 8         BY THE WITNESS:
 9               No, I don't, because he had his own
10           automobile when he came --
11         BY THE COURT:
12               Sustained.
13         BY MS. VALLEJO:
14               He's asking these questions about a
15           subject that I didn't raise first of the
16           all.
17         BY THE COURT:
18               I just sustained your objection.
19         BY MS. VALLEJO:
20               Thank you, Your Honor.
21  EXAMINATION BY MR. BURNS:
22  Q.     Now, you said that you spoke to Mr. Sidney
23  when he was in the hospital?
24  A.     Yes.
25  Q.     And you say, at this point, nephews George
26  and --
27  A.     Forest.
28  Q.     -- Forest Dobronich had then come in and taken
29  him over?
30  A.     I didn't say that.
31  Q.     I'm asking you the question is were they then
32  now his chief spokesperson?  Was there a time that
```

31

JOSEPH P. ROMANO

```
 1   Forest and George relayed to you that they were in
 2   the hospital and that they had taken over his care?
 3   A.     They did not say they were taking over his
 4   care.  They said they were going to the hospital to
 5   check on him and they called me from the hospital.
 6   Q.     And since that time, have they entered into
 7   some sort of a power of attorney over him?
 8   A.     Yes.
 9   Q.     Yes?
10   A.     Yes.
11   Q.     And was that done in the hospital?
12   A.     No.
13   Q.     Wasn't done in the hospital.  Where was it
14   that it was done?
15   A.     I have no idea.
16   Q.     And have they also now exercised some
17   authority over his money?
18   A.     No.  They've put some money back in the
19   account.  They haven't taken any out.
20   Q.     So he's not given them authority over his
21   account in any regard?
22   A.     They do not have trading authority on the
23   account.  They do not.
24   Q.     Now, do you know while Mr. Sidney was in the
25   hospital what things they might have been saying to
26   him about Darnay and Calvin?
27   A.     No, I do not.
28   Q.     Don't know that?
29   A.     I don't, no.
30   Q.     And to the best of your knowledge, Mr. Sidney
31   at the time when he said he wanted to do something or
32   not, he said he didn't remember?
```

JOSEPH P. ROMANO

1   A.      That's correct.  He told me he did not

2   remember authorizing me to transfer all these funds

3   out.

4   Q.      He said that?

5   A.      Yes.

6   Q.      And you don't know whether that's true or not

7   true whether he was remembering or not remembering?

8   A.      No.

9   Q.      And you don't know whether he was being

10  influenced by George and Forest?  You don't know that

11  he might not have been influenced, whether unduly or

12  not, by George and Forest?

13  A.      I do not know that.

14          BY MR. BURNS:

15                  That's all the questions I have.

16          BY MS. VALLEJO:

17                  Your Honor, I have one question.

18  REDIRECT EXAMINATION BY MS. VALLEJO:

19  Q.      Mr. Romano, since the authority to withdraw

20  funds from Mr. Dobronich's account was withdrawn on

21  behalf of Darnay Thibodaux, have any funds been

22  withdrawn from Mr. Dobronich's account?

23          BY MR. BURNS:

24                  Judge, let me object.  That was not

25              brought up during mine, and to the extent

26              that that's a new question on a new

27              subject -- and I don't mine it if you let

28              me ask one question right after that.

29          BY THE COURT:

30                  I'll allow the question.

31          BY THE WITNESS:

32                  No, ma'am.  Only the 1,200 per month

33

DETECTIVE STEFAN MONTGOMERY

```
 1              has left his account.  That is all.
 2        BY MR. BURNS:
 3              That did not prompt any other
 4          question, Judge.
 5        BY THE COURT:
 6              You can step down, sir.  Is there
 7          any further need of this witness?
 8        BY MS. VALLEJO:
 9              No, Your Honor.
10        BY THE COURT:
11              You're released from your subpoena,
12          and you're free to go if you like.
13        BY MS. VALLEJO:
14              Thank you, sir.  I'd like to call
15          Detective Montgomery to the stand.
16              (DETECTIVE STEFAN MONTGOMERY, after
17          having been first duly sworn under oath,
18          did testify as follows:)
19        BY THE COURT:
20              Good afternoon.
21  DIRECT EXAMINATION BY MS. VALLEJO:
22  Q.    Detective Montgomery, state your full name and
23  address for the record.
24  A.    Detective Stefan Montgomery, Financial Crimes
25  Investigator, St. Tammany Parish Sheriff's Office.
26  Q.    And have you had occasion to become familiar
27  with the details of financial transactions between
28  Darnay and Calvin Thibodaux and Mr. Sidney Dobronich?
29  A.    Yes, I have.
30  Q.    Can you explain to the Court how you became
31  affiliated with that.
32  A.    I investigated a complaint that was filed on
```

DETECTIVE STEFAN MONTGOMERY

1   behalf of Mr. Dobronich by his nephews George and
2   Forest Dobronich.
3   Q.      Can you relate to the Court what the nephews
4   reported to you?
5   A.      They were made aware of some large and unusual
6   financial transactions being made from his investment
7   account through another family member, and so they
8   came down to investigate that and see what was going
9   on.  They actually spoke to him.  They reported to me
10  that they had spoken to him and he did not remember
11  those, so they contacted the Thibodauxs and tried to
12  get some information from the Thibodauxs.
13          They had reported to me that they actually all
14  went up to the hospital to speak to Mr. Dobronich,
15  and that he did not remember those transactions and
16  there was a bit of uneasiness with possibly him being
17  coached.  So with that concern, they came to the
18  sheriff's office and filed an initial complaint.
19  Q.      As a result of that complaint, did you have an
20  opportunity to speak to Mr. Dobronich directly?
21  A.      I did.
22  Q.      Can you tell the Court your conversations with
23  Mr. Dobronich.
24  A.      I spoke with him on several occasions, and on
25  those occasions, each time that I spoke with him he
26  stated that he'd had no knowledge of those
27  transactions, that he did not give them permission to
28  handle his finances.  He was very clear in that Joe
29  Romano from Romano Investments Insurance, LPL
30  Investments handled his money.
31  Q.      And did you speak to Darnay and Calvin
32  Thibodaux?

35

DETECTIVE STEFAN MONTGOMERY

1  A.     I did.

2  Q.     Can you relate to the Court what your

3  conversations were with them, the initial

4  conversations.

5  A.     Initial conversations with them was that they

6  had consulted an attorney, but they did want to have

7  an opportunity to tell their side of it.  They had

8  obtained a legal power of attorney.  He had given

9  them -- they had a will prepared and he left them all

10  his assets upon his death with the will and also had

11  signed over his property to them.  That was all done

12  through a notary.

13  Q.     Okay.  And did you have further reason to

14  investigate this case?

15  A.     I did.

16  Q.     On what basis did you feel like you wanted to

17  investigate this case further?

18  A.     Well, the conversation that I had with the

19  Thibodauxs was a little further down in the

20  investigation.  Once I originally spoke with the

21  complainants, I contacted, immediately contacted the

22  investment broker, and I had an in-depth conversation

23  about the specific transactions and what those

24  transactions were made for.

25      I actually have a copy of my report, if you

26  don't mind if I kind of go through it as a timeline

27  because it's lengthy, and I can be a little more

28  specific.  I spoke to Mr. Romano on March 18th and

29  went over the transactions that had been conducted

30  and what his typical pattern of spending was.

31      And typically Romano Investments deposited

32  $1,200 a month into his account for living expenses,

36

DETECTIVE STEFAN MONTGOMERY

1   and they had done that for quite a while.  On
2   February 13th, Romano was contacted by Darnay
3   Thibodaux requesting $30,000 to settle his medical
4   bills.
5        There was some issue over she was.  He wasn't
6   familiar with them.  She ended up giving them the
7   power of attorney and actually had to get Mr.
8   Dobronich on the phone to authorize the money to be
9   transferred.
10       On February 20th, she requested another
11  $30,000 for more medical bills.  On March 5th, she
12  contacted him requesting 179,000 and said that she
13  was going to buy a home with Mr. Dobronich.  And on
14  March 11th she requested another 95,000 for
15  unforeseen closing costs for that house totalling
16  $334,000 in about 30 days, a little less than
17  30 days.
18  Q.   In your conversation with Mr. Dobronich -- you
19  said you had several of them?
20  A.   I did.
21  Q.   Did Mr. Dobronich ever tell you that he had a
22  caretaker?
23  A.   No.  He actually said he lived alone and took
24  care of himself pretty much.
25  Q.   Did he tell you anything about his social
26  activities and what he did and whether he was
27  independent or if relied on someone to bring him
28  places?
29  A.   Prior to his hospitalization, he took care of
30  himself and did his own -- actually, prior to
31  speaking with him directly, I found out after
32  interviewing his nephews what his status was, but,

37

DETECTIVE STEFAN MONTGOMERY

1  yes, he was independent.  Up until the time that he
2  was hospitalized, he drove himself and was
3  independent.
4  Q.     Do you have any knowledge -- did he speak to
5  you at all about his properties and his home in
6  particular?
7  A.     Yes.  He indicated to me that the original
8  property that he lived in, he rented, did a rent to
9  own agreement with the Thibodauxs, and he moved into
10 a smaller piece of property next door on an adjoining
11 piece of property.
12 Q.     Did he ever indicate to you that he wished to
13 buy a larger home?
14 A.     No.
15 Q.     Were there any other witnesses that you spoke
16 to during the course of your investigation?
17 A.     Oh, yes.
18 Q.     Can you tell the Court who you spoke to in
19 addition.  Before we do that, Detective Montgomery,
20 did you do any investigation with regard to Mr.
21 Dobronich's finances with his banks?
22 A.     I did.
23 Q.     Can you tell the Court what investigation you
24 conducted with regard to that?
25 A.     I determined that the power of attorneys were
26 filed with both Citizen Savings Bank and with Capital
27 One Bank.  There was -- through the looking of the
28 finances, there was a tremendous amount of that
29 money, 334,000 that moved around between the two
30 accounts, and there one or two transactions that
31 I picked up on that occurred prior to the power of
32 attorney being signed and him being hospitalized.

DETECTIVE STEFAN MONTGOMERY

1  Q.      Can you tell the Court what those transactions
2  were?
3  A.      There was an 800 something dollar -- let me
4  pull up the account.  By looking at his pattern of
5  spending, he didn't use a debit card for anything.
6  There was some checks written, but there was one
7  debit card purchase on February 8, 2013, for $834 at
8  Wal-Mart in Bogalusa.  I was able to contact them and
9  find out that that was for the purchase of an iPhone
10 5 and a laptop computer.
11 Q.      Do you have any knowledge whether Mr.
12 Dobronich knows who to use a computer?
13 A.      I don't have any knowledge.  So I did find out
14 that after contacting the bank, subpoenaing records
15 and going through that process, that on
16 February 15th, she filed the power of attorney with
17 Citizen's Bank.  On February 19th, she withdrew
18 $9,000 in cash.
19 Q.      So this is the power of attorney that was
20 signed on February 13th; is that correct?
21 A.      Correct.  On February 13th here she cashed a
22 check for $10,500 and then obtained a cashier's check
23 in the amount of $9,950 payable to Nationwide Auto
24 Sales.  Actually, I followed up with Nationwide Auto
25 Sales.  They purchased a truck for Calvin Thibodaux.
26 Q.      Do you have any knowledge whether these
27 withdrawals and checks taken out of Citizen's Bank
28 were done with the use of the power of attorney?
29 A.      They were.
30 Q.      Thank you.
31 A.      On February 25th, there was a check written
32 for $1,300 by Darnay Thibodaux to Northpark Nissan.

DETECTIVE STEFAN MONTGOMERY

1   There was a new AT&T debit, a monthly debit from AT&T
2   phones that started appearing on the account.  And
3   then on March 11th, she transferred $5,000 to his
4   Capital One checking account.
5         BY THE COURT:
6               Whose Capital One checking account?
7         BY THE WITNESS:
8               To Mr. Dobronich's Capital One
9               checking account.  From the Capital One
10              account on February 20th, which is where
11              all the money was wired to was to this
12              Capital One account, the large amount of
13              the money, but on February 20th, she
14              obtained a cashier's check payable to
15              Calvin Thibodaux for $26,000.
16              The memo field of that check
17              referenced doctor bills.  It was a
18              cashier's check, but on the back of the
19              check it was actually endorsed by
20              Northpark Nissan and used to purchase the
21              2013 Nissan Altima that was registered to
22              the Thibodauxs.
23              That was on the 20th.  On the 21st,
24              when she obtained the second $30,000 wire,
25              the day after on February 22nd, she made a
26              $15,000 cash withdrawal.  The same day on
27              March 5th that she obtained the 179, she
28              wrote a check to cash for 10,000.
29              On the 7th, she made a cash
30              withdrawal of 4,500.  On March 8th, she
31              withdrew 10,000.  On March 11th, she
32              withdrew 10,000.  March 11th, she also

DETECTIVE STEFAN MONTGOMERY

1           obtained a cashier's check for $45,000 for
2           the purchase of property at 29066 Ellis
3           Drive.
4                She obtained a $22,944.11 cashier's
5           check payable to Evergreen Tractor.  They
6           purchased a brand new Kubota tractor
7           loader and implements with, and then on
8           the 12th she requested the $95,000 closing
9           costs.
10                On the 13th, she obtained a $50,000
11          check payable to Platinum Title for the
12          purchase of other land.  And on that same
13          day on March 13th, she obtained a
14          cashier's check in the amount of $100,00
15          payable to Calvin Thibodaux which was
16          deposited into his Resource Bank account.
17          On March 13th, she makes a cash withdrawal
18          of 29,000.
19  EXAMINATION BY MS. VALLEJO:
20  Q.    Is it your understanding that all of these
21  withdrawals and wire transfers were performed by the
22  use of the power of attorney?
23  A.    They were.
24  Q.    Did you do a further investigation into the
25  banking accounts of Capital One Bank checking?
26  A.    On the checking account -- and there was some
27  money transferred back and forth between the two
28  accounts.  She, on February 14th from the checking
29  account, she actually wrote Calvin Thibodaux a
30  $14,000 check that went into the Resource Bank
31  account.  She cashed a check for 5,000 on
32  February 20th.

41

DETECTIVE STEFAN MONTGOMERY

1        March 12th, she cashed a check for 3,000, cash
2   withdrawal for 5,000.  There was some charges that
3   were made from the account to iTunes, and there was a
4   $500 debit card transaction made to Berryland Camper
5   Sales followed up with Berryland Camper and they were
6   in the process of purchasing a 5th wheel -- not a 5th
7   wheel camper, but a large, new slide-out camper.
8        We went to the property that they had
9   purchased on Ellis Drive, and the camper was parked
10  there.  We located that camper.  We actually went to
11  their residence to inform them of the money, to talk
12  to them about this situation, and at the time we had
13  conducted a search warrant for the Resource Bank
14  account to get hold of the records.
15       That money that was transferred, we were not
16  able to locate them at the house that evening,
17  however, we saw the camper and there was a lot -- the
18  tractor, the truck.  All of these new things were
19  there at their residence.
20  Q.   At their residence on Nell Drive?
21  A.   On Nell Drive.
22  Q.   Can you explain a little further of your
23  investigation what you did?
24  A.   Sure.  I spoke with their attorney who had
25  called in reference to -- Mr. Burns -- in reference
26  to the money.  He was calling to inquire about that,
27  and I explained to them that it was an investigation
28  that was being conducted and the nature of that
29  investigation, and I asked for all of us to sit down
30  and meet over the situation.
31       They did not choose to do that, so I asked to
32  have all the assets that were purchased held by us

42

DETECTIVE STEFAN MONTGOMERY

1   until we concluded the investigation, and they chose
2   not to do that.  He indicated that there was a
3   recording of Mr. Dobronich giving permission for
4   these purchases, so I asked for a copy of that to
5   review it, and they did not want to provide that.
6        So at that time, we applied for and were
7   granted search warrants for the address that was
8   purchased, the address that they lived at, and also
9   Mr. Dobronich's address, because we saw for ourselves
10  and we had been told by the nephews when they went
11  out there there appeared to be fresh construction
12  material outside the trailer that he lived in.
13       And Mr. Burns indicated that they had
14  purchased the camper for him to live in and
15  rehabilitate from his hip fracture and they were
16  possibly going to rent that property out, his home.
17  Q.    You say you got a search warrant.  Can you
18  tell the Court what you found as a result of your
19  search warrant of all three properties.
20  A.    Amongst the paperwork that we took, which I
21  can go down the entire list, it's a pretty exhaustive
22  list if you want me to, but we were able to -- we
23  found bank statements, LPL Financial statements at
24  their house.
25  Q.    At the Thibodaux's house?
26  A.    At the Thibodaux's house.  We did find
27  original copies of the power of attorney, the will,
28  account statements.  Like I said, we were able to
29  find carbon copy receipts of some of the cashier's
30  checks that they had issued.  We found two medical
31  bills in the name of Mr. Dobronich that totaled
32  $1,946.17.  That's all the bills that were in at the

43

DETECTIVE STEFAN MONTGOMERY

```
 1  time.
 2  Q.     Did you find any medical bills in the amounts
 3  of $30,000?
 4  A.     Oh, no, no.  We recovered a -- one of the
 5  things that we recovered was an invoice book titled
 6  house note only.  That coincided with what we had
 7  discussed with him about his rent-to-purchase
 8  agreement, and according to the book that they had
 9  made $500 monthly payments beginning July 1st, 2011,
10  for that property, but March 24, 2012, is when the --
11  that was the last entry into that book that showed a
12  remaining balance of $80,500.
13         When I asked them out there at the house
14  during the time about that, they told me that he had
15  wanted to give them the property and told them not to
16  make anymore payments.
17         BY THE COURT:
18              Could you repeat that for me,
19         please.
20         BY THE WITNESS:
21              When I interviewed them out at the
22         house, they stated that Mr. Dobronich told
23         them not to make anymore payments; he
24         wanted to give them the property.
25  EXAMINATION BY MS. VALLEJO:
26  Q.     The book that you reviewed in their home that
27  indicated rent-to-own payments that started in July
28  of 2011, were those indications of payments signed by
29  anyone?
30  A.     I believe the first couple were signed by both
31  parties, by one of the Thibodauxs as well as Mr.
32  Dobronich.  The last several did not appear to be
```

44

DETECTIVE STEFAN MONTGOMERY

```
 1  signed, and then they stopped.
 2  Q.      Was the handwriting consistent throughout?
 3  A.      Yes.
 4  Q.      -- of each payment?  Wrote in whose hand?
 5  A.      I don't have any idea.
 6  Q.      The handwriting in the back was the same
 7  handwriting in July of 2011 as it was in March 2012?
 8  A.      Appeared to be.
 9  Q.      Okay.  Thank you.
10  A.      We also located there was a safe, a safe in
11  the bedroom.  We had actually been out there in the
12  days prior to that.  The safe was still in the box.
13  It was sitting on a trailer outside.  That safe was
14  still -- that safe was inside the house.  It
15  contained a bill of sale for a boat and a 50
16  horsepower motor that was bought on February 13th.
17          It contained a bill of sale for a 2006 Honda
18  four-wheeler that was dated February 12th, some
19  accessories from Ken's ATV and Champion Cycle.  The
20  Evergreen Tractor equipment invoice, a handwritten
21  bill of sale for a 1974 Chevy Nova for $2,000 that
22  was dated February 23rd, and then the Wal-Mart
23  receipt for the purchase of the iPhone that also had
24  a service contract that was in Mr. Dobronich's name.
25  And all of those items were present and were taken
26  during the search.
27  Q.      They were seized?
28  A.      They were seized, correct.  There was $7,500
29  in cash in hundred dollar bills.
30          BY THE COURT:
31                  How much?
32          BY THE WITNESS:
```

DETECTIVE STEFAN MONTGOMERY

1          Seven thousand five hundred.  There
2     was a Latter and Blum folder in the
3     bedroom that had a purchase agreement for
4     property at 28529 Hall Road, which is not
5     far from their property.  This coincided
6     with the cashier's check that they had
7     issued.  It was actually a thousand dollar
8     deposit that was put down.
9          I do -- to go back.  When I spoke to
10    Mr. Burns at the time specifically about
11    the items being purchased, he did inform
12    me of property they were intending to
13    purchase on that day and that he did ask
14    them to return the cashier's check, not to
15    go through with that sale.
16  EXAMINATION BY MS. VALLEJO:
17  Q.     Do you know why he asked them not to go
18  through that sale?
19  A.     I do not.
20     BY MR. BURNS:
21          That's speculation.
22     BY MS. VALLEJO:
23          If he told you.
24     BY THE COURT:
25          He answered he did not know.
26     BY THE WITNESS:
27          So that check was deposited but they
28     put down a thousand dollars deposit on the
29     purchase of that property.  Located there
30     was some folders with checkbooks that had
31     Mr. Dobronich's and Darnay Thibodaux's
32     name on them, new checks that had been

46

DETECTIVE STEFAN MONTGOMERY

1           made with both their names on them.
2    EXAMINATION BY MS. VALLEJO:
3    Q.    Do you recall which bank?
4    A.    Capital One.  There was a new Springfield
5    40-caliber pistol that was located that was purchased
6    after the date of the power of attorney.  There was
7    some various tools and equipment that were purchased,
8    and that we found purchase receipts for.
9           BY THE COURT:
10                All of this is contained on your
11                return on the search warrant?
12          BY THE WITNESS:
13                It is.  Inside the Altima, which was
14                contained on the property, there was some
15                receipts for some electricity bills.
16                There was a printout of a vehicle
17                registration for Mr. Dobronich's 2001
18                Dodge van in the car.
19   EXAMINATION BY MS. VALLEJO:
20   Q.    This was found in the Altima?
21   A.    It was found in the Altima.  It was printed
22   out February 21, 2013, and there was some
23   prescription drug printouts from Mr. Dobronich dated
24   February 19th.  When we searched the interior of the
25   2001 Chevy truck, there were several bills of sales
26   for equipment and trailers purchased.
27          There was several balance receipts from the
28   Capital One accounts like you would go to check your
29   balance at ATM machine from Mr. Dobronich's accounts.
30          There was a cash receipt to Berryland Campers
31   dated March 15th where they had paid $19,000 in cash
32   to Berryland on the camper.  Through that time, by

DETECTIVE STEFAN MONTGOMERY

1  the time we did the search warrants, since the check

2  that they had written for the remaining balance was

3  no longer good from Mr. Thibodaux's account,

4  Berryland Camper refunded them that $19,000 in a

5  check, and that check was in the truck, so we took

6  possession of that.

7        When we went to Mr. Dobronich's residence, we

8  found that there was some new construction done in

9  the trailer.  It was walled up.  There was like an

10  additional room that was not added, but there was

11  maybe like a large living area that was walled up to

12  make an additional bedroom.

13  Q.    How many bedrooms were in the trailer to begin

14  with?

15  A.    I believe it was a two bedroom.  It was

16  converted to a three bedroom.  We found some of his

17  personal effects and paperwork, bank statements,

18  previous bank statements, and other than that, other

19  than some small coins and stuff, nothing of real

20  relation to this case.

21        We went to 29066 Ellis Drive, which is the

22  property that they had purchased with the cashier's

23  check from this account.

24  Q.    That's the cashier's check for $45,000?

25  A.    Correct.  And we met Kayla Thibodaux, which is

26  Darnay Thibodaux's daughter, and Brandon McQueen.

27  They were in the process of renovating.  There's a

28  double wide trailer on that property.  They were in

29  the process of renovating that just within the days

30  that it took that we went out there and took the

31  warrants.

32        But they indicated that Darnay and Calvin had

48

DETECTIVE STEFAN MONTGOMERY

1  recently purchased the property and that they had an
2  agreement to rent the property from them, and they
3  were in the process of renovating it while they lived
4  there.  We found some receipts from Lowe's for all
5  the construction materials.  They did indicate that
6  that was money paid by them; it wasn't given to them
7  by the Thibodaux's, however, one of the items that
8  they purchased, which was a grill, a barbecue grill
9  appeared to be the same one at Calvin and Darnay's
10 house.
11      So as far as equipment that we actually took
12 from the house, we took a 2013 Nissan Altima, a 1974
13 Chevy Nova that had been restored, the 2006 Honda
14 four-wheeler, a five by eight carry on trailer, a
15 2001 Chevy truck, a 2013 Cub Cadet lawnmower, a 2013
16 Kubota tractor with all the implements on the
17 trailer.
18 Q.    Did you seize these properties because there
19 was evidence that these properties were purchased
20 with Mr. Dobronich's funds?
21 A.    Yes, all of these items were.  When we went
22 back to -- am I still talking, or do you want me --
23 Q.    You can go on.  Well let me ask you this
24 first, Detective Montgomery.  You seized all of the
25 movable items that you found to be purchased with Mr.
26 Dobronich's funds?
27 A.    That's correct.
28 Q.    Why were the immovable items not frozen,
29 seized, placed a lien on by the sheriff's department?
30 A.    Well, we were not in a position to seize real
31 property.  Although we know that it was bought with
32 Mr. Dobronich's money, we were not in a position to

49

DETECTIVE STEFAN MONTGOMERY

1   seize that real property.  That's why.

2   Q.     Okay.  Thank you.  Did you have a

3   conversations with other witnesses during the course

4   of your investigation?

5   A.     I did.

6   Q.     Can you tell the Court about those

7   conversations.

8   A.     In following up with the purchase of the

9   property, that real property that we were talking

10  about, there was an act of donation that was filed

11  for this property between the Thibodauxs and Buffy

12  Crawford Singletary, yet there was a check for the

13  purchase of that property.

14        So we interviewed Buffy Singletary about that,

15  the existence of the check, but yet there was an act

16  of donation.  She said she had known them for many

17  years.  They actually lived in that house on Ellis

18  Drive from them.  They had rented the property from

19  her.

20  Q.     You say "they", the Thibodauxs?

21  A.     The Thibodauxs had rented that property from

22  her, and when they had moved out they explained to

23  her they met someone around the corner who was going

24  to rent their place, which is Mr. Dobronich.  She was

25  contacted by -- she was contacted by them who said

26  that they wanted to purchase the property, they would

27  make a loan to get the property, and they agreed upon

28  a price of $45,000.

29        And on March 7th, she got a text message from

30  Darnay Thibodaux stating that they had a loan for the

31  property.  Buffy brought the legal description to

32  Hickory Title.  Hickory Title is the same company who

DETECTIVE STEFAN MONTGOMERY

1  did the act of donation, the will, and the power of
2  attorney, dropped the information off so they could
3  draw up the paperwork on it.
4      The Thibodauxs wanted it done through Rebecca
5  Crawford's office, Hickory Title, not through a land
6  title service according to her statement.  So when
7  they went up there to sign the paperwork, it was set
8  up as act of donation, and although she was uneasy
9  about it in the event that the check wasn't good, for
10  whatever reason they went through with the process,
11  so she knowingly signed off on the act of donation,
12  but she received a $45,000 check for the payment of
13  that property.
14 Q.    That's Buffy Singletary?
15 A.    Buffy Singletary.  And the notary service
16  provided that act of donation paperwork knowing that
17  this was a cash sale.
18 Q.    Right.  Did you have an occasion to speak to
19  Rebecca Crawford, the notary who prepared the act of
20  donation from Mr. Dobronich to Darnay and Calvin, the
21  last will and testament and power of attorney?
22 A.    I did.  I met with her on April 2nd at her
23  residence.  Myself and Detective Kristie Abadie met
24  with her and her husband at their residence.  Her
25  attorney, Deanna Lamz, was on the phone, cell phone
26  speakerphone listening into the conversation.
27      BY THE COURT:
28          Whose attorney?
29      BY THE WITNESS:
30          Deanna Lamz.
31      BY THE COURT:
32          Whose attorney?

DETECTIVE STEFAN MONTGOMERY

1       BY THE WITNESS:
2               Rebecca Crawford.  I'm sorry.  She
3           confirmed that she was called to notarize
4           the power of attorney and the last will
5           and testament.  They were prepared at her
6           office and that those services were
7           requested by the Thibodauxs, and they were
8           conducted at St. Tammany Parish Hospital.
9               Actually, two of the three were not.
10          One of the papers was not ready in time so
11          they did that once he was released from
12          the hospital, and she went out to his
13          house on a second occasion to do one of
14          the papers.
15  EXAMINATION BY MS. VALLEJO:
16  Q.     Do you know which one?
17  A.     The power of attorney and the will were done
18  at the hospital.  The land was done at his house.
19  They knew the Thibodauxs.  Calvin and her husband had
20  been lifelong friends so they were familiar with
21  them, and she does -- she stated that she was
22  semi-retired but does travel to different locations
23  to provide notary work.
24          BY THE COURT:
25              Are you referring to Ms. Lamz?
26          BY THE WITNESS:
27              Ms. Crawford, the notary.  I'm
28          sorry.  Ms. Lamz was listening on the
29          speakerphone as her legal counsel.  So I
30          asked her specifically about the signing
31          of this paperwork at the hospital.  She
32          said that she asked him several questions

DETECTIVE STEFAN MONTGOMERY

```
1              as standard procedure to ensure that he
2              was competent and read the entire will,
3              and that he read, Mr. Dobronich read the
4              entire will and reviewed the power of
5              attorney before signing it, and it was
6              witnessed by her husband and a nurse, Pam
7              Adams.
8  EXAMINATION BY MS. VALLEJO:
9  Q.     By Ms. Crawford's husband?
10 A.     Correct.  She said that he did seem to
11 understand that he knew what he was signing, and he
12 did not have a lot of questions about the paperwork.
13             BY THE COURT:
14                  I hate to interrupt in
15             mid-testimony, but my staff has not had a
16             break since we started at 9:30 this
17             morning.  I'm going to recess at this time
18             until 2:15.
19             BY MS. VALLEJO:
20                  Thank you.
21             BY MR. BURNS:
22                  Thank you, Judge.  Can we leave our
23             stuff on the table?
24             BY THE COURT:
25                  Yes, sir.
26                  (At this time, a recess was taken.)
27             BY THE COURT:
28                  I apologize to you guys also.  I had
29             no idea that settlement conference would
30             take that long.
31             BY MR. BURNS:
32                  Not a problem, Judge.
```

```
 1       BY MS. VALLEJO:
 2                Your Honor?
 3       BY THE COURT:
 4                Yes, ma'am.
 5       BY MS. VALLEJO:
 6                Today has gone long for everyone,
 7           and I'd like to request possibly to
 8           interrupt Detective Montgomery's testimony
 9           to put Mr. Dobronich on.  He's becoming
10           tired and he's not well, and I'm not sure
11           how much longer he can go today.
12       BY THE COURT:
13                Certainly.
14       BY MS. VALLEJO:
15                Thank you, Your Honor.
16       BY THE COURT:
17                You want to finish the next witness
18         . first?
19       BY MS. VALLEJO:
20                No, I'd like to interrupt it.
21       BY THE COURT:
22                That's fine.
23       BY MS. VALLEJO:
24                I think Detective Montgomery might
25           go quite long.
26       BY THE COURT:
27                Do you have any objection to that?
28       BY MR. BURNS:
29                No objection.
30       BY THE COURT:
31                He's welcome to testify from right
32           there if Mr. Burns doesn't mind.  Just
```

SIDNEY DOBRONICH

1           wheel him so you can see him and Mr. Burns

2           can see him.  He can stay in his chair.

3       BY MR. BURNS:

4               He wants to walk.

5       BY THE COURT:

6               You're welcome to stay in the chair.

7               (SIDNEY DOBRONICH, after having been

8           first duly sworn under oath, did testify

9           as follows:)

10      BY THE COURT:

11              There's some water for you, sir.

12      BY MS. VALLEJO:

13              May I approach, Your Honor?

14      BY THE COURT:

15              Yes, ma'am.

16      BY MS. VALLEJO:

17              It's difficult for him to hear.

18  DIRECT EXAMINATION BY MS. VALLEJO:

19  Q.   Hello, Mr. Dobronich.  How are you?

20  A.   I'm good.

21  Q.   Can you state your full name for the record.

22  A.   Sidney Dobronich.

23  Q.   And where do you live, Mr. Dobronich?

24  A.   St. Bernard.

25  Q.   St. Bernard?

26  A.   St. Bernard.

27  Q.   How long you lived in St. Bernard?

28  A.   Twenty years.

29  Q.   Did you move away from St. Bernard at any

30  point in time?

31  A.   (Affirmative response).

32  Q.   Where did you move to?

SIDNEY DOBRONICH

```
 1  A.      St. Marie Street.
 2  Q.      St. Marie Street.  Where's that?
 3  A.      Like right below the parish.
 4  Q.      I see.  Right above the parish, maybe in New
 5  Orleans?
 6  A.      Yeah, yeah, New Orleans.
 7  Q.      And have you ever lived in Sun, Louisiana?
 8  A.      That's where I'm at now.
 9  Q.      That's where you live now.  I see.  Do you
10  know your address?
11  A.      Yes.
12  Q.      What's your address?
13  A.      29127 Nell Drive.
14  Q.      Okay.  Is that in Sun or in Bogalusa?
15  A.      That's a Sun.
16  Q.      How long have you lived there?
17  A.      About four years.
18  Q.      Okay, and where did you live before you lived
19  there?
20  A.      Arabi.
21  Q.      Did you live in Washington state for a while?
22  A.      Never.
23  Q.      You never lived in Washington state?  Did you
24  move to the west coast for a period of time?
25  A.      (Negative response).
26  Q.      You don't recall that.  What kind of work did
27  you do?
28  A.      Tugboat captain.
29  Q.      A tugboat captain for how many years?
30  A.      The last 20.
31  Q.      Did you retire as a tugboat captain?
32  A.      Yeah.
```

56

SIDNEY DOBRONICH

1  Q.    Do you live with anyone Mr. Dobronich?
2  A.    What?
3  Q.    Does anyone live with you?
4  A.    Yeah.
5  Q.    Who lives with you?
6  A.    Well, she's dead now, my wife.
7  Q.    What's that?  Your wife, I see.  What was your
8  wife's name?
9  A.    Venice.
10 Q.    Venice.  And is she deceased or you're
11 divorced?
12 A.    Deceased.
13 Q.    I see.  After your wife died, did you live
14 with anyone after that?
15 A.    No, that's all.
16 Q.    So have you lived alone since your wife died?
17 A.    She's dead for a couple of years now.
18 Q.    I see.  Did you live with anyone after that?
19 A.    No, no.
20 Q.    So you lived on Nell Drive by yourself?
21 A.    (Affirmative response).
22 Q.    Do you have anyone taking care of you?
23 A.    No.
24 Q.    Are you able to take care of yourself?
25 A.    Yeah.
26 Q.    What things do you do for yourself?
27 A.    Everything.
28 Q.    Like do you cook?
29 A.    Cook and all, do a little cooking, eat out.
30 Q.    Do you want to have somebody taking care of
31 you?
32 A.    Well, maybe.

57

SIDNEY DOBRONICH

1  Q.     Okay.  And do you drive?

2  A.     Yeah, yeah.

3  Q.     What kind of car do you have?

4  A.     Dodge van.

5  Q.     A Dodge van.  What year is it?

6  A.     2001.

7  Q.     What sort of things do you do when you get in

8  your car?  Where do you go?

9  A.     I go to the store.

10  Q.     Do you ever go to the casino?

11  A.     Once in a while, yeah.

12  Q.     And do you visit any of your family?

13  A.     They all live in St. Bernard.

14  Q.     Is that right?  And what family members -- can

15  you tell the Court what family members you have?  Who

16  is your family?

17  A.     They all live out in St. Bernard.

18  Q.     Can you give me a name of one of your family

19  members, one of your relatives?

20  A.     Fannie Cruise (phonetic), George Dobronich,

21  Forest Dobronich, them three.

22  Q.     Those are the three you see the most?

23  A.     Yeah.

24  Q.     At any time have you ever felt that any of

25  your family members abandoned you?

26  A.     No, not really, not really.

27  Q.     Are you a type of person to call them often

28  and go visit often?

29  A.     Yeah, we visit and all.

30  Q.     And who do you believe takes care of your

31  money?

32  A.     I do.

SIDNEY DOBRONICH

1   Q.    You take care of it.  Do you want anyone else
2   to take care of your money?
3   A.    No.
4   Q.    Have you ever signed any documents authorizing
5   anyone else to take care of your money?
6   A.    No.
7   Q.    No?  Would you ever want to do that?
8   A.    When the time comes.
9   Q.    When the times comes?
10  A.    When the times comes.
11  Q.    But you don't want to do that just yet?
12  A.    I don't want to do it just yet.
13  Q.    Have you ever donated any money, any property
14  to anyone?
15  A.    Never.
16  Q.    Never.  Have you donated the house that you
17  live in today on Nell Drive?  Have you donated that
18  to anyone?
19  A.    I'm selling one of them.  There's two trailers
20  on two acres, and I'm renting this, you know.
21  Q.    Who are you renting it to?
22  A.    Thibodaux.
23  Q.    And you said you're renting it or you're
24  selling it?
25  A.    Selling it to them.
26  Q.    How much are they paying you?
27  A.    Five hundred a month.
28  Q.    And how long has that been?  Do you know when
29  they first started living there?
30  A.    I don't know how long it's been.  A year
31  maybe.
32  Q.    About a year.  And you have -- have they been

SIDNEY DOBRONICH

```
 1  repaying you for that rent?
 2  A.     Ma'am?
 3  Q.     Have they been paying you for the rent?
 4  A.     Yeah.
 5  Q.     What do you do when they pay you?  Do you
 6  write it down?  Do you give them a receipt, or what
 7  do you do?
 8  A.     In a book.  I got it in a book.
 9  Q.     You write it in a book?
10  A.     Yeah.
11  Q.     So every time they pay you, you write the
12  payment down in a book?
13  A.     Yeah.
14  Q.     Do you have a cell phone?
15  A.     No.
16  Q.     No.  Do you need a cell phone?
17  A.     No.  I don't know how to use them.
18  Q.     Do you have a computer?
19  A.     No.
20  Q.     Do you know how to use a computer?
21  A.     Never used it.
22  Q.     Do you want a computer?
23  A.     No.
24  Q.     How about a camper?  Do you want a camper?
25  A.     A what?
26  Q.     A camper like to go camping out in the woods?
27  A.     No, I don't go for that no more.
28  Q.     You don't want that?
29  A.     I had one.
30  Q.     How about a 1974 Chevy?  Do you want a 1974
31  Chevy?
32  A.     Not get it.
```

SIDNEY DOBRONICH

1   Q.    Well, do you want to buy one?

2   A.    No.

3   Q.    Do you want anyone else to buy one for you?

4   A.    (Negative response).

5   Q.    How about those other things I named?  Do you

6   want anyone else to buy them for you?

7   A.    (Negative response).

8   Q.    How about a 2013 Altima Nissan car?  Do you

9   want one of those?

10  A.    I don't need one, no.  I got that Dodge.

11  Q.    Are you happy with your Dodge?

12  A.    Yeah.

13  Q.    Did you ask anyone to purchase a Nissan car

14  for you?

15  A.    A what?

16  Q.    Did you ask anyone to buy a new car for you?

17  A.    No.

18  Q.    No, okay.  How about another house?  Do you

19  want to buy another house?

20  A.    No.

21  Q.    Not for any reason?

22  A.    I own a home now in Chalmette and two trailers

23  where I'm at, and that's it.

24  Q.    What about for investment purposes?

25  A.    (Negative response).

26  Q.    Do you know how much money you have in your

27  investments?

28  A.    (Negative response).

29  Q.    Who takes care of that for you?

30  A.    Joe Romano.

31  Q.    Anybody else?

32  A.    Uhg-ug (Negative response).

61

SIDNEY DOBRONICH

```
1   Q.      Okay.  If I were to tell you, Mr. Dobronich,
2   that you signed a document authorizing Darnay
3   Thibodaux to have access to your investment accounts,
4   would you agree with that?
5   A.      (Negative response).
6   Q.      Do you recall signing a such a document?
7   A.      I don't remember.
8   Q.      Do you want Darnay Thibodaux to handle your
9   finances?
10  A.      No.
11  Q.      Do you want her to have access to your money?
12  A.      Uhg-ug (Negative response).
13  Q.      Do you remember signing that document?
14  A.      I don't remember.
15  Q.      How about a last will and testament leaving
16  all of your property to Darnay and Calvin Thibodaux?
17  Do you remember signing that document?
18  A.      Uhg-ug (Negative response).
19  Q.      Who do you want to have your property when you
20  die?
21  A.      My nephews and nieces and all.
22  Q.      And how about if I showed you a document where
23  you donated your house that you live in to Darnay and
24  Calvin Thibodaux; do you remember that?
25  A.      No.  They buying it on time.
26  Q.      I'm talking about not the house they're living
27  in.  I'm talking about the house you're living in.
28  A.      I don't remember that.
29  Q.      Would you want to do that?  Would you want to
30  donate your house to them?
31  A.      No.
32  Q.      If I were to tell you that Darnay has spent
```

SIDNEY DOBRONICH

```
 1   $330,000 of your money, would you agree to allow her
 2   to do that?
 3   A.      No.
 4   Q.      Do you want that money back?
 5   A.      (Affirmative response).
 6   Q.      Can you say yes or no?
 7   A.      Yes.
 8   Q.      Do you want that money back?
 9   A.      If I could possibly get it.
10   Q.      Did you ever tell Darnay and Calvin to stop
11   paying you for the house that they're buying from
12   you, that you wanted to give it to them?
13   A.      No, I didn't say that.
14   Q.      No.  Do you want them to continue paying you
15   for that house?
16   A.      Yeah.
17   Q.      Did you know that Darnay was on your checking
18   accounts and that she could write a check from your
19   checking accounts?
20   A.      No, I didn't know that.
21   Q.      Do you agree to that?
22   A.      I didn't give her authority for that.
23   Q.      Do you want her to be on your checking account
24   now?
25   A.      Uhg-ug (Negative response).
26   Q.      At any time, did Darnay Thibodaux live with
27   you?
28   A.      No.
29   Q.      No?  Did she become your caretaker?
30   A.      Uhg-ug (Negative response).
31   Q.      Who is your caretaker?
32   A.      I don't have any.
```

SIDNEY DOBRONICH

1  Q.    Do you need a caretaker?

2  A.    I do it all.

3  Q.    So Darnay Thibodaux never was your caretaker?

4  A.    No.

5  Q.    Did she ever go to your house and clean your

6  house occasionally?

7  A.    Well, she'll come in there and clean and all

8  maybe once a month.

9  Q.    Did she do anything else for you?

10  A.    No, that's it.

11  Q.    Did you ever lend Calvin Thibodaux any money?

12  A.    What?

13  Q.    Did you lend Calvin Thibodaux any money?

14  A.    I sold him the home he's living in.

15  Q.    So you're giving him a loan to buy the home?

16  A.    Yeah.

17  Q.    Did you lend him any cash?

18  A.    I didn't lend him none.

19  Q.    Do you remember when you fell and broke your

20  hip?  Do you remember falling and breaking your hip?

21  A.    Oh, yeah, yeah.

22  Q.    Was Darnay Thibodaux in the trailer with you

23  when that happened?

24  A.    (Affirmative response).

25  Q.    Let the record reflect he's shaking his head

26  yes.

27  A.    If what?

28  Q.    You're shaking your head yes that she was in

29  the house with you when you fell?

30  A.    Yeah.

31  Q.    And when you had the heart attack in February,

32  do you know who brought you to the hospital?

SIDNEY DOBRONICH

1   A.      No, I don't know who brought me.

2   Q.      Was it Darnay Thibodaux?

3   A.      It might have been them.  It might have been.

4   Q.      Do you have any idea how much your medical

5   bills were when you were in the hospital for your

6   heart attack?  Do you know how much your medical

7   bills were?

8   A.      Never got it.

9   Q.      Never got any.  Okay.  Did you ask Joe Romano

10  to withdraw $30,000 from your investment account to

11  pay medical bills?

12  A.      I told him.

13  Q.      To pay your medical bills?

14  A.      Yeah.

15  Q.      Was it $30,000?

16  A.      I don't know what the amount was other than I

17  have to check with him on that.

18  Q.      But whatever your medical bills were, you

19  wanted him to be able to cover it?

20  A.      I never got a bill for all that yet.

21          BY MS. VALLEJO:

22                  Let me take a look at my notes, Your

23          Honor.  That's all the questions I have,

24          Judge.

25          BY MR. BURNS:

26                  I have just a few.  Thank you.  I'd

27          like to stand up, Judge.

28          BY THE COURT:

29                  Certainly.

30          BY MR. BURNS:

31                  Thank you very much.

32  CROSS-EXAMINATION BY MR. BURNS:

SIDNEY DOBRONICH

1  Q.     Mr. Sidney, my name is Roy Burns, and I
2  promise you there's no wrong answer in this
3  courtroom.  Do you understand that?  Do you have
4  something called sundowner's disease where you have
5  trouble remembering things?
6  A.     (Affirmative response).
7  Q.     Yes?
8         BY THE COURT:
9              You have to answer out loud, okay.
10            Mr. Dobronich, you have to answer out
11            loud.
12        BY THE WITNESS:
13                What?
14 EXAMINATION BY MR. BURNS:
15 Q.     Do you have trouble remembering?
16 A.     No.
17 Q.     No problems remembering?
18 A.     No.
19 Q.     Now, look, I ask these two people to stand up
20 over here.  Would you-all stand up, please.  Do you
21 know who those two people are?
22 A.     Yeah.
23 Q.     Who is that on the right?
24 A.     Calvin Klein and his wife.
25 Q.     Darnay and Calvin?
26 A.     Yeah.
27 Q.     You know them?
28 A.     Yeah.
29 Q.     Now, so the judge knows, they live right next
30 door to you on Nell Drive; is that correct?
31 A.     Yes.
32 Q.     And you've been knowing them for a very long

66

SIDNEY DOBRONICH

1  time, for a time; is that correct?

2  A.    A couple of years.

3  Q.    Okay.  Been knowing them for a couple of

4  years?

5  A.    Yeah.

6  Q.    I'm going to ask another lady to stand up in

7  here.  Please come forward, please.  Do you know that

8  lady right there?

9  A.    Yeah.

10 Q.    That's a notary public.  She's been to your

11 house on Nell Drive in Sun, Louisiana; is that not

12 correct?

13 A.    (Affirmative response).

14 Q.    Do you know her name?

15 A.    Ms. Swartz.

16 Q.    So she's come by your house as far as that's

17 concerned?

18 A.    Yeah.

19 Q.    Now, you say you don't remember some things

20 but --

21       BY THE COURT:

22            Can Ms. Crawford sit down?

23       BY MR. BURNS:

24            Of course she can.  Please sit down.

25 EXAMINATION BY MR. BURNS:

26 Q.    Has that lady been to your house?  Yes, she's

27 been to your house?

28 A.    (Affirmative response).

29       BY MR. BURNS:

30            Let the record reflect he's

31         indicated yes, please, Your Honor.

32 EXAMINATION BY MR. BURNS:

67

SIDNEY DOBRONICH

1   Q.    Have you ever given Darnay Thibodaux any money
2   or checks?
3   A.    No.
4   Q.    Now, what I'd like to do -- now, I'd like to
5   show you something, and if you can, can you see that?
6   And do you know what that is?
7         BY THE COURT:
8                You have to answer out loud.
9         BY THE WITNESS:
10               Yeah.
11  EXAMINATION BY MR. BURNS:
12  Q.    All right.  What is it, Mr. Sidney?
13  A.    It's a check for 9,000.
14  Q.    And who is it payable to?
15  A.    Huh?
16  Q.    Who is it payable to?
17  A.    To Darnay.
18  Q.    And who signed that check as the maker?
19  A.    They forged my name to it.  It ain't my
20  signature on the bottom.
21  Q.    That's not your signature?
22  A.    No, sir.
23  Q.    Would you tell me what is the date on that
24  check?
25  A.    February 15th of 2013.
26        BY MR. BURNS:
27               I'd like to mark the copy as a
28           defense exhibit.  I'll use the original.
29           What is the number?
30        BY THE CLERK:
31               Defense Exhibit 2.
32        BY MR. BURNS:

SIDNEY DOBRONICH

1           As D Number 2.  I'd like to offer,
2       introduce, and file that into evidence.
3   BY THE COURT:
4           Can you identify the check for me,
5       Mr. Burns.
6   BY MR. BURNS:
7           Yes, please.  It is a check on the
8       account of Mr. Sidney Dobronich, check
9       number 547, dated February 15, 2013,
10      payable to Darnay Thibodaux, $9,000,
11      signed by Mr. Sidney.  I'd like to offer,
12      introduce, and file that into evidence.
13  BY MS. VALLEJO:
14          I'd like to clarify the record, Your
15      Honor.  Mr. Sidney Dobronich testified
16      that it was a forged signature.  He
17      indicated it has a Sidney Dobronich
18      signature on the bottom, not signed by Mr.
19      Dobronich.
20  BY MR. BURNS:
21          I think the judge can make the
22      decision.
23  BY THE COURT:
24          Let it be received.
25  BY MR. BURNS:
26          Thank you very much.
27  EXAMINATION BY MR. BURNS:
28  Q.   Now, Mr. Sidney, do you like automobiles?
29  A.   Yeah.
30  Q.   And particularly, old automobiles; is that
31  correct, yes?
32  A.   If I owned them.

SIDNEY DOBRONICH

1  Q.    But you like them, you like old automobiles?

2  A.    Yeah.

3  Q.    And you like to go to automobile shows in

4  Bogalusa and in Covington yes?

5         BY MS. VALLEJO:

6               Your Honor, I'm going to object.

7            He's leading the witness.

8         BY THE COURT:

9               Overruled.

10  EXAMINATION BY MR. BURNS:

11  Q.    Now, to think about this, have you been in

12  Darnay's automobile a Nissan automobile, a 2013

13  Nissan automobile?  Yes?  Yes?

14  A.    Yeah.

15  Q.    And you've also been in vehicles that Calvin

16  Thibodaux has driven before; is that correct?  Yes?

17  A.    Yeah.

18  Q.    And in several of the trips that Calvin in

19  particular made with you was to some automobile

20  street shows where the old automobiles are there,

21  yes?  Ask the record to reflect he's saying yes.

22  Okay?

23         BY MS. VALLEJO:

24               Your Honor, I'm going to object.

25            I'd like for Mr. Burns to give Mr.

26            Dobronich an opportunity to answer yes or

27            no before Mr. Burns says yes.

28         BY THE COURT:

29               Let me explain something.  Can you

30            hear me okay?

31         BY THE WITNESS:

32               Yeah.

SIDNEY DOBRONICH

```
 1        BY THE COURT:
 2              You see this young lady right here
 3          doing that?  You have to answer out loud
 4          so she can write your answer down, okay?
 5        BY THE WITNESS:
 6              Yeah.
 7        BY THE COURT:
 8              So when the attorneys ask you a
 9          question you have to answer out loud, and
10          if you don't understand, just say you
11          don't understand.  Thank you.
12   EXAMINATION BY MR. BURNS:
13   Q.     So I'm going back.  Have you been taken to
14   some of these automobile shows in Bogalusa by Calvin
15   Thibodaux?
16   A.     One time.
17   Q.     All right.  And you like to go there and talk
18   to the people who own the cars and discuss them; is
19   that correct?
20   A.     Yeah.
21   Q.     And let me tell you about a car that I believe
22   that you like greatly.  Do you like the Chevrolet
23   Camaro new vehicle, yellow in color in particular?
24   A.     Yeah.
25   Q.     Do you remember telling Darnay that you would
26   like to buy her a yellow Chevrolet Camaro car before
27   you went into the hospital?
28   A.     I don't remember.
29   Q.     Don't remember that one.  Do you ever remember
30   discussing with her that she didn't want the yellow
31   Camaro, and she wanted the Nissan, the 2013 Nissan?
32   Do you remember that?
```

71

SIDNEY DOBRONICH

1  A.      (Negative response).

2  Q.      Don't remember that?

3  A.      (Negative response).

4  Q.      And that you authorized her and gave her

5  permission to buy a Nissan, a 2013?

6  A.      I don't remember.

7  Q.      That's possible though?

8  A.      Uhm-hum (Affirmative response).  Yeah.

9  Q.      Now, you say that you never gave her a piece

10  of real estate.  Do you ever remember signing a

11  document that I'm going to mark as Defense Exhibit

12  Number 3, Defense Exhibit Number 3, and this is a

13  copy of an original instrument number 1890089 dated

14  the blank day of February 2013?

15       All right.  Now, would you look at that and

16  rather than make you read that, is that an act of

17  donation where you gave to the Thibodauxs an acre of

18  ground on Nell in Sun, Louisiana?  Do you remember

19  that?

20  A.      Uhm-hum (Affirmative response).

21  Q.      You remember that; is that correct?  So if

22  you'd look on the last page, you don't deny that's

23  your signature?

24       BY THE COURT:

25              Is that your signature on the

26          document?  Answer me out loud.

27          Mr. Sidney, turn the page over.  Do you

28          see a signature down there on the bottom?

29          Go one more page.  Try one more page.  Is

30          that your signature?

31       BY THE WITNESS:

32              Yeah.

72

SIDNEY DOBRONICH

1       BY THE COURT:

2               You signed that?

3       BY THE WITNESS:

4               Uhm-hum (Affirmative response).

5       BY THE COURT:

6               Okay.  Mr. Burns, go ahead.

7       BY MR. BURNS:

8               At this time, I'd like to offer,

9           introduce, and file into evidence Defense

10          Exhibit Number 3.

11      BY THE COURT:

12              Any objection?

13      BY MS. VALLEJO:

14              No objections.

15      BY THE COURT:

16              Let it be received.  Are you

17          finished with it, Mr. Sidney?

18      BY THE WITNESS:

19              Sir?

20      BY THE COURT:

21              Are you finished looking at it?  All

22          right.  Hand it to Mr. Burns.

23  EXAMINATION BY MR. BURNS:

24  Q.    Now, Mr. Sidney, do you believe -- do you

25  understand what the term or at least my term is what

26  we call indian giving?  Do you understand what that

27  means?  Do you understand what I said?  What does it

28  mean to be an indian giver?

29  A.    Yeah.  That's an old saying.

30  Q.    Well, of course.  I know you would know that.

31  Now, are you an indian giver?

32  A.    No.

73

SIDNEY DOBRONICH

1  Q.     Now, did you maintain -- so if you gave
2  something to Darnay and Calvin, it's theirs, right?
3  You have to answer my question.
4  A.     Yeah.
5  Q.     You certainly believe that you have the
6  capacity to get out of the chair and walk to the
7  seat; is that correct?  All right.  Now, did you
8  maintain any mortgage against that property?
9  A.     I'm selling them my home.
10 Q.     I understand.  Do you have any claim of
11 ownership for something that you gave away?
12 A.     Yeah.
13 Q.     You do.  What is your claim to that piece of
14 ground?
15 A.     A piece of property, a trailer on the acre of
16 land.
17 Q.     Now, I'd like to show you -- now, where did
18 that donation take place if you remember?  Where did
19 you sign those papers?
20 A.     In Covington.
21 Q.     Did anybody force your hand to that piece of
22 document?
23 A.     No.
24 Q.     And did you generally understand what you were
25 doing?
26 A.     Yeah.
27 Q.     Now, I want to show you an affidavit, sir, and
28 this is an affidavit that I'm going to mark as
29 Defense Exhibit Number 4.  Take your time and look at
30 it, and it's dated March 27, 2013, affidavit, okay.
31 When you finish reading just acknowledge your head,
32 okay, please.  Are you finished reading it?

74

SIDNEY DOBRONICH

1   A.      Uhm-hum (Affirmative response).
2   Q.      Would you look at the bottom of it.  Do you
3   remember I pointed out Mrs. Crawford.  Do you know
4   Rebecca Crawford?
5   A.      Yeah.
6   Q.      Is that her name on the bottom of it?
7   A.      It is.
8   Q.      And is that your signature on the bottom of
9   it?
10  A.      Yeah.
11  Q.      And without going into it, it says -- and
12  we're going to go into it -- that you gave her the
13  power of attorney to buy a Kubota tractor, a
14  four-wheeler, a 2001 Chevy pickup, a Nissan, other
15  property with your full knowledge and with your
16  account with your consent with your money from your
17  account.  Does it say that?  And that you do not wish
18  to pursue these people for criminal charges.  It says
19  what it says; does it not, sir?  Yes?
20  A.      Yeah.
21  Q.      And whose signature is on the bottom of that
22  affidavit?  Is that your signature on the bottom?
23  A.      Yeah.
24          BY MR. BURNS:
25                  I'd like to offer, introduce, and
26          file into evidence -- thank you, sir --
27          Defense Exhibit Number 4.
28          BY MS. VALLEJO:
29                  No objection.
30          BY THE COURT:
31                  What was the date on that affidavit?
32          BY MR. BURNS:

75

SIDNEY DOBRONICH

```
 1                    March 27, 2013.
 2          BY THE COURT:
 3                    And it says what?
 4          BY MR. BURNS:
 5                    Do you need an extra copy of it?
 6          BY MS. VALLEJO:
 7                    No, I'm good.
 8  EXAMINATION BY MR. BURNS:
 9  Q.    Now, I want to explore that for just a second.
10  I'd like to show you what I'm going to mark --
11          BY THE COURT:
12                    Wait.  I have a question, Mr. Burns.
13          BY MR. BURNS:
14                    Yes, sir, surely.
15          BY THE COURT:
16                    Why did you do this?  Did somebody
17             ask you to do this?
18          BY THE WITNESS:
19                    I don't know.
20          BY THE COURT:
21                    You don't know why you did this?
22             You don't remember who asked you to do it?
23          BY THE WITNESS:
24                    (Negative response).
25          BY THE COURT:
26                    Was it your idea?  You came up with
27             this by yourself?
28          BY THE WITNESS:
29                    (Affirmative response).
30          BY THE COURT:
31                    You called up Ms. Crawford and said
32             I want to do an affidavit?
```

76

SIDNEY DOBRONICH

```
 1        BY THE WITNESS:
 2               Yeah.
 3        BY THE COURT:
 4               You called her up?  Ms. Crawford is
 5           right there.  You called her up and said I
 6           want to do an affidavit and say that
 7           everything I did I don't want to prosecute
 8           them for and I want to give this to them?
 9           You called them up and said that?  It was
10           your idea?
11        BY THE WITNESS:
12               (Affirmative response).
13        BY THE COURT:
14               Why?
15        BY THE WITNESS:
16               I don't know.
17   EXAMINATION BY MR. BURNS:
18   Q.    Now, I show you what I marked for
19   identification.  Where am I, 5 or 6?
20        BY THE CLERK:
21               You are at 5 after the affidavit.
22        BY MR. BURNS:
23               So I'm going to 5.
24   EXAMINATION BY MR. BURNS:
25   Q.    Do you know Buffy Crawford and Charles
26   Singletary?
27   A.    (Negative response).
28   Q.    You don't know them?  Have you ever purchased
29   any property from the Singletarys?
30   A.    (Negative response).
31   Q.    I want to go back.  Do you ever remember
32   having some discussions with -- the Thibodauxs were
```

77

SIDNEY DOBRONICH

```
 1  friends of yours, correct?  Yes?  And let's talk
 2  about an injunction for just a second.  You waved to
 3  her this morning when you saw her for the first time;
 4  is that not correct?
 5  A.      Yeah.
 6  Q.      Are you afraid of her?
 7  A.      No.
 8  Q.      She's been in your house, she's taken you
 9  grocery shopping.  Now, let's talk about your health.
10  I want to talk about your health before I get back to
11  the affidavit.  Do you go to the veteran's hospital
12  or clinic in Bogalusa?
13  A.      Yeah.
14  Q.      Who takes you there?
15  A.      I go.
16  Q.      Has Darnay ever taken you there?
17  A.      No.
18  Q.      No.  Have they ever adjudged you at that
19  hospital of being incompetent?
20  A.      (Negative response).
21  Q.      No, right?
22  A.      No.
23  Q.      So from the standpoint do you remember when
24  you went in the hospital for your heart problems that
25  you had?  Do you remember you went to the St. Tammany
26  hospital for heart problems, yes?
27  A.      (Affirmative response).
28  Q.      Do you remember that it was Darnay who took
29  you there?  Yes?
30  A.      Yes.
31  Q.      Have you ever said to her and to others that
32  she's saved your life?
```

SIDNEY DOBRONICH

1   A.      Yeah.

2   Q.      When you were discharged with your heart

3   problems --

4           BY THE COURT:

5                   Let me stop you right there.

6           .    Mr. Dobronich, look at me.  What are we

7                doing here right now?

8           BY THE WITNESS:

9                   Huh?

10          BY THE COURT:

11                  What are we doing right here in this

12               courtroom right now?

13          BY THE WITNESS:

14                  In court.

15          BY THE COURT:

16                  Why are we here?

17          BY THE WITNESS:

18                  Why am I here?  I don't know.

19          BY THE COURT:

20                  What am I doing here?  What am I

21               supposed to do?  Do you know what my role

22               is and what I'm supposed to be doing?

23               What?  You're just nodding yes.  All

24               right.  You can step down.  You can step

25               down.

26                  Based on my observation of this

27               gentleman on the stand, I do not think

28               he's competent to testify.  Call your next

29               witness.

30          BY MS. VALLEJO:

31                  I'd like to recall Detective

32               Montgomery.

79

DETECTIVE STEFAN MONTGOMERY

```
1        BY THE COURT:
2                You've already been sworn.
3        (DETECTIVE STEFAN MONTGOMERY, after having been
4   previously sworn under oath, was recalled to the
5   stand and did testify as follows:)
6   DIRECT EXAMINATION BY MS. VALLEJO:
7   Q.      Detective Montgomery, before we get started on
8   continuing your testimony where we left off, did you
9   have an opportunity to observe Darnay and Calvin
10  Thibodaux in the hallway while we were on break?
11  A.      I did.
12  Q.      And can you tell the Court what you observed.
13  A.      I observed that on two occasions Darnay
14  Thibodaux made an intentional lap around the middle
15  section, and as she passed Mr. Dobronich, she would
16  make eye contact with him.  The first time, I
17  couldn't tell exactly what she was doing, but she got
18  his attention as she passed.
19          The second time I saw her get up and make the
20  lap around, I stood.  I got up and stood by Mr.
21  Dobronich between him and where she would have
22  passed, and she blew him a kiss as she walked by him
23  gathering his attention again.
24  Q.      Thank you, Captain Montgomery.  Where were we
25  when we took a break with regard to your
26  investigation and the witnesses that you had spoken
27  to during your investigation?
28  A.      We were discussing my interview with
29  Ms. Crawford and her husband in regarding to the
30  signing of the power of attorney, will, and the act
31  of donation for the property.
32  Q.      Can you continue that testimony, please.
```

DETECTIVE STEFAN MONTGOMERY

1  A.     Sure.  As we spoke to her about the signing of
2  the documents, she felt that he was -- that he looked
3  at the documents and he knew what he was signing, and
4  she did say that it was noisy in the rooms.  There
5  were people present but that they felt confident that
6  he knew what he was doing.
7        After we did the search warrants at the
8  Thibodaux's residence that evening, the Thibodauxs
9  apparently went back to Ms. Crawford's house,
10 contacted her again, and stated that the police had
11 showed up and taken all their stuff, and that upon
12 the advice of their attorney they needed to get an
13 affidavit stating that he wanted to give them all
14 this stuff.
15       So they contacted her again to go back to the
16 hospital and get a second affidavit verifying that
17 everything that they bought was with his permission.
18 They didn't initially want to go, according to her
19 statement, because it was family night, but they were
20 upset and afraid of being arrested, so she did go
21 meet them back at the hospital.
22       Darnay was up in the room when they arrived
23 already.  She sat down and handwrote an affidavit.
24     BY THE COURT:
25            Who is she?
26     BY THE WITNESS:
27            Ms. Crawford handwrote an affidavit
28        at the hospital in front of Mr. Sidney,
29        and again, the Thibodauxs were present,
30        children were present, but she felt that
31        that's what he wanted to do.
32 EXAMINATION BY MS. VALLEJO:

DETECTIVE STEFAN MONTGOMERY

1   Q.     Did she make any comment to you about whether
2   he was in pain or if he looked a little different
3   than he looked previously?  I refer you to page 21 of
4   your report.
5   A.     She advised him that she needed to get a
6   statement and he nodded his head yes, but he didn't
7   say a lot.  She stated that he seemed like he was in
8   a little bit more pain and not as responsive as the
9   first time and more confused maybe, a little confused
10  was her statement.
11        I asked Ms. Crawford in her experience as a
12  notary if she had come across a situation such as
13  this, and she stated that she'd been a notary for 33
14  years and she'd never come across a situation in
15  which she had signed documents and this amount of
16  money had been withdrawn and used in such a short
17  amount of time.
18        She did relay a personal story within her
19  family where her sister had obtained power of
20  attorney and taken some of her mother's money and
21  that they were still upset about that within the
22  family, but she did not see anything odd about Mr.
23  Dobronich's transaction.
24        So I showed her the act of donation that had
25  been conducted between Buffy Singletary and the
26  Thibodauxs on April 13, 2013.  She was aware of the
27  document but then later stated that it was a sale
28  between parties, not an act of donation.  I asked her
29  how she knew that it was a sale, and she said because
30  there was a check involved and that her secretary had
31  handled the paperwork.  She did not handle it
32  personally, but that she knew it was a cash sale.

DETECTIVE STEFAN MONTGOMERY

1   Q.      Did you speak to anyone else during your
2   investigation?
3   A.      Well, I spoke to Janet Singletary who is an
4   employee of Ms. Crawford at Hickory Title.  She
5   confirmed that it was a cash sale, and she was not
6   sure why they wanted it drawn up as an act of
7   donation, but they had done it several times in the
8   past for people and that it wouldn't save them any
9   tax, shield them from any tax liability, so that she
10  prepared the paperwork because that's what she was
11  asked to do by the Thibodauxs.
12        I contacted Buffy Crawford Singletary
13  regarding the paper.  She met with us at the complex
14  in Slidell on April 4th.  Buffy said she had known
15  them for many years, that she had actually rented
16  them the house at one time and that they had
17  contacted her, I think as I stated previously before
18  lunch, that they had approached her about buying the
19  property.
20        They had settled on an amount of $45,000, that
21  they had made a loan for it.  Then as the
22  negotiations went on, before the sale took place,
23  Darnay Thibodaux told her that her I believe
24  grandmother or relative had died and that the death
25  of her grandmother, that's where the money was coming
26  from.
27  Q.      This is what Buffy Singletary told you?
28  A.      That was her statement to me, that Darnay's
29  grandmother passed and that's how they were
30  purchasing the property.
31        Buffy Singletary told me that she had never
32  met Mr. Dobronich, but she did feel that she was

DETECTIVE STEFAN MONTGOMERY

1  being pressured now by the Thibodauxs to say that she
2  had met him.  She was at this point worried that she
3  would now be in trouble because of the real estate
4  transaction that had been conducted, so she showed me
5  several text messages between the two, and we asked
6  her to conduct some recorded phone calls back to
7  Darnay Thibodaux in order to either confirm or deny
8  what she was telling us was true.
9         So we did that on that date, and they did not
10  want her to meet with me.  They actually disconnected
11  the phone call and told her they would call her back.
12  They told her that they had contacted their attorney
13  and that their attorney said for her to not go yet.
14  Q.      To not meet with you?
15  A.      To not meet with me yet.  Her statement was
16  for them -- that she didn't have to go meet with me
17  yet.
18  Q.      Right.
19  A.      She asked them -- she asked Darnay Thibodaux
20  what she was supposed to say if she was asked about
21  meeting Mr. Dobronich.  She was adamant that she was
22  not going to lie and get in trouble, but she did ask
23  Darnay Thibodaux what she was supposed to say if
24  asked about meeting with Mr. Dobronich, and Darnay
25  instructed her to say that they met him at his house
26  on January 15th where you told him you wanted to sell
27  the land.
28         When Singletary told her that it made her
29  nervous because she never met Mr. Sidney, Darnay
30  replied, I'd do it for you, Buffy.  So Singletary
31  asked her what if Mr. Sidney says he's never met me,
32  and Darnay replied, trust me, he'll say he did.  He's

DETECTIVE STEFAN MONTGOMERY

1   met a few people, trust me.  And then she replied

2   he's in Mississippi.

3        These phone calls -- there were several phone

4   calls.  They contacted her back after they had talked

5   to their attorney.  Then they actually -- at that

6   time, we placed a phone call from her to the notary,

7   to Janet Singletary in the situation.  Janet

8   Singletary explained that she was concerned about the

9   matter and she had been contacted by the police.

10       Buffy asked her if it was illegal, and Janet

11  Singletary replied not to my knowledge, but it's my

12  understanding I'm the one in question because I knew

13  it was a sale and not a donation, but I mean how many

14  other times have we done that for people.  We've done

15  it several times.

16       Janet Singletary did admit that she was busy

17  and should have stopped it, but she didn't, and

18  didn't have anything to hide and would encourage

19  Buffy to tell the truth.  At the conclusion of that

20  call, Calvin Thibodaux called Buffy back and stated

21  this is coming from the notary and everything is

22  legal, and he explained that it was done as a

23  donation because they did not want to go through a

24  title search and Becky Crawford would not let it be

25  done if it was not legal.

26       Calvin told her the detective's friend was the

27  DA and they were just making money off them.  When

28  she expressed her concern over lying about meeting

29  Mr. Sidney, Calvin stated I just asked you to do it,

30  that was all.  Calvin explained this is a civil case,

31  and you can't get arrested in a civil case.

32       The next person that I interviewed was

DETECTIVE STEFAN MONTGOMERY

 1 | Christina Penton.
 2 | Q.      Okay.
 3 | A.      That was on April 4th, that evening.
 4 | Christina Penton identified herself as Darnay
 5 | Thibodaux's daughter.  They stated that just before
 6 | Christmas, Darnay had contacted -- let me back up.  I
 7 | met with Christina Penton and Lynn Lemoine.  Just to
 8 | clarify Christina Penton is her daughter and Lynn
 9 | Lemoine is Darnay Thibodaux's mother.
10 | Q.      So Christina Penton is Darnay Thibodaux's
11 | daughter?
12 | A.      Correct.  Lynn Lemoine is Darnay's mother, and
13 | they requested to meet with me.
14 | Q.      Okay.
15 | A.      Christina Penton told me that in January of
16 | 2013, Darnay Thibodaux called her and told her she
17 | was cleaning Mr. Sidney's house and she found a bank
18 | receipt showing that she had $800,000 in his account.
19 | This was prior to any of this paperwork ever being
20 | signed.
21 |         Then several weeks later Christina Penton told
22 | me she had contacted her mother and learned that Mr.
23 | Dobronich had just been released from the hospital
24 | after suffering a heart attack.
25 |         Lynn Lemoine said that just before that
26 | Christmas day that they had -- Christmas 2012 that
27 | Darnay had asked to borrow $300 to buy presents for
28 | their children; they didn't have money.  And she
29 | denied loaning her any money, but when they showed up
30 | on Christmas day that they had purchased a different
31 | car and bought four-wheelers for the kids.  They did
32 | not know where that money had come from.  They did

DETECTIVE STEFAN MONTGOMERY

1   know that since this time before I talked to them
2   that they had purchased a large amount of new items.
3           Based on all the evidence that we compiled,
4   bank records, statements, the fraudulent real estate
5   transaction, we felt overwhelming probable cause to
6   issue arrest warrants for the arrest of Darnay and
7   Calvin Thibodaux at that time.
8   Q.      Were they, in fact, arrested?
9   A.      They were arrested.  They turned themselves in
10  upon notice.
11  Q.      And what were they charged with?
12  A.      Exploitation of the infirmed.
13  Q.      Detective Montgomery, during your
14  investigation, did you have the opportunity to obtain
15  copies of counter checks and withdrawals from Capital
16  One Bank?  And may I approach, Your Honor?
17          BY THE COURT:
18                  Yes, ma'am.
19  EXAMINATION BY MR. BURNS:
20  Q.      Withdrawals that were made by Darnay
21  Thibodaux.  I show you these.  Do you recognize
22  those?
23  A.      Yes.  I obtained -- during my investigation, I
24  obtained a complete set of records from both Capital
25  One and Citizen's Savings Bank withdrawals, deposits,
26  wire transfers, checks.
27  Q.      In fact, in accordance with your testimony,
28  Detective Montgomery, I'd like to show you the file
29  that you provided to me that you put together as a
30  result of your investigation and your interviews with
31  various people.  I'd like you to identify it for me.
32  It's numbered 1 through 220.  Would you take a look

87

DETECTIVE STEFAN MONTGOMERY

1   at this, please.
2   A.      Yes.   This is the attachments to my police
3   report.
4   Q.     Can you just look through the pages to tell me
5   that they're numbered in the manner that you numbered
6   them and that they are the documents that you put
7   together?
8   A.      Yes.
9   Q.      And this is the 26-page report that you had
10  typewritten that you had just read from; is that
11  correct?
12  A.      That's correct.
13          BY MS. VALLEJO:
14                  Your Honor, I'd like to offer, file,
15              and introduce into evidence the
16              withdrawals and counter checks from
17              Capital One Bank as Petitioner's Number --
18              3, 2?
19          BY THE CLERK:
20                  I'm looking.
21          BY MS. VALLEJO:
22                  I think it's 2.
23          BY THE COURT:
24                  Any objection?
25          BY THE CLERK:
26                  I think it's t2wo as well.
27          BY MS. VALLEJO:
28                  I'd like to offer, file, and
29              introduce into evidence Petitioner's
30              Number 3, which is the -- is Number 2
31              accepted into evidence, Your Honor?
32          BY THE COURT:

DETECTIVE STEFAN MONTGOMERY

1              Any objection?
2       BY MR. BURNS:
3              No objection.
4       BY THE COURT:
5              Let it be received.
6       BY THE WITNESS:
7              Just to clarify, there is an actual
8          standard St. Tammany Sheriff's Office
9          report format with this that contains
10         identifying information, people, evidence,
11         exhibits and such that is not right here.
12         This report is actually too big to fit in
13         the computer report writer, so it had to
14         be completed as an attachment.
15      BY MS. VALLEJO:
16             Did you actually type that yourself?
17      BY THE WITNESS:
18             Oh, I did.
19      BY MS. VALLEJO:
20             I'd like to offer, file, and
21         introduce the 26-page report along with
22         the attachments as Petitioner's Number 3.
23      BY THE COURT:
24             Any objection?
25      BY MR. BURNS:
26             No objection.
27      BY THE COURT:
28             Let it be received.
29  EXAMINATION BY MS. VALLEJO:
30  Q.    And on how many occasions have you spoken to
31  Mr. Sidney Dobronich?
32  A.    During the investigation?

89

DETECTIVE STEFAN MONTGOMERY

1  Q.     Yes.

2  A.     Three.

3  Q.     And when you spoke to Mr. Dobronich on three

4  separate occasions, was he consistent with what he

5  told you with regard to his financial expenditures by

6  the Thibodauxs?

7  A.     Yes, he was.

8  Q.     Can you tell the Court what he consistently

9  told you?

10  A.     No, that he did not authorize them power of

11  attorney to spend his money or to give his property

12  to them.

13  Q.     Did he ever tell you he agreed to donate his

14  property to them?

15  A.     He did not.

16  Q.     Did he ever tell you he agreed that they could

17  have access over his money?

18  A.     He did not.

19  Q.     Did he ever tell you that he wanted his

20  beneficiaries to be Calvin and Darnay Thibodaux?

21  A.     He did not.

22  Q.     In fact, who did he tell you he wanted to be

23  his beneficiaries?

24  A.     George and Forest, his nephews.

25  Q.     Did he ever tell you that he needed a

26  caretaker or whether he needed someone to drive him

27  around?

28  A.     He stated that he drove himself and took care

29  of himself.

30  Q.     Was there a transaction that the Thibodauxs

31  were trying to conduct and they were stopped because

32  the bank account had been frozen and they wrote a

90

DETECTIVE STEFAN MONTGOMERY

1 different check?

2      BY MR. BURNS:

3            Let me object to that leading.

4         That's just testimony.

5      BY THE COURT:

6                Sustained.

7 EXAMINATION BY MS. VALLEJO:

8 Q.    Can you tell me about the transaction with

9 Berryland Campers?

10 A.    Yes.  They put --

11      BY THE COURT:

12             Isn't this repetitive?  Hadn't he

13          testified to that already?

14      BY MS. VALLEJO:

15             Did you testify to that already?

16      BY THE WITNESS:

17             There's more to the story.  .

18      BY THE COURT:

19             Okay.  Go ahead, witness.

20      BY THE WITNESS:

21             After they placed the down payment

22          and they gave the cash for the camper,

23          they wrote a check for the remaining

24          balance.  We froze that bank account, and

25          that check was not honored by Berryland.

26             At that time, they went back to Mr.

27          Dobronich, according to their attorney,

28          and had him write a check out for the

29          remaining balance himself.

30 EXAMINATION BY MS. VALLEJO:

31 Q.    Was this while he was in the hospital?

32 A.    This was while he was in the hospital.   And

91

DETECTIVE STEFAN MONTGOMERY

1   then they brought that check to Berryland to pay for
2   the camper after we had frozen the bank account.
3   Q.      Did you see Mr. Dobronich's home?
4   A.      Yes, I did.
5   Q.      Was it a large enough home for one single
6   person to live in?
7   A.      Yes.
8   Q.      Did you see the camper that was purchased on
9   his alleged behalf?
10  A.      Yes.
11  Q.      And was the home that he lived in larger or
12  smaller than the camper?
13  A.      Larger.
14  Q.      Was it, in your opinion, sufficient for him to
15  have lived in?
16  A.      Much safer than a camper.
17          BY MS. VALLEJO:
18                  That's all the questions, Your
19              Honor.
20          BY THE COURT:
21                  Mr. Burns.
22          BY MR. BURNS:
23                  Yes, thank you.
24  CROSS-EXAMINATION BY MR. BURNS:
25  Q.      Officer Montgomery, you know me well, Roy
26  Burns?
27  A.      Sure.
28  Q.      First thing I'd like to show you what I'll
29  mark as Defense Exhibit Number 5 which happens to be
30  the act of donation from the Crawfords to the
31  Thibodauxs; is that correct?  I'm just asking you to
32  identify it as part of your investigation, that this

DETECTIVE STEFAN MONTGOMERY

```
 1  is what you were testifying to?
 2  A.    Okay.
 3  Q.    Is that yes?
 4  A.    Yes.
 5  Q.    And is there any place in this particular
 6  document here an ownership or anything entitled to
 7  Mr. Sidney?
 8  A.    As far as the --
 9  Q.    This land?
10  A.    Let me see.  I believe you're referring to the
11  life usufruct.
12  Q.    That's the other one.  I'm going to that in
13  just a second.
14  A.    Ask your question again, please.
15  Q.    Is Mr. Sidney Dobronich's name any place in
16  that document or the chain of title to the best of
17  your knowledge?
18  A.    Not that I'm aware of.
19       BY MR. BURNS:
20            That's fine.  I'd like to offer,
21       file, and introduce into evidence original
22       instrument number 1892482 which is called
23       an act of donation from Singletary to
24       Thibodaux over a piece of property.
25       BY THE COURT:
26            Any objection?  Ms. Vallejo, any
27       objection?
28       BY MS. VALLEJO:
29            No objection, Your Honor.  I'm
30       sorry.
31       BY THE COURT:
32            Let it be received.
```

93

DETECTIVE STEFAN MONTGOMERY

```
1   EXAMINATION BY MR. BURNS:
2   Q.      Let's talk about some of the good.  I've heard
3   a lot of stuff here that to me could be interpreted
4   different ways, but let's talk about good things.
5   Whether it started with Mr. Sidney and confected
6   through them, there was a contract for them to buy
7   additional real estate.  You talked about it.  Are
8   you aware of that?
9   A.      Specify the contract for additional.
10  Q.      Your testimony was that there was a check that
11  was to purchase additional real estate?
12  A.      There were two checks to purchase two
13  different pieces of real estate.
14  Q.      That was not consummated?
15  A.      One.
16  Q.      That's the one I'm talking about.
17  A.      Yes.  Yes.  Okay.
18  Q.      There was a check associated with that?
19  A.      That's correct.
20  Q.      And whether it's me or them, when there was
21  some concern raised about completing that document,
22  before there was a sequestration, before you seized
23  anything, that transaction was stopped and the money
24  given back to you-all?
25  A.      I don't know if that occurred before or after
26  we seized the bank account, but, yes, upon my
27  conversation with you, that money was returned back
28  to his bank account.
29  Q.      Right.  Okay.  You showed some concern.  We
30  agreed to it, and gave it back without any fight
31  whatsoever?
32  A.      That's correct.
```

94

DETECTIVE STEFAN MONTGOMERY

1  Q.     Now, let's talk about the transaction as it
2  relates to what you talked about, the donation from
3  Mr. Sidney to Darnay.  Would you agree with me that
4  there is a lifetime usufruct on that piece of
5  property in favor of this man right here?
6  A.     According to that document, yes.  He has the
7  right to live there until he dies.
8  Q.     Now, let's go to the thing dealing with the
9  Berryland Camper for just a second.  There's a lot of
10 stuff going on here in and about that time, right?
11 A.     Yes.
12 Q.     And part of that is that there was a Berryland
13 Camper.  You don't really know what the real reason
14 for that Berryland Camper, do you?
15 A.     I know what you told me it was for.
16 Q.     Not me.  I want you to talk about personally,
17 and that is that my clients after that went and
18 canceled that sale and gave a check back.  The
19 Berryland Camper, although it was located on the
20 property, was given back because of the concern that
21 you had.  Was that transaction completed or not?
22 A.     Well, the transaction was not completed.
23 However, they did not willingly give the camper back.
24 They, in fact, went back and had Mr. Dobronich write
25 a second check over and above us seizing the money
26 out of the original check, and then that check was
27 dishonored because the bank refused that check, at
28 which point in time, Berryland offered them the
29 option to walk away, return the camper and walk away
30 from the sale until a later time.
31 Q.     Now, let's go to the -- again, we're staying
32 on the Berryland Camper.  Part of it was $17,000 or

95

DETECTIVE STEFAN MONTGOMERY

1  so cash that was put as a down payment?

2  A.      I believe it was 19, but, yes.

3  Q.      And honestly, you can't -- if Calvin says that

4  was his money through whatever he did, his job, child

5  support, whatever, can you trace one dollar of that

6  $17,000 cash to Mr. Sidney's account?

7  A.      Well, I wasn't there when he physically walked

8  it in there, so there's no way for anyone to prove --

9  Q.      Cash?

10 A.      -- specifically where that cash specifically

11 came from.

12 Q.      Okay.  Just want to make sure of that.  But

13 that cash was ultimately seized?

14 A.      Yes, it was.

15 Q.      And so you can't trace it, but you seized

16 $17,000 worth of money that you can't trace the money

17 that this man or this lady took from him; is that

18 true?

19 A.      Well, let's get right on the figures first.

20 It was a $500 debit card transaction from

21 Mr. Sidney's account that was reversed back into his

22 account by Berryland from that.  The check was

23 dishonored, and then the cash that was provided to

24 them was given back to them in the form of a check.

25 We seized the check during the search warrant.

26 Q.      Right.  But you can't trace that, any $1 of

27 that $17,000 to Mr. Sidney, the cash?  You've already

28 testified to that, right?

29         BY MS. VALLEJO:

30                 Object, Your Honor.  Detective

31             Montgomery is about to answer.

32         BY THE COURT:

96

DETECTIVE STEFAN MONTGOMERY

```
 1              All right.  Go ahead and make your
 2         answer.
 3      BY THE WITNESS:
 4              What I testified to is that I wasn't
 5         there at the time.  I cannot specifically
 6         say that they took money because we have
 7         no idea of knowing what cash from this
 8         bank serial number.  None of that is
 9         reported.  We see the money go going out
10         in large volumes from his account.
11              We know that money put into Calvin
12         Thibodaux's account was to be used
13         specifically for that camper, but we
14         seized it or put a hold on it, so -- but
15         if we could specifically say that the
16         hundred dollars bills they took out of
17         whatever bank account or shoe box and
18         brought it to Berryland Camper, no one can
19         say that.
20  EXAMINATION BY MR. BURNS:
21  Q.    All right.  I want to go back to the Wal-Mart
22  incident about the iPhone and your very first
23  testimony about an iPhone and computer?
24  A.     Correct.
25  Q.     It was paid for by debit card?
26  A.     Correct.
27  Q.     Did your investigation tell you that they
28  used, Calvin and Darnay used the debit card, or was
29  Mr. Sidney with him at Wal-Mart and he used his debit
30  card to buy an iPhone and a computer for them?  I
31  want you to tell me what did your investigation tell
32  you to a reasonable certainty that who used that
```

97

DETECTIVE STEFAN MONTGOMERY

```
 1  debit card, who was at Wal-Mart, that type of thing?
 2       BY THE COURT:
 3            What does that have to do with the
 4         sequestration?
 5       BY MR. BURNS:
 6            I'm sorry?
 7       BY THE COURT:
 8            What does that have to do with
 9         dissolution of sequestration?
10       BY MR. BURNS:
11            I'm sorry.  I thought this was wide
12         open because of what you let come in
13         throughout this entire case.  I can
14         certainly limit it to the sequestration.
15       BY THE COURT:
16            We're doing the sequestration, the
17         revocation of the donation, but that
18         property has already been returned.
19       BY MR. BURNS:
20            What has?
21       BY THE COURT:
22            The computer and the phone, is it
23         still in their possession?
24       BY MR. BURNS:
25            It's seized.
26       BY THE WITNESS:
27            The phone was never recovered.
28       BY MR. BURNS:
29            The phone has not been recovered.
30       BY THE COURT:
31            I'm not limiting it to the
32         sequestration.  I didn't know if you were
```

DETECTIVE STEFAN MONTGOMERY

1           approaching that or the revocation of
2           donation.
3       BY MR. BURNS:
4               I was trying to get to the whole mix
5           of things that he was subject to
6           examination.
7       BY THE COURT:
8               If you want to perpetrate his
9           testimony for the future criminal trial,
10          but we need to get out of here sometime
11          today.
12      BY MR. BURNS:
13              We do.  I'm going to take the
14          Judge's advice on that.
15      BY THE WITNESS:
16              I'll be happy to explain it to you.
17      BY MS. VALLEJO:
18              I would like to hear the answer,
19          Your Honor.
20  EXAMINATION BY MR. BURNS:
21  Q.     Okay.  Go ahead.
22  A.     At approximately 4 o'clock that evening,
23  Darnay was at the electronics counter attempting to
24  purchase the phone and the computer.  Having
25  purchased phones before at Wal-Mart, there's a
26  contract process.  You don't just buy the phone.
27  There's a contract that goes with it.  There appeared
28  to be some issues with getting that contract
29  approved.
30          The video that was available to us at the time
31  from the time that had elapsed was not complete video
32  but there were certain segments that were available.

99

DETECTIVE STEFAN MONTGOMERY

1    From 4:30 -- this was around 4 o'clock in the
2    evening.  At about 4:30 that evening the video turned
3    on.
4        Mr. Dobronich was standing near the entrance
5    exit of Wal-Mart with his groceries by himself, and
6    he stood there for a number of minutes while Darnay
7    was at the electronics counter.  Calvin was not in
8    the picture.  She left the electronics counter about
9    4:33, I think, walked up to him.
10       He was standing there waiting with all his
11   groceries by himself.  She led him outside the front
12   door, talked to him for a minute, put a phone up to
13   his ear, talked to him while he talked to -- who I
14   can only speculate would be the AT&T people -- to
15   approve this, and then when whenever transaction
16   transpired, she left him standing outside of the
17   store with his groceries while she went back inside
18   to the electronics counter and completed the
19   transaction by herself for the computer and for the
20   phone.
21   Q.    Okay.  Good.  So I want to take the judge's
22   advice to talk about the sequestration because really
23   that's what this is about.
24   A.    Sure.
25   Q.    All of the movable assets --
26   A.    Yes.
27   Q.    The movable assets are not in their possession
28   and were not in their possession at the time of the
29   issuance of the sequestration.  They had been seized
30   by the St. Tammany Parish Sheriff's Office; is that
31   correct?
32   A.    I don't know when the sequestration was filed,

DETECTIVE STEFAN MONTGOMERY

1   but we have possession of most of those items.

2   Q.      Right.  You have them?

3   A.      Yes.

4   Q.      And they're not subject to my client's

5   disposing of in any regard?

6   A.      Not now.

7   Q.      Correct, not now.  Okay.  And we talked about

8   real estate for a second, and that you're not

9   equipped in terms of the sheriff's office to seize

10  real property was your term?

11  A.      Correct.

12          BY MR. BURNS:

13                  Judge, at this time, I'd like for

14          you -- I would mark for identification as

15          D number 6, or ask you to take judicial

16          notice that, in fact, the notice of

17          sequestration in this matter deals with

18          parcel number one and parcel number two.

19          BY THE COURT:

20                  And not movable assets.

21          BY MR. BURNS:

22                  Not movables, right.

23          BY THE COURT:

24                  They've all been seized.

25          BY MR. BURNS:

26                  Sir?

27          BY THE COURT:

28                  They've all been seized by the

29          sheriff.

30          BY MR. BURNS:

31                  Correct, correct, and they're not

32          subject to alienation.

101

DETECTIVE STEFAN MONTGOMERY

1   BY THE COURT:

2           Any objection to that, Ms. Vallejo?

3   BY MS. VALLEJO:

4           The sequestration includes any cash

5       that the Thibodauxs have in their

6       possession that was not seized that came

7       from Mr. Dobronich's accounts and any cash

8       that they may have paid to Mr. Burns or

9       anyone in his firm as attorney's fees that

10      came from Mr. Dobronich's accounts which

11      we have outstanding discovery to

12      Mr. Thibodaux to respond to.

13  BY THE COURT:

14          Before I answer that question, I'm

15      going to ask the officer a question.  Were

16      you made aware of any other movable assets

17      in their possession that they obtained

18      through funds?

19  BY THE WITNESS:

20          Yes.

21  BY THE COURT:

22          Allegedly funds?

23  BY THE WITNESS:

24          Yes.

25  BY THE COURT:

26          They've all been seized through the

27      sheriff?

28  BY THE WITNESS:

29          There's still a boat that is

30      outstanding that was not on the property

31      at the time.  It was apparently in

32      Mississippi, and possibly the sale has

102

DETECTIVE STEFAN MONTGOMERY

```
 1              been reversed on that.  I'm not positive
 2              on that.  That's still an outstanding
 3              issue.  I'm still tracking it down.
 4              There's still outstanding issues in this
 5              that we're completing.
 6          BY THE COURT:
 7                  Okay.
 8  EXAMINATION BY MR. BURNS:
 9  Q.      Please, we've looked through this and we've
10  talked about boats ad nauseam.
11          BY THE CLERK:
12                  Is this accepted into evidence?
13          BY MR. BURNS:
14                  Judge, would you either take
15              judicial notice of it and or accept D 6
16              as, in fact, the notice of whatever has
17              been sequestered right here, two pieces of
18              real estate only?
19          BY THE COURT:
20                  I'll allow it into evidence.  Let it
21              be received over objection.
22  EXAMINATION BY MR. BURNS:
23  Q.      Now, all right.  This boat thing, and again,
24  please, give me any detail of any boat, motor and
25  trailer that you can track to money that are held by,
26  owned by, or ever bought by the Thibodaux's in
27  connection with this case.  Please give us the
28  detail.
29  A.      Took into evidence two copies of a bill of
30  sale for a 2009 Yamaha 50 horsepower boat motor sold
31  to Calvin Thibodaux on February 13, 2013, by Wayne
32  O'Berry, Jr., for $3,500, notarized by Janet
```

DETECTIVE STEFAN MONTGOMERY

1  Singletary.

2  Q.     Where is that boat?

3  A.     It was not on the premises at the time that we

4  did the search warrant.  They were having some custom

5  work done to it, and it was not on the property.

6  Q.     Again, the next question would be did you

7  leave a boat at their house or at their daughter's

8  house?

9  A.     At their house there was a boat there,

10  correct.

11  Q.     So as it relates to the $3,000, can you give

12  me one bit of evidence that that $3,000 that was used

13  had anything to do with Mr. Thibodaux?

14  A.     All of these purchases happened -- all of

15  these purchases happened after the date that they

16  began receiving money from Mr. Dobronich.

17  Q.     And that is the evidence that you have that

18  because they bought a boat during a period of time

19  that they were the power of attorney over his account

20  that that has to be his money?  That's the logic that

21  you're giving me.  It's yes or no.

22  A.     Yes.

23  Q.     Now, I want to talk about the accounts for a

24  second.  All of these interbank transactions that

25  you're talking about that you put into evidence was

26  money that went from his investment account into his

27  savings account; is that not correct, into

28  Mr. Sidney's savings account?

29  A.     That's correct.

30  Q.     And right.  Contemporaneous with all this

31  going on in terms of there was a change in the name

32  of the bank account that had Mr. Dobronich's name on

DETECTIVE STEFAN MONTGOMERY

1  it, that was an account that Darnay had an ability to
2  sign a limited power of attorney over his checking
3  account at the same time.  Would you agree with that?
4  A.     She filed a power of attorney with the bank,
5  yes.
6  Q.     I want to talk about medical for just a
7  second.  When you spoke to Mr. Sidney in the hospital
8  on one or more occasions -- you told me three.
9  A.     Correct.
10  Q.     And I asked you point blank, was he competent
11  then, did he understand you, you believed him and
12  that he was competent to make decisions and to talk;
13  is that correct?
14  A.     Yes, sir.
15  Q.     And so as we sit here today, the judge has
16  made a finding that he's not competent to testify.
17  That would be a substantial change in his demeanor
18  from the time that you saw him.
19  A.     I can only testify to the day that I spoke to
20  him to the days that I spoke with him, and that is
21  why I specifically spoke to him on three different
22  occasions, including the day that he was discharged
23  from the hospital.
24  Q.     And he was competent or at least understood
25  you; is that correct?
26  A.     That's correct.  He remembered me from the
27  first occasion that I visited with him.  He
28  remembered me the second occasion, and he remembered
29  me on the third occasion.  On the third occasion, he
30  was being discharged from the hospital and --
31  Q.     Okay, go ahead.  I'm sorry.
32  A.     He specifically knew where he was.  I think he

DETECTIVE STEFAN MONTGOMERY

1  knew what day it was.  He knew who the president was.
2  Q.      All the questions that people might, when
3  they're worried about competency, ask them such as a
4  notary public.
5        Do you have as a result of your investigation,
6  any medical evidence that you want to give us today
7  that on each one of these occasions that he signed a
8  power of attorney either in favor of Darnay Thibodaux
9  or in favor of these people here, which is within a
10  two-week period, right?  Do you have any medical
11  testimony to offer us today that Mr. Sidney was not
12  lucid at the time that he did any one of these
13  transactions?
14  A.      I wasn't there for those transactions.
15  Q.      Accepted.
16  A.      I can only testify to my experience as a nurse
17  and with dealings with people with dementia,
18  sundowners, such on.
19  Q.      And you've used the word sundowners.  What is
20  sundowners?
21  A.      Sundowners is in the evening when people that
22  are aged will forget who other people are.  They will
23  forget where they are.
24  Q.      Now, using your experience, sundowners have
25  trouble remembering things, and it's sundowners
26  because it's in the evening, the biggest onset of it?
27  A.      They don't have trouble remembering things.
28  Sometimes they remember things that have happened in
29  the past.  They believe they're living in the past,
30  or they're remembering things that happened 40 years
31  ago.
32  Q.      Now, again, here's the question I asked to

106

DETECTIVE STEFAN MONTGOMERY

1   you.  As a result of your investigation and you being

2   a nurse, and we know you weren't there, have you

3   gathered one piece of evidence from the VA in

4   Bogalusa or from St. Tammany Parish Hospital in

5   February of 2013 in March of 2013 that this man

6   lacked capacity?

7   A.     Medical records that I gathered were placed

8   into evidence, and I don't feel that I can testify

9   one way or the other on them.

10           BY THE COURT:

11                 Thank you.

12  EXAMINATION BY MR. BURNS:

13  Q.     Let's see if we can -- again, do you know in

14  February who brought him to the hospital?

15  A.     I do not.

16  Q.     Do you know at the conclusion of his hospital

17  stay in February who he was discharged to?

18  A.     He was discharged with Darnay Thibodaux.

19  Q.     Right.  That was the caregiver or the people

20  who were most responsible.  Did you ever hear in any

21  record that his family was around him in February of

22  2013 at the St. Tammany Parish Hospital?

23  A.     Well, from interviews with his family, I was

24  told that they were not aware he was in the hospital.

25  They were never contacted to come to the hospital.

26  Q.     Fine, that's fine.  Does Mr. Sidney have some

27  rights of privacy?

28  A.     Everyone has a right to privacy.

29  Q.     And so the question is family members don't

30  necessarily have a right to know about people's

31  medical condition if they don't want them to; would

32  you agree with that?  HIPPA?

DETECTIVE STEFAN MONTGOMERY

1      BY THE COURT:

2            Mr. Burns, please tell me how this

3        is relevant or how this witness is

4        competent to testify to this?  How is this

5        relevant to the issue of the revocation of

6        the donation or the dissolution of the

7        writ of sequestration?  How?

8      BY MR. BURNS:

9            I'm just trying to get some points

10        made, Judge, about competency, about his

11        ability and capacity to do something.

12      BY THE COURT:

13            He could have been the most

14        competent person in the world, and that's

15        not going to affect my decision as to

16        whether or not he can now revoke the

17        donation, or whether or not the writ was

18        properly issued in the first place, or

19        whether I've heard sufficient evidence to

20        dissolve that writ.

21            I don't think his competency -- I

22        don't think counsel could stipulate he's

23        competent.  I'll tell you it doesn't

24        matter to my determination whether he was

25        competent.

26      BY MR. BURNS:

27            Will you stipulate that he was

28        competent from February 1st through

29        April 1st, 2013?

30      BY MS. VALLEJO:

31            No.

32  EXAMINATION BY MR. BURNS:

DETECTIVE STEFAN MONTGOMERY

1  Q.     Now, you brought up that sometime in December
2  of 2012 or January 2013, you spoke with Darnay's
3  daughter about some Christmas presents.  Do you
4  remember talking to --
5  A.     I spoke to them and had a conversation that
6  they relayed to me that they had a conversation back
7  in December.
8  Q.     I just want to make the point clear that the
9  car that they drove up in could not have been the
10 Nissan 2013 model that was acquired in --
11 A.     Oh, I didn't testify that it was.
12 Q.     Can you tell me from any fact that you've
13 gathered that -- let's just talk about the two pieces
14 of real estate.  Let's talk about the Buffy
15 Singletary first, and that Mr. Sidney was forced to
16 give them the money, forced, coerced, intimidated,
17 unduly influenced to give them the purchase money for
18 the piece of property acquired from Buffy Singletary.
19 A.     I believe he was coerced.
20 Q.     Give me the facts of it.  I want to know.
21 That's an opinion.  What is the coercion?  What is
22 the coercion?
23 A.     According to the exploitation of the infirmed
24 law, and I can't speak verbatim on the stand.  I'd be
25 happy to read it.  The power of attorney, misuse of
26 power of attorney by fraudulent means or practices is
27 part of that law.
28 Q.     All right.  Authorization.  The statute talks
29 without authorization.  That's part of it, correct?
30 A.     I'm sorry?
31 Q.     The statute that you just talked about has
32 many parts to it.

DETECTIVE STEFAN MONTGOMERY

```
1  A.      Well, it's very short.  It has just one or two
2  parts to it.
3  Q.      But it says without authorization.  Can we
4  look at the statute?
5  A.      It says by fraudulent means, or we'll read the
6  statute.
7  Q.      The authorization of -- a power of attorney is
8  an authorization; would you not agree to that?
9  A.      Yes.
10 Q.      And then what were the terms that you said the
11 statute said, your two terms, because I want to know
12 the facts.
13 A.      We'll get the attorney --
14         BY MR. BURNS:
15              Thank you.
16 EXAMINATION BY MR. BURNS:
17 Q.      All right.  I want you to talk about we know
18 that he's got -- they have authorization, and then
19 you use the term misuse of, okay, right, by
20 fraudulent or coercion.  What were the terms that you
21 used for the statute that you had?
22         BY THE COURT:
23              You understand this is not the
24         criminal proceeding?
25         BY MR. BURNS:
26              I do, Judge.
27         BY THE COURT:
28              The issue before me is whether or
29         not the writ was wrongfully issued and
30         whether I'm going to dissolve it right now
31         and whether or not I'm going to revoke an
32         act of donation.  That's before me today;
```

110

```
 1              is that correct?
 2      BY MR. BURNS:
 3                  No, sir, that's not before you.  The
 4          first issue is.
 5      BY THE COURT:
 6                  Why isn't the revocation of donation
 7          before me?
 8      BY MR. BURNS:
 9                  Because that's the trial on the
10          merits of this.  That goes on the merits.
11          Really, honestly, the only thing on a
12          sequestration is the plaintiff needs to
13          prove the grounds for the issuance of the
14          sequestration, and the trial on the merits
15          has to do with all the stuff that we've
16          been talking about.
17      BY THE COURT:
18                  So we're going to try this again for
19          eight hours?
20      BY MR. BURNS:
21                  Yes, sir.  Yes, sir.
22      BY THE COURT:
23                  Yes, sir, you think so?  I'm ready
24          to rule.  You can step down.  Any other
25          witnesses?
26      BY MR. BURNS:
27                  Yes, sir.  Yes, sir.
28      BY MS. VALLEJO:
29                  If you're ready to rule --
30      BY THE COURT:
31                  I'm going to take a recess.  We'll
32          reconvene this.
```

111

```
 1      BY MR. BURNS:
 2              Judge, I'd like to call --
 3      BY THE COURT:
 4              We'll reconvene this trial later in
 5          the week.
 6      BY MR. BURNS:
 7              Thank you very much.
 8              (At this time, a recess was taken.)
 9      BY THE COURT:
10              Be seated.  Call your next witness.
11      BY MR. BURNS:
12              May it please the Court, I believe
13          it's my turn if that's correct.
14      BY THE COURT:
15              Do you rest?
16      BY MS. VALLEJO:
17              I rest.
18      BY MR. BURNS:
19              I'm sorry.  In connection with this
20          matter, Judge, I would like to offer the
21          entire record in this proceeding from the
22          time that the first matter was filed and
23          set this matter for May 14, 2013, which
24          was a request for a writ of sequestration
25          as an incidental matter to a petition, my
26          rule to dissolve this particular matter,
27          the return on the subpoena duces tecum,
28          the answer, the entire record as is
29          including the briefs.
30              At this time I'd like to offer,
31          file, and introduce into evidence D Number
32          7 in connection with the writ to resolve,
```

1          which is my attorney fee request and court

2          costs.  I'm sorry, I apologize.  My cost

3          request in addition as it relates to the

4          temporary restraining order.

5                  We'd like to offer, file, and

6          introduce into the record the entire

7          proceeding, particularly the temporary

8          restraining order and the petition

9          associated with this showing the failure

10         to follow the Code of Civil Procedure, and

11         the affidavit of attorney's fees would be

12         also in connection with that.

13                 That would be all that I would offer

14         in this matter.

15    BY THE COURT:

16                 The matter is submitted?

17    BY MR. BURNS:

18                 Submitted.  Those two matters are

19         submitted, yes.  I'm assuming you're

20         accepting my affidavit and --

21    BY THE COURT:

22                 Oh, yes, sir, it's all accepted.

23         Let it be received into evidence.

24    BY MR. BURNS:

25                 Thank you very much.

26    BY THE COURT:

27                 The Code of Civil Procedure Article

28         3571, grounds for sequestration, states

29         that when one claims the ownership or

30         right to possession of property or a

31         mortgage, security, interest, lien, or

32         privilege thereon, he may have the

113

1    property seized under writ of

2    sequestration if it is within the power of

3    the defendant to conceal, dispose of, or

4    waste the property.

5        And under Code of Civil Procedure

6    Article 3573, the Court, on its own

7    motion, may order the sequestration of the

8    property, the ownership of which is in

9    dispute without requiring security when

10    one of the parties does not appear to have

11    a better right of possession than the

12    other.

13        I think it's been clearly

14    established by the evidence presented

15    today that the property at issue in

16    parcels 1 and 2 was purchased with the

17    funds of the claimant in this matter, Mr.

18    Dobronich, and that he would therefore

19    have a claim to the property that was

20    purchased with those funds.

21        That would satisfy the request for a

22    writ of sequestration and without a bond

23    in the Court's discretion, especially

24    given the allegations at the time the writ

25    was presented and the subsequent proof

26    presented in court in the context of this

27    hearing.

28        I think the evidence clearly

29    establishes that there's been a pattern

30    and series of events in which these people

31    methodically and purposely used undo

32    influence on this highly susceptible and

1    easily influenced gentlemen.  They used

2    their influence to convert his funds.

3    Their outrageous behavior in taking

4    advantage of this elderly neighbor and

5    landlord is exceeded only by their greed.

6         They have lied and perpetrated

7    falsehoods on this Court and ignored

8    orders of this Court and generally

9    operated by their own rules.  They bought

10   cars and trailers and campers and land and

11   splurged on this man's frugality.  He

12   apparently has lived very modestly for

13   years only to become a victim to their

14   profligacy and greed.

15        As to parcel one, the allegations of

16   ownership as an act of donation, the

17   petition to revoke, obviously this is a

18   sufficient claim of ownership to support

19   the writ of sequestration and right to

20   possession.  I would therefore deny the

21   motion to dissolve the writ of

22   sequestration.

23        As to parcel two, the purchase of

24   property from Buffy and Charles Singletary

25   which was disguised as a donation, in

26   itself tends to indicate to this Court the

27   subterfuge and the lies that were involved

28   in that, clear enough allegations to issue

29   the writ and proof of this hearing

30   sufficient to defeat the motion to

31   dissolve the writ.

32        I want to set the rule for violation

115

1   of the protective order for my next

2   hearing date.  I'm sorry.  The injunction

3   for them to not come into contact with

4   Mr. Dobronich, and I would extend that

5   until the next hearing.

6   BY MS. VALLEJO:

7           Thank you, Your Honor.

8   BY THE COURT:

9           Anything else I need to address?

10  BY MR. BURNS:

11          Yes, you do, Your Honor.  As part of

12  a rule that I brought in this particular

13  matter was a rule to show cause to them,

14  to the plaintiffs in this particular

15  matter, is I have set a deposition in this

16  matter.  Formal notice and service was

17  made on the attorney of record.

18          Ms. Vallejo filed a petition on

19  their behalf to cancel my deposition.  I

20  filed a rule asking to show cause why the

21  deposition should not be taken of Mr.

22  Dobronich, or in lieu of them allowing us

23  to take his deposition that their petition

24  be dismissed.

25  BY THE COURT:

26          Given my finding today regarding my

27  concern relative to his competency, and

28  maybe it was a lateness of the day and the

29  tiredness of the gentleman, I think that I

30  will rule that he not be subject to a

31  deposition until examination by a

32  physician indicating to me that he is, in

```
 1        fact, competent.

 2              He had a problem telling me who I

 3        was, what he was doing here, what this

 4        whole proceeding was about.  I understand

 5        your right to depose him.  I would like

 6        for you to have that right, but I want him

 7        examined by a doctor before I make that

 8        determination.

 9   BY MR. BURNS:

10              Now, just a question, Judge.

11        There's always a cost associated with

12        that, and my clients, as testified to and

13        agreed to, are paupers, Your Honor.

14   BY THE COURT:

15              It's going to be at his own expense.

16   BY MR. BURNS:

17              At their expense.

18   BY THE COURT:

19              So I want him to be examined by --

20        if he has a regular physician, I want a

21        report from that doctor to tell me whether

22        or not he is competent to understand these

23        proceedings and to give a deposition.  And

24        I want that done as quickly as possible

25        within the next ten days.

26              As soon as I receive that --

27        obviously, copy Mr. Burns, and if the

28        doctor indicates he's competent, I'll

29        allow you to reschedule his deposition.

30   BY MR. BURNS:

31              As part of the inquiry, Judge, do

32        you think it would be fair to state
```

```
 1              whether he is ever going to be competent
 2              to testify in the future?  It could be
 3              short term or long term.
 4       BY THE COURT:
 5                  Absolutely.
 6       BY MR. BURNS:
 7                  I'd like to take his deposition
 8              further.
 9       BY THE COURT:
10                  Absolutely.
11       BY MR. BURNS:
12                  Thank you very much.
13       BY THE CLERK:
14                  I think Ms. Vallejo had a problem
15              with our next hearing date of July 23rd.
16              The one after that is August 27th.
17       BY MR. BURNS:
18                  That's all right with us.
19       BY MS. VALLEJO:
20                  Fine.  Thank you.
21       BY MR. BURNS:
22                  Judge, in connection with that, I'd
23              ask that a subpoena again be given to
24              Ms. Crawford.  She was a material witness
25              to the allegations that were spoken about
26              in the back of the Court, and she would be
27              one of our witnesses.
28       BY THE COURT:
29                  Now, are we going to have a hearing
30              of the trial of these issues?
31       BY MR. BURNS:
32                  Sometime in the future, yes, sir.
```

```
 1        BY THE COURT:
 2                  So what are we hearing at our next
 3           rule date?
 4        BY THE CLERK:
 5                  The contempt.
 6        BY MR. BURNS:
 7                  The contempt.  That's my
 8           understanding.  I think that again, just
 9           following the code is that --
10        BY THE COURT:
11                  The trial on the injunction and
12           revocation of donation will be set when a
13           motion to set is filed.
14        BY MR. BURNS:
15                  That's correct, after the full
16           discovery.
17        BY MS. VALLEJO:
18                  It's my understanding that the
19           hearing in August is only on the attempt
20           of the violation of the TRO.
21        BY THE COURT:
22                  That's correct.
23        BY MR. BURNS:
24                  And I'd ask that Ms. Rebecca
25           Crawford be made a witness to that matter.
26        BY THE COURT:
27                  All right.  Thank you very much.
28        BY MR. BURNS:
29                  Thank you very much.
30                  *    *    *    *    *
31
32
```

```
 1                  REPORTER'S CERTIFICATE

 2          I, Elizabeth L. Cannon, Certified Court

 3   Reporter, Certificate No. 91330 which is at this time

 4   current and in good standing, Official Court Reporter

 5   in and for the Parish of St. Tammany, State of

 6   Louisiana, do hereby certify that the foregoing

 7   testimony was taken by me on Tuesday, June 25, 2013,

 8   and represents a true, accurate and complete

 9   transcript of said testimony taken on said date

10   before the Honorable Peter J. Garcia, Judge

11   Presiding, Division "D", to the best of my ability

12   and understanding.

13

14

15

16
                         Elizabeth L. Cannon, CCR
17                       Official Court Reporter
                         Certificate No. 91330
18

19

20

21                  CERTIFICATE OF FILING

22

23          I hereby certify that the foregoing transcript

24   has been submitted to the Clerk of Court's Office for

25   filing into the record on the _____ day of

26   _____, 2013.

27

28

29

30                       Elizabeth L. Cannon, CCR
                         Official Court Reporter
31

32
```

120