TWENTY-SECOND JUDICIAL DISTRICT COURT

PARISH OF ST. TAMMANY

STATE OF LOUISIANA

**FOREST DOBRONICH AND GEORGE DOBRONICH
AS MANDATORY AGENTS AND
ATTORNEYS-IN-FACT OF SIDNEY DOBRONICH
VERSUS #2014-30680 "I"
DARNAY THIBODAUX AND CALVIN THIBODAUX**

---

TRANSCRIPT OF THE PROCEEDINGS TAKEN IN THE ABOVE CAPTIONED
MATTER HEARD BY THE HONORABLE REGINALD T. BADEAUX, III,
PRESIDING JUDGE, DIVISION "I," ON FEBRUARY 24, 2015.

---

APPEARANCES:

**PEGGY GONSOULIN VALLEJO, ESQ.**
THE VALLEJO LAW FIRM, LLC
428 WEST 21ST AVENUE
COVINGTON, LOUISIANA 70433
985-892-6855
**ATTORNEY REPRESENTING
FOREST DOBRONICH, GEORGE DOBRONICH**
AS MANDATORY AGENTS AND
**ATTORNEY-IN-FACT OF SIDNEY DOBRONICH**


**CLAIBORNE BROWN, ESQ.**
222 NORTH VERMONT STREET
COVINGTON, LOUISIANA 70448
985-246-7063
**ATTORNEY FOR DARNAY AND CALVIN THIBODAUX**


**BRIDGETTE L. JONES**
OFFICIAL COURT REPORTER
CERTIFIED COURT REPORTER



HC 9

1                           <u>INDEX</u>

2

3                                          FEBRUARY 24, 2015

4

5                                                    PAGE

6

7    CAPTION                                            1

8

9

10

11   WITNESSES:

12       **FOREST DOBRONICH:**

13           DIRECT EXAMINATION BY MS. VALLEJO        35

14           CROSS-EXAMINATION BY MR. BROWN           41

15

16       **DETECTIVE STEFAN MONTGOMERY:**

17           DIRECT EXAMINATION BY MS. VALLEJO        53

18           CROSS-EXAMINATION BY MR. BROWN           61

19           NO REDIRECT EXAMINATION BY MS. VALLEJO   65

20

21       **FOREST DOBRONICH CONTINUED:**

22           CROSS-EXAMINATION CONTINUED BY MS. VALLEJO  67

23           REDIRECT EXAMINATION BY MS. VALLEJO      69

24

25       **GEORGE DOBRONICH:**

26           DIRECT EXAMINATION BY MS. VALLEJO        71

27           CROSS-EXAMINATION BY MR. BROWN           79

28           NO REDIRECT EXAMINATION                  84

29

30

31

32

```
 1          COURTNEY DOBRONICH:

 2              DIRECT EXAMINATION BY MS. VALLEJO        84

 3              NO CROSS-EXAMINATION BY MR. BROWN        86

 4

 5

 6              (EXAMINATION OF THE WITNESSES CONCLUDED)

 7

 8

 9      CERTIFICATE PAGE                                92

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32
```

```
 1                  SIDNEY DOBRONICH EXHIBIT LIST

 2

 3              (THE FOLLOWING EXHIBITS WERE OFFERED, FILED

 4           AND INTRODUCED INTO EVIDENCE:)

 5

 6

 7     DOBRONICH #1   CD                                    22

 8

 9                    PROFFER: DEFENDANTS DARNAY AND CALVIN

10                    THIBODAUX

11                    THE FOLLOWING EXHIBITS ARE ALREADY FILED

12                    INTO THE RECORD.

13

14     THIBODAUX #1   LETTER FROM P. VALLEJO TO HON. GARCIA

15                    RE: DR. VERRETTE DATED 7/9/13          22

16                    THIBODAUX #1 WAS ENTERED AS AN EXHIBIT.

17                    COURT DELETED PROFFER THIBODAUX #1

18

19     THIBODAUX #2   AFFIDAVIT OF DARNAY THIBODAUX NOTARIZED

20                    8/14/14                               22

21

22     THIBODAUX #3   STATEMENT BY NEPHEW FOREST J. DOBRONICH

23                    RE: SIDNEY DOBRONICH                  23

24

25     THIBODAUX #4   COPY OF LAST WILL AND TESTAMENT OF

26                    SIDNEY JOSEPH DOBRONICH               23

27

28     THIBODAUX #5   COPY LETTER FROM P. VALLEJO TO R. BURNS

29                    DATED 5/21/13                         23

30

31     THIBODAUX #6   COPY OF MOTION TO CANCEL DEPOSITION AND

32                    TO QUASH DEPOSITION SUBPOENA          24
```

```
 1

 2    THIBODAUX #7    COPY OF LETTER FROM: BLAKE TO R. BURNS

 3                    DATED 12/2/14                            24

 4

 5    THIBODAUX #8    COPY OF LETTER FROM P. VALLEJO TO R. BURNS

 6                    DATED 7/17/13                            24

 7

 8    THIBODAUX # 9   COPY OF LETTER FROM P. VALLEJO TO

 9                    HON. GARCIA DATED 8/13/13               25

10

11                        *  *  *  *  *

12

13              (THE DEFENDANTS: CALVIN AND DARNAY THIBODAUX

14               OFFERED, FILED AND INTRODUCED THE FOLLOWING

15               EXHIBIT:)

16

17    D-2             LETTER FROM P. VALLEJO TO HON. GARCIA

18                    RE: DR. VERRETTE DATED 7/9/13

19

20                        *  *  *  *

21

22

23

24

25

26

27

28

29

30

31

32
```

1    THE COURT:

2              Let's proceed.

3    MS. VALLEJO:

4              Yes, Judge.  **Peggy Vallejo on behalf of the**

5         **defendants in the matter of Succession of Sidney**

6         **Dobronich 2014-30680.**  We filed an Exception of

7         Vagueness and Ambiguity --

8    MR. BROWN:

9              Your Honor, may I make my appearance, please.

10        **Claiborne Brown on behalf of the plaintiffs in the**

11        **petition, Calvin and Darnay Thibodaux.**  Just to be

12        clear, Your Honor, I understand we are taking them

13        up at the same time, but my understanding is just

14        for a clear record.  We will argue the exceptions

15        first and assuming if the exceptions are granted,

16        then we move into the petition to nullify

17        testimony?

18   THE COURT:

19             Okay.  I will sustain the Exception of No

20        Right of Action dismissing the petition.

21   MS. VALLEJO:

22             Good.

23   THE COURT:

24             How about that?

25   MR. BROWN:

26             Well, Your Honor, I would like to --

27   THE COURT:

28             Well, you can make some argument and talk me

29        out of it.

30   MR. BROWN:

31             I tell you what, Your Honor -- well, the only

32        thing, Your Honor, I just wanted to bring to your

                         Page      6

```
 1                 attention is, and again, just for the record, we
 2                 filed -- I don't know if it will make a difference
 3                 at this point, but yesterday, we filed a petition
 4                 to file statutory willing to appoint a notary
 5                 search for testament in this case.  Your Honor,
 6                 may I approach?  I have handed Ms. Vallejo a copy.
 7    THE COURT:
 8                      What is this?
 9    MR. BROWN:
10                      I noticed in my initial argument, Your Honor,
11                 I was under the impression that the February 2013
12                 will had been attacked in the other proceeding
13                 from Judge Garcia.  It was referenced and it was
14                 attached as an exhibit, but it was not put at
15                 issue in that case.  After thinking about that,
16                 again, that didn't make much sense.  Out of an
17                 abundance of caution, I decided to file that will
18                 into these proceedings.  I haven't asked for
19                 anything other than filing the copy of the will
20                 that we have.  We do not have the original of the
21                 will.  My understanding is based on the other
22                 matters that that original is contained within the
23                 evidence at St. Tammany Parish Sheriff's Office,
24                 so we have asked a notary to search for that
25                 testament.
26    THE COURT:
27                      Has anybody found it?
28    MR. BROWN:
29                      Your Honor, essentially, it is there.  We
30                 haven't asked to have it looked for.  That is the
31                 subject of that petition there.  And subject to
32                 that, it's our position that, essentially, the
```

```
1                    Exception of No Right of Action has been cured.

2                    Having said that, if the Court feels like it needs

3                    any other further argument, that's fine.  The only

4                    thing also that we would ask for a designation I

5                    believe this would be a final judgment, if the

6                    exception is sustained.

7    THE COURT:

8                    What do you think about that, Ms. Vallejo?

9    MS. VALLEJO:

10                   Judge, I disagree that the petition to file a

11                   statutory will and to appoint a notary in search

12                   of the testament may resolve the exception with

13                   regard to vagueness and ambiguity, but it

14                   certainly does not resolve the exception with

15                   regard to judicial -- res judicata.  It is clear

16                   that his clients pled guilty, they were charged

17                   initially with exploitation.

18   THE COURT:

19                   Let me make it clear, your clients, the

20                   Thibodaux's Calvin and Darnay Thibodaux, allegedly

21                   got this guy's Power of Attorney and within a

22                   month siphoned over $200,000 out of his estate,

23                   buying themselves cars or whatever, and they pled

24                   guilty to that.

25   MS. VALLEJO:

26                   That is correct.

27   THE COURT:

28                   They have the audacity, the audacity to file

29                   this petition.

30   MS. VALLEJO:

31                   That is correct.

32   THE COURT:
```

```
 1                    I can take judicial notice of their
 2              conviction in Division "D".
 3    MS. VALLEJO:
 4                    That's fine.
 5    THE COURT:
 6                    What was the precise charge there?  I guess
 7              it was cruelty to the infirm?
 8    MS. VALLEJO:
 9                    Yes.  Revised Statute 14:93.4 (1) and 14:93.4
10              (2) exploitation of the infirm.
11    THE COURT:
12                    Exploitation, that's the word I was looking
13              for.  Even if there was a will, apparently,
14              testimony by Dr. Verrette in Division "D" said it
15              seems dementia was such a state to do anything.
16    MR. BROWN:
17                    And, Your Honor, that's an interesting point,
18              because the report was submitted by the -- well, I
19              guess the plaintiffs in that case it was submitted
20              and they obtained a judgment to that fact.  That
21              report was issued two weeks before this will was
22              supposed to be executed, the will in this case.
23    THE COURT:
24                    So I understand that the filing of this
25              petition is a search for a will -- the plaintiffs
26              hope to delay the ruling in this Court while we
27              look for this will somewhere that they believe
28              exists, an oleographic will.  They, apparently,
29              don't have a copy of it, because they would have
30              filed it with their petition.
31    MS. VALLEJO:
32                    Your Honor, the facts of the case are that in
```

```
 1              the process of the Thibodaux's fraudulently and by
 2              undue influence getting Mr. Dobronich to donate
 3              all of his immovable property to them, give them a
 4              Power of Attorney to access all of his assets, at
 5              the same time, in the same hospital bed, they had
 6              him sign a statutory will that they had prepared
 7              and brought to the hospital.  That's the will he's
 8              trying to bring forward.
 9                   Mr. Dobronich, at home, while he was
10              convalescing, before he died, wrote a handwritten
11              will.  He wrote his handwritten will on --
12    MR. BROWN:
13                   July 18, 2013.
14    MS. VALLEJO:
15                   And they are attacking that handwritten will
16              claiming that because Dr. Verrette wrote a letter
17              July 25, 2013 saying that Mr. Dobronich was not
18              competent to testify, he was not competent to
19              write this handwritten will.  We oppose that.
20              As the law clearly states, you have to prove that
21              a party is not competent on the day he writes his
22              will, and they are not able to prove that.  We are
23              able to prove that he was competent on the day he
24              wrote his will.  He had stated his intentions long
25              before he wrote that will.  He stated his
26              intentions in the hearing before Judge Garcia that
27              he never intended to give the Thibodaux's all his
28              proceeds or leave them anything in his will.
29              There is multiple evidence that Mr. Dobronich was
30              unduly influenced.  They pled guilty to that fact
31              with regard to all of the actions that they took.
32              And for them to take a different position now to
```

```
 1              come in and say that the will that they unduly
 2              influenced him to write should stand is clearly
 3              not assessable here, Your Honor.  That's why I
 4              think this petition to find the statutory will
 5              doesn't resolve any exception.  I think that they
 6              are judicially stopped by their guilty plea based
 7              on their actions with Mr. Dobronich.  They are
 8              stopped from now claiming that that will they had
 9              him sign is valid.  They have no standing in the
10              Court to attack the handwritten will written by
11              Mr. Dobronich.
12   MR. BROWN:
13              Your Honor, again, at the risk of -- and I
14              don't want to waste the Court's time on this, but
15              obviously, it's very important that I make my
16              record in this regard.  The plaintiffs in this
17              case, or the family in this case, I do need to
18              address something with regards to the criminal
19              matter.  We have been -- and I got into this case
20              a little bit later on.  But we have been defending
21              against a criminal prosecution in state court and
22              potential criminal prosecution in federal court,
23              along with this succession's proceeding.
24              Essentially, what this case is about is there is a
25              dispute as to who gets the succession of Mr.
26              Dobronich.
27              Now, I can say it is our position that Mr.
28              Dobronich authorized every single one of those
29              transactions at issue.  The guilty plea in this
30              case -- and, again, anybody who has represented a
31              criminal defendant knows there is a lot of dynamic
32              that goes into that.  Right now, we have a
```

```
 1            440-page writ application.  It went to the First
 2            Circuit, and in fairness as an officer of the
 3            Court, the First Circuit has denied it, but it's
 4            going to the Supreme Court.  We will litigate that
 5            issue.  I don't want to get into it, but needless
 6            to say we are attacking the fairness of the
 7            conviction in that case.  Obviously understandable
 8            that the judge, if the Court decides to use that
 9            as judicial notice.
10                 But I would make the point that exploitation
11            of the infirm, the guilty plea of exploitation of
12            the infirm does not impact and has not been
13            alleged that there was anything with regards to
14            that statutory will.  The reason why we filed the
15            statutory will in this case is to make sure that
16            we maintain our standing.  We've argued about a
17            lot of problems that we have in this case, but our
18            standing is not one of them.  We have a will that
19            has been filed in this Court to the Exception of
20            No Right of Action should be overruled.  That
21            being said, if the Court maintains that exception
22            --
23  THE COURT:
24                 Let me stop you there.  You said the will
25            has been filed with the Court, where is it?  Why
26            don't I see it?
27  MR. BROWN:
28                 That's correct.  We filed a copy of the will.
29  THE COURT:
30                 You want me to appoint somebody to go on a
31            goose chase to find this will that has not been
32            filed --  you said it was filed with the Court.
```

Page     12

```
1              Is it filed with the Court?
2    MR. BROWN:
3              The original has not been filed with the
4         Court, Your Honor.
5    THE COURT:
6              Then why should I appoint somebody to go look
7         for something we know is not there?
8    MR. BROWN:
9              We are under the impression that it is there,
10        Your Honor.
11   THE COURT:
12             Why don't they have a copy?
13   MR. BROWN:
14             We can ask the St. Tammany Parish Sheriff's
15        Office to produce that.  I mean, I can certainly
16        draw --
17   THE COURT:
18             Was that exhibit in their criminal matter,
19        did they file that in the record over there?  I
20        doubt it.
21   MR. BROWN:
22             We did attach a copy of the note.  I mean,
23        again, I have a copy of the detective's notes, 26
24        pages, and that is contained within that copy that
25        they conducted a search and a seizure of my
26        clients' premises.  And in conducting that search,
27        the seized the original copy of the will.  They
28        have it in evidence.  I believe they marked it as
29        D3 in evidence.  So it's our contention that that
30        will does exist and it's with the St. Tammany
31        Parish Sheriff's Office.  Again, the reason why I
32        didn't ask for an appointment is that I didn't see
```

Page    13

```
 1            anything in the Code of Civil Procedure that
 2            talked about actually compelling --
 3   THE COURT:
 4            The copy you gave me said it was filed on
 5            February 3.  I've never seen this.  This has never
 6            been presented to me to appoint anybody.  It
 7            wasn't even set on the docket for today.  That
 8            should have been brought to me a long time ago to
 9            appoint somebody to look -- a copy February 3.
10            Wait, wait.
11   MR. BROWN:
12            The 23rd, Your Honor.
13   THE COURT:
14            The 23rd, okay.
15   MR. BROWN:
16            Again, I filed that -- that was an attempt to
17            --
18   THE COURT:
19            To stop me from kicking your clients out of
20            court today.  It defies credibility that they
21            plead guilty to stealing over $300,000 and then
22            come in and say, we should get it back because we
23            are the rightful heirs.  I hope they are paying
24            you well -- in advance.  If not, you're going to
25            learn a horrible lesson, Mr. Brown.
26            What I'm trying to decipher in my own brain
27            now if I rule against you today and ignore your
28            pleadings, will the First Circuit agree with me,
29            or will they be sticklers for detail and say, oh,
30            well, we should've at least looked for the will
31            and packaged everything up nice and tight.  I
32            would say it's probably 50/50 either way.
```

Page     14

```
 1                    Unless you can tell me, Ms. Vallejo -- I know
 2               without looking at the statute again that somebody
 3               who is convicted of exploitation of the infirm,
 4               they can no longer have a Power of Attorney for
 5               that person.  But I don't think there is anything
 6               saying they're disqualified as heirs.
 7      MS. VALLEJO:
 8                    You know, Your Honor, even if you denied the
 9               exception, we are ready to bring forward evidence
10               that the oleographic will that Mr. Dobronich
11               signed is a valid will and it was probably
12               probated by the Court.
13      THE COURT:
14                    Which would make any will he did before null
15               and void.  How do you propose to proceed?  I mean,
16               I do have some misgivings about running roughshod
17               over the plaintiffs.  Although, I hope they were
18               here --
19      MS. VALLEJO:
20                    Mrs. Thibodaux is in jail.  I would be happy
21               to proceed on their petition to nullify the
22               testament and put on my witnesses.
23      THE COURT:
24                    Let's do that.  That might make the whole
25               appointment of somebody --
26      MS. VALLEJO:
27                    Right.  Exactly.
28                    Do you have any witnesses?
29      MR. BROWN:
30                    Your Honor, I have no witnesses.  But it's
31               our understanding that the proponents of the will
32               have the burden of proof to present testimony.
```

Page     15

```
 1                    As a housekeeping note, Your Honor, again, I
 2              apologize, I do need to make a record.  At this
 3              point in time, I have submitted a number of
 4              exhibits, and I would like to offer, file and
 5              introduce those for the record of the proceedings.
 6   MS. VALLEJO:
 7                    Is this attached to your pleadings?
 8   MR. BROWN:
 9                    They were attached to the pleadings.  They
10              were served on prior counsel.
11   MS. VALLEJO:
12                    If they're part of his motion and they were
13              served on me, I have no opposition.
14   THE COURT:
15                    Very well.  Identify those exhibits for the
16              Court specifically though.  Let's make the record
17              crystal clear in case you want to take it to the
18              First Circuit on my decision.  I have not made up
19              my mind yet or anything.
20   MR. BROWN:
21                    I understand, Your Honor.  I have those
22              exhibits.  They are attached to the pleadings that
23              have been filed with the Court.
24   THE COURT:
25                    Identify them for the Court.
26   MR. BROWN:
27                    Okay.  I will do so.
28   THE COURT:
29                    So the First Circuit will know exactly what
30              pleadings you are talking about.  When you just
31              throw a random statement in there the exhibits
32              that were attached to the pleadings, maybe they
```

```
1              weren't attached.
2    MR. BROWN:
3              I have Exhibit 1, which is a Power of
4              Attorney that was executed on March 28, 2013 in
5              favor or Mr. Forest Dobronich and George
6              Dobronich.
7    THE COURT:
8              I imagine that was Exhibit 1 in the criminal
9              trial as well.  What is your other exhibit?
10   MR. BROWN:
11             Your Honor, I apologize.  I have several
12             exhibits --
13   THE COURT:
14             Or would have been had they not pled guilty.
15   MR. BROWN:
16             Yes, Your Honor.
17             Exhibit 2, a letter that was attached in the
18             other civil proceedings, a July 9 letter from Ms.
19             Vallejo to Judge Garcia attaching a copy of the
20             medical report of Dr. Paul Verrette.  That is
21             Exhibit 2.
22             Ms. Vallejo, I will wait for you if you want
23             to --
24   MS. VALLEJO:
25             No, go ahead.  I'm listening.
26   MR. BROWN:
27             I just want to make sure you have it.  If you
28             have any questions about anything, please stop me.
29   MS. VALLEJO:
30             No.
31   THE COURT:
32             She will chime in if she has an objection.
```

1    MR. BROWN:

2                    That exhibit also contains a copy of the July

3               2, 2013 report of Dr. Verrette saying that Mr.

4               Dobronich had dementia, and his dementia is such

5               that he is not able to direct in affairs

6               concerning personal property and matters

7               consistent with his --

8    THE COURT:

9                    Ms. Vallejo, are you going to let that in

10              without objection?

11   MS. VALLEJO:

12                   The letter from Dr. Verrette?

13   THE COURT:

14                   I mean, it's rank hearsay.

15   MS. VALLEJO:

16                   It is.  And it's a copy and it's not an

17              original and I do object to it.

18   THE COURT:

19                   I am going to sustain the objection.

20   MR. BROWN:

21                   I would proffer that for the record.

22   THE COURT:

23                   That will be Plaintiff's Proffer Number 1.

24              Call it Thibodaux Proffer Number 1.

25   MR. BROWN:

26                   Thank you, Your Honor.

27                   I have Exhibit Number 3 -- well, actually, I

28              don't need Exhibit Number 3.  That's the

29              oleographic testimony, so I don't need that one,

30              Your Honor.

31                   I have Exhibit Number 4, which is a judgment

32              in the other proceedings.  The judgment on August

Page      18

```
 1              27, 2013 that was declaring Mr. Dobronich

 2              incompetent to testify in these proceedings by way

 3              of deposition or trial testimony.

 4  THE COURT:

 5              I'm sorry.  What is that?

 6  MR. BROWN:

 7              Exhibit 4, is the judgment that was issued in

 8              the other civil proceedings.

 9  THE COURT:

10              What other civil proceedings?  That's the

11              first time I've heard anything.  What other civil

12              proceedings?

13  MS. VALLEJO:

14              The civil proceeding pending before Judge

15              Garcia, Your Honor, that Mr. Dobronich filed

16              before he died requesting the Court to revoke the

17              Act of Donation, the Power of Attorney, and the

18              Last Will and Testament.

19              As a background, Your Honor, with regard to

20              this judgment, I am going to object to this

21              judgment without any other explanation of it.

22              Mr. Dobronich was put on the stand during the

23              sequestration hearing of that matter, and there

24              are 24 pages of his testimony.  It was late in the

25              day.  It was two or three o'clock by the time he

26              got on the stand.  I examined Mr. Dobronich on

27              direct.  He answered all of his questions fine.

28              Mr. Burns started to cross-examine him, after 12

29              pages of cross-examination by Mr. Burns, with

30              rapid fired questions and conflicting questions,

31              Mr. Dobronich became confused and tired.  At that

32              point Judge Garcia said this witness is not able
```

```
 1                 to testify.  But prior to that, there are 24 pages
 2                 of testimony where Mr. Dobronich clearly stated
 3                 his intentions, what he wanted and what he didn't
 4                 want, and this is the result of this judgment that
 5                 Judge Garcia didn't feel like Mr. Dobronich was
 6                 any longer qualified to testify that day.
 7     MR. BROWN:
 8                 Your Honor, I'm not sure of the basis of the
 9                 objection.
10     THE COURT:
11                 I'll overrule the objection.  I'll give it
12                 whatever weight it should be afforded though.  I
13                 mean, it's a judgment of the Court.  I'll take
14                 judicial notice of it.
15     MR. BROWN:
16                 Thank you, Your Honor.
17                 Exhibit 7, is actually referred to in
18                 paragraph 14 of Mr. Vallejo's exception.  It's the
19                 petition for revocation of Act of Donation return
20                 of cash and property for damages in sequestration.
21     THE COURT:
22                 What happened to Exhibits 5 and 6?
23     MR. BROWN:
24                 I'll go back.  Five is copy of the detailed
25                 --
26     THE COURT:
27                 I'm taking a ten-minute recess.  Get your
28                 exhibits, get them in order, mark them correctly.
29                 I don't want Exhibit 1, 7, 12.  I want 1, 2, 3.
30     MR. BROWN:
31                 Thank you, Your Honor.  I will do that, Your
32                 Honor.
```

1    THE COURT:

2                   I don't want the Court of Appeals to be spent

3              wasting their time looking for nonexisting

4              exhibits.

5                   I'll be back in ten minutes.

6                             * * * *

7                   (At this time, the proceedings in the

8              Dobronich Succession continued.)

9    THE COURT:

10                  Let's go back to Sidney Dobronich.

11   MR. BROWN:

12                  I was going to go ahead and rattle each one

13             of them off.  Some of them I attached for the

14             Court's benefit.  They were already in the record,

15             but I put them in as exhibits just so the Court

16             would have them and not have to dig in the record

17             in different spots.  I will go ahead and just

18             rattle them off.  I will be as quick as possible.

19             Again, Judge, I'm just trying to make my record,

20             and I appreciate the Court's patience for that.

21                  I'll start off with the first one.

22                  Do I need to start over Ms. Vallejo?

23   MS. VALLEJO:

24                  You were on four.

25   THE COURT:

26                  Let's just start at the beginning.

27   MR. BROWN:

28                  Yeah, let's start from the beginning.

29                  Exhibit 1, is March 28, 2013 Power of

30             Attorney that was executed by Mr. Dobronich in

31             favor of George and Forest Dobronich.

32   THE COURT:

```
 1                    That will be Thibodaux Number 1.
 2    MR. BROWN:
 3                    Number 2, is actually two documents.  The  in
 4             the civil revocation matter and the accompanying
 5             matter attaching the doctor's report of Dr. Paul
 6             Verrette.  That exhibit also includes the July 2,
 7             2013 report of Dr. Verrette in which he says Mr.
 8             Dobronich has dementia and his dementia is such
 9             that he is not able to direct his affairs
10             concerning person or property in matters
11             consistent with his own interest.
12    MS. VALLEJO:
13                    I objected to that attachment.
14    THE COURT:
15                    I am going to sustain that objection.
16    MR. BROWN:
17                    I will proffer it, Your Honor.  Again, when
18             Your Honor sustains an objection, I am just going
19             to say proffer for the record and move on.
20    THE COURT:
21                    That's fine.  That will be Thibodaux Proffer
22             Number 1.
23    MR. BROWN:
24                    The third exhibit was a copy of the July 18,
25             2013 will and it also attached the Affidavit for
26             Probate.  That is already in the record, so we are
27             not seeking to have that attached as an exhibit.
28    MS. VALLEJO:
29                    Then clarification is Mr. Dobronich's
30             holographic will.
31    MR. BROWN:
32                    Olographic will.
```

```
 1    THE COURT:
 2                  That will be Thibodaux Number 3.
 3    MS. VALLEJO:
 4                  No objection.
 5    MR. BROWN:
 6                  Exhibit 4, is a copy of a judgment in the
 7            civil -- I'm referring to it as the civil
 8            revocation matter, Your Honor.  August 27, 2013, a
 9            judgment declaring Mr. Dobronich incompetent to
10            testify in these proceedings by way of deposition
11            or trial testimony.
12    MS. VALLEJO:
13                  I have no objection as long as the Court
14            makes a note of the circumstances under which that
15            judgment was rendered.
16    THE COURT:
17                  I will allow it in as Thibodaux Number 4,
18            subject to the parameters pointed out by Ms.
19            Vallejo earlier.  By that, I mean the Court may
20            consider that judgment as being relevant as in
21            that single day of testimony by Mr. Dobronich.
22    MS. VALLEJO:
23                  Correct, Your Honor.
24    MR. BROWN:
25                  Exhibit 5, is a copy of the detailed
26            descriptive list that was filed in this case.  We
27            do not need to have that attached to the record,
28            it is already there.
29    MS. VALLEJO:
30                  No objection, Your Honor.
31    THE COURT:
32                  We will put that in as Thibodaux Number 5.
```

```
1    MR. BROWN:
2                   Exhibit 6, is the order, also August 6 --
3              actually, the order is dated August 8, it is the
4              one filing the holographic will saying that
5              proces-verbal will be dispensed with and said
6              testament be recorded, filed and ordered executed
7              in accordance with the terms and laws of
8              Louisiana.
9    MS. VALLEJO:
10                  No objection.
11   THE COURT:
12                  Let it come into evidence as Thibodaux Number
13             6.
14   MR. BROWN:
15                  Exhibit Number 7, is the April 17, 2013
16             petition for revocation of Act of Donation return
17             of cash, moveable property, and for damages for
18             order of sequestration filed by Forest and George
19             Dobronich as mandatory agents and attorneys in
20             fact of Sidney Dobronich.
21   MS. VALLEJO:
22                  No objection.
23   THE COURT:
24                  Let it come into evidence as Thibodaux Number
25             7.
26   MR. BROWN:
27                  Number 8, is an affidavit of Darnay
28             Thibodaux.
29   MS. VALLEJO:
30                  I going to object to that, Your Honor.  Ms.
31             Thibodaux is not here present today.
32   THE COURT:
```

1                    I will sustain that objection.

2    MR. BROWN:

3                    Defense will offer that as a proffer, Your

4            Honor.

5    THE COURT:

6                    That will be Thibodaux Proffer Number 2.

7    MR. BROWN:

8                    Exhibit 9, is a typed statement of Mr. Forest

9            Dobronich.  Mr. Dobronich is here and that was

10           given just for the Court's benefit.  We are not

11           seeking to attach that as an exhibit.

12   MS. VALLEJO:

13                    Whose statement?

14   MR. BROWN:

15                    I'm not attaching that.

16   MS. VALLEJO:

17                    Right.  So you're not admitting it?

18   MR. BROWN:

19                    I'm not admitting it.

20   MS. VALLEJO:

21                    So, not Number 9?

22   MR. BROWN:

23                    I might as well admit it, because then I have

24           to go ahead and change the rest of my exhibits the

25           way they are numbered for the Court.

26   MS. VALLEJO:

27                    Objection to the admission of that statement.

28   MR. BROWN:

29                    I will proffer it.

30   MS. VALLEJO:

31                    Mr. Dobronich is here today to testify live,

32           and I object to it.

Page      25

1    THE COURT:

2                    I'll sustain the objection.

3                    Do you want that as Proffer Number 3?

4    MR. BROWN:

5                    Yes, Your Honor.

6    THE COURT:

7                    That will be Thibodaux Proffer Number 3.

8    MS. VALLEJO:

9                    For the record, Your Honor, these exhibits

10            are being attached with regard to exceptions that

11            were filed by --

12   MR. BROWN:

13                   They are being attached in regards to the

14            petition to annul.  The exceptions have been, to

15            my understanding, deferred.

16   THE COURT:

17                   Go ahead.

18   MR. BROWN:

19                   Exhibit Number 10, is a copy of the February

20            14, 2013 Last Will and Testament.  Again, it's a

21            copy that was provided and it looks to be part of

22            the investigation of St. Tammany Parish Sheriff's

23            Office.

24   MS. VALLEJO:

25                   I object to it not being an original.

26   THE COURT:

27                   That's a police report?

28   MR. BROWN:

29                   That's part of the police report, Your Honor.

30   THE COURT:

31                   I'm going to sustain the objection.  The Code

32            of Evidence specifically excludes police reports.


                        Page     26

 1    MS. VALLEJO:

 2                    Correct.

 3    MR. BROWN:

 4                    We will offer that as a proffer, Your Honor.

 5    THE COURT:

 6                    That will be Thibodaux Proffer Number 4.

 7    MR. BROWN:

 8                    Exhibit 11, Your Honor, it was more of an

 9            ease of -- it's for the Court's benefit.  In a

10            companion case we have a -- there's a Federal

11            companion case filed a 28-page memo.  Attach that

12            as Exhibit 11.

13    MS. VALLEJO:

14                    No objection.

15    THE COURT:

16                    Let it come into evidence.

17    MR. BROWN:

18                    Just for the record that was I believe a

19            March 5, 2015 response to the Federal Courts

20            notice of granting summary judgment in favor of

21            the plaintiff in that case, which is the United

22            States.

23    MS. VALLEJO:

24                    Which is the United States, just for

25            clarification.

26    MR. BROWN:

27                    Another clarification that has not happened

28            yet.

29    MS. VALLEJO:

30                    It's actually dated March 5, 2015?

31    MR. BROWN:

32                    No, January 5, 2015.

                        Page      27

1           Exhibit 12, is in globo.  A writ of habeas
2           corpus that was filed in a previous suit that was
3           later dismissed.  Again, this is more for ease of
4           the Court's understanding of what was going on in
5           this case.
6    MS. VALLEJO:
7           I object to it not being relevant at all in
8           this matter.  That entire matter was dismissed.
9    MR. BROWN:
10          I will withdraw that.
11   THE COURT:
12          So noted.
13   MR. BROWN:
14          I'm going to start marking mine, Your Honor.
15          Just bear with me one minute.
16          Exhibit 12, is a May 21, 2013 letter from Ms.
17          Vallejo to counsel, Roy Burns, stating they
18          objected to any deposition of Mr. Dobronich based
19          on medical problems.
20   MS. VALLEJO:
21          I object to that as not being relevant at all
22          as to the petition to annul their statutory will.
23   THE COURT:
24          I will sustain the objection as to relevancy
25          and as to hearsay.
26   MR. BROWN:
27          I would like to offer it as a proffer, Your
28          Honor.
29   THE COURT:
30          That will be Thibodaux Proffer Number 5.
31   MR. BROWN:
32          Exhibit 13, Motion to Cancel Deposition and


                    Page      28

```
 1                    to Quash Deposition Subpoena filed by Forest and
 2                    George Dobronich in the civil revocation action.
 3       MS. VALLEJO:
 4                         Objection, no relevance.
 5       THE COURT:
 6                         Sustained.
 7       MR. BROWN:
 8                         I would like to offer that as a proffer.
 9       THE COURT:
10                         That will be Thibodaux Proffer 6.  I sustain
11                    that objection on relevancy grounds.
12       MS. VALLEJO:
13                         All of these were attached to your brief?
14       MR. BROWN:
15                         They were attached -- I had a memorandum and
16                    a supplemental memorandum.  They're in the record.
17       MS. VALLEJO:
18                         All of it?
19       MR. BROWN:
20                         Yes.
21       MS. VALLEJO:
22                         I don't think so.
23       MR. BROWN:
24                         Again, I did not serve them on you, Peggy,
25                    because at the time you were not counsel of
26                    record.  They had been served on Mr. Tabary.
27       MS. VALLEJO:
28                         All timely?
29       MR. BROWN:
30                         All timely.
31       MS. VALLEJO:
32                         I going to object to anything that was not
```

```
1              attached to his memorandum or motion --
2    MR. BROWN:
3              Fair enough.
4    MS. VALLEJO:
5              -- in addition to my other judgment.
6    THE COURT:
7              Okay.
8    MR. BROWN:
9              Exhibit Number 14--
10   THE COURT:
11             Hold up a second.  I'm going to try to settle
12        the dispute.  Were these exhibits he's talking
13        about attached to the original petition and/or
14        memorandum in support of the petition?
15   DEPUTY CLERK MCCLAIN:
16             There are seven exhibits that are filed to
17        the petition to annul probated testimony.  Then,
18        there is a memorandum filed after that.  It's just
19        those seven.
20   THE COURT:
21             How many more exhibits do you have?
22   MR. BROWN:
23             Judge, I have three more.  That's it.
24   MS. VALLEJO:
25             The last Exhibit Number 7, attached to the
26        petition, is our petition for revocation of Act of
27        Donation filed on April 17, 2013.  That's Number
28        7.
29   DEPUTY CLERK MCCLAIN:
30             There's a supplemental memorandum in support
31        of the petition to annul testimony.  Is that the
32        memorandum you were talking about?
```

1      MR. BROWN:

2                      That is correct.  That was Number 8 through

3              17 was attached to that.

4      DEPUTY CLERK MCCLAIN:

5                      It picks up at 8 and goes to 17.

6      MR. BROWN:

7                      That's correct.  It is only going to be 16

8              now.

9                      Exhibit 14, is a December 2, 2014

10             correspondence from the Louisiana Attorney

11             General's Office to Mr. Burns providing a check

12             register from the account that Forest Dobronich

13             had used to support Sidney Dobronich.

14     MS. VALLEJO:

15                     Objection, absolutely no relevance at all.

16     THE COURT:

17                     Objection is sustained.

18     MR. BROWN:

19                     I would like to offer that as a proffer, Your

20             Honor.

21     THE COURT:

22                     That will be Thibodaux Proffer Number 7.

23     MR. BROWN:

24                     Exhibit 15, is a July 17 letter from Ms.

25             Vallejo to Mr. Burns.  For the record, that is one

26             day before the execution of this holographic

27             testament.  This is to confirm my conversation

28             with you during the status conference with Judge

29             Garcia where I inform you and the Judge that we

30             oppose the setting of Sidney Dobronich's

31             deposition based on his incompetency and dementia.

32             As a result of that information, Judge Garcia set

1          this matter on the docket for August 27, 2013.

2    MS. VALLEJO:

3               I object to it being --

4    DEPUTY CLERK MCLAIN:

5               I am sorry.  That is not what it says in the

6          record -- 15 is a December --

7    MR. BROWN:

8               I'm changing the numbers.  I'm sorry.  That

9          will be marked on as 16.  I thought since we had

10          one that I withdrew --

11   DEPUTY CLERK MCCLAIN:

12               You can leave it, you just have to tell me

13          what you're calling it.

14   MR. BROWN:

15               I will leave it.  It is marked on there as

16          Exhibit 16, the one that was filed there.  I

17          apologize.

18   DEPUTY CLERK MCCLAIN:

19               Exhibit 16 is July 17.

20   MS. VALLEJO:

21               I object to any relevancy in these

22          proceedings with respect to this particular -- the

23          holographic will.

24   THE COURT:

25               It may be relevant, but I'm going to sustain

26          the objection on hearsay.

27   MR. BROWN:

28               I would like to offer that as a proffer, Your

29          Honor.

30   THE COURT:

31               That will be Thibodaux Proffer Number 8.

32   MR. BROWN:

```
 1                    This one is marked as Exhibit 17.  It is a
 2              copy of August 13, 2013 cover letter from Ms.
 3              Vallejo to the Court in civil revocation action
 4              attaching a July 25, 2013 medical report of Dr.
 5              Verrette's follow-up saying he is not mentally
 6              stable enough to be able to provide any competent
 7              testimony in a court of law, including a
 8              deposition.
 9    MS. VALLEJO:
10                    Object to that as being relevant and hearsay,
11              irrelevant and hearsay.
12    THE COURT:
13                    It may be relevant but it's hearsay.  I
14              sustain the objection.
15    MR. BROWN:
16                    Attach that as a proffer, Your Honor.
17    THE COURT:
18                    That will be Thibodaux Proffer Number 9.
19                    Anything else?
20    MR. BROWN:
21                    That's it.
22    MS. VALLEJO:
23                    I would like to call my first witness, Your
24              Honor.
25    THE COURT:
26                    Go ahead.
27    MS. VALLEJO:
28                    I call Forest Dobronich.
29    THE COURT:
30                    Are they both testifying?
31    MS. VALLEJO:
32                    Yes.
```

1    THE COURT:

2                    I'm going to swear them both in at this time.

3                            * * * * * * * *

4    <u>**FOREST DOBRONICH:**</u>  BEING FIRST DULY SWORN TO TELL THE TRUTH,

5    THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP HIM GOD,

6    TESTIFIED AS FOLLOWS:

7                            * * * * * * * *

8     <u>**GEORGE DOBRONICH:**</u>  BEING FIRST DULY SWORN TO TELL THE

9     TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP

10    HIM GOD, TESTIFIED AS FOLLOWS:

11                            * * *

12                    (**Forest Dobronich** was duly sworn and

13            testified as follows:)

14   THE COURT:

15                    For the record, gentlemen, would you identify

16            yourselves?

17   MR. GEORGE DOBRONICH:

18                    George Dobronich.

19   THE COURT:

20                    And you are, sir?

21   MR. FOREST DOBRONICH:

22                    Forest Dobronich.

23   THE COURT:

24                    Let the record reflect that both witnesses

25            are under oath at this time.

26   MS. VALLEJO:

27                    Thank you, Your Honor.

28                            * * *

29                    (**Forest Dobronich** was duly sworn and

30            testified as follows:)

31                        **DIRECT EXAMINATION**

32   EXAMINATION BY MS. VALLEJO:


                        Page      34

1    Q.   Did you know Sidney Dobronich?

2    A.   Yes, I did.

3    Q.   How did you know Mr. Dobronich?

4    A.   He was my uncle.

5    Q.   I suppose you knew him all of your life?

6    A.   Yes.

7    Q.   Did you see Mr. Dobronich from time to time while he

8    was alive?

9    A.   Yes.

10   Q.   How often?

11   A.   He would come by my place probably two or three times a

12   year, you know, and visit my business.  Which we did some

13   work for him on his cars.  He would come spend the day, you

14   know, just to shoot the breeze with us.

15   Q.   Did you have a good relationship with Mr. Dobronich?

16   A.   Oh, yes.

17   Q.   Did you ever have a bad relationship with him?

18   A.   No.

19   Q.   Did he ever come to you and say, you've abandoned me,

20   you did not pay attention to me?

21   A.   No.

22   Q.   On July 18, 2013, your uncle handwrote a will; is that

23   correct?

24   A.   Yes.

25   MS. VALLEJO:

26             Your Honor, I would like to make a note for

27        the record that this handwritten will is in the

28        record of this matter, and Madam Clerk had

29        informed me earlier that the original will is in

30        the vault, but the copy is in the record.

31   THE COURT:

32             That's fine.

1    BY MS. VALLEJO:

2    Q.   Were you present when Sidney wrote this will?

3    A.   Yes.

4    Q.   Did anyone that you know of coerce him to write this

5    will?

6    A.   No.

7    Q.   Did anyone that you know of tell him what to put in

8    this will?

9    A.   No.

10   Q.   Have you ever talked to your uncle prior to him writing

11   this will about what his intentions were with respect to his

12   estate after he died?

13   A.   Yes.  My uncle has been to my business quite a few

14   times in the last, I guess, ten years.  You know, he has

15   mentioned -- my uncle liked to talk about money.  He's

16   mentioned that, "you know, I have no kids.  That's going to

17   be for all my nieces and nephews, you know, when the time

18   comes."  That's basically what he told us on different

19   occasions over the past ten years.

20   Q.   So he told you that he wanted to leave his --

21   A.   Assets to all his nieces and nephews.

22   Q.   And he told you that --

23   A.   Divided equally.

24   Q.   Okay.  And he told you that on more than one occasion?

25   A.   Oh, yes.

26   Q.   I would like you to take a look at this will, which is

27   a copy of his original handwritten will.  If you can, tell

28   me if you recognize that will?

29   A.   Yes.  That's the will he wrote.  That's his

30   handwriting.

31   Q.   Were you present on the day he wrote that will?

32   A.   Yes, I was.

1    Q.   Did he write that will all at one point in time, or did
2    he get up and move around?
3    A.   No, he wrote it all at one time.
4    Q.   Can you read into the record what the will states?
5    A.   I, Sidney Dobronich, being of sound mind and body would
6    like to leave all of my possessions at the time of my death
7    to all of my nieces and nephews to be divided equally.
8    Q.   How many nieces and nephews did he have?
9    A.   He's got nine.
10   Q.   And the succession of your uncle was opened in this
11   Court; is that correct?
12   A.   Yes.
13   Q.   Was the judgment of possession executed with regard to
14   that succession leaving your uncle's assets to all nine
15   nieces and nephews?
16   A.   Yes.
17   MS. VALLEJO:
18                Your Honor, I have a video -- actually, let
19          me lay the foundation.
20   BY MS. VALLEJO:
21   Q.   Forest, you said you were present when your uncle wrote
22   this will.  Was there a videotaping of him writing his will
23   or afterward?
24   A.   It was afterwards.  We had a camera and, you know,
25   basically, I just backed up what he wrote with video.  I
26   asked him a few questions, you know, and got his response,
27   and I just recorded it as verification of what he just
28   wrote.
29   Q.   You have been involved in the court proceedings with
30   respect to the Thibodaux's and the petition to revoke the
31   Act of Donation and all of the other acts that were passed
32   by the Thibodaux's; is that correct?

```
1    A.   Yes, I have.
2    Q.   You have been involved with -- you say you have seen
3    your uncle and you've been with your uncle.  And Mr. Brown,
4    the Thibodaux's attorney, previously referenced letters that
5    were alleging that your uncle was incompetent and not able
6    to testify.  When you saw your uncle -- did your uncle move
7    in with you after he left the hospital
8    A.   My uncle moved in with me on April 2, the day he was
9    released from the hospital for his hip replacement.
10   Q.   April 2.  What year?
11   A.   Probably 2013.
12   Q.   Did your uncle live with you --
13   A.   He lived with me the whole year.  Yes, until he passed
14   on.  I think he passed on March 26 or 24.
15   Q.   Approximately a year?
16   A.   A year.  Right at a year, yes.
17   Q.   Did you have an opportunity to observe your uncle with
18   respect to his capacity and his competency?
19   A.   Yes.
20   Q.   How old was your uncle?
21   A.   My uncle was 86.
22   Q.   Can you describe to the Court your uncle's mental
23   state, not every single day, but how was your uncle's mental
24   state from the time he moved in with you until he died?
25   A.   Okay.  My uncle's mental state from the time he moved
26   in until he died, I would say, you know, the beginning,
27   maybe the first six months that I had him, he looked to be
28   in good shape mentally.
29        Okay.  The only thing I found is that after taking him
30   out of his habitat and bringing and subjecting him to, you
31   know, like long days at rehab, or a couple of hours at
32   rehab, or long days in court, doctors, driving him here and
```

1    there, he did not like being disturbed with that.  He got

2    fatigued real fast, and his mind did go.  But other than

3    that, if he was sitting at home, which he was comfortable

4    with, really he was competent.

5         He held conversations with me, you know.  And at times,

6    he would go, you know, late in the evenings, he could lose a

7    little something, you know.  But for the most part, mornings

8    and midevenings were fine.  Like I said, he was just like

9    any older person, it comes and goes with their competency.

10   Q.   Did he know where he was living?

11   A.   Oh, yes.

12   Q.   Did he know who you were?

13   A.   Oh, sure.

14   Q.   Did he know what day of the week it was?

15   A.   Uh --

16   Q.   If he would read a newspaper, would he be confused

17   about --

18   A.   Oh, no, no.  He read newspapers.

19   Q.   Would he know family and friends who would come to

20   visit him?

21   A.   Oh, yes.  Sure.

22   Q.   Would he be able to tell you what it was that he wanted

23   to do on that particular day, if there was anything he

24   wanted to do?

25   A.   Yes, he would be.

26   Q.   How about on the day that he wrote his will, can you

27   describe his competency on that day?

28   A.   His competency was good that morning.  He was

29   talkative.  I had got up and made him some breakfast, and he

30   was discussing different things about work with me, you

31   know.  I would say he was having a pretty good day.

32   Q.   What kind of things was he discussing with you

```
1    regarding work?

2    A.   Well, am I off today, or am I going in later, or you

3    know.

4    Q.   So he somewhat knew your schedule?

5    A.   Yeah, yeah.  He would question, you know, just to start

6    a conversation.

7    Q.   And you say you took a recording video of him.

8    MS. VALLEJO:

9                 Your Honor, I would like play the video of

10              Mr. Dobronich after he wrote his will?

11   THE COURT:

12                Sure.

13   MR. BROWN:

14                I have no objection, Your Honor.

15                         * * *

16                (At this time, Ms. Vallejo tried to play the

17              video. The results of playing the video were

18              unsuccessful.)

19   MS. VALLEJO:

20                Shall I continue to question him, Your Honor?

21   THE COURT:

22                Yes.  Go ahead and continue to question him

23              on the first round.

24                         * * *

25                DIRECT EXAMINATION CONTINUED

26

27   BY MS. VALLEJO:

28   Q.   Did your uncle ever tell you he wanted to leave his

29   assets to anyone other than his nieces and nephews?

30   A.   No.

31   Q.   Did you spend some holidays with your uncle?

32   A.   My uncle came to a couple of family functions within
```

1    the last couple of years.  Yes, and my other cousins.

2    Q.   Do you know if he ever spent family functions, holidays

3    with anybody else other than his family?

4    A.   Not that I know of.  He was a private person, too.  He

5    respected his privacy.

6    Q.   So if he wanted to see you, he would call you?

7    A.   Oh, yeah.

8    Q.   And if you wanted to visit with him, you would call

9    him?

10   A.   Yeah.  We would stop by, you know.  Just all of a

11   sudden stop by if we wanted to see him.  If we were over

12   that way, we would stop by just to check on him.  You know,

13   he was kind of a private person.

14   MS. VALLEJO:

15              That's all the questions I have of Forest

16          Dobronich.   I will come back to the video, Your

17          Honor, if you don't mind after Mr. Brown

18          cross-examines him.

19   THE COURT:

20              Do you have any questions?

21   MR. BROWN:

22              Yes, Your Honor.  I will try and be brief.

23                        * * * *

24                   **CROSS-EXAMINATION**

25

26   CROSS-EXAMINATION BY MR. BROWN:

27   Q.   Mr. Dobronich, at the time that your uncle executed

28   this July 18, 2013 holographic testament, was there a Power

29   of Attorney in effect that was in -- was there a Power of

30   Attorney in effect that named you as his agent in fact?

31   MS. VALLEJO:

32              Your Honor, I object to the question as to

                        Page      41

```
 1              relevance.  A Power of Attorney doesn't have any
 2              authority with regard to writing a will or not
 3              writing a will.
 4   THE COURT:
 5                   Overruled.  He's under cross.
 6                   You can answer the question, sir.
 7   THE WITNESS:
 8                   Yes, we did -- I did have Power of Attorney,
 9              yes, me and my brother.
10   BY MR. BROWN:
11   Q.   You mentioned that he was living with you after he got
12   out of the hospital.  Was he living with you at the time he
13   executed this July 18, 2013 will?
14   A.   Yes.
15   Q.   I received a copy of a check register from the State of
16   Louisiana in connection with a civil case --
17   MS. VALLEJO:
18                   Your Honor, I object to this.  This check
19              register has absolutely nothing to do with his
20              writing of a will.
21   THE COURT:
22                   Let me hear what the question is.
23   BY MR. BROWN:
24   Q.   And it mentions --
25   THE COURT:
26                   Don't make statements, ask questions, Mr.
27              Brown.
28   MR. BROWN:
29                   Yes, Your Honor.
30   BY MR. BROWN:
31   Q.   Did you have to provide a sitter for your uncle?
32   MS. VALLEJO:
```

 1                    I object, Your Honor.

 2     THE COURT:

 3                    Overruled.

 4     THE WITNESS:

 5                    Yeah, we had 24/7 sitters.

 6     BY MR. BROWN:

 7     Q.   You had 24/7 sitters after he got out of the hospital

 8     on April 2?

 9     A.   Yes.  A number of people.

10     Q.   I will get back to that.  You had 24/7 sitters July 18,

11     2013 when he purportedly executed this will?

12     A.   Yes.  I was the sitter that day.  I took off that day,

13     because we couldn't get a sitter.

14     Q.   When you say sitter, what do the sitters have to do?

15     A.   They accommodated everything he needed.  His health was

16     in bad shape.  I mean, he had UTI infections from the

17     kidneys function, I mean, kidney malfunction.  You know, we

18     sat with him -- we didn't leave him out of sight, especially

19     after he fell and broke a hip.

20     Q.   Did you have to assist him with going to the bathroom?

21     A.   Oh, yes.  Sure.

22     Q.   You had to assist him with just walking from the bed to

23     any piece of furniture in the house?

24     A.   Not every day.  You know, you could look at him to see

25     how stable he was from day-to-day, you know.  But he could

26     get weak all of a sudden.

27     Q.   Would it be fair to say he couldn't go outside and

28     drive his car during that time frame; is that right?

29     A.   No, no.  I wouldn't trust him driving a car at that

30     time.

31     Q.   And you said 24/7 sitters, so there was somebody

32     watching him the entire day in the time frame of July --

                              Page      43

1    A.    Yeah.  We had family.  It was mixed with family and
2    outside sitters.
3    Q.    For the record, let me finish the question.  You had
4    somebody watching him 24 hours a day, seven days a week
5    during the time frame of July 18, 2013 when he purportedly
6    executed this will?
7    A.    Yes.
8    Q.    You mentioned sitters, there were a number of people,
9    can you just tell me who?
10   A.    It was mostly family members that took care of him, you
11   know.  We filled in with a couple of cousins, maybe a couple
12   of -- I think we had two outside sitters also.
13   Q.    Who were those sitters?
14   A.    Ramona Dillon and another lady by the name of Debra,
15   and I don't know Debra's last name.
16   Q.    You mentioned a number of doctor visits.  I want to
17   zoom in on one in particular.  There has been reference to a
18   July 2, 2013 evaluation of your uncle by Dr. Paul Verrette.
19   Do you recall that?
20   A.    Yes.
21   Q.    Tell me about that.  Why did he go to Dr. Verrette on
22   July 2, 2013?
23   A.    I think Judge Garcia wanted an evaluation on him.
24   Q.    So the purpose of that visit was evaluation.  Again, an
25   evaluation for capacity?
26   A.    I guess.  I don't know what -- I guess it was to decide
27   something later for the court proceedings.
28   Q.    Were you directed to bring him to Dr. Verrette?
29   A.    No.
30   Q.    Why did you bring him to Dr. Verrette?
31   A.    That's my local doctor for years.
32   Q.    What does he do?

1    A.   He's an MD, a family physician.

2    Q.   Does he have any particular training in psychology,

3    psychiatry that you know of?

4    A.   He's not a psychologist or a psychiatrist.  No.  He's a

5    regular family doctor.

6    Q.   Had you brought Mr. Dobronich to Dr. Verrette prior to

7    that time?

8    A.   Yes, I did.

9    Q.   When?

10   A.   I would say maybe a couple of months prior, he had

11   something else wrong with him.  I think he prescribed him

12   something.

13   Q.   What?

14   A.   I can't remember.  I'm pretty sure he visited Dr.

15   Verrette one time before.

16   Q.   How about after?

17   A.   No.

18   Q.   So other than this one time in July 2, which was

19   specifically pursuant to the Court order, as to your

20   understanding; is that correct?

21   A.   Yes.

22   Q.   But you don't know why the Court ordered him to visit

23   -- to see the doctor?

24   A.   No, I mean, I guess it was to evaluate him of some

25   sort.

26   Q.   Did you receive that evaluation?

27   A.   I think it was disclosed to me maybe a week after the

28   will at some point.

29   Q.   Do you recall what that evaluation said?

30   A.   It said something about not being able to take care of

31   person, or property, or something.

32   Q.   You said you didn't see that until a week after?

Page     45

```
 1    A.   I'm pretty sure something had been emailed to me by

 2    then.

 3    Q.   Just for the record --

 4    MR. BROWN:

 5              Your Honor, may I approach?

 6    THE COURT:

 7              Yes.

 8    MS. VALLEJO:

 9              Your Honor, I object.  This is an exhibit

10         that was objected to previously and sustained.

11    MR. BROWN:

12              I just want to let the witness -- I'm just

13         showing the witness an exhibit and asking him a

14         question about it.

15    THE COURT:

16              Overruled.  Maybe he can lay a foundation for it

17         this time.

18    BY MR. BROWN:

19    Q.   Mr. Dobronich, do you recall ever seeing that document?

20    Is that the document --

21    THE COURT:

22              Identify what document that is for the

23         record, please.

24    MR. BROWN:

25              For the record, this is the July 2, 2013

26         evaluation --

27    THE COURT:

28              It's Thibodaux Proffer Number 1.

29    MR. BROWN:

30              For the record, it's Thibodaux Proffer Number

31         1.  I have it marked as Exhibit 2.

32    BY MR. BROWN:
```

1    Q.   Is that the document that you saw about a week later?

2    A.   I'm pretty sure, yes.

3    Q.   And you don't recall receiving a carbon copy July 9,

4    2013 letter from your attorney regarding that evaluation?

5    A.   A carbon copy?

6    Q.   Yeah?  Were you carbon copied?

7    A.   Was I sent something?

8    Q.   Yes, sir?

9    A.   I don't recall.  I mean, unless -- would it be saying

10   emailed?

11   Q.   It could be email, but did you receive it?

12   THE COURT:

13              Did you get a copy of that in any shape or

14         form whatsoever?

15   THE WITNESS:

16              Yeah, I did eventually get a copy.  I think

17         it was by email probably later July something, in

18         that time frame of this year.

19   BY MR. BROWN:

20   Q.   Do you recall receiving that letter?

21   A.   Yes, I'm pretty sure I got that.

22   Q.   When did you get it?

23   A.   I don't know.  I don't know.  I don't look at emails

24   everyday either, you know.

25   Q.   Let me ask you this, it was a letter dated July 9,

26   2013.  Do you have any independent reason to doubt that

27   date?

28   A.   No.  Not if that email was on there.

29   Q.   You did receive that letter, you just testified to

30   that?

31   A.   Yeah, I'm pretty sure I received that by email.  I

32   don't know what time frame it was received.

```
 1    MR. BROWN:
 2                   At this time, Your Honor, I would like to
 3              readmit this Thibodaux Proffer 1 as an exhibit and
 4              ask that it be entered as evidence.
 5    THE COURT:
 6                   What is that?
 7    MR. BROWN:
 8                   This is the July 9, 2013 cover letter to
 9              Judge Garcia.  And the witness just testified that
10              he received it.  He didn't know when he received
11              it, but he --
12    THE COURT:
13                   What kind of letter from whom?
14    MR. BROWN:
15                   From his attorney to him.
16    THE COURT:
17                   Whose attorney?
18    MR. BROWN:
19                   From Mr. Dobronich's attorney.
20    THE COURT:
21                   Now who is that?
22    MR. BROWN:
23                   That would be Ms. Vallejo, Judge.
24    MS. VALLEJO:
25                   I object to the admission of hearsay.
26    THE COURT:
27                   I'm going to overrule the objection.  It
28              might have some relevance.
29    THE CLERK:
30                   That's no longer a proffer?
31    MR. BROWN:
32                   It's no longer a proffer.
```

Page      48

```
 1    THE COURT:

 2                   Proffer Number 1, make it Thibodaux Exhibit

 3              Number 1.

 4    MR. BROWN:

 5                   It would be Number 2, Judge.

 6    BY MR. BROWN:

 7    Q.   Do you recall if your uncle received that letter?

 8    A.   Did he receive it?

 9    Q.   Yes?

10    A.   Through mail?  Eventually, he probably did.

11    Q.   Did he receive a copy of that evaluation?

12    A.   The actual evaluation from the doctor?

13    Q.   Yes?

14    A.   No.  I've never seen an evaluation or anything.  Are

15    you talking about the outcome of it?

16    Q.   Yes?

17    A.   Yeah.  I think I seen something came through late July

18    of the outcome, what the findings were through an

19    evaluation.

20    Q.   Was he provided with a copy of the findings, your

21    uncle?

22    A.   No.

23    Q.   Why not?

24    A.   Well, I didn't --

25    MS. VALLEJO:

26                   Your Honor, I object.  I don't know that this

27              witness has knowledge of why or why not his uncle

28              --

29    THE COURT:

30                   Don't prompt the witness.  If he can answer

31              it, he can answer it.

32                   Objection overruled.
```

Page    49

```
1    THE WITNESS:
2                 No.  I probably didn't give it to him or
3            anything.  I don't know.  Maybe I did.  I can't
4            remember that really.
5    BY MR. BROWN:
6    Q.   Now, Mr. Dobronich, were you aware that a judgment was
7    entered on August 27, 2013 declaring your uncle incompetent
8    to testify?
9    A.   Yes, I've seen that.  Yes.
10   Q.   Was that judgment based upon the evaluation that you
11   said you received to your knowledge?
12   A.   Yes.
13   Q.   And that evaluation was submitted to the Court in those
14   proceedings, correct?
15   A.   What proceedings?  Do you mean the civil proceedings?
16   Q.   Yes?
17   A.   Yes.
18   THE COURT:
19                 This is a civil proceeding.  What other civil
20            proceeding are you talking about?
21   MR. BROWN:
22                 I'm talking about the identification --
23   THE COURT:
24                 Are you talking about a criminal case?
25   MR. BROWN:
26                 I'm talking about the civil -- there was a
27            civil revocation matter, Your Honor.
28   THE COURT:
29                 I've never heard -- what is a civil
30            revocation?
31   MR. BROWN:
32                 Again, it was a petition that was filed to
```

1               revoke a donation that was made in favor of the

2               Thibodaux's.

3    THE COURT:

4               That was the matter in Division "D"?

5    MR. BROWN:

6               That's correct, Your Honor.  I apologize.

7    THE COURT:

8               All right.  I'm just trying to keep the

9          record clear in case somebody wants to appeal this

10         later.

11              Go ahead.

12   MR. BROWN:

13              I will refer to it as the civil matter in

14         Division "D", Your Honor, for clarification.

15   BY MR. BROWN:

16   Q.   Mr. Dobronich, you mentioned that evaluation, the July

17   2 evaluation, was submitted to Division "D", correct?

18   A.   Submitted to Judge Garcia, yes.

19   Q.   And that again was during the time that you had Power

20   of Attorney over your uncle, correct?

21   A.   Yes.

22   Q.   And you don't contest that that evaluation was

23   submitted by your attorney -- that you submitted that

24   evaluation?

25   A.   That Dr. Verrette submitted it?

26   Q.   No.  That your attorney submitted it to the Court?

27   A.   Oh, yes.

28   Q.   Mr. Dobronich, did you have an occasion to receive a

29   follow-up letter from Dr. Verrette regarding your uncle's

30   competency?

31   A.   Yes.  Yes, I remember the follow-up.  I think it was in

32   August.

1    Q.   And that follow-up was submitted to the Court as well

2    in the Division "D" matter?

3    A.   I guess it was.

4    Q.   I have what has been accorded Thibodaux Proffer 9.   Do

5    you recognize these documents?   Oh, I'm sorry.   I have two

6    documents.   One of them is a cover letter dated August 2013,

7    and it is enclosing a July 25, 2013 doctor's report.   Do you

8    recognize these documents?

9    A.   Yes, I have seen them before.

10   Q.   The July 25, 2013 document is the report of Dr.

11   Verrette?

12   A.   Yes.

13   Q.   Do you recognize that document?

14   A.   I've seen it.

15   Q.   This August 13, 2013, is that the cover letter to the

16   Court in the Division "D" matter?

17   A.   Yes.

18   MR. BROWN:

19             At this time, Your Honor, I would like to

20          readmit Thibodaux Proffer 9.

21   THE COURT:

22             Which is?

23   MR. BROWN:

24             Which is the August 13, 2013 cover letter

25          from Ms. Vallejo to Judge Peter Garcia in the

26          Division "D" matter.   It is enclosing the July 25,

27          2013 follow-up report of Dr. Paul Verrette.

28   MS. VALLEJO:

29             No objection.

30   THE COURT:

31             Objection sustained.   It's hearsay.   You

32          could have subpoenaed Dr. Verrette to be here

Page    52

```
 1              today.
 2    MR. BROWN:
 3                   Just note my original proffer, Your Honor.
 4    THE COURT:
 5                   Noted.
 6                   Are you about finished with this witness?
 7    MR. BROWN:
 8                   I'm almost finished, Your Honor.
 9    THE COURT:
10                   I'll tell you what, we are going to recess.
11              Let's interrupt his questioning.  I want to get to
12              the detective's testimony and then I want to
13              recess for lunch and come back later this
14              afternoon and finish up.  There is no way you're
15              going to finish this up.
16    MS. VALLEJO:
17                   Right.
18    THE COURT:
19                   Captain Montgomery, come be sworn in, please.
20                        * * * * * * * *
21    STEFAN MONTGOMERY:  BEING FIRST DULY SWORN TO TELL THE
22    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP
23    HIM GOD, TESTIFIED AS FOLLOWS:
24                        * * *
25                   DIRECT EXAMINATION
26
27    DIRECT EXAMINATION BY MS. VALLEJO:
28    Q.   Can you please state your full name and employment for
29    the record?
30    A.   Detective Stefan Montgomery, Financial Crimes
31    Investigator with St. Tammany Parish Sheriff's Office.
32    Q.   Detective Montgomery, are you familiar with the
```

Page        53

1   criminal and civil proceedings with regard to Sidney

2   Dobronich and Calvin and Darnay Thibodaux?

3   A.   Yes, I am.

4   Q.   Can you briefly explain to the Court how you became

5   involved in the criminal proceedings?

6   A.   I was assigned to investigate this matter on March 18,

7   2013.  I met with the Dobronich's here, that are present

8   here today, out of concern for their uncle, Sidney

9   Dobronich.

10  Q.   Did you have an occasion to speak with Mr. Sidney

11  Dobronich?

12  A.   I did on three separate occasions.

13  Q.   Can you briefly describe your conversations with Mr.

14  Dobronich and the purpose of having a meeting and conversing

15  with him?

16  A.   The original conversation that I had with Mr. Sidney

17  Dobronich was on the day I received the complaint.  Once I

18  met with the complainants, I went to the hospital personally

19  and met with him at St. Tammany Hospital.  I asked him some

20  general questions to make sure that he was oriented to time

21  and place that he was at.  And I asked him some more

22  detailed questions in reference to his knowledge of where

23  his assets were going and if he had given permission to the

24  Thibodaux's --

25  MR. BROWN:

26              I'm going to object on the grounds of hearsay

27         and limit this testimony to competency of the

28         witness.

29  THE COURT:

30              Overruled.

31  BY MS. VALLEJO:

32  Q.   You can continue.

1    A.    I --

2    Q.    What did Mr. Dobronich indicate to you that he was

3    aware of the Thibodaux's activities with regard to his

4    finances?

5    MR. BROWN:

6                    Same objection, calls for hearsay.

7    THE COURT:

8                    I am going to overrule that objection.   There

9              is no way of getting around that.   He's dead.

10   THE WITNESS:

11                   In Mr. Dobronich's recorded statement, which

12             I have here today, he indicated that Joe Romano

13             was his financial adviser and handled his

14             financials for him and paid his medical bills.   He

15             denied that the Thibodaux's handled any bills or

16             paid anything for him.

17   BY MS. VALLEJO:

18   Q.    Did you have an occasion to speak to Mr. Dobronich

19   about his Last Will and Testament?

20   A.    I did.

21   Q.    Did he have any knowledge that Darnay and Calvin

22   Thibodaux had a Last Will and Testament prepared for him to

23   have him sign it in the hospital?

24   A.    If I can refer to my report here for just a second?

25   Q.    Sure.

26   A.    No.   When I asked him who his beneficiaries were, he

27   replied, "I guess it would be George and Forest, my

28   nephews."

29   Q.    What conversation was that?   Do you know which day that

30   was?

31   A.    That was the very first conversation.

32   Q.    Did you have any other conversations with him where he

```
 1    spoke about who he wanted to leave his assets to when he
 2    died?
 3    A.   I don't recall specifically asking him that.  I was
 4    more concerned with the details of where his money was going
 5    at the time and his knowledge of it.
 6    Q.   Did he indicate to you that he wanted to leave
 7    everything to his nieces and nephews?
 8    A.   Let me check here in the subsequent statements.
 9    Q.   Yes.
10    MR. BROWN:
11                   At this time, Your Honor, may I approach the
12              witness?  I'm not familiar with the notes that
13              he's reviewing.  I would just like to --
14    THE COURT:
15                   You would like to what?
16    MR. BROWN:
17                   I just want to confirm that he's reviewing
18              the same thing I have and maybe whether he does or
19              doesn't, Your Honor.
20    THE COURT:
21                   You're making an objection -- you object to
22              him reading from his notes?
23    MR. BROWN:
24                   I object to him reading from his notes, Your
25              Honor.
26    THE COURT:
27                   I will sustain that objection and inform him
28              he can't read from his narrative, but he can
29              review his narrative, if it will help him to
30              refresh his memory.
31                   Would reviewing your documents help you
32              refresh your memory?
```

Page     56

```
1    THE WITNESS:

2                   It would.  Thank you, Your Honor.

3    THE COURT:

4                   You can go ahead and review your documents,

5              please.  But I admonish you you have to be able to

6              testify independently.  Does it refresh your

7              memory or it doesn't?

8    THE WITNESS:

9                   I don't recall any specific discussions with

10             him other than that.

11   THE COURT:

12                  That's asked and answered.  Next question.

13   BY MS. VALLEJO:

14   Q.   Was Mr. Dobronich -- did you have conversations with

15   him about leaving everything to Calvin and Darnay Thibodaux

16   in the will?

17   A.   Yes.  I asked him about that if he was aware of that.

18   Q.   What was his response?

19   A.   He said no.

20   Q.   Did he ever state whether that was his intention or

21   not?

22   A.   He stated no, it was not his intention to have those

23   purchases.

24   Q.   In the investigation that you undertook with regard to

25   the allegations against Calvin and Darnay Thibodaux, did

26   they include obtaining a Power of Attorney, obtaining a Last

27   Will and Testament, and donations of immovable property by

28   the Thibodaux's by the way of undue influence and fraudulent

29   activity?

30   MR. BROWN:

31                  Objection, compound.

32   THE COURT:
```

```
 1                    Sustained.

 2                    Can you break that question up?

 3   MS. VALLEJO:

 4                    Yes.

 5   BY MS. VALLEJO:

 6   Q.   Did your investigation of the Thibodaux's include their

 7   fraudulent activities with --

 8   MR. BROWN:

 9                    Objection, mischaracterization of testimony.

10   THE COURT:

11                    Overruled.

12   BY MS. VALLEJO:

13   Q.   With regard to their obtaining a Power of Attorney over

14   Mr. Dobronich?

15   A.   Yes.

16   Q.   And did your investigation of the Thibodaux's include

17   the fraudulent obtaining of a Last Will and Testament by Mr.

18   --

19   MR. BROWN:

20                    Objection, relevance to the proceedings.

21   MS. VALLEJO:

22                    Can I finish my question, please?

23   BY MS. VALLEJO:

24   Q.   The fraudulent activity of the Thibodaux's with regard

25   to obtaining a Last Will and Testament from Mr. Dobronich?

26   MR. BROWN:

27                    May it please the Court, I had an objection

28            of relevance pending.  I didn't hear the Court's

29            ruling on that and the question.

30   THE COURT:

31                    It's overruled.

32   MR. BROWN:
```

```
 1                    Thank you, Your Honor.
 2      MS. VALLEJO:
 3      Q.   And did your investigation of -- did you answer the
 4      question?
 5      A.   I'm not sure.
 6      Q.   Can you answer the question now, please?
 7      A.   I investigated the legality of the documents that they
 8      had him sign and notarize.
 9      Q.   Was there an outcome to your investigation?
10      A.   Yes.
11      Q.   Can you state to the Court what that outcome was?
12      A.   My outcome was they exploited him.
13      THE COURT:
14                    This is all fine and great.  This is not a
15              criminal prosecution.  They're challenging the
16              holographic will.
17      BY MS. VALLEJO:
18      Q.   Have you ever seen the holographic will that Mr.
19      Dobronich executed?
20      MR. BROWN:
21                    Objection, relevance.
22      THE COURT:
23                    Overruled.
24      THE WITNESS:
25                    By holographic you mean?
26      BY MS. VALLEJO:
27      Q.   Handwritten will?
28      A.   I have not.
29      Q.   Have you ever seen Mr. Dobronich's handwriting?
30      A.   Yes.
31      MS. VALLEJO:
32                    May I approach the witness?
```

1    THE COURT:

2              You may.

3    BY MS. VALLEJO:

4    Q.   Do you recognize Mr. Dobronich's handwriting?

5    MS. VALLEJO:

6              And I'm handing the detective the holographic

7              will dated July 18, 2013 written Mr. Sidney

8              Dobronich.

9    THE WITNESS:

10             I can say that appears to be the same thing

11             that I have seen in similar writing checks that he

12             has signed as far as Mr. Dobronich's signature.

13   BY MS. VALLEJO:

14   Q.   So that does appear to be Mr. Dobronich's signature at

15   the bottom of this page?

16   THE COURT:

17             What about the handwriting of the body of the

18             will itself?

19   THE WITNESS:

20             Correct.  The Sidney Dobronich appeared, this

21             is where I'm looking at checks that he had signed,

22             things that I investigated, these appear to be the

23             same shaky style of handwriting in my opinion.

24   BY MS. VALLEJO:

25   Q.   Does the handwriting in the body of the will match

26   the handwriting of the signature?

27   A.   Yes.

28   MS. VALLEJO:

29             That's all of the questions I have, Your

30             Honor.

31   THE COURT:

32             Mr. Brown, any questions?

```
 1    MR. BROWN:

 2                    Yes, Your Honor.

 3                        * * *

 4                  CROSS-EXAMINATION

 5    CROSS-EXAMINATION BY MR. BROWN:

 6    Q.   Just for the record, Detective Montgomery, you said you

 7    had a recording of the first interview you had with Mr.

 8    Dobronich on March 18?

 9    A.   Yes.

10    Q.   Where in that recording did it appear that Mr.

11    Dobronich represented that he wanted his nephews to have his

12    property?

13    A.   It's on the disc.  I don't know where exactly on here

14    it is, but --

15    MR. BROWN:

16                    At this time point in time, Your Honor, I

17              would like to have that recording entered into

18              evidence, because I don't recall hearing on that

19              recording that Mr. Dobronich said he wanted his

20              nephews to have that property.

21    THE COURT:

22                    If I recall his testimony, he doesn't recall

23              it either.  What disc are you talking about?

24    MR. BROWN:

25                    He said he has a recording.

26    THE COURT:

27                    Where?  Does he have it with him?

28    MR. BROWN:

29                    Yes, Your Honor.

30    THE COURT:qf

31                    You haven't listened to it?

32    MR. BROWN:
```

```
 1                    I have listened to it, Your Honor.
 2   THE COURT:
 3                    Do you have a copy?
 4   MR. BROWN:
 5                    I do have a copy, Your Honor.
 6   THE COURT:
 7                    Why do we need his copy?
 8   MR. BROWN:
 9                    I will move on, Your Honor.
10   BY MR. BROWN:
11   Q.   Detective Montgomery, you said you interviewed him
12   three times.  The first time he seemed competent, the first
13   time you interviewed him?
14   A.   Yes.
15   Q.   The second time?
16   A.   Yes.  The reason for me interviewing him three times
17   was to see if he gave a consistent story, answered the
18   questions that I asked him the same way every time.
19   Q.   The second time you interviewed him, he seemed, to you,
20   to be competent?
21   A.   He seemed competent.
22   Q.   Did he know where he was oriented times four?  Do you
23   know what I mean by that?
24   A.   Time, place.
25   Q.   Just for the record, time, place, person, and event,
26   does that sound right?
27   A.   Sounds good.  I asked him general questions.  Do you
28   know who the president is?  Do you know what day it is?
29   Do you know where are you at?
30   Q.   When was that second interview?  I want to say for ease
31   of finding that, does March 21 sound about right?
32   A.   March 21, that's correct.
```

1    Q.   The second interview was not recorded; is that correct?

2    A.   That is correct.

3    Q.   The third interview was April 2, does that sound about

4    right?

5    A.   That's correct.

6    Q.   At that time, Mr. Dobronich seemed oriented times four?

7    A.   He was preparing to leave the hospital.

8    Q.   You asked him about signing documents previous to that

9    time?

10   A.   Previous to?

11   Q.   To April 2?

12   A.   Yes.

13   Q.   And he told you that he signed something but didn't

14   recall what it was?

15   A.   Yes.

16   Q.   Did you find out what document he was referring to?

17   A.   He didn't know what document it was.

18   Q.   You are aware that he signed a document on March 28,

19   2013 giving Power of Attorney to George and Forest

20   Dobronich?

21   A.   What was the date on it?

22   Q.   March 28, 2013?

23   A.   Yes.

24   Q.   Knowing that information, did you then ascertain

25   whether or not that was the document he was referring to

26   when he said he didn't recall what he signed?

27   A.   What was the date of the third interview?

28   Q.   April 2, 2013.

29   A.   I don't recall specifically.

30   Q.   Just for the record, I don't recall if I asked you

31   this, he did seem alert and oriented times four on April 2,

32   2013?

1      A.    He was alert and oriented in the three interviews that

2      I conducted.

3      Q.    Okay.  That's fine.  I will move on.

4      MR. BROWN:

5                    Your Honor, may I approach?

6      THE COURT:

7                    Sure.

8      BY MR. BROWN:

9      Q.    This has been marked as Exhibit 3.  This is a copy of a

10     will that was Mr. Dobronich's handwriting.  Can you tell me

11     what -- I've got -- pointing to a word here, actually, how

12     do I do this?

13     MR. BROWN:

14                   Your Honor, I'm trying to figure out how to

15              do this on the record.  I'm looking at --

16     THE COURT:

17                   Well, I wish I could help you, but --

18     MR. BROWN:

19                   I understand.

20     BY MR. BROWN:

21     Q.    Read the first sentence.

22     A.    I, Sidney Dobronich, being of sound mind and body.

23     Q.    Let me stop you there.  You said sound mind, does it

24     have mind or mine, M-I-N-E?

25     A.    Looks like M-I-N-E.  It could be either.  I didn't

26     write this.

27     Q.    I understand.  I understand.  But if the affidavit of

28     probate said the will read sound mine, M-I-N-E, you wouldn't

29     dispute that based on what you are seeing?

30     A.    I have no idea.

31     Q.    Do you know what a sound mine is, M-I-N-E?

32     A.    It could be a misspelling.  It could be a "D" that

1    looks like an "E".

2    Q.   Or it could be somebody who didn't want to say that

3    they were of sound mind.  Would that be a correct assumption

4    or a fair assumption?

5    A.   I don't think it's a coded message.

6    THE COURT:

7                That's an argumentative question.

8    MR. BROWN:

9                That's all I have, Your Honor.

10   THE COURT:

11               You will have to make that argument to the

12       Court.

13   MR. BROWN:

14             That's all I have, Your Honor

15   MS. VALLEJO:

16             No further questions for this witness, Your

17       Honor.

18   THE COURT:

19             You may step down.  Thank you, Detective, for

20       coming on short notice.

21   THE WITNESS:

22             Thank you.

23   THE COURT:

24             We're going to take a recess.  You promised

25       it would be short.

26             Court will be recessed until 3:30.  See y'all

27       back here at 3:30 p.m.

28             (At this time, a recess was taken.)

29                    * * *

30             (The Succession of Sidney Dobronich

31       continued.)

32   MR. BROWN:

1              I've got three of the proffers I just want to
2        make sure I get this clean for the record.
3              Proffer Number 1, which is the July 9, 2013
4        letter from Ms. Vallejo to Division "D".
5              Proffer Number 8, which is the July 17 letter
6        from Ms. Vallejo to Roy Burns.
7              Proffer Number 9, which is a letter from Ms.
8        Vallejo to Judge Garcia.
9              My understanding of the basis of the
10       objection is it's not being objected to on the
11       basis of authenticity, it's being objected on the
12       basis of hearsay.  I did want to make just a quick
13       argument on that, and then I will leave it at
14       that.
15             We are not seeking to introduce these
16       documents for the purpose of proving that Mr.
17       Dobronich had dementia at that time.  We are
18       offering them for the purpose that that was George
19       and Forest Dobronich's position that they put
20       forward to Division "D" at those particular times.
21       That is interval to our argument on the
22       application of judicial estoppel.
23  THE COURT:
24             So noted.
25  MR. BROWN:
26             That's all I have, Your Honor.
27  THE COURT:
28             That's it.  Okay.
29             Call your next witness, please.
30                         * * *
31  MS. VALLEJO:
32             Mr. **Forest Dobronich** is under

1                cross-examination.

2    THE COURT:

3                He said he's finished.

4    MS. VALLEJO:

5                Oh, that's it.

6    MR. BROWN:

7                I had a couple of more questions.  I have a

8          couple of follow-ups.

9                          * * *

10                 **CROSS-EXAMINATION CONTINUED**

11   CROSS-EXAMINATION BY MR. BROWN:

12   Q.   Mr. Dobronich, regarding July 18, the execution of the

13   will by your uncle, you were there when he did that?

14   A.   Yes.

15   Q.   And I know Ms. Vallejo is preparing a video that was

16   taken.  You took a video of Mr. Dobronich?

17   A.   Yes.

18   Q.   Describe that for me, please.

19   A.   After he finished writing his will, I think it took

20   about -- sitting at the dinner table probably about 20 to 25

21   minutes he sat around.  He sat down on the bed and that's

22   when I videoed him.

23   Q.   The video, was that just him saying -- what did that

24   entail?

25   A.   Saying that -- I think I asked him a couple of

26   questions and his response.

27   Q.   Was anybody else there?

28   A.   My daughter and my grandson were there.  They wasn't --

29   they were in another part of the house, and she was tending

30   to him.

31   Q.   When you say your daughter, just so we know, do you

32   have more than one daughter?

1    A.   I have three daughters.

2    Q.   Just identify who it was?

3    A.   Courtney.

4    Q.   Mr. Dobronich, I have what's been offered as Thibodaux

5    Proffer Number 8.

6    MR. BROWN:

7              Your Honor, may I approach?

8    THE COURT:

9              Yes.

10   BY MR. BROWN:

11   Q.   This is a July -- it's been dated a July 17, 2013

12   letter from Ms. Vallejo to Mr. Roy Burns.  Have you received

13   a copy of that letter?

14   A.   Yeah, I think I received a copy.  I just don't know

15   when I received it.

16   Q.   I just need to ask you a few questions.  It references

17   a status conference in front of the -- it references a

18   status conference in front of the judge in the matter in

19   Division "D" wherein Ms. Vallejo represents that she objects

20   -- we oppose the setting of Sidney Dobronich's deposition

21   based on his incompetency and dementia.  I want to ask you,

22   sir, does that accurately reflect your position?

23   A.   My position?

24   Q.   Yes?

25   A.   I mean, my position about what?

26   Q.   Does that reflect your position as of July 17?

27   A.   Do I agree to that?

28   Q.   Yes?

29   A.   I mean, it's a doctor that said it.  I mean, you know,

30   I disagree.  I was under the assumption it was to give

31   testimony at the coming trial or deposition.  That's all I

32   knew.  It was to determine if he could give testimony in a

1    deposition.

2    Q.   But as of July 17, 2013, you would agree that that was

3    your legal position to Division "D"?

4    MS. VALLEJO:

5              I'm going to object to that.  He's asking for

6         a legal conclusion, and Mr. Dobronich just

7         answered his question.

8    THE COURT:

9              I think it's been asked and answered.  You

10        don't need to argue with him.  Go onto something

11        else.  He testified he thought whatever opinion

12        that was, it was relevant to a proposed deposition

13        at the time or further court testimony.  At least

14        I understood that's what he --

15   MR. BROWN:

16             Yes, Your Honor.  I understand.  Again, I

17        appreciate the Court's patience.  I just want to

18        make sure I've covered everything.

19             That's all I have, Your Honor.

20   MS. VALLEJO:

21             I have just two follow-up questions and then

22        I will play the video, Your Honor.

23   THE COURT:

24             Okay.

25                      *  *  *  *

26                  REDIRECT EXAMINATION

27   REDIRECT EXAMINATION BY MS. VALLEJO:

28   Q.   Forest, were you in court on June 25, 2013 for the Rule

29   for Sequestration where your uncle testified beginning at

30   about 3:30 in the afternoon?

31   A.   Yes, I was.

32   Q.   Did you hear his testimony when I asked him, page 62

1    line 19 of the transcript:

2         Who do you want to have your property when you die?

3         And his answer was:

4         My nephews and nieces and all?

5    A.   Yes, I was there.

6    Q.   You heard that testimony?

7    A.   Yes.

8    Q.   Is that consistent with what your uncle told you on

9    previous occasions?

10   A.   Yes.  It's very consistent.

11   Q.   Did anyone file any interdiction proceedings --

12   A.   No.

13   Q.   -- with regard to your uncle?

14   A.   No.

15   Q.   And it was your testimony earlier that your uncle had

16   good days and bad days, just as any 87-year-old gentleman

17   would have?

18   A.   Yes.

19   Q.   And on the day that he wrote his will he was oriented

20   to time, place and circumstance?

21   A.   Yes.  I found he was, yes.

22   MS. VALLEJO:

23              Your Honor, I am finally able to pull this

24         up.

25   BY MS. VALLEJO:

26   Q.   I'm going to play this video, and is this a video that

27   you personally recorded?

28   A.   Yes.

29   Q.   On July 8, 2013?

30   A.   Yes.  That's the video that was probably done the next

31   25 to 35 minutes after he wrote the will.

32              (At this time, the video was played for the

```
 1            Court.)
 2   MR. BROWN:
 3                Is there a way we can put that disc into
 4            evidence?
 5   MS. VALLEJO:
 6                I have no objection to that.
 7   THE COURT:
 8                Okay.
 9   MS. VALLEJO:
10                That's all of the questions I have for Mr.
11            Forest Dobronich.
12   THE COURT:
13                Do you have a copy of that or is that the
14            only copy you have?
15   MS. VALLEJO:
16                I may be able to download it to my computer.
17            I'll have to ask Mr. Dobronich if he has another
18            copy of this.  Let's see, I think I got.  Okay.  I
19            did.
20   THE COURT:
21                Well, then, why don't we put that in the
22            record as Dobronich Number 1.
23   MS. VALLEJO:
24                All right.  Forest Dobronich Number 1,
25            because we will have George Dobronich also.
26            Forest Dobronich.
27                            * * *
28   MS. VALLEJO:
29                I would call to the stand **George Dobronich.**
30   THE COURT:
31                I remind you that you are still under oath,
32            Mr. Dobronich.
```

1    MR. BROWN:

2                    I think you swore in Forest Dobronich, I

3              don't know if you swore in --

4    THE COURT:

5                    I swore both of them.

6    MR. BROWN:

7                    I apologize, Your Honor.

8    THE COURT:

9                    No problem.

10                          * * * *

11                  (**George Dobronich,** was duly sworn and

12              testified as follows:)

13                     **DIRECT EXAMINATION**

14   DIRECT EXAMINATION BY MS. VALLEJO:

15   Q.   Can you state your full name for the record, please?

16   A.   George Dobronich.

17   Q.   You knew Mr. Sidney Dobronich?

18   A.   Very well.

19   Q.   How did you know him?

20   A.   He was my uncle and --

21   THE COURT:

22                    Those don't really amplify, I don't think.

23   MS. VALLEJO:

24                    Does it work?

25   THE COURT:

26                    That's just for the back-up recordings.

27   **BY MS. VALLEJO:**

28   Q.   You said you knew him very well?

29   A.   Yes, I did.

30   Q.   How often did you see Sidney?

31   A.   Over the course of the last ten years, probably

32   averaged six to eight times a year.

1    Q.    You and Sidney had a good relationship?

2    A.    Yes, very well.

3    Q.    Did you ever have a falling out, did he ever accuse you

4    of abandoning him --

5    A.    No.

6    Q.    -- or not paying attention to him in any way?

7    A.    No.

8    Q.    Did you go to his home?

9    A.    Yes, I did.

10   Q.    Did you visit him at other places as well?

11   A.    He would come visit us at the business.

12   Q.    Are you familiar with the events that have taken place

13   with regard to the criminal prosecution and the civil suit

14   that is pending in Division "D"?

15   A.    Yes.

16   Q.    Were you in court on June 25, 2013 when your uncle

17   testified?

18   A.    Yes, I was.

19   Q.    Can you describe to the Court how that testimony went

20   and what occurred during that testimony?  What time did he

21   get on the stand?

22   A.    Well, probably got here early that morning, probably

23   around 8:30 or whatever.  He was relatively alert then.  He

24   did real well during the course of the day, as far as

25   alertness.  He didn't actually go on the stand until that

26   afternoon around 3:00 or 3:30.  And I'm sure, by that time,

27   he was physically getting tired.  And once he was put on the

28   stand, he was alert at first for about the first 45 minutes

29   to an hour, and then he started kind of getting tired I

30   guess.

31   Q.    Was that generally how he would be?

32   A.    Yeah, I guess.  I mean, his age shows the factor and

Page     73

1    the fact that it was such a long day that day.  In the past,

2    when I had seen him, when I would go visit or whatever, I

3    really wasn't there that length of time.  I would be there

4    maybe an hour, hour and a half, two hours.

5    Q.   And he appeared to be alert and --

6    A.   He was alert the whole time.

7    Q.   -- competent?

8    A.   Yes.

9    Q.   Aware of his surroundings, who you were, who he was

10   what day of the week it was?

11   A.   Oh, yeah.

12   Q.   We are talking in 2013?

13   A.   Well, I saw him December 2012.  I had surgery in

14   February of 2013, so I didn't see him until all of this,

15   which was a few months later.

16   Q.   Right.  When you saw him in December 2012, did you have

17   a conversation with him?

18   A.   Yes.

19   Q.   Did you have a conversation with him about the

20   Thibodaux's?

21   A.   Yes, I did.

22   Q.   What did he tell you?

23   A.   I didn't know --

24   MR. BROWN:

25              Objection to hearsay.

26   MS. VALLEJO:

27              I think the rules of evidence are excused

28         with regard to the deceased.

29   THE COURT:

30              Yes.  Overruled.

31   THE WITNESS:

32              I didn't know who the Thibodaux's were.  I

```
 1              just know he had neighbors that he had told me in

 2              the past were renting from him.  That particular

 3              day there, he told me something to the effect that

 4              they had owed him five months rent.  They hadn't

 5              paid him any rent, and they had just borrowed

 6              $7,000 from him.

 7     BY MS. VALLEJO:

 8     Q.   This was December of 2012?

 9     A.   Yes.

10     Q.   When was his heart attack?

11     A.   I think that happened maybe January of 2013.

12     Q.   So a month later?

13     A.   Yes.

14     Q.   You visited him after December 12, 2012?

15     A.   No, because I had a knee replacement.  Well, just a few

16     weeks after that.  I was between the hospital stay and

17     therapy, and I was out until I got the call about this

18     taking place.

19     Q.   And that was in approximately what month of 2013?

20     A.   That would have been February, I think, end of

21     February.  I had the surgery February 1, so probably the end

22     of February.

23     Q.   You saw your uncle after February 2013.  Did you visit

24     him in the hospital?

25     A.   Yes.

26     Q.   Where did he go after he left the hospital?

27     A.   My brother's house.

28     Q.   Did you visit him at your brother's house?

29     A.   Yes, I did.

30     Q.   I want to get back to the testimony on June 25.  Were

31     you in the courtroom when he testified?

32     A.   Yes.
```

1    Q.   Did you hear the testimony when I asked him, "who do

2    you want to have your property when you die?"  And his

3    answer was, "my nephews and nieces and all."  Did you hear

4    that testimony?

5    A.   Yes, I did.

6    Q.   Was that consistent with what he had told you in the

7    past?

8    A.   Yes, it was.

9    Q.   Explain to the Court what your uncle had said and on

10   how many occasions he told you this.

11   A.     I remember -- I mean, he was gone for a two-year

12   period before the Thibodaux's rented from him.  He was in

13   Washington state.  When he came back, and the initial time I

14   went and visited him, he made a comment about he had gotten

15   some type of information from Joe Romano as it related to

16   his investments.  He told me -- and he had told me this in

17   the past, but this particular day, he said, that's going to

18   be left to ya'll, and I questioned him.  He said, well, all

19   my nieces and nephews, I'm going to leave my assets to them.

20   I didn't open the letter.  I didn't read any of the

21   information in the statement that that was his wishes at

22   that particular time.

23   Q.   As it turns out, what was the value of his estate?

24   A.   I don't know.  I know now I think it was around

25   $800,000 at that time.  I didn't know at that particular

26   time.

27   Q.   Did he tell you about his nieces and nephews in

28   addition to that one particular time, did he tell you on

29   other occasions?

30   A.   Yes, he did.  He had mentioned that to me in the past.

31   I didn't question him about it, because I didn't feel it was

32   my position.

Page      76

```
1    Q.   Right.  He said things like that to you before?

2    A.   Yes, he did.

3    Q.   Did he visit you at the station?

4    A.   Yes.

5    Q.   He knew about what kind of work you and Forest did?

6    A.   Oh, yes.  He came quite often.

7    Q.   Did you ever talk to him about that at the station?

8    A.   Well, he used to ask us a lot of things about the

9    station.

10   Q.   Now I'm talking about the time period of -- I want to

11   concentrate on February 2013 until the date of his death.

12   A.   Well, one time in particular when I went to pick him

13   up, after he was staying with my brother, he had brought up

14   something about -- my brother and I were at my brother's

15   house, and he was concerned about who was at my station

16   running my station, which we told him.  We were actually

17   closed when he asked us that.  But he was worried about how

18   both of us were there that particular day and nobody was

19   running the business.

20   Q.   Right.  Approximately what month in 2013?

21   A.   That would have been probably in May.

22   Q.   In May of 2013.  So he was alert enough to know that

23   you and Forest were together --

24   A.   Yeah.

25   Q.   -- and nobody was minding the station?

26   A.   Correct.

27   Q.   You saw him how many times between the time that he

28   started to live with Forest and the day he died?

29   A.   Probably six to seven times.  I took him to the doctor

30   I think three times.  Forest would take him to the therapy

31   place.  And I went and saw him right before he passed away.

32   Q.   Can you describe to the Court his mental state on the
```

1    times that you visited him?

2    A.   Well, I would usually go there in the morning time, so

3    he was pretty alert every time I would see him.

4    Q.   Was he oriented to time, place and person?

5    A.   Yeah.

6    Q.   He knew who he was?

7    A.   Yes.

8    Q.   He knew who you were?

9    A.   Yes.

10   Q.   He could hold a conversation?

11   A.   In fact, right before he passed away, the last time I

12   went and visited him, he knew me by name so.  That was only

13   about a week and half, two weeks before he passed away.

14   Q.   So is it fair to say he had good days and bad days?

15   A.   Probably, yeah, I think that would be a fair

16   assessment.

17   Q.   Would it be fair to say he was tired after a period of

18   time if you were to take him some place?

19   A.   Well, one of the times I took him to the doctor,

20   between me picking him up and going to the doctor's and then

21   returning, it was probably about four hours one afternoon,

22   and by the time we got back, he was zapped.  He was tired.

23   Q.   He was tired.  So in the afternoons he would get tired?

24   A.   Yes.

25   Q.   I would like to show you this document that is Sidney's

26   handwritten will.  And I would like to ask you if you

27   recognize that writing?

28   A.   Yeah, that looks like his handwriting.

29   Q.   You have seen your uncle's handwriting in the past?

30   A.   Yes, I have.

31   Q.   Does that appear to be your uncle's handwriting?

32   A.   Yes, it does.

1    Q.   The contents of that will, is that consistent with what

2    he had told you in the past what his intentions were?

3    A.   Yes, it is.

4    MS. VALLEJO:

5                That's all of the questions I have.

6                      * * * *

7                   CROSS-EXAMINATION

8    CROSS-EXAMINATION BY MR. BROWN:

9    Q.   Mr. Dobronich, you testified earlier that your uncle

10   had been gone for a two-year period and came back, and he

11   talked about something from Joe Romano, and that it was his

12   intention that it be left to you.  Do you recall that?

13   A.   Not to me.  His nieces and nephews.

14   Q.   What was the time frame of that statement?  When did

15   that happen?

16   A.   Well, he's mentioned it to me a few times.  But this

17   particular day, he had just gotten a statement from Joe

18   Romano, and that's how he got on that subject.  He and I

19   were sitting in the den and he just happened to mention he

20   had a statement that he had gotten recently.  I don't know

21   if it was that day or not.  He made a comment about leaving

22   it to his nieces and nephews.

23   Q.   Let me ask you this.  What is the time frame, because

24   I'm not clear as to when that particular --

25   A.   This particular time was the first week or the second

26   week of December 2012.

27   Q.   Okay.  Did you recall having any conversations prior to

28   December 2012 with your uncle regarding who he was going to

29   leave his property to?

30   A.   When I would go visit, my uncle always would bring any

31   of that up.  He was usually the one that instigated --

32   Q.   I understand that.  But do you recall him instigating

1    that conversation prior to December 2012?

2    A.    Yes.   Yes.   He mentioned it maybe once or twice,

3    because he had been gone for that two-year period.   Then he

4    came back in like May of 2011, so I hadn't seen him for two

5    years.   Then when I started visiting again after he came

6    back.   He had made a comment in maybe two or three times

7    before the December --

8    Q.    Two to three times.   Other than those comments that he

9    made to you, was there any other comments made about who

10   your uncle was going to leave his property to?

11   A.    (Indicating the nod of his head.)

12   Q.    Were you aware of any documents indicating who your

13   uncle was going to leave his property to?

14   A.    (Indicating the shake of his head)

15   Q.    Were you aware or made aware of a statutory will that

16   was made in February 14, 2013 in favor of Calvin and Darnay

17   Thibodaux?

18   A.    No, not at that time.

19   Q.    I'm just saying were you ever made aware of that?

20   A.    Yeah, later on down the line.

21   Q.    About when?

22   A.    About the actual will made out to Calvin and Darnay?

23   Q.    Yes.   When did you find out about it?

24   A.    When all this started I guess in April or May of 2013.

25   Q.    All right.   Do you recall obtaining a Power of Attorney

26   dated March 28, 2013 over your uncle's -- over everything?

27   A.    Uh-huh (affirmative).   My brother and I.

28   Q.    That was obtained when your uncle was in the hospital?

29   A.    Yes, I think it was.

30   Q.    Did you know about the February 2013 will at that time?

31   A.    No.

32   Q.    About how long after that did you find out about the

1    2013 will?

2    A.   Well the first time we went to court, I don't recall

3    any will February 2013.

4    Q.   Well, at the time you went to the hospital to get that

5    Power of Attorney -- let me ask you this.   What did you know

6    about?

7    A.   The only thing I knew at that particular time is they

8    were draining his assets.

9    Q.   Did you tell him about that at that time?

10   A.   Did we what?

11   Q.   Did you tell your uncle about the Thibodaux's draining

12   his assets at that time?

13   A.   Yes, it was mentioned to him in the hospital I'm sure.

14   Q.   What was his reaction?

15   A.   At that time I don't recall if he had a whole lot of

16   reaction to it.

17   Q.   He wasn't angry?

18   A.   Well, he made a comment that he didn't really realize

19   he was doing that.

20   Q.   Did he make any other comments about that?

21   A.   I mean, he wasn't really as talkative when he was in

22   the hospital.   I don't know if it was because of the fact he

23   had just had that surgery or whatever.

24   Q.   But you did make sure, as one of the people there, that

25   he was at least lucid, correct?

26   A.   Yes.   Well, he was talking to us.

27   Q.   You didn't see anything that would make you indicate he

28   didn't understand what was going on at that time?

29   MS. VALLEJO:

30              Specify what period of time you're talking

31         about.

32   BY MR. BROWN:

1    Q.    March 28, 2013 when the Power of Attorney was signed in

2    their favor?

3    A.    March 28?  When he was in the hospital?

4    Q.    The day when -- do you remember when he actually had

5    the Power of Attorney in your favor?  You recall that, don't

6    you?

7    A.    Yes, yes.

8    Q.    My question is at the time you're in the hospital with

9    him and he is executing that Power of Attorney, did you

10   notice anything that would make you think he didn't

11   understand what was going on?

12   A.    At that particular moment, as far as I can remember, he

13   was lucid at that time.

14   Q.    Then I asked you if he had reacted being angry when he

15   found out the Thibodaux's were draining his assets, and you

16   mentioned he didn't really react or make a comment?

17   A.    He was surprised that they were doing what they did.

18   Q.    And just so I have it for the record, on March 28, 2013

19   in the hospital, who else was there beside yourself and your

20   uncle?

21   A.    My brother, Ms. Vallejo.  I think that was it.

22   Q.    Do you recall -- I don't know if you know of two other

23   individuals being there?

24   A.    Not that I recall.

25   Q.    Do you know a Vicky Wilson?  Do you know who that is?

26   A.    I have no idea.

27   Q.    Do you know who Leo Hemelt is?

28   A.    Yeah, that's your husband.  (Pointing)

29   Q.    Was he there at that time?

30   A.    I guess.

31   MS. VALLEJO:

32                If you can clarify -- I asked the Court if he

```
 1              could clarify who the witnesses were to the Power
 2              of Attorney.
 3   MR. BROWN:
 4                  That's my question, Your Honor.
 5   THE WITNESS:
 6                  I know it was Peggy and I and my brother.  I
 7              don't think Hemelt.  I was talking to my uncle.
 8              I don't remember exactly.  We were more concerned
 9              about what was going on with the Thibodaux's at
10              that time.
11   BY MR. BROWN:
12   Q.   Just so I'm clear, you weren't there when your uncle
13   purportedly executed the July 18, 2013 holographic
14   testament?
15   A.   No, sir.
16   Q.   But at the time he executed that, or purportedly
17   executed that document, you still had Power of Attorney over
18   him; is that correct?
19   A.   Yes, sir.
20   Q.   Were you ever involved in between -- and I'm talking
21   about the time frame April 2, 2013 -- well, let me back up.
22   April 2, 2013, to your recollection, is that when your uncle
23   got out of the hospital?
24   A.   Yes.
25   Q.   And from April 2, 2013 through July 18, 2013, he was at
26   your brother's house?
27   A.   Correct.
28   Q.   Did you ever sit for your uncle between April 2, 2013
29   and July 18, 2013?
30   A.   Actually sit for him, no.  I did bring him to the
31   doctor multiple times during that period, maybe three or
32   four.  My brother was the primary caregiver.
```

1    Q.   But in your estimation, was he able to take himself to

2    the doctor?

3    A.   Oh, no.

4    MR. BROWN:

5              Nothing further, Judge.

6                        * * * *

7    MS. VALLEJO:

8              I have no follow-up.

9              I have one very short witness.  I have about

10         four questions for her.

11             Courtney Dobronich.

12   THE CLERK:

13             Raise your right hand, please.

14                  * * * * * * * *

15   **COURTNEY DOBRONICH:**  BEING FIRST DULY SWORN TO TELL THE

16   TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP

17   HER GOD, TESTIFIED AS FOLLOWS:

18                        * * *

19                  **DIRECT EXAMINATION**

20

21   DIRECT EXAMINATION BY MS. VALLEJO:

22   Q.   Ms. Dobronich, can you state your full name for the

23   record, please?

24   A.   Courtney Dobronich.

25   Q.   Are you related to any of the Dobronich's in this room?

26   A.   Yes.  My uncle George and that's my father.

27   (Pointing.)

28   Q.   Forest?

29   A.   Forest, yes.

30   Q.   And did you know Sidney Dobronich?

31   A.   Yes.

32   Q.   How long have you known Sidney?

1    A.    I only knew him when he stayed with us.  I lived with
2    my father at that time.  That was when I met him.
3    Q.    When Sidney moved into your father's house in April of
4    2013, that's when you met him?
5    A.    Yes.
6    Q.    You said you were living with your father at that time?
7    A.    Yes.
8    Q.    Was anyone else living in the house at that time?
9    A.    It was me, my son, and my dad and mom.
10   Q.    Did you have an opportunity to witness Sidney
11   Dobronich during that period of time from April 13 until the
12   day he died?
13   A.    Yes.
14   Q.    Can you describe to the Court what you witnessed about
15   Sidney with respect to his mental capacity on any given day?
16   A.    Most of the time he seemed all right.  Like he seemed
17   like he was competent.  He had his bad times and good times.
18   We had daily conversations.  I would watch him some days
19   when I didn't have school, and he seemed alert.
20   Q.    He had days where he was oriented to time, place and
21   person, who you are, who he was?
22   A.    Yes.
23   Q.    What day of the week it was?
24   A.    Yes.
25   Q.    And he would have some other bad days --
26   A.    Yes.
27   Q.    -- where he wouldn't be so alert?
28   A.    Yes.  He wouldn't be very responsive some times.
29   Q.    Could you say whether the good times were more often
30   than the bad times?
31   A.    Yes.
32   Q.    Do you recall -- Sidney hand wrote a will on July 18,

1     2013.  Do you recall whether you were there or not when he

2     wrote the will?

3     A.   I was in the house that day, but I wasn't a part of it

4     or anything like that.

5     Q.   Do you recall his state of mind on that day at all?

6     A.   That day, he was fine.  I mean, I didn't notice

7     anything --

8     Q.   He was alert on that day?

9     A.   Yes.

10    MS. VALLEJO:

11              That's all of the questions I have.

12                          * * * *

13    MR. BROWN:

14              I have no questions, Your Honor.

15    THE COURT:

16              Thank you.  You may step down.

17    MS. VALLEJO:

18              I have no other witnesses, Your Honor.

19                          * * * *

20    MR. BROWN:

21              Your Honor, may we approach?  Actually, we

22         are the only ones here.  I'm kind of in a quandary

23         right now.  It's one small point maybe.  Earlier I

24         had these three letters, and my position with

25         regards to the three items was that George and

26         Forest and his daughter's position with regard to

27         the matter in Division "D" was that Mr. Dobronich

28         was incompetent.  Counsel has indicated that she

29         does not object to the authenticity of these

30         objects, but she objects to the fact that they are

31         hearsay.  I would be remiss if I didn't at least

32         raise the Court's attention.  I think the only --

Page     86

```
 1                I've got two options here.  I can either ask the
 2                counsel for a stipulation at that point, or I
 3                could call her to the stand and ask her these
 4                specific questions with regards to their position
 5                at the time.  I don't want to do that, but I feel
 6                like I'm not doing my job if I don't at least try
 7                and clear up that hearsay objection, unless
 8                counsel is willing to stipulate to the
 9                authenticity and the admissibility of these three
10                documents.
11      THE COURT:
12                     What are you asking me to do?  Are you moving
13                me to recess this --
14      MR. BROWN:
15                     No, Your Honor.
16      THE COURT:
17                     Do you have witnesses?
18      MR. BROWN:
19                     I was just going to ask if --
20      THE COURT:
21                     I can answer that for you.  I'm just going to
22                say no.
23      MR. BROWN:
24                     No, I didn't need a recess, Your Honor.
25      THE COURT:
26                     Isn't that correct?
27      MS. VALLEJO:
28                     That's correct, Your Honor.
29      THE COURT:
30                     You're not going to withdraw your objections
31                to these documents?
32      MS. VALLEJO:
```

1              No, I'm not.

2    MR. BROWN:

3              At this point in time, I would ask to be able

4         to call Ms. Vallejo to the stand and get a ruling

5         from the Court.

6    THE COURT:

7              Absolutely not.

8    MR. BROWN:

9              That's fine, Your Honor.  That's all I need.

10   MS. VALLEJO:

11             Your Honor, it's our position that we have

12        proven that the holographic will is a valid,

13        handwritten will by Mr. Sidney Dobronich on a day

14        that he was very competent.  He knew what he was

15        doing.  He had stated his intentions on previous

16        occasions to various other people.  His will

17        complies with Article 1575 of the Civil Code of

18        holographic testament.  They had the date at the

19        top of it, July 18, 2013.  He says clearly what

20        his intentions are with regard to his assets at

21        the time of his death.  He signed his signature at

22        the end and he dated it again.  We had three

23        witnesses to testify to his handwriting, that they

24        have seen his handwriting in the past.  And they

25        verify that is the same handwriting that they've

26        seen in the past.  I believe the Thibodaux's

27        petition to annul the testament should be denied.

28   THE COURT:

29             Rebuttal?

30   MR. BROWN:

31             Your Honor, this is for the record.  The

32        Thibodaux's do not contest the issue as regards to

```
1              competency.  It is our position that Mr. Dobronich
2              was mentally, very sharp throughout all of the
3              phases of these proceedings.  We would argue there
4              is certainly very compelling evidence that this
5              July 18, 2013 will was not done with his consent.
6              Also, there is evidence that the Dobronich's have
7              taken a position in another matter with regards to
8              Mr. Dobronich's competency that is inconsistent
9              with what was presented here today, and we would
10             argue that judicial estoppel applies.  That's all
11             the argument we have, Your Honor.
12                  (At this time a Police Officer came to the
13             bench for a warrant to be signed.)
14                             * * * *
15                            RULING
16     THE COURT:
17                  All right.  Today was a hearing to annul the
18             probative testament of Sidney Dobronich.  Also,
19             Peremptory Exception of Vagueness and Ambiguity
20             and No Right of Action on behalf the defendant's
21             purported heirs to Mr. Dobronich.
22                  First, as to the Peremptory Exception of
23             Vagueness and Ambiguity and No Right of Action,
24             I'm going to overrule those exceptions.  And to
25             the extent, I guess, you know, it has been argued
26             they have no right of action to even come in here.
27             Well, I guess they do have a right of action, as
28             much as they believe, "they" and by meaning "they"
29             I mean the "Thibodaux's."  They believe they are
30             the beneficiaries of what they claim to be the
31             last valid Will and Testament of Mr. Dobronich.
32                  However, subsequent to that will, Mr.
```

Page      89

1              Dobronich perfected an holographic will on July

2              18, 2013.  Now, around that time, there was some

3              -- even though there is no evidence really before

4              the Court as to his mental status, I understand

5              the gist of those -- or at least proffered

6              documents, reported documents was that at or

7              around that time he was not competent.  And

8              intended Dr. Verrette to handle his affairs, but

9              certainly not to be deposed in a deposition or

10             testify in a Court of Law.  The best I can tell,

11             this was ordered by Judge Garcia after testimony

12             was taken by the late Mr. Dobronich in his court

13             late on one day where he got confused and was

14             worried about Mr. Dobronich's mental status.

15                  But even if I were to allow the doctor's

16             report into evidence here, absent him being here

17             to testify and being cross-examined, I still would

18             find that the holographic will is valid.  It is

19             dated and several people verify or they believe

20             that is his handwriting, especially an unbiased

21             witness, Detective Montgomery, it was in his

22             handwriting with that date and his signature on

23             it.  Notwithstanding any argument surrounding his

24             mental competency at the time to effect that will,

25             there is a strong line of juris prudence in our

26             state that one is presumed to be competent.  He

27             was not under any form of interdiction at the

28             time.  Merely, like I say, and I'm not even really

29             considering the doctor's letter, but if I did, it

30             was just stating that he didn't think he was able

31             to competently testify.  I don't really know what

32             that means.  Maybe the doctor meant he was not

```
 1                able to give an accurate history.  But absent any
 2                clear and convincing evidence that he was
 3                incompetent, I find he was competent at the time
 4                he effected the will, and the will is in proper
 5                form, and the petition to annul the probative
 6                testament is hereby denied and dismissed at
 7                petitioner's cost.
 8                     That is the judgment of the Court.
 9      MR. BROWN:
10                     Thank you, Your Honor.
11      MS. VALLEJO:
12                     Thank you, Your Honor.
13      THE COURT:
14                     Would you prepare those judgments?
15      MS. VALLEJO:
16                     Yes, Your Honor.
17      THE COURT:
18                     Also, just as a last housekeeping, I do note
19                that filed yesterday was on behalf of Thibodaux's
20                petition to file statutory will and appoint to
21                search testament,  I have not been presented with
22                the original just yet for any signing.  It might
23                be on my desk.  My intent, in light of the Court's
24                ruling this afternoon, is to deny that petition,
25                because even if that will was out there, it
26                wouldn't make any difference, because the will I
27                just declared proper, will be the final and last
28                and will supersede any testimony.
29      MR. BROWN:
30                     Understood, Your Honor.
31                     (The proceedings in the Dobronich Succession
32                concluded.)
```

## REPORTER'S CERTIFICATE

This certificate is valid only for a transcript accompanied by my original signature and original seal on this page.

I, Bridgette L. Jones, Official Court Reporter, in and for the State of Louisiana, employed as an official court reporter by the Twenty-Second Judicial Court for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding, that the transcript has been prepared in compliance with the transcript format guidelines required by statute or by rules of the board or by the Supreme Court of Louisiana and that I am not related to counsel or to the parties herein nor am I otherwise interested in the outcome of this matter.



Bridgette L. Jones, CCR
Official Court Reporter
Certificate No. 91376

COPY