TWENTY-SECOND JUDICIAL DISTRICT
STATE OF LOUISIANA
PARISH OF ST. TAMMANY


THE STATE OF LOUISIANA                    DIVISION: "C"

VERSUS                                    NUMBER:  538643

DARNAY THIBODAUX


THE HONORABLE RICHARD SWARTZ
JUDGE


A Transcript of a Portion of the Proceedings
Taken in Open Court at Covington, Louisiana, on
December 16, 2014


MOTION


APPEARANCES:

      REPRESENTING THE STATE OF LOUISIANA:

           JONATHAN BLAKE, ESQ
                   Assistant Attorney General

      REPRESENTING THE DEFENDANT:

           CLAIBORNE  W. BROWN,  ESQ.


REPORTED BY:  KAREN CARITE JENKINS, C.C.R.
              Official Court Reporter


HC 13

# INDEX

## WITNESS                         PAGE

DR. MICHELLE GARRIGA

    Direct Examination                    4
       By Mr. Brown

    Cross Examination                    42
       By Mr. Blake

```
 1          BY THE COURT:
 2                  Good morning.
 3                  Docket 538643, State of Louisiana
 4          versus Calvin Thibodaux, Jr and Darnay
 5          Thibodaux.
 6                  Counsel, make your appearances,
 7          please.
 8      BY MR. BLAKE:
 9                  May it please the Court, Your Honor,
10          John Blake, on behalf of the Louisiana
11          Attorney General's office.
12      BY MR. BROWN:
13                  Good morning, Your Honor, Claiborne
14          Brown on behalf of defendants, Calvin and
15          Darnay Thibodaux.
16                  Also here but not present in the
17          courtroom are Roy Burns and Lam Tram, also
18          for defendants Calvin and Darnay
19          Thibodaux.
20      BY THE COURT:
21                  Counsel, are we ready to proceed
22          with trial?
23      BY MR. BLAKE:
24                  Ready to proceed, Judge.
25      BY MR. BROWN:
26                  Yes, Your Honor.
27                  Actually, Your Honor, at this point
28          in time Mr. Burns would like to put on the
29          record that the State has offered a plea
30          deal to the defendants that the defendants
31          at this point have declined that deal.
32      BY THE COURT:
```

```
 1              Do you want to go into any details
 2         or that's sufficient?
 3    BY MR. BROWN:
 4              I think that's sufficient unless Mr.
 5         Burns, I mean, if he wants to go further
 6         in detail certainly we can, but I think
 7         we've advised the -- I can represent to
 8         Your Honor as an officer of the Court we
 9         have advised our clients, my clients, as
10         to the particular terms of the deal,
11         advised them of what that deal would mean
12         as well as what it would mean to go to
13         trial either way.  I feel that they have
14         been fully advised and we are just ready
15         to proceed.
16    BY THE COURT:
17              Is that correct, Mr and Mrs
18         Thibodaux?  You are married?
19    BY MS. THIBODAUX:
20              Yes.
21    BY THE COURT:
22              Okay.
23              We do have a motion that we need to
24         take up.  I see Dr. Garriga is present.  A
25         motion to exclude the expert testimony
26         brought by the defense.  You may proceed.
27    BY MR. BROWN:
28              At this point we call Dr. Garriga.
29
30              DR. MICHELLE GARRIGA
31         AFTER HAVING BEEN DULY SWORN
32         WAS EXAMINED AND TESTIFIED
```

1           AS FOLLOWS:

2

3           DIRECT EXAMINATION

4

5      EXAMINATION BY MR. BROWN:

6   Q.    Good morning, Doctor, my name is Claiborne

7   Brown, we met earlier.  I am counsel for defendants.

8   I just wanted to go into your background.  I

9   apologize, I have not had a chance to see your C.V.,

10  but I just wanted to start with what is your field of

11  expertise in?

12  A.    I am board certified in forensic and general

13  psychiatry.

14  Q.    And when were you board certified?

15  A.    I was board certified in 2006 or 2007.  I

16  finished my fellowship in forensic psychiatry in 2006

17  at Tulane and in the year following I took my boards

18  and passed.

19  Q.    And just again, if you could, I don't want to

20  go through it but if you could just hit the wave tops

21  of your educational experience and background?

22  A.    I attained my undergraduate degree at LSU,

23  then I went to medical school at LSU Health Science

24  Center in Shreveport.  I graduated from medical

25  school in 2001.  I went on to do an internship in

26  psychiatry residency at Tulane in New Orleans and

27  then upon --  that's a four year residency training.

28  And then I did an extra year in a fellowship at

29  Tulane to get further training in forensic

30  psychiatry.

31  Q.    Okay.  So, you had that one -- and again, I

32  apologize, you had that one year in fellowship in

1  forensic psychiatry?

2  A.      After my general residency.

3  Q.      Okay.

4  A.      In psychiatry.

5  Q.      Any other fellowships or internships in

6  forensic psychiatry?

7  A.      No.

8  Q.      And after that have you had any experience in

9  forensic psychiatry from going to that post-board

10 certification?

11 A.      Yea.  I've been working as a forensic

12 psychiatrist the entire time.

13 Q.      Again, that's since 2006 to present?

14 A.      Well, I've been working in forensics since

15 2005 when I started the fellowship.

16 Q.      Okay.

17 A.      So, it was exclusively forensic psychiatry and

18 I've worked exclusively in forensic psychiatric

19 practice since then.  I see patients at the forensic

20 hospital in Jackson, Louisiana.  Currently I have two

21 wards there which I see patients, and then I have a

22 contract to provide psychiatric services at a

23 forensic group home in Baton Rouge, Louisiana and I

24 also do sanity commissions for St. Tammany and

25 Washington Parishes and a few other parishes less

26 frequently throughout the state.

27 Q.      Have you had an opportunity to testify in

28 court?

29 A.      Yes.

30 Q.      About how many times?

31 A.      Oh, goodness, I don't know off the top of my

32 head.

1  Q.      I take it --

2  A.      I've been qualified numerous times in St.

3  Tammany Parish including in this court.

4  Q.      Okay.   And just for the record, it would be

5  safe to say more than ten times?

6  A.      Yes.

7  Q.      How about more than twenty-five (25) times?

8  A.      Testifying?

9  Q.      Yes.

10 A.      Yes.

11 Q.      Okay.   That's fine.

12         I actually did some research, saw you in the

13 newspaper a couple times back, but I did want to ask

14 you about one case in particular if you can remember,

15 it was a case of State versus Shane Foster, it was a

16 killing of a Ku Klux Klan recruit, do you happen to

17 recall that case?

18 A.      A little.   Yes.

19 Q.      And I know you are a very gentle -- the reason

20 I bring that up is I understand that you initially

21 found the defendant incompetent to stand trial.

22 A.      Okay.

23 Q.      And then later on found him competent to stand

24 trial.   Does that sound about right?

25 A.      Yes.

26 Q.      Okay.   So, you have had instances where you

27 have done an exam and found somebody incompetent to

28 stand trial and then later on can find him competent;

29 that's a possibility, correct?

30 A.      Yes.   I mean, the Court finds them competent,

31 but --

32 Q.      But it is based on your recommendations?

1   A.      Yea.   My recommendation, I would have said

2   that I didn't think he had capacity at that time.

3   Q.      Okay.

4   A.      And then later said that he did.   That's not

5   surprising.

6   Q.      So, it's possible for capacity to change?

7   A.      Yes.

8   Q.      Okay.   When I moved to the assignment in this

9   case, have you performed a forensic psychiatric

10   evaluation of Sydney Dobronich's records review only,

11   correct?

12   A.      Correct.

13   Q.      And do you recall when you received this

14   assignment?

15   A.      No.

16   Q.      I've got your report was completed on August

17   14th; does that sound about right?

18   A.      Yes.

19   Q.      Do you have a copy of your report with you?

20   A.      I do.

21   Q.      Okay.   Do you have a copy of any of the

22   materials that you reviewed for that report?

23   A.      No.   Not with me.

24   Q.      All right.   So, you did a -- it says a records

25   review only, so it's safe to say that you didn't

26   interview anybody?

27   A.      That is correct.

28   Q.      Have you done a forensic psychiatric

29   evaluation where you have interviewed people?

30   A.      Yes.

31   Q.      Can you tell me why that's important?

32   A.      Why interviewing people is important?

1    Q.      Yes.

2    A.      Well, it depends on what I am doing the

3    evaluation for.

4    Q.      Okay.  Let's assume --

5    A.      But it would always be to obtain information.

6    Q.      And when you are doing interviews, let's say

7    it's a forensic psychiatric evaluation of somebody

8    who is passed away that you don't actually interview

9    the person you're doing the evaluation on but you do

10   interview other witnesses who observed that person,

11   correct?

12   A.      You can if need be but it is not necessary.

13   Q.      Well, I want to talk about some of the things

14   that you are able to obtain when you interview other

15   individuals who actually observed that person.

16           Tell me about that?

17   A.      Tell you about -- I'm not sure I understand

18   that question.

19   Q.      Okay.  Well, you have an individual who let's

20   say observed a person for a certain portion of -- for

21   a relative portion.  When you interview that person,

22   what kind of questions do you ask?

23   A.      Again, it depends on what I am doing the

24   evaluation for.  I am assuming you're asking about

25   dementia since that's the issue in this case?

26   Q.      Yes.  Yes.  Absolutely.

27   A.      So, I mean, I would ask them about how they

28   think the person is doing.  If they have noticed any

29   problems with the individual.  How their current

30   level of functioning versus their past level of

31   functioning.  What are their concerns.

32   Q.      So do you ask them certain questions about how

9

1   the person -- you know, when you saw them, how did

2   the person look?

3   A.      Yes.

4   Q.      How did they appear?

5   A.      Yes.  Could be a question.

6   Q.      How did they respond to questions?

7   A.      Yes.

8   Q.      Okay.  I want to dive into this particular

9   evaluation.  I've got a section on your report,

10  sources of information, St. Tammay Parish Hospital,

11  what is that?

12  A.      Those are the medical records from Mr.

13  Dobronich's two admissions.

14  Q.      Okay.  Do you happen to recall the two

15  admissions off-hand?

16  A.      Yea.  He was admitted in February of 2013 for

17  a cardiac event and in March of 2013 when he broke

18  his hip.

19  Q.      Do you recall the discharge dates for each of

20  those admissions?

21  A.      According to what I have here, it was February

22  10th through the 15th and March 12th through the

23  17th.

24  Q.      And I want to make sure I've got all this

25  because I've got, and it may just be -- were you

26  aware of a discharge of St. Tammany Parish Hospital

27  on April 2nd?

28  A.      That might be the rehab.  I think he went to

29  rehab at St. Tammany.

30  Q.      Okay.  Just so we know, have you reviewed the

31  rehab notes?

32  A.      They were all together so there was some of

```
1   that in there but I don't think there were detailed
2   rehab notes.
3   Q.     I didn't see anything in your report that
4   looked like you had any reference to the rehab notes.
5   Did you see --
6   A.     I don't think I had those.
7   Q.     Okay.  You mean you didn't have the notes at
8   that time.
9   A.     Yea.  I did not have the rehab notes.
10  Q.     Okay.
11  A.     Those weren't included in the records.
12  Q.     Okay.
13  A.     That I had for review.
14  Q.     And just to be clear, the only thing you had
15  were medical records that indicated a hospital stay
16  from March 12th through March 17th of 2013?
17  A.     Yes.
18  Q.     And just so I have that, other than the
19  hospital notes from the February 10th through 15th
20  visit and March 12th through 17th visit, you didn't
21  review any other records from St. Tammany Parish
22  Hospital?
23  A.     Correct.  All the records that I reviewed are
24  listed in the sources of information.
25  Q.     I understand that.
26         It says, St. Tammay Parish Sheriff's Office
27  Detective Stefan Montgomery investigation documents
28  is another source?
29  A.     Yes.
30  Q.     You recall off-hand how long or how voluminous
31  those documents were?
32  A.     No.  And I believe I looked at them on the
```

1    computer so you're not looking at a stack, you know,

2    you're scrolling through, but it took a long time to

3    go through them all.

4    Q.     Okay.  I just want to make sure we are

5    referring to the same thing.

6          BY MR. BROWN:

7                     Your Honor, may I approach the

8             witness?

9          BY THE COURT:

10                    Yes.

11                    Show the documents to counsel.

12         BY MR. BROWN:

13                    I will Your Honor.

14

15         EXAMINATION RESUMED BY MR. BROWN:

16   Q.     Doctor, does that look familiar?  I understand

17   if it's got marks on it.

18   A.     Yea.  It looks familiar, and I'm sorry.  I

19   should have pulled my records and brought them.  I

20   mean, it might look familiar just because I've read

21   my report again.

22   Q.     No.  I understand and I will -- I just want to

23   make sure that we are looking at the same thing and I

24   will refer, I'm pretty much going to stay in your

25   report, but I may need to jump into this and I will

26   give you an opportunity to look at this and make sure

27   that's it's, you know, the same thing that you

28   reviewed.

29   A.     Okay.

30   Q.     But did you have an opportunity to review, in

31   connection with St. Tammany Parish documents, were

32   there anything else other than the detective notes?

1    A.      I don't believe so.  I think it was just the

2    notes, but again, I haven't looked at these in a

3    while since I wrote my report.  I would be happy to

4    bring them and show you what I have, but --

5    Q.      Let me back up on that.  So, in connection

6    with your preparation for testimony you didn't

7    review, do any document review?

8    A.      In preparation for the testimony today?

9    Q.      Yes.

10   A.      No.  I did not pull those records back out.  I

11   reviewed my report because I do a summary --

12   Q.      Okay.

13   A.      -- of the records in my report.

14   Q.      And just to be clear, you don't recall

15   reviewing any attachments to that, you know, those

16   detective notes?

17   A.      No.  I don't believe so.

18   Q.      Didn't review any witness statements that were

19   provided?

20   A.      Yea.  There were references to witness

21   statements.

22   Q.      Okay.

23   A.      Within it.

24   Q.      No.  I understand that, but you didn't --

25   A.      The actual witness statements.

26   Q.      You didn't look at them?

27   A.      I don't believe so.

28   Q.      Next item is I've got Twenty-Second Judicial

29   District Court, St. Tammany Parish transcript of

30   proceedings.  Do you see that, Doctor?

31   A.      Yes.

32   Q.      What is that?

1   A.     I believe that was a civil hearing involved in

2   this matter, I think they were trying to get back

3   some of the money or property and it was the

4   transcripts from that hearing which people testified.

5   Q.     Okay.  And then transcripts of who testifying?

6   A.     To me most importantly Mr. Dobronich testified

7   but also Joseph Romano testified and Detective

8   Montgomery.

9   Q.     Anyone else testify?

10  A.     I don't think so.

11  Q.     And I think I have that, that hearing as June

12  25th of 2013, does that sound about right?

13  A.     Yes.

14  Q.     Any other transcripts from any proceedings

15  that you're referring to as St. Tammany Parish

16  district court, St. Tammany Parish transcript of

17  proceedings?

18  A.     No.

19  Q.     Okay.  I've got another item that is last will

20  and testament and durable power of attorney?

21  A.     Uh-huh.

22  Q.     And I think we had a last will and testament

23  that was an unsigned last will and testament?

24  A.     Yes.

25  Q.     Okay.  Dated February 14, 2013?

26  A.     Uh-huh.  Yes.

27  Q.     And I also saw a durable procuration dated

28  February 2014?

29  A.     Yes.

30  Q.     And both of those were prepared by Rebecca --

31  well, strike that.

32         Both of those reflected an individual by the

1   name of Rebecca Crawford as the notary on those,

2   correct?

3   A.     May I see the durable procuration was

4   notarized by Rebecca Crawford.

5   Q.     Okay.  And the last will and testament was --

6   so, you didn't actually review a signed or executed

7   February 14, 2013 will, have you?

8   A.     No.  It was a copy.

9   Q.     Other than, just to be clear, the durable

10  procuration was executed or was signed?

11  A.     Yes.

12  Q.     And executed by a notary?

13  A.     Yes.

14  Q.     Any other documents in connection with

15  February 14, 2013?

16  A.     No.

17         BY MR. BROWN:

18               Your Honor, may I approach?

19         BY THE COURT:

20               Yes.

21

22         EXAMINATION RESUMED BY MR. BROWN:

23  Q.     I am handing the witness what has been

24  previously marked as DMJ-2, it was marked for

25  identification, do you recognize that, Doctor?

26  A.     Looks like -- no.  Not really.  I don't

27  recognize it.

28  Q.     Okay.  So, this doesn't look like the

29  donation?

30  A.     I don't know that I ever saw the donation.

31  Q.     Okay.  That's fine.  If you did not see it.

32         And I know you testified that you probably

1    didn't see this as well, I just want to show you, I

2    had marked for identification as DMJ-1, it's a little

3    will questionnaire?

4    A.    No.  I never saw that.

5    Q.    You never saw that.  Turn the page, that's

6    part of the same little questionnaire.

7          And the last will and testament, does that

8    look somewhat like the form that you were provided,

9    Doctor?

10   A.    I don't know.  I'd have to look at the one

11   that I have.

12   Q.    But it's fair to say --

13   A.    I mean, it looks like a last will and I looked

14   at a last will and testament.

15   Q.    I know.  I understand.  And it's fair to say

16   that you have not reviewed this copy of the last will

17   and testament that is executed?

18   A.    Correct.

19   Q.    And I think this is the durable procuration,

20   Doctor, this is also part of J-2, that is something

21   that you reviewed, that one?

22   A.    It looks like the same one that I reference in

23   my report.

24   Q.    And there is one more document in there,

25   Doctor, I appreciate your patience, I think you

26   referred to it in your report, but, this is -- have

27   you seen that one?  That is -- first off, what does

28   that look like, Doctor?

29   A.    It's an advanced directive.

30   Q.    Okay.  Who is that relating to?

31   A.    Mr. Dobronich.

32   Q.    And does he have any marks on there that

1   indicated what he wanted to do or didn't want to do?

2   A.      Yea.  He does.

3   Q.      What is that?

4   A.      It says, that he wants life-sustaining

5   procedures except nutrition and hydration to be

6   withheld or withdrawn and then it is signed.

7   Q.      And just for the record, you haven't reviewed

8   that or seen that before today?

9   A.      I don't remember.  Let me look.  I know they

10  talked about that with him.  I remember seeing

11  something.  I don't remember if that was in there or

12  not.

13  Q.      It might be in the reference from Detective

14  Montgomery's notes.

15  A.      It might be.

16  Q.      Okay.

17  A.      Yea.  Because I have in mine that on February

18  14th it was noted that the advance directive was

19  placed in the chart.  So, I probably didn't actually

20  see this.

21  Q.      Right.

22  A.      But noted that he had done it.

23  Q.      Okay.  I got it.  But just for the record, you

24  don't recall independently reviewing the advance

25  directive?

26  A.      No.  I don't recall that.

27  Q.      All right.  And you also mentioned that you

28  had reviewed medical records of Dr. Paul Verrette?

29  A.      Yes.

30  Q.      Okay.  And what did that consist of?

31  A.      A visit that Mr. Dobronich went to Dr.

32  Verrette and he was evaluated by him and then he did

1  an addendum letter addressing his mental and physical

2  state so that was on July 2, 2013 and the addendum

3  was on July 25, 2013.

4  Q.      Do you have any idea what Dr. Verrette's

5  specialty is?

6  A.      No.  I inferred that he was either internal

7  medicine or family practice or general practice.

8  Q.      Who did you hear that from?

9  A.      I asked Mr. Blake yesterday if he had a

10  specialty and he said that he believed he was family

11  practice and I just noted that he didn't say he was a

12  neurologist or a psychiatrist.

13  Q.      Why is that important?

14  A.      Why is that important?

15  Q.      Yea, that he is not a neurologist or

16  psychiatrist?

17  A.      Oh, to know what their specialty is, you know

18  if he was specifically a neurologist or a

19  psychiatrist or a general practitioner.

20  Q.      Well, let me ask you this, is a neurologist or

21  psychologist going to -- is the level of evaluation

22  going to be different for a neurologist or

23  psychologist versus a general practitioner?

24  A.      I mean, they are specialized in that so yea.

25  I would think it would be, but I also think that

26  someone in general practice can diagnose dementia.

27  Q.      Would it be fair to say that the level of

28  evaluation is going to be more, shall I say,

29  thorough, with a neurologist or psychologist as

30  opposed to a general practitioner?  Do you agree with

31  that?

32  A.      In general, yea, it will be more specialized

1    and more focussed.

2    Q.      Are there going to be some tests that a

3    neurologist or psychologist or psychiatrist would do

4    that a general practitioner wouldn't do?

5    A.      There could be.

6    Q.      What are those tests?

7    A.      I mean, there are lots of tests.

8    Q.      Okay.

9    A.      I mean, a neurologist is going to be trained

10   in doing a more thorough neurological evaluation and

11   a psychiatrist is going to be trained in doing a more

12   extensive psychiatric evaluation, but any doctor can

13   order CT's or lab work.

14   Q.      Were CT's or lab work ordered by Dr. Verrette?

15   A.      I do not believe he ordered a CT and I didn't

16   have any records of lab work.

17   Q.      Do you have any other tests performed by Dr.

18   Verrette that you would expect to see from a

19   neurologist, psychologist or psychiatrist?

20   A.      No.  I think he just did an evaluation.

21   Q.      And tell me about that evaluation.  What did

22   he do?

23   A.      He didn't specify what he did.

24   Q.      But from your review of the records, can you

25   determine what his evaluation was?

26   A.      He appeared to have done a mental status

27   evaluation because he noted his orientation and his

28   confusion.

29   Q.      What is a mental -- I'm sorry.  I didn't mean

30   to interrupt.

31   A.      So, it was probably, and again, I mean, I

32   don't know that I can testify to what Dr. Verrette

1    did, what typically I believe would have happened

2    would have been talking to him.

3    Q.      Okay.  An interview, correct?

4    A.      Yes.

5    Q.      You said mental status evaluation, can you

6    just go through what that is exactly?

7    A.      Mental status evaluation is an interview that

8    we do with a patient that we are assessing all kinds

9    of things.  So, assessing mood, assessing their

10   thought processes, their memory, their ability to

11   concentrate and focus, their speech, we are always

12   noting their physical appearance, how they move, how

13   they walk, how they formulate their thoughts, convey

14   their thoughts.  We are also looking for any signs of

15   psychosis, paranoia, signs of anxiety, signs of

16   mania.

17   Q.      I want to, Doctor, you said a lot of things

18   there, I need to back up.

19           You said assessing appearance, correct?

20   A.      Yea.

21   Q.      Assessing mood, thoughts, concentration,

22   focus?

23   A.      Yes.

24   Q.      And their ability to convey thoughts?

25   A.      Yes.

26   Q.      And looking for I guess indications of

27   psychosis, anxiety, paranoia?

28   A.      Yes.

29   Q.      Let's go with that one, indications of

30   psychosis, anxiety and paranoia, did you see anything

31   in Dr. Verrette's exam looking for those things?

32   A.      No.  He did not specify in the records that I

1   reviewed those things.  He specified his memory and
2   his orientation as being problematic.
3   Q.      Anything else that he noted as being
4   problematic?
5   A.      His multiple medical problems.
6   Q.      From, I guess, from a cognitive standpoint?
7   A.      No.  It was mostly his assessment.
8   Q.      And again, assessing memory problems, how did
9   Dr. Verrette do that?
10  A.      He did not say.
11  Q.      So, as you sit here today, you have no idea
12  how Dr. Verrette came up with that Mr. Dobronich had
13  memory problems?
14  A.      No.  I wouldn't say that.  I mean, he noted
15  that he had forgotten that his mother was deceased.
16  So, he specified that and usually we ask people, we
17  give them some things to remember and then ask them
18  later if they recall what we told them to remember so
19  I inferred that he would have done something like
20  that, but he didn't note that specifically, but he
21  did say about Mr. Dobronich forgetting that his
22  mother had died.
23  Q.      And other than him forgetting that his mother
24  had died, was there any other indication from your
25  review of Dr. Verrette's medical records of problems
26  with Mr. Dobronich's memory?
27  A.      Other than Dr. Verrette saying that he noted
28  problems with the memory, that's all I had.
29  Q.      All right.  That was the only, forgetting his
30  mother was deceased was the only thing that you saw
31  in terms of how Dr. Verrette came up with that
32  conclusion?

1  A.      Yes.  Of specifics listed in the records that
2  I reviewed.
3  Q.      Okay.  You mentioned orientation, tell me
4  about how somebody assesses orientation?
5  A.      You say, what's your name, where are you,
6  what's today's date, why are you here.
7  Q.      All right.  And that is somebody who answers
8  all four questions, how do you mark that?
9  A.      You saw whether or not they are oriented to
10  person, place, time, situation.
11  Q.      Can you mark that any other way?  Oriented
12  times four?
13  A.      Oh, yea.
14  Q.      So, it will show up in a medical record either
15  way, correct, Doctor?
16  A.      Correct.  It is a common abbreviation.
17  Q.      And in that orientation test, can you score
18  any higher than a times four?
19  A.      No.
20  Q.      And just while we are on that topic, where was
21  Mr. Dobronich's orientation when Dr. Verrette
22  examined him?
23  A.      He said he was not oriented to place,
24  situation, or time.
25  Q.      And while we are on there, is there any one of
26  the orientation parameters that is more difficult for
27  a person to get than others?  If you don't understand
28  I will try to explain that.
29        Put it a different way, if I am oriented times
30  three, is it the same concern if I am oriented to
31  person, place and event is that the same as being
32  oriented to person, time and event?  Do you see where

1    I am going, Doctor?

2    A.      No, but maybe I can -- I mean, when you're

3    asking about someone's orientation it can vary.   I

4    mean, if someone doesn't know who they are, that's

5    worse than not knowing the date of the month.

6    Q.      Okay.

7    A.      But you're looking, you know, you're taking it

8    all in.   Somebody who is in jail and doesn't know

9    that it's December 16th versus December 12th, that's

10   not really -- you're not having major concerns about

11   their orientation or their mental health, but

12   thinking that it's 1983 is a different story, or

13   thinking that they are a different person is a

14   different story.   So, there is not, you know, it's

15   not a litmus test, we say, it's not something that if

16   they miss this one it means this.   It's always person

17   and situation dependant.

18   Q.      And I understand, Doctor, and you answered my

19   question.   That's exactly where I was going.

20           So, somebody who is marked on a medical record

21   as oriented times three, they don't get to times four

22   but, you'd want to know a little bit more information

23   before -- if it's oriented times three and they just

24   get the date wrong, what does that mean to you?

25   A.      It totally depends on the situation.

26   Q.      Let me ask you this, when you're oriented, can

27   somebody say answer that question, December 16th or

28   can they say Tuesday, can that count as a passing

29   score on that part of the orientation test?

30   A.      I mean, it's not really an orientation test.

31   So, it depends on where someone is documenting that.

32   So, if there is something called a mini-mental status

1   evaluation and that is a scored test that is used to

2   screen people for their mental status and possible

3   delirium and possible dementia.  So, in that test it

4   is scored and it is scored on five points.  So, that

5   would be very specific and you would know that the

6   individual should have asked them all the specific

7   questions, what's the day of the week, what month,

8   what year, what season are all asked on that test.

9        When you're in a hospital or an ER they might

10  not even ask the person those questions, they will

11  just sometimes write alert and oriented times three

12  to indicate that they just look okay.  They are not

13  noticing anything wrong with their mental state at

14  that time.

15        In an evaluation like Dr. Verrette was doing

16  where he is specifically addressing dementia, I would

17  assume that he specifically asked orientation in that

18  context.

19  Q.    Well, let me back up because again, you

20  confused -- well, I don't want to say confused, too

21  much confusing in this, I just want to clarify.  You

22  mentioned was it, a mini-orientation test?

23  A.    There is something called a mini-mental status

24  exam.

25  Q.    And that's a specific scored examination that

26  they do?

27  A.    Yea.  It can be used.

28  Q.    And was that done by Dr. Verrette in this

29  case?

30  A.    He did not document that he did it but I don't

31  know whether or not he did or not.

32  Q.    But in the records that you reviewed --

1    A.      It is really designed to be -- originally that
2    test was designed to be used by not so much doctors,
3    even though it is used a lot, it was designed to help
4    like nurses and people like that be able to come up
5    with a score of someone's mental state so that you
6    could compare it over time.
7    Q.      Okay.
8    A.      So, you know, I mean, it's a mini, it's a
9    mini-evaluation so when you're evaluating someone for
10   dementia, you're going to do a more thorough
11   evaluation than that, typically.
12   Q.      Well, again, I don't think I asked this, do
13   you recall if the medical records indicated why
14   Dobronich was going to see, specifically why he was
15   going to see Dr. Verrette in this case?
16   A.      I don't know if it said specifically in Dr.
17   Verrette's records why he was going to see him.  I
18   inferred because it was -- because of all the issues
19   regarding his will and power of attorney.
20   Q.      So, did Mr. Dobronich take himself to get
21   evaluated by Dr. Verrette?
22   A.      I don't know.  I would doubt it.
23   Q.      Okay.  So, you would have expected that
24   somebody else would take him to get evaluated by Dr.
25   Verrette?
26   A.      That's what I had assumed.
27   Q.      Referring to page 18 of your report, Doctor,
28   assessment, it is my opinion to a reasonable degree
29   of medical certainty that Mr. Dobronich suffered from
30   major neurocognitive disorder dementia, possible
31   vascular neurocognitive disorder prior to February
32   2013 and up through his death?

```
 1    A.      Yes.
 2    Q.      Okay.  First off, what is major neurocognitive
 3    disorder?
 4    A.      It's the formal terminology for dementia.
 5    Q.      What is dementia?
 6    A.      It's a cognitive decline in one or more
 7    domain.  So, you will have problems with memory, but
 8    you can also have problems with attention, executive
 9    functioning, learning, language, motor, perception
10    problems and social skills.
11    Q.      And I have to back up try to clarify.  Any
12    time I see the word major I am wondering if there is
13    a minor.  Is there a minor neurocognitive disorder?
14    A.      No.
15    Q.      Okay.  So, how do we determine when something
16    becomes a major neurocognitive disorder?  And that
17    might be a bad question, Doctor, if you could help me
18    out I would appreciate it.
19    A.      No.  It's not.  When it starts to cause
20    problems in their life.
21    Q.      So, it's something that somebody else, a lay
22    person, is going to be able to see, correct?
23    A.      Often.  Yes.
24    Q.      All right.  I am going to look at your report
25    because actually you have it in your report, decline
26    in one or more domains, complex attention, what is
27    that?
28    A.      The ability to maintain focus with multiple
29    things going on.  Your ability to maintain focus in
30    your environment.
31    Q.      Can you give me an example of that or just an
32    example of what that is and what problem that would
```

1  be?

2  A.      So, it would be starting a task and being able

3  to finish a task, remembering what you're doing and

4  staying focussed on that without getting distracted.

5  Q.      Okay.  Give me an example, please?

6  A.      Cooking and sometimes demented people leave

7  the stove on, leave the burners on.

8  Q.      Okay.  All right.  Executive function, what is

9  that?

10  A.      Executive functioning comes from your frontal

11  lobe in your brain, so it's your ability to be able

12  to walk into a room and assess what's going on and

13  how are you going to integrate yourself into that

14  room and what are you going to do.  I mean, I am

15  using a room but it could be anything.  So, it's a

16  human being's ability to look at a situation, assess

17  what's going on and figure out how they are going to

18  navigate through that situation.

19  Q.      Okay.  Again, I think I got it, but can you

20  give me an example of that?

21  A.      Walking in the courtroom today.  I walked in,

22  I saw the Judge wasn't here so I could go sit down,

23  it was still casual and I could talk to the Clerk or

24  a person sitting beside me.  I also knew that we were

25  going to have to wait a while because they didn't

26  look like they were ready to start court, but then

27  also knowing that when the Judge walks in that it's a

28  formal setting now and that our behavior is going to

29  be different.  They way we are going to sit is going

30  to be different.  How loudly we talk is going to be

31  different because the court is in session.  But it is

32  any situation, it's not just such a formal setting as

1  this, it's walking in, noticing who is sitting at the

2  table, who are you going to talk to, where are you

3  going to put your keys, how are you going to remember

4  where your keys are before you left.  So, it's just

5  how or how we decide to handle ourselves in a

6  situation.

7  Q.    And I got that.  A good example of that would

8  be somebody in church screaming and yelling in

9  church, that would be an indication of a problem with

10  executive functioning?

11  A.    That's a pretty extreme example.

12  Q.    Okay.

13  A.    That would probably be problems with other

14  things.  So, executive functioning is that complex

15  integration of information and processing of

16  information that we do all the time without realizing

17  it.

18  Q.    Okay.  I understand it, but you have it in

19  your report so I got to ask about it.

20        Perceptual motor, explain that to everybody.

21  A.    Coordination, motor functioning just means

22  that you're just physically moving around.

23  Q.    Okay.

24  A.    Your ability might mean things like your

25  ability to walk, or balance, or fine motor skills,

26  just any movement.

27        And perceptual is being able to correctly

28  perceive data coming in from the environment.

29  Q.    And social cognition?

30  A.    Social cognition would be social skills would

31  be the easiest way to explain that.

32  Q.    Okay.  All right.  And you have decline in one

1    or more of the domains you just talked about, that

2    can have a multitude of ideologies?

3    A.      Yes.

4    Q.      What does that mean?

5    A.      Well, dementia is a broad category.  So,

6    dementia can be from different idealogies, meaning it

7    can be from -- you can have dementia from

8    Alzheimer's, you can have dementia from Lewy Body

9    disease, Parkinson's disease can cause a dementia or

10   you can have multi-infarct dementia which is probably

11   what I believe Mr. Dobronich had where that stems

12   from hypertension.  The way of thinking about that

13   is, you know, when you have a heart attack what's

14   going on in the arteries in your heart to cause a

15   heart attack are also happening in the arteries in

16   your brain.  So, you can also have these multiple

17   little infarcts that occur over time causing a

18   dementia.

19   Q.      Okay.  How do you test for that?  When I say

20   that, the last one you just said about --

21   A.      Multi-infarct dementia?

22   Q.      Multi-infarct dementia.

23   A.      Well, you can do a CT scan and it can show it,

24   but it's common when somebody is elderly and has

25   likely causes of the dementia to not test for it

26   because the treatment, you know, Alzheimer's and

27   multi-infarct dementia isn't going to be different,

28   really.  So, the idealogy isn't really that important

29   from the medical standpoint.

30   Q.      Okay.  Any other way to, again, I understand

31   about its importance, but any other way to test for

32   multi-infarct dementia?

29

1    A.      No.   I mean you would do an evaluation and

2    detect dementia, but as far as, you know, studies,

3    no.   You wouldn't test that any particular way.

4    Q.      And in your review of the records, was a CT

5    scan ever done on Mr. Dobronich to determine if he

6    had multi-infarct dementia?

7    A.      I never saw a CT scan.

8    Q.      You mention other things that can cause

9    dementia, what other things can cause dementia?

10   A.      I said Lewy Body disease, Alzheimer's,

11   Parkinson's, there were various causes of dementia.

12   Q.      Can you have an instance of temporary

13   dementia?

14   A.      You can have pseudo dementia which is caused

15   by depression.   It can make a person look demented

16   while they are depressed.

17   Q.      But you can't -- and what I am getting at is,

18   are there things that can cause somebody to exhibit a

19   cognitive decline in one or more domains that you

20   talked about that can be temporary?

21   A.      I think that maybe you're referring to

22   delirium.

23   Q.      Okay.

24   A.      Which is an acute state caused by illness.   I

25   think everybody can think of an image of somebody

26   they have seen with a high fever not making sense and

27   being delirious.   So, there is cognitive issues

28   there, but those resolve with the underlying illness.

29   Q.      How about drug use?

30   A.      Yes.

31   Q.      How does that factor in?

32   A.      Medications can cause alterations in cognitive

1    functioning.  That was noted in Mr. Dobronich's case

2    when he was given, I believe he was given

3    benzodiazepines at one point or he was sedated after

4    his stint placement and they felt that the changes in

5    his mental state were due to the medication at that

6    time.

7    Q.     I mean, is that something that you would, and

8    not just for -- back up.  Let me rephrase that

9    question.

10         Is that something that you would expect a

11   cognitive decline after or soon after a surgery not

12   just in an elderly person but in anybody?

13   A.     No, not necessarily anybody but it is not

14   surprising for it to happen.

15   Q.     Okay.

16   A.     You know, even with dementia or without

17   dementia, you can certainly have a worsening of your

18   mental state after surgery with medication, with

19   illness, with pain, with just being in a different

20   place, when someone is demented, they can have a

21   worsening of their mental state.

22   Q.     And to backup, Doctor, you mentioned

23   orientation as a way to check somebody's cognitive

24   functioning, what is the Glascow Coma Scale?

25   A.     It's a way to document someone's mental state

26   after a trauma.  It's used a lot in emergency rooms

27   and they give a numerical value.

28   Q.     And what is that numerical value?

29   A.     Oh, I don't remember.  I haven't gone over the

30   coma scale in a while.

31   Q.     Okay.

32   A.     I don't use it.

1    Q.      Okay.

2    A.      I noted that his was always pretty high.

3    Q.      Okay.  Yes.  And when you say high, is fifteen

4    (15) the highest score you can get on the --

5    A.      I don't remember.  I thought maybe sixteen

6    (16) but I haven't looked at that in a while.  I

7    remember that his was, there wasn't a problem with

8    his Glascow Coma Scale in the records.

9            BY MR. BROWN:

10                  Judge, may I approach?

11           BY THE COURT:

12                  Yes.

13

14           EXAMINATION RESUMED BY MR. BROWN:

15   Q.      I just want to make sure.

16   A.      Yea, so three through fifteen. (15)  So,

17   fifteen (15) would be the highest.

18   Q.      That's all I wanted to --

19   A.      I think he was usually around fifteen. (15)

20   Q.      Okay.  All right.  I want to ask you a couple

21   questions about capacity.  Can you have a

22   neurocognitive disorder and still have capacity?

23   A.      Yes.

24   Q.      And how do you test for capacity, Doctor?

25   A.      It depends on what the capacity is for.

26   Q.      Why is that important?

27   A.      Well, capacity is capacity to do a certain

28   thing, so it depends on what the certain thing is.

29   Q.      So, depends on what the certain thing is.  I

30   got you.  How about capacity to make a will?

31   A.      So, when testing for capacity you would be

32   looking for does that person understand what all his

1 property is.   Does he understand who he wants to give

2 it to, what does that mean, what are the

3 ramifications of giving it to a certain person or not

4 giving it to a certain person.

5 Q.      And again, I think you testified before that

6 capacity can change over time?

7 A.      Yes.

8 Q.      So, someone can be evaluated to be or to not

9 have capacity and then later be evaluated to have

10 capacity; is that correct?

11 A.      Yes.

12 Q.      You mentioned before, we will call it

13 delirium, capacity can change from day-to-day?

14 A.      Yea, but we were talking or we are

15 encompassing a lot of different things with that.

16 Q.      I understand.

17 A.      Like you asked me about the case before and in

18 that aspect capacity, I believe that was about a

19 psychosis, so psychosis can be treated and get

20 better, a delirium can be treated and get better, a

21 dementia can't get better.

22 Q.      Now, just so I am clear, I figured out the

23 question I wanted to ask earlier, can somebody, and I

24 will use the term, coming off an overdose of drugs,

25 and recovering from an overdose of drugs, is that

26 considered delirium, would that be an example of a

27 delirium?

28 A.      Some one could be delirious in that instance.

29 Q.      That could probably be the same thing for say

30 too much alcohol use?

31 A.      Well, I mean, there is a difference between

32 intoxication and a delirium.

1   Q.      What is that?

2   A.      A delirium is most likely, when you are

3   talking about drugs, that's most likely going to

4   happen during a withdrawal.

5   Q.      Okay.  Well, let's use the example a surgery,

6   somebody goes to get stints placed in.  First of all,

7   what kind of surgery is that?

8   A.      Okay.  I will speak on cardiology.  A stint is

9   just when they place a stint within the vessels of

10  the heart.

11  Q.      And just in general is that typically done

12  under anesthesia?

13  A.      I think that depends.  It is not always done

14  under anesthesia.

15  Q.      But you would expect to have some medications

16  administered to the patient?

17  A.      I believe Mr. Dobronich had medications during

18  that, but that would be an intoxication not a

19  delirium and I use intoxication medically not that he

20  was using drugs or drunk, but the medicine is still

21  affecting his mental state.

22  Q.      And that's what I am trying to get at because

23  I just want to make sure I am clear on what we are

24  talking about because -- let's go to intoxication.

25  Can intoxication result in cognitive decline in one

26  or more domains that you mentioned earlier?

27  A.      Yes.

28  Q.      Doctor, is it possible to fool a lay person

29  regarding capacity?

30  A.      I would think so.

31  Q.      Can you explain that?

32  A.      I don't really know what you're asking.

1  Q.     Is it possible for somebody to, again, to
2  think based on their observation of the person to
3  transact or to let's just say make a will?  That they
4  can observe them and to think that they have capacity
5  to transact a will but not actually have that
6  capacity?
7  A.     Yes.
8  Q.     All right.  Based on what I told you, can you
9  explain that piece?
10 A.     I don't really know what you're asking, I
11 mean, can a person think somebody is not as ill as
12 they are, yes.  I don't know how I can really testify
13 about, I mean, there are people who are not doctors,
14 yes.
15 Q.     If I get authorization from somebody to spend
16 their money and they are later found out by somebody
17 like you to not have capacity, can I still have
18 reasonably thought that they had capacity to
19 authorize me to do it?
20        BY MR. BLAKE:
21                 Objection, Judge.  Speculation.
22        BY THE COURT:
23                 Sustained.  And I don't know how
24            that relates to this motion to exclude
25            this Doctor's testimony.  That may be a
26            question you can ask during the course of
27            the trial or some question like that, but
28            we are here to determine whether or not
29            the methodology that this lady used was
30            correct and whether or not it would be
31            helpful to the jury.  Half of the
32            questions you have asked today may be good

35

1              for the jury trial but it is not for this

2              hearing and we are now well over an hour

3              into this and we have not even got to

4              cross examination by the State.

5        BY MR. BROWN:

6                   I apologize, Your Honor, I will

7              move on.

8

9        <u>EXAMINATION RESUMED BY MR. BROWN:</u>

10  Q.    Doctor, would you characterize this particular

11  analysis as a psychiatric autopsy?

12  A.    Yes.

13  Q.    Can you define psychiatric autopsy?

14        BY MR. BLAKE:

15              Objection.

16

17              (Witness responds)

18

19  A.    A psychiatric autopsy is looking at someone's

20  mental state after they are dead, retrospectively.

21  Q.    I want to read you a definition and ask you if

22  you agree with this definition.  "The best way to do

23  a psychiatric autopsy of a person who is not present

24  or deceased is to gather as much information as

25  possible about the person's prior functioning in life

26  with a particular focus on her functioning at the

27  time in question."  Does that sound accurate?

28  A.    Partially.  I think it's as much information

29  as necessary or as much information that is useful.

30  I mean there is always an unlimited, in any

31  circumstance there is an unlimited amount of

32  collateral information out there you could keep

1  interviewing people, there is always more people who
2  knew the person so in this case I gathered, I
3  reviewed the information that I thought was needed to
4  form an opinion to a reasonable degree of medical
5  certainty.
6  Q.     What about the functioning at the particular
7  time in question, is that accurate?
8  A.     Yes.  You're looking at at time.  I would
9  suspect that what you're reading from was looking at
10 a very specific time and date versus this I was
11 looking over a period of time.
12 Q.     What period of time?  That would be February
13 2013 until March 2014 until the time --
14 A.     Well, and up through July.
15 Q.     Okay.
16 A.     Is the information that I had available.
17 Q.     Doctor, is there any peer review of a mental
18 status exam or of a psychiatric autopsy that takes
19 into account the period you just described from say
20 looking at a period of well over a year in time?
21 A.     I don't think I was looking at over a year in
22 time, but I mean, are you asking --
23 Q.     Look back up, it says your opinion is major
24 neurocognitive disorder prior to February of February
25 2013 and up until his death.  What is the actual time
26 period you're talking about?
27 A.     I thought he died in around August, but all
28 the information -- maybe I should have said this more
29 specifically, the information that I looked at was
30 the last documentation I had was of that July 25th
31 addendum.
32 Q.     Let me ask, okay, does March 2014 sound about

1   correct for the time of Mr. Dobronich's death?

2   A.      Yea, I don't remember what I was told about

3   that.  So, yea, that could be right.  And when I

4   would say up until his death because dementia doesn't

5   go away.  So, if he had dementia in February, if he

6   had it in March he's going to have it up until when

7   he dies.

8   Q.      Did anything -- let me get back to my original

9   question.  Let's just assume, okay.  Prior to

10  February 2013, can you give me a time frame what we

11  are talking about, prior to February 2013?

12  A.      I said prior to February 2013 because I felt

13  that he had significant enough dementia that, you

14  know, dementia is progressive unless you had a

15  sentinel event like you had a stroke and then you

16  have essentially brain damage from that stroke and

17  you could have a sudden onset of severe dementia but

18  most dementia is slow and progressive.  So, he had

19  evidence of dementia in February which means he

20  probably had it for a while before.  I can't say if

21  he had it for months or years before but he

22  definitely would have had it before to have that

23  level of dementia in February.

24  Q.      Well, can you put a time frame on it where he

25  did not have major neurocognitive disorder?

26  A.      Of when he did not?

27  Q.      Yes.

28  A.      No.  I didn't look for a date to say he

29  clearly didn't have dementia on this date.  No.

30  Q.      So, if you can't give me a start time of when

31  we are talking about of major neurocognitive

32  disorder; is that correct?

1  A.      That is correct.  I can say he had it in

2  February.

3  Q.      And to go back to my next question, is there

4  any peer reviewed journal that has accepted a

5  psychological autopsy or mental status exam where you

6  have a period of up to at least a year and a year and

7  a month, possibly longer?

8  A.      I still don't understand what you're asking

9  me.  There are lots of peer reviewed articles about

10  psychiatric autopsy where they are looking back.

11  Q.      At a specific time frame, correct?

12  A.      Yes.  I mean, I don't know.  I mean, I never

13  looked at them like that.  I can't talk about whether

14  it was for an exact date or over a time period

15  because if you're dealing with dementia it is over a

16  time period so it's not going to address it as, I

17  mean, you're getting towards legal situations where

18  you're asking about does a person have capacity at a

19  given moment and so usually when someone is doing a

20  psychiatric autopsy it is often looking at that, but

21  it might also be looking over a period of time.

22  Q.      So, is it fair to say you don't know of any

23  peer reviewed journals that talk about a psychiatric

24  evaluation where the time period is a year and a

25  month, maybe longer?  Would that be a fair statement?

26  A.      No.  No.  I don't know -- I can't comment

27  about specificity of all of those articles.  I mean,

28  there are lots of peer reviewed journals about

29  psychiatric autopsy, whether they're looking at one

30  date or looking over time, they are always going to

31  be looking over time because you're looking at the

32  information surrounding -- even if you're addressing

1   one day you're looking at data surrounding that.

2   Q.    You mention that the reason for the time frame

3   was the dementia, correct?  Or because of dementia,

4   is slow it is a continuously degenerative process?

5   A.    Yes.

6   Q.    Did you do anything in your analysis to

7   differentiate between dementia and delirium or

8   intoxication in this analysis?

9   A.    Yes.  I mean when I looked at the records I

10  noted that there were times that they thought it was

11  from medication and that they were always looking for

12  causes of delirium and so I took that into account

13  during my evaluation.  Delirium, intoxication and

14  dementia aren't mutually exclusive.  You can have all

15  of them.

16  Q.    But you can also have intoxication and not

17  necessarily dementia, correct?

18  A.    Correct.

19  Q.    And would you say that your review of the

20  medical records would indicate that possibly was more

21  due to intoxication then dementia?

22  A.    No.  I mean, there were times, you know, when

23  after he had the stint placed that they believed that

24  his change in mental state was from the medication

25  and that resolved.  So, the symptoms that they were

26  seeing, they felt got better.  So, I think he did

27  have an intoxication, you know, or reaction to the

28  medication you could say, or continued residual

29  affects of the medication.

30  Q.    And can hospital staff possibly mistake

31  intoxication for dementia?

32  A.    Yes.  They are trained to always suspect an

1    intoxication or delirium because that's a much more
2    dangerous -- you want to look for a delirium or
3    intoxication first because that's dangerous.  A
4    dementia is chronic and it's not going to change, but
5    somebody can die during a delirium.  So, in a
6    hospital setting they are always going to be looking
7    for those things first.
8    Q.    You also had a basis to -- or your conclusions
9    were due to Mr. Dobronich's behavior from fiscally
10   conservative and independent and as describe by his
11   family and financial advisor to that seen during the
12   early part of 2013, correct.
13   A.    Yes.  So, I took that information from
14   Detective Montgomery's report and his financial
15   advisor's testimony.
16   Q.    To wrap this up, did you do any determination
17   as to whether or not any of the people that you were
18   talking to had a reason to tell you something that
19   wasn't true?  To put something that wasn't true in
20   the materials that you reviewed?
21   A.    Yes.  I always consider that.
22   Q.    Did you consider that the information from Mr.
23   Dobronich's nephews possibly was that they had an
24   interest in putting in information in that report
25   that wasn't true?
26   A.    Yes.
27        BY MR. BROWN:
28                  I tender the witness.
29                  Thank you, Judge.
30        BY THE COURT:
31                  Yes, sir.
32

1                        CROSS EXAMINATION

2

3            EXAMINATION BY MR. BLAKE:

4    Q.      Doctor, to follow-up on that last question,

5    did you consider that Calvin and Darnay Thibodaux

6    made statements that were not true, that they had an

7    interest?

8    A.      Yea.  And in reviewing all the records I have

9    to attempt to weigh the validity of what the people

10   are saying.  That's why reviewing, it was nice in

11   this case to have sworn testimony.

12   Q.      Okay.

13   A.      Where somebody is sworn to tell the truth.

14   Q.      Okay.

15   A.      And then also I got to review Mr. Dobronich's

16   testimony.

17   Q.      Okay.

18   A.      Which was very helpful in rendering my

19   opinion.

20   Q.      How so?

21   A.      Because it demonstrates his thought processes,

22   you know, I had actual record of what he said and how

23   he said it.  So, that was very valuable.

24   Q.      Okay.  Was his capacity called into question

25   based on the transcript you read?

26   A.      Yes.

27   Q.      By who?

28   A.      By the judge in the case.

29   Q.      Okay.  Now, when you were asked reviewed the

30   portion of the records the system of Detective

31   Montgomery's report, there were other statements in

32   that report, correct?

```
 1   A.      Yes.

 2   Q.      Okay.  And you examined those statements as

 3   well, right?

 4   A.      I believe it was Detective Montgomery

 5   referring to statements they had made.

 6   Q.      That's what I meant.  Okay.  And you put that

 7   in your report, correct?

 8   A.      Yes.

 9   Q.      Okay.  Now, you also would agree, Doctor, that

10   capacity is a task-specific thing, correct?

11   A.      Correct.

12   Q.      Okay.  So, in other words, the person would

13   have capacity to do some things but other things he

14   may not?

15   A.      Correct.

16   Q.      Okay.  Now, you would agree also, too, Doctor,

17   that I heard Mr. Brown mention about peer reviews

18   regarding certain type cases involving time spent of

19   a year-and-a-half, all cases are different, correct?

20   A.      Yes.

21   Q.      And every case has to be treated differently,

22   correct?

23   A.      Correct.

24   Q.      Okay.

25           BY MR. BLAKE:

26                    That's all I have, Judge.

27           BY THE COURT:

28                    Any re-direct?  It's limited to the

29           questions of Mr. Blake?

30           BY MR. BROWN:

31                    No, Your Honor.

32           BY THE COURT:
```

```
 1                    Nothing.
 2                    Thank you, Doctor.  You may step
 3            down.
 4                    I have the memorandum filed by Mr.
 5            Brown.  Does anyone need to make any
 6            argument here?
 7       BY MR. BLAKE:
 8                    Yes, Judge, just on the motion.
 9       BY MR. BROWN:
10                    Yes, Judge.
11                    Your Honor, just again, I think
12            we've established that when you look at
13            what is the reliability in the expert's
14            opinion in this case and we are not
15            challenging Dr. Garriga's expertise but
16            the methodology issue here that the
17            defense thinks is not appropriate for this
18            jury.
19                    First off, we got to the question of
20            peer reviewed and Dr. Garriga did admit to
21            psychiatric autopsies but that is the
22            definition that is accepted in Louisiana
23            refers to a specific time frame of when a
24            will was created and she has taken a time
25            frame of a year and a month over which she
26            has admitted she does not know of any peer
27            review that talks about a psychiatric
28            autopsy or mental status exam that spans
29            that distance of time.
30                    Also, there are several witnesses
31            and statements that she has not
32            considered.  She has basically considered
```

```
 1            things second and third-hand.  Again, her
 2            opinion is in terms of a psychiatric
 3            autopsy by definition considers as many
 4            sources as possible, Dr. Garriga has
 5            clearly failed to do that in this case.
 6                 So, the defense feels that based on
 7            the case law and based on the principles
 8            of Daubert and 702 that her opinion should
 9            be excluded.
10       BY THE COURT:
11                 Thank you.
12       BY MR. BLAKE:
13                 Well, Judge, I strongly disagree, I
14            mean, Dr. Garriga is a very well
15            experienced psychiatrist.  She has been
16            doing this for a long time, has testified
17            numerous times.
18                 Your Honor, when you look at the
19            cases that are actually cited in Mr.
20            Brown's memorandum, okay, the doctors in
21            those cases where the courts have held
22            that their methodology was proper and
23            passed Daubert as well as Code of Evidence
24            Article 702 they did pretty much the same
25            thing she did, Your Honor.  Okay.  They
26            looked at the medical records.  They
27            looked at depositions.  I know there were
28            no depositions in this case, but there was
29            testimony under oath.  She looked at the
30            transcript, Your Honor.  She looked at the
31            decedent's neurologist's statements and
32            the case law.  She looked at that.  She
```

```
 1          looked at documentation from Dr. Verrette,
 2          Your Honor.  She also looked at financial
 3          documents, I mean, she looked at all the
 4          reports that included references to
 5          financial documents and things like that.
 6          She didn't interview any witnesses, Judge,
 7          but they did have in the case law cited in
 8          this motion that the Court's have held
 9          also, so it is nothing wrong with what she
10          did here, Your Honor.  I think she did a
11          very thorough examination.
12               Regarding the issue of something
13          appearing in a peer journal regarding the
14          length of time that we are talking about,
15          Judge, what cases are distinguished on the
16          facts, we all know that, so just because
17          it is not mentioned that doesn't
18          necessarily mean that the methodology is
19          wrong.
20               Judge, both of these cases, in the
21          Zeringue case, which is a First Circuit
22          case as well as the Pardue case, which is
23          the Second Circuit case, Judge, the
24          doctors in those cases did exactly the
25          same thing as she did.  Okay.  They looked
26          at the records that were presented to
27          them, they made their decision and the
28          courts actually upheld that, Judge.  I
29          mean, she looked at extensive police
30          report from Detective Stefan Montgomery
31          that referenced other statements of people
32          that observed Mr. Dobronich.  She looked
```

```
1              at hospital records, Judge.  There were

2              lots of hospital records.  She looked at

3              them, Your Honor.  She looked at them, she

4              looked at the will.  She looked at the

5              testimony of Mr. Dobronich that was taken

6              of June 25, 2013 where his capacity was

7              called into question by Judge Garcia.

8              Judge, she looked at everything we

9              provided to her.  She did a very thorough

10             examination here.  So, to say that what

11             she is doing here is improper or that her

12             methodology was improper, Judge, I think

13             that is completely wrong.  I think the

14             proper question that Mr. Brown is

15             addressing is for the trier of fact to

16             determine.  Okay.  That ultimately the

17             jury is going to decide, okay, regarding

18             Mr. Dobronich's capacity, but to say that

19             her methodology is wrong is completely off

20             base.

21                  So, Judge for that reason I believe

22             that his motion, motion in limine, should

23             be denied.

24   BY THE COURT:

25                  Thank you.

26                  Anything else, Mr. Brown?

27   BY MR. BROWN:

28                  No, Your Honor.

29   BY THE COURT:

30                  All right.  The Court has listened

31             closely to the testimony here today.  Has

32             considered the arguments of counsel, the
```

47

1      memorandum filed by defense counsel.
2      Certainly there is a three-prong test in
3      our Daubert analysis.
4           First, the expert must be qualified
5      to testify concerning the matters that she
6      would intend to address.  Clearly Dr.
7      Garriga is qualified in the area of
8      forensic psychiatry to testify.
9           The next test is the methodology.
10     Based on the testimony of Dr. Garriga the
11     Court finds that she has complied with the
12     methodology requirements and in fact her
13     testimony was that she had enough evidence
14     to make a determination within reasonable
15     medical certainty that Mr. Dobronich had
16     dementia.  So, the Court finds that that
17     prong is satisfied.
18          The last one, the testimony will
19     assist the trier of fact to understand the
20     evidence or determine a fact at issue, and
21     the Court finds that her testimony will
22     assist the trier of fact.  Of course, the
23     jury has the right to accept or reject her
24     testimony at trial and defense has the
25     right to cross examine her as to her
26     methodology and her conclusions.  That
27     will be a consideration for the jury to
28     make during the course of the trial as to
29     whether or not her testimony is reliable
30     and should be accepted and used in the
31     determination.
32          So, the motion to exclude her

```
 1              testimony is denied.
 2                   Now, we have jurors up in the jury
 3              room.  They have been chosen by random
 4              allotment.  They will be brought down to
 5              the courtroom, placed in the jury box in
 6              the order in which they were chosen.  Do
 7              we have a stipulation between counsel as
 8              to that process?  You stipulate that was
 9              the way the procedure was done?
10         BY MR. BLAKE:
11                   Yes, Your Honor.
12         BY MR. BROWN:
13                   Defense has no objection to the
14              random allotment.
15         BY THE COURT:
16                   So, we have a stipulation the jurors
17              were chosen by random allotment in the
18              jury pool room.  They will be placed in
19              the jury box when we begin our jury
20              selection in the order in which they were
21              chosen.
22                   Thank you very much.
23                   Counsel, be back at 1:00 o'clock.
24              We will begin jury selection at that
25              point.
26                   Actually let's be back here at
27              12:30.
28
29         (Court recessed - Court resumed)
30
31
32
```

# REPORTER'S CERTIFICATE

I, Karen Carite Jenkins, CCR, Certified Court Reporter, Certificate No. 91227, which is at this time current and in good standing, Official Court Reporter in and for the Parish of St. Tammany, State of Louisiana, do hereby certify the the foregoing testimony taken by Oneita Graham on December 16, 2014, on said date before the Honorable Richard Swartz, Judge Presiding, Division "C", was transcribed to the best of my ability and understanding from the backup recordings of Oneita Graham, Official Court Reporter, in and for the Parish of St. Tammany.

KAREN CARITE JENKINS, CCR
Official Court Reporter
Certificate No. 91227