## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DARNAY THIBODAUX**                                    **CIVIL ACTION**

**VERSUS**                                              **NO. 19-2241**

**JON REEVES, DISTRICT ADMINISTRATOR,**               **SECTION: "M"(3)**
**ET AL.**

### REPORT AND RECOMMENDATION

Petitioner, Darnay Thibodaux, filed this federal application seeking habeas corpus relief

pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that her application

be **DISMISSED WITH PREJUDICE**.

On December 17, 2014, petitioner pleaded guilty in the Louisiana Twenty-Second Judicial

District Court to two counts of exploitation of the infirmed pursuant to La. Rev. Stat. Ann. §

14:93.4.[1] Although she shortly thereafter moved to withdraw her guilty pleas,[2] the district court

denied that motion on January 29, 2015,[3] a denial which was subsequently upheld by the state's

appellate courts.[4] Also on January 29, 2015, she was sentenced on each conviction to a concurrent

---

[1] State Rec., Vol. 3 of 16, transcript of December 17, 2014; State Rec., Vol. 1 of 16, minute entry dated December 17, 2014; State Rec., Vol. 2 of 16, guilty plea form.

[2] State Rec., Vol. 2 of 16, Motion to Withdraw Guilty Plea and Motion to Dismiss Indictment.

[3] State Rec., Vol. 3 of 16, transcript of January 29, 2015.

[4] The Louisiana First Circuit Court of Appeal denied her related writ application challenging that ruling on February 19, 2015. State v. Thibodaux, No. 2015 KW 0280 (La. App. 1st Cir. Feb. 19, 2015); State Rec., Vol. 7 of 16. The Louisiana Supreme Court then likewise denied relief on May 15, 2015. State v. Thibodaux, 170 So. 3d 967 (La. 2015); State Rec., Vol. 3 of 16.

term of ten years' imprisonment, with five years suspended; it was also ordered that she be placed on five years' probation after release and make restitution.[5]

On July 28, 2016, petitioner, through counsel, filed an application for post-conviction relief with the state district court;[6] that application was then later supplemented on two occasions.[7]  On February 23, 2017, the state district court denied relief.[8]  Her related writ applications were thereafter likewise denied by the Louisiana First Circuit Court of Appeal on May 25, 2017,[9] and July 24, 2017,[10] and the Louisiana Supreme Court on January 18, 2019.[11]

On March 11, 2019, petitioner, through counsel, filed the instant federal application seeking habeas corpus relief.[12]  The state filed an answer conceding that petitioner was "in custody" for federal habeas corpus purposes[13] but arguing that her application was untimely.[14]

---

[5] State Rec., Vol. 3 of 16, transcript of January 29, 2015.

[6] State Rec., Vol. 3 of 16, Petition for Post Conviction Relief.

[7] State Rec., Vol. 4 of 16, Motion for Leave to Supplement Petition for Post-Conviction Relief with an Additional Claim; State Rec., Vol. 6 of 16, Motion for Leave to Supplement Petition for Post-Conviction Relief with an Additional Claim.

[8] State Rec., Vol. 6 of 16, Reasons for Judgment and Order dated February 23, 2017.

[9] State v. Thibodaux, No. 2017 KW 0487, 2017 WL 2295097 (La. App. 1st Cir. May 25, 2017); State Rec., Vol. 11 of 16.

[10] State v. Thibodaux, No. 2017 KW 0736, 2017 WL 3140817 (La. App. 1st Cir. July 24, 2017); State Rec., Vol. 13 of 16.

[11] State v. Thibodaux, 261 So. 3d 773 (La. 2019); State Rec., Vol. 15 of 16.

[12] Rec. Doc. 1.

[13] Federal law provides:  "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254 (a).  Although the United States Supreme Court has "interpreted the statutory language as requiring that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time [her] petition is filed," its "interpretation of the 'in custody' language has not required that a prisoner be physically confined" in order seek federal habeas corpus relief.  Maleng v. Cook, 490 U.S. 488, 490-41 (1989).  Rather, the custody requirement is met if a petitioner, "as a result of a state-court criminal conviction," suffers "substantial restraints not shared by the public generally."  Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502, 510 (1982).  Although petitioner was no longer physically confined at the time her federal application was filed, she was on probation.  See Rec. Doc. 1-2, p. 31.  That suffices.  See Brian R. Means, Federal Habeas Manual § 1:9 (May 2021 Update) ("A person who is on parole or probation at the time he files his federal habeas petition satisfies the custody requirement.").

[14] Rec. Doc. 11.

She filed a reply.[15]  She then subsequently filed a motion asking that these federal proceedings to be stayed pending the outcome of a St. Tammany Parish Sheriff's Office investigation of Detective Montgomery, one of the officers involved in her state criminal case.[16]  She later filed another motion in which she made the following requests:  (1) she be allowed to withdraw her motion for a stay because the referenced investigation had been completed; (2) she be allowed to supplement her application and conduct discovery; and (3) the Court hold an evidentiary hearing and allow expansion of the record.[17]  The Court allowed her to withdraw her motion for a stay and ordered the state to file a response to the remaining requests.[18]  The state filed a response as ordered,[19] and she filed a reply to that response.[20]  By separate order issued this date, the undersigned United States Magistrate Judge is denying that motion in all remaining respects given that the federal application is in fact untimely for the following reasons.

### Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a statute of limitations for petitioners seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Specifically, the AEDPA provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[15] Rec. Doc. 17.
[16] Rec. Doc. 19.
[17] Rec. Doc. 22.
[18] Rec. Doc. 23.
[19] Rec. Doc. 24.
[20] Rec. Doc. 27.

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

## **Subsections B and C**

Subsections B and C of 28 U.S.C. § 2244(d)(1) clearly do not apply in the instant case because petitioner does not allege the existence of either a state-created impediment or a newly recognized constitutional right.

## **Subsection A**

The state argues that Subsection A applies in this case. As noted, under that subsection, a petitioner must bring her claims in federal court within one (1) year of the date on which her underlying state criminal "judgment" became "final." 28 U.S.C. § 2244(d)(1)(A). For AEDPA purposes, the "judgment" at issue consists of the conviction and the sentence; therefore, a petitioner's judgment is not "final" under Subsection A until **both** her convictions **and** sentences are final. See Burton v. Stewart, 549 U.S. 147, 156-57 (2007); Scott v. Hubert, 635 F.3d 659, 665-67 (5th Cir. 2011). With respect to determining that date of finality, the United States Fifth Circuit Court of Appeals has explained:

The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became

final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." Id. at 694; see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).

Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. See Foreman, 383 F.3d at 338-39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. See Causey v. Cain, 450 F.3d 601, 606 (5th Cir. 2006); Roberts, 319 F.3d at 693.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Here, petitioner pleaded guilty on December 17, 2014,[21] and she was sentenced on January 29, 2015.[22] Under Louisiana law, she then had thirty days in which to file an appeal.[23] Because she filed no such appeal,[24] her state criminal judgment became final for the purposes of this federal proceeding no later than March 2, 2015.[25]

In normal circumstances, petitioner's limitations period for seeking federal habeas corpus relief would have commenced on that date. However, in this case, commencement of that period was delayed due to tolling. Specifically, regarding the limitations period set forth in § 2244(d)(1), federal law expressly provides: "The time during which a properly filed application for State post-

---

[21] State Rec., Vol. 3 of 16, transcript of December 17, 2014; State Rec., Vol. 1 of 16, minute entry dated December 17, 2014; State Rec., Vol. 2 of 16, guilty plea form.

[22] State Rec., Vol. 3 of 16, transcript of January 29, 2015.

[23] Louisiana law states that a criminal defendant has thirty days to file a motion to appeal a conviction or sentence. La. Code Crim. P. art. 914.

[24] See Rec. Doc. 1, p. 3, answer to Question No. 8.

[25] Because the thirtieth day fell on a Saturday, she had until Monday, March 2, 2015, to file an appeal. See La. Code Crim. P. art. 13; La. Rev. Stat. Ann. § 1:55.

conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

Here, such tolling was triggered by petitioner's filing of her motion to withdraw her guilty pleas on January 9, 2015.[26] See, e.g., Gallow v. Cooper, 301 F. App'x 342, 344-45 (5th Cir. 2008) (holding that a motion to withdraw a guilty plea is a proper post-conviction motion under Louisiana law and, therefore, tolls the federal limitations period); Johnson v. Rogers, Civ. Action No. 14-1696, 2015 WL 858078, at *2 & n.20 (E.D. La. Feb. 26, 2015) (same). Moreover, although the state district court denied her motion was January 29, 2015,[27] she sought supervisory review of that denial in a timely manner.[28] Accordingly, her motion remained "pending" for tolling purposes until that ruling became final by the Louisiana Supreme Court's related denial of relief on May 15, 2015.[29] See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004) ("[A] state habeas application is pending, in the context of § 2244(d)(2), as long as the ordinary state collateral review process is in continuance, or, in other words, until the application has achieved final resolution through the State's post-conviction procedures. Thus, a petitioner is entitled to, and indeed often must invoke, one full round of collateral review in state court before seeking federal habeas relief. While that full round of state habeas proceedings is properly in progress, AEDPA's one-year period of limitations is tolled." (citations and internal quotation marks omitted)). It was at that point that the federal limitations period finally commenced in the

---

[26] State Rec., Vol. 2 of 16, Motion to Withdraw Guilty Plea and Motion to Dismiss Indictment.

[27] State Rec., Vol. 3 of 16, transcript of January 29, 2015.

[28] The state concedes that petitioner's related writ applications were timely filed. See Rec. Doc. 11, p. 6.

[29] State v. Thibodaux, 170 So. 3d 967 (La. 2015); State Rec., Vol. 3 of 16.

instant case.[30]  The limitations period then expired one year later on May 16, 2016,[31] unless that deadline was further extended by additional tolling.

Because petitioner had no other applications for state post-conviction or other collateral review pending at any time on or before May 16, 2016, she is not entitled to further statutory tolling.[32]

---

[30]  The undersigned notes that a petitioner receives no additional tolling credit for the period during which she could have sought review by the United States Supreme Court with respect to that denial of collateral review.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

[31]  Because the three-hundred-sixty-fifth day of the limitations period fell on a Sunday, petitioner's deadline was extended through the following Monday, May 16, 2016.  See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed. R. Civ. P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

[32]  Although petitioner subsequently filed a post-conviction application on July 28, 2016, filings after the expiration of the federal statute of limitations have no bearing on § 2244(d)(2) tolling determinations.  See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000).  Simply put: once the federal limitations period has expired, "[t]here [i]s nothing to toll."  Butler v. Cain, 533 F.3d 314, 318 (5th Cir. 2008).

However, petitioner advances an additional argument which must be addressed.  Specifically, in her reply to the state's response, Rec. Doc. 17, she argues that her federal limitations period was tolled by the Motion for Restitution **filed by the state** on January 20, 2016.  She opines that the state's motion should be considered a request for "other collateral review" under the definition given that term by the United States Supreme Court in Wall v. Kholi, 562 U.S. 545 (2011).

In Kholi, the Supreme Court was confronted with the issue of whether a petitioner's motion for a reduction of his sentence qualified as "other collateral review" under 28 U.S.C. § 2244(d)(2).  The respondent argued that it did not because it did not challenge the legal validity of the petitioner's conviction or sentence, but instead merely sought a discretionary sentencing reduction.  The petitioner and – more importantly, the Supreme Court – disagreed, noting that the respondent's view was too narrow.

The Supreme Court acknowledged that "'[c]ollateral review' is not defined in AEDPA, and we have never provided a comprehensive definition of that term."  Id. at 551.  The Supreme Court then parsed the term.  It noted that review is "collateral" if it "is not part of **direct** review"; in other words, collateral review is "a form of review that is not part of the **direct appeal** process."  Id. at 552 (emphasis added).  The Supreme Court then proceeded to the word "review," but simply noted that "the meaning of that term seems clear.  'Review' is best understood as an 'act of inspecting or examining' or a 'judicial reexamination.'"  Id. at 553.  The Supreme Court therefore concluded: "Viewed as a whole, then, 'collateral review' of a judgment or claim means a judicial reexamination of a judgment or claim in a proceeding outside of the direct review process."  Id.  Based on that conclusion, the Supreme Court then found that a motion for a reduction of sentence is a form of "collateral review" – it is "collateral" because it is not part of direct review; it is "review" because it "involves judicial reexamination of the sentence to determine whether a more lenient sentence is proper."  Id. at 555-56.

Based on the foregoing language in Kholi, petitioner argues:

Clearly, the State's Motion for Restitution, constituted "an act of inspecting or examining" of the sentence imposed upon petitioner on January 29, 2015, as it specifically called for the determination of the amount of restitution that was initially ordered by the Court at that time.

However, another type of tolling is also potentially available:  the AEDPA's statute of limitations "is subject to equitable tolling in appropriate cases."  Holland v. Florida, 560 U.S. 631, 645 (2010).  That said, a petitioner bears the burden of proof to establish entitlement to equitable tolling, Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002), and, frankly, it is "unavailable in most cases," Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).  Specifically, "a petitioner is entitled to equitable tolling only if [she] shows both that (1) [she] has been pursuing [her] rights diligently, **and** (2) some extraordinary circumstance stood in [her] way and prevented timely filing."  Holland, 560 U.S. at 649 (emphasis added; internal quotation marks omitted).

---

Additionally, the Motion for Restitution can also fairly be considered "a judicial reexamination" of the amount of restitution because, as specifically acknowledged by the 22nd JDDO in its response, the State had raised and sought resolution of the amount of restitution at the January 29, 2015 sentencing hearing.

Rec. Doc. 17, p. 6.  While that argument poses an interesting issue, petitioner does not cite – and the undersigned has not found – a case holding that such a motion filed by the state tolls a petitioner's limitations period under § 2244(d)(2).

In fact, the undersigned has found few cases even considering the effect of restitution motions under § 2244(d)(2), and those which do exist reach differing conclusions.  See Liptrot v. Horton, Civ. Action No. 2:18-CV-13126, 2019 WL 2295370, at *2 (E.D. Mich. May 28, 2019) ("Petitioner's motion to modify restitution did not toll the limitations period pursuant to 28 U.S.C. § 2244(d)(2) because the motion did not seek a judicial reexamination of the judgment of conviction."); but see Brown v. Lynch, Case No. ED CV 19-1635, 2020 WL 6265129, at *3 ("[P]etitioner's motion to reduce the restitution amount would appear to fit within the plain language of collateral review, as defined by the Supreme Court in Wall [v. Kholi]."), adopted, 2020 WL 6263182 (C.D. Cal. Oct. 22, 2020); Carbajal v. Davey, Case No. CV 15-8990, 2016 WL 5796918, at *3 (C.D. Cal. Aug. 22, 2016) ("Prior to filing his first state habeas petition, petitioner made an ex parte request to reduce his ordered restitution and a motion to modify his sentence, either or both of which may be considered applications for collateral review." (citing Kholi)), adopted, 2016 WL 5844461 (C.D. Cal. Sept. 28, 2016).  Nonetheless, even the cases seemingly aligned with petitioner's view are distinguishable.

First, those cases involved motions filed by the petitioner, not by the state.  On that distinction, petitioner opines that "the phrase 'or other collateral review' does not specify that the 'collateral review' proceedings are limited to those filed by the petitioner."  Rec. Doc. 17, p. 6.  True enough; however, it likewise does not specify otherwise, and it is at least arguable that such a condition is implicit.

Second, and perhaps more importantly, the motions in those cases sought **modifications** of the restitution orders.  Here, the state's motion did not seek modification or, for that matter, any type of "review" of the order imposing restitution.  Even the Supreme Court's opinion in Kholi appears to indicate that would be required, noting: "We thus agree with the First Circuit that '"review" commonly denotes "a looking over or examination **with a view to amendment or improvement**."'  Kholi, 562 U.S. at 553 (emphasis added).  Here, far from seeking amendment or modification of the restitution order, the state was simply seeking enforcement of that existing order.

For these reasons, the undersigned finds that petitioner's reliance on Kholi is misplaced and that the state's motion did **not** constitute "other collateral review" within the meaning of § 2244(d)(2).

Regarding the two prongs of the <u>Holland</u> test, the United States Supreme Court has explained:

> [W]e have expressly characterized equitable tolling's two components as "elements," not merely factors of indeterminate or commensurable weight. <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements"). And we have treated the two requirements as distinct elements in practice, too, rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other. <u>See, e.g.</u>, <u>Lawrence v. Florida</u>, 549 U.S. 327, 336-337, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (rejecting equitable tolling without addressing diligence because habeas petitioner fell "far short of showing 'extraordinary circumstances'"); <u>Pace</u>, *supra*, at 418, 125 S.Ct. 1807 (holding, without resolving litigant's argument that he had "satisfied the extraordinary circumstance test," that, "[e]ven if we were to accept [his argument], he would not be entitled to relief because he has not established the requisite diligence").

<u>Menominee Indian Tribe of Wisconsin v. United States</u>, 577 U.S. 250, 256 (2016).[33] Here, however, petitioner has not met **either** prong for the following reasons.

In the instant case, petitioner argues that she is entitled to equitable tolling because "the criminal matter was prosecuted against [her] in conjunction with several other state and Federal civil actions specifically designed to weaponize the process against her in favor of her opponents in what was essentially a civil dispute over property and inheritance rights."[34] More specifically, she contends that "the State of Louisiana knowingly filed and prosecuted a baseless restitution motion for the specific purpose of intimidating the petitioner from seeking post conviction relief within the 1 year limitation period for Federal *habeas corpus* relief."[35]

---

[33] <u>Menominee Indian Tribe</u> was not a habeas corpus case. However, its equitable tolling discussion is expressly based on the Supreme Court's interpretation of <u>Holland</u>; therefore, the reasoning therein is applicable to habeas cases. <u>See, e.g.</u>, Brian R. Means, Federal Habeas Manual § 9A:83 (May 2021 Update).

[34] Rec. Doc. 1-2, p. 43.

[35] <u>Id.</u> at p. 44.

The state, however, argues that those ancillary restitution proceedings did not qualify as an "extraordinary circumstance" at all, much less one that prevented petitioner from complying with the federal statute of limitations. The state also argues that, in any event, petitioner did not exercise the diligence required for equitable tolling. Both points are well taken.

First, the fact that the government files a restitution proceeding against an individual who was **expressly ordered to pay restitution** is not an "extraordinary circumstance"; on the contrary, it would be expected. Moreover, while fighting that parallel proceeding might have been distracting, it simply cannot be said to have been so incapacitating that it **prevented** petitioner from also filing a § 2254 petition, especially given that she was being represented by counsel in both efforts. Further, the allegation that the restitution proceedings were instituted for the very purpose of dissuading her from seeking habeas relief (or for any other nefarious purpose) is wholly speculative and conclusory. Lastly, it simply is not credible to suggest that any reasonable person, especially not one who has the benefit of counsel, would be so cowed or intimidated by a parallel restitution action that she would feel compelled to forgo her right to seek federal relief concerning what she considered to be an unconstitutional conviction.

Second, in any event, petitioner also cannot meet the "diligence" prong of the Holland analysis. It is true that a petitioner need not show that she exercised the "maximum feasible diligence"; rather, "[t]he diligence required for equitable tolling purposes is reasonable diligence." Holland, 560 U.S. at 563 (quotation marks omitted). Nonetheless, the undersigned cannot say that petitioner exercised even reasonable diligence in this case for the following reasons.

The United States Fifth Circuit Court of Appeals has held that "[w]hat a petitioner did **both before and after** the extraordinary circumstances that prevented [her] from timely filing may

indicate whether [she] was diligent overall." Jackson v. Davis, 933 F.3d 408, 411 (5th Cir. 2019) (emphasis added).  Here, petitioner took no action whatsoever to challenge her conviction or sentence in either state or federal court during the four months between the date her conviction became final (May 15, 2015) and the date the Motion for Restitution Hearing was filed (September 15, 2015); she also took to no such action during the additional six months between the date the restitution motion was dismissed (January 20, 2016) and the date her post-conviction application was filed (July 28, 2016).  Even more importantly, after the state post-conviction proceedings concluded upon the Louisiana Supreme Court's denial of relief on January 18, 2019, she did not seek federal relief until after another seven weeks elapsed, despite being represented by counsel who was aware of a limitations problem (a fact obviously demonstrated by virtue of the fact that the petition itself specifically requested equitable tolling).  That is not indicative of diligence.  See Stroman v. Thaler, 603 F.3d 299, 302 (5th Cir. 2010) (finding a lack of diligence where a petitioner who became aware of a limitations problem after belatedly discovering that his bid for state relief had been denied nonetheless then allowed an additional seven weeks to elapse before seeking federal relief).

Lastly, one other factor should be noted. Where, as here, a limitations problem is known to potentially exist, a petitioner can file "a 'protective' petition in federal court and [ask] the federal court to stay and obey the federal habeas proceedings until state remedies are exhausted." Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005).  Although petitioner and her counsel could have taken advantage of the option by filing a protective federal application at the same time the state post-conviction application was filed, they did not do so.  That, too, is problematic.  While a petitioner's failure to file a protective federal habeas petition is not alone dispositive, it can nonetheless weigh

against her in the reasonable diligence inquiry.  See Palacios v. Stephens, 723 F.3d 600, 608 (5th Cir. 2013); Batiste v. Vannoy, Case No. 6:18-CV-01601, 2019 WL 5296494, at *4 (W.D. La. July 24, 2019), adopted, 2019 WL 5296500 (W.D. La. Oct. 18, 2019); Morgan v. Terrell, Civ. Action No. 13-00783, 2015 WL 4488546, at *7 (M.D. La. July 22, 2015).

For all of these reasons, the Court finds that petitioner simply has not met her burden to establish that equitable tolling is warranted.

Finally, it must also be noted that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013).  In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).  In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims.  Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996.  Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
>
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations.  We caution, however, that tenable actual-innocence gateway pleas are rare:  "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.  In the instant case, petitioner expressly contends that she is actually innocent of the crimes of which she stands convicted.[36]

---

[36] See, e.g., Rec. Doc. 1-2, pp. 32-33 and 43.

As noted, petitioner was convicted of two counts of exploitation of the infirmed.  At the time of the charged offense in this case, Louisiana law defined that crime as:

> (1) The intentional expenditure, diminution, or use by any person, including a caregiver, of the property or assets of the infirmed, a disabled adult, or an aged person, including but not limited to a resident of a nursing home, mental retardation facility, mental health facility, hospital, or other residential facility without the express voluntary consent of the resident or the consent of a legally authorized representative of an incompetent resident, or by means of fraudulent conduct, practices, or representations.
>
> (2) The use of an infirmed person's, or aged person's, or disabled adult's power of attorney or guardianship for one's own profit or advantage by means of fraudulent conduct, practices, or representations.

La. Rev. Stat. Ann. § 14:93.4(A) (version prior to 2014 amendment).[37]

Normally, in assessing a claim of actual innocence, a federal habeas court first examines the evidence presented at trial.  See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014).  Of course, that is impossible here because there was no trial since petitioner pleaded guilty.

Nevertheless, even if the Court merely looks to the version of the facts that petitioner herself presents in her federal application, it is apparent that the evidence against her was quite damning.  Specifically, she recounts the following events:

1.      In 2010, petitioner and her husband befriended Sidney Dobronich, an elderly man living alone.  Mr. Dobronich had no spouse or descendants; however, he did have something which

---

[37] "Acts 2014, No. 811, § 6, effective June 23, 2014, changed some terminology to refer to persons 'with infirmities' or 'who is aged' or 'with intellectual disabilities.'" State v. Gibson, 186 So. 3d 772, 781 n.4 (La. App. 4th Cir. 2016).

proved critical in this case: "a sizable estate which he maintained in an investment account and several bank accounts."[38]

2.    "[B]eginning in the Summer of 2012 through February of 2013," Mr. Dobronich allowed petitioner to begin performing "care-giving services" for him.[39]    After "Petitioner expressed to Mr. Dobronich her intention to continue to take care of Mr. Dobronich and not to allow him to be placed in a nursing home," he allegedly offered her "an incentive" to do just that – namely, if she and her husband would agree to "developing and managing rental property with Mr. Dobronich's financial assistance," then "he would then leave all of his assets to [them] in his will."[40]

3.    After he subsequently suffered a heart attack, "Mr. Dobronich executed a statutory will and a power of attorney executed in favor of Petitioner, which provided Petitioner with access to Mr. Dobronich's finances."[41]

4.    Using that power of attorney, and purportedly at Mr. Dobronich's "specific direction," petitioner then

> engaged in several transactions in connection with their arrangement:  assets were moved from Mr. Dobronich's investment account to purchase undeveloped or dilapidated real estate property within the immediate vicinity of Mr. Dobronich's and the Thibodaux's home, as well as to purchase several items necessary to develop and renovate such property.  Mr. Dobronich also authorized the Thibodauxs to purchase vehicles and other personal items.  From February through March of 2013, Mr. Dobronich specifically authorized over 30 transactions, which included purchases, cash withdrawals and transfers, totaling over $334,000.[42]

---

[38] Rec. Doc. 1-2, p. 1.
[39] Id. at p. 2.
[40] Id.
[41] Id.
[42] Id. at pp. 2-3 (citations omitted)

5.      In March of 2013, Mr. Dobronich's nephews became aware of those financial transactions and "engaged the St. Tammany Parish Sheriff's Office in an investigation of the Thibodauxs for elder exploitation."[43]  As a result:

> [An] investigation was conducted by Detective Stefan Montgomery.  Det. Montgomery's investigation proceeded from March 18, 2013 through April 4, 2013.  His investigation involved a search of Mr. Dobronich's financial records, three interviews with Mr. Dobronich, as well as interviews with the Thibodauxs as well as representatives from various financial institutions.  Det. Montgomery also engaged the support of the United States Secret Service; and on March 27, 2013, conducted a raid of the Thibodaux residence and the residence of Mr. Dobronich (with 10 armed St. Tammany Parish Sheriff's deputies and U.S. Secret Service Agents) and seized several items from their respective residences.[44]

6.      On March 27, the "same day that petitioner endured the arguably frightening and intimidating raid on her home by several armed U.S. Secret Service Agents and St. Tammany Parish sheriff's deputies,"[45] Rebecca Crawford, the notary who had notarized the power of attorney and will in favor of petitioner and her husband, returned to notarize a hastily prepared handwritten statement signed by Mr. Dobronich in which he stated both that he did not want to press charges against petitioner and her husband and that their purchases, specifically including a "Kubota Tractor, a 4-wheeler, 2001 Chevy PK, a 2013 Nissan Altima and property(s)," were "purchased with his consent and were authorized with his full knowledge."[46]

7.      The next day, the nephews were able to wrest control of Mr. Dobronich from petitioner and her husband.  Petitioner states:

> [O]n March 28, 2013, the Nephews, with their lawyers, went to Sidney Dobronich's hospital room and coerced him into signing a general power of attorney, revoking petitioner's POA and providing the Nephew's with said general power of attorney. Using said power of attorney, upon his discharge from the hospital on April 2, 2013,

---

[43] Id. at p. 3.
[44] Id. at pp. 3-4 (citations omitted).
[45] Id. at p. 9.
[46] Id. at pp. 8- 9.

Sidney Dobronich was taken by his nephew, Forest Dobronich, to his home in Diamondhead, Mississippi, where he was in the exclusive custody and control of his Nephews, under what was described as 24/7 supervision (until his death in March of 2014).[47]

8.      The criminal investigation and the nephews' involvement thereafter spawned a flurry of actions in both state and federal court concerning Mr. Dobronich's assets.  In one of the related hearings held in June of 2013, Mr. Dobronich testified and confirmed that he had signed the aforementioned March 27 notarized statement.  However, the court was so concerned that it then "terminated Mr. Dobronich's testimony soon after that point, citing his competence; and ordered that his competency be evaluated."[48]

9.      Dr. Paul Verrette shortly thereafter submitted to the court a report stating:

Mr. Dobronich was evaluated on July 2, 2013.  He has multiple medical problems which include, hypertension, hypertensive cardiovascular disease, coronary artery disease, s/p coronary artery stent, osteoarthritis with total hip replacement of the left hip, chronic renal insufficiency and dementia.  Dementia is likely due to his history of hypertension and cerebrovascular disease. His dementia is such that he is not able to direct his affairs concerning person or property in matters consistent with his own interest.[49]

10.     The court then issued a judgment declaring that Mr. Dobronic was incompetent to testify at trial or in a deposition.[50]

11.     Regarding the criminal case, petitioner acknowledges:

[T]he Louisiana Department of Justice, which was handling the prosecution in the criminal case, procured expert testimony from Dr. Michelle Garriga regarding a forensic psychiatric analysis of Mr. Sidney Dobronich.  This expert testimony relied heavily upon the Verrette Reports and the statements of the Nephews and concluded that Mr. Dobronich suffered from Major Neurocognitive Disorder (Dementia) and lacked the capacity to consent to any of the transactions conducted

---

[47] Id. at p. 7 (citations omitted).
[48] Id. at p. 11.
[49] Id. at p. 14.
[50] Id. at p. 15.

within the last 2 years of his life, including between February and March of 2013 for which petitioner was being prosecuted.[51]

She then concludes:

> As a result of the potential testimony of Dr. Garriga, and being functionally deprived of Mr. Dobronich's exculpatory testimony (and succumbing to a year and a half of considerable pressure from multiple lawsuits in state and Federal courts, as well as heavy handed intimidation from state and Federal law enforcement); on December 17, 2014, petitioner and her husband changed their pleas to guilty as charged.[52]

---

[51] Id. at pp. 16-17 (citation omitted).

[52] Id. at p. 20. Although the undersigned finds that the foregoing version of events as alleged by petitioner herself is alone sufficiently damning to defeat her assertion of "actual innocence," it should be noted that a less self-serving summary was previously provided by United States District Judge Ivan L.R. Lemelle in connection with the related forfeiture action previously filed in this federal court. In that proceeding, Judge Lemelle summarized the evidence against petitioner as follows:

> This in rem forfeiture action arises out of an investigation into elder exploitation. On March 26, 2013, law enforcement became aware that a caretaker and her husband, via power of attorney and other mechanisms, were defrauding their neighbor, a hospitalized elderly man named Sidney Dobronich ("Mr. Dobronich" or "Dobronich").
>
> Law enforcement contacted Romano Investments and Insurance ("Romano Investments"), with which Mr. Dobronich had a large amount of money invested into a brokerage account. For two years, Romano Investments had been wiring a monthly electronic deposit of $1,200 to Mr. Dobronich's Capital One bank account. On February 13, 2013, Romano Investments was contacted by Darnay Thibodaux ("Darnay"), who identified herself as Mr. Dobronich's neighbor and caretaker, claimed to have power of attorney, and requested $30,000 to settle his medical expenses.
>
> On February 20, 2013, Darnay presented a power of attorney and last will and testament to Romano Investments, showing that she had full authority and that all of Mr. Dobronich's assets were being willed to her upon his death. Darnay requested an additional $30,000 transfer to the Capital One account for medical bills.
>
> On March 5, 2013, Darnay contacted Romano Investments and requested a transfer of $179,000 to the Capital One account for the purchase of a home. On March 11, 2013, Darnay called again, requesting an additional $95,000 for closing costs. The brokerage firm reached out to Mr. Dobronich's family, prompting an investigation.
>
> On March 13, 2013, Darnay deposited $100,000 into her husband Calvin Thibodaux's Resource Bank account. On March 19, 2013, Calvin wrote a check to draw from his account $17,697.93 to finalize the purchase of a Rockwood travel trailer. Cash payments totaling more than $23,000 were also made to finalize this purchase. When the check could not be deposited by the retailer, Berryland Campers, a refund check in the amount of $19,000 was issued payable to Calvin Thibodaux.
>
> On March 18, 2013, law enforcement met with Mr. Dobronich, who denied giving permission to Darnay to borrow money, to handle his finances, or to make any transactions on his behalf. Mr. Dobronich did not recall making any large withdrawals from the brokerage account other than the $30,000 to settle medical bills. He did not recall granting power of attorney; however, recalled that Darnay gave him "a bunch of paperwork."
>
> After adding herself to Mr. Dobronich's bank account via power of attorney, from February 15, 2013 to March 15, 2013, Darnay made withdrawals and debits from the bank account, amounting

As part of her "actual innocence" argument, petitioner primarily attempts to convince the Court that the foregoing incriminating evidence is largely suspect or unreliable.  She further attempts to insinuate that it was in fact the nephews who sought to take advantage Mr. Dobronich, pointing to their own efforts to have him sign other documents which gave them control or were financially advantageous to them.

---

to more than $334,000.  Law enforcement obtained Mr. Dobronich's Capital One bank account records and determined that most of the money had been withdrawn in cash or used to purchase large items, including vehicles (Nissan Altima sedan and Chevrolet Silverado truck), a tractor and real estate.  None of the money was used for the alleged medical expenses or were purchases attributable to Mr. Dobronich.

On March 27, 2013, law enforcement seized from the Thibodaux residence:  the Nissan Altima registered to Darnay; the Chevrolet truck registered to her husband Calvin; the tractor; and, Mr. Dobronich's wallet.

....

The Government alleges that the affidavit [on which the Claimants rely to show that Dobronich had "full knowledge" of the transactions at issue and knowingly gave them authorization to engage in the same ] was presented to Dobronich on March 27, 2013, while he was in the hospital, and in a fragile and vulnerable condition.  The Government supports this with the judicial determination, during state court civil proceedings that Dobronich was "incompetent to testify in these proceedings by way of deposition or trial testimony."  Further, during his interview with law enforcement on March 18, 2013, Dobronich denied giving permission to Claimants to borrow money, handle his finances, or make any transactions on his behalf.  Thus, there is serious question as to Dobronich's capacity to make the attestations proffered by Claimants.

The evidence shows that, on February 20, 2013, Darnay Thibodaux obtained a cashier's check in the amount of $26,000 payable to Calvin Thibodaux with "doctor bills" listed in the memo field; and, that the check was endorsed and deposited on the same day for the purchase of the Nissan Altima, a purchase Claimants contend Dobronich authorized.

Further, on February 13, 2013, and again on February 20, 2013, Darnay contacted Romano Investments for $30,000 wire transfers from Dobronich's investment account to his Capital One bank account, advising that the funds were needed in order to settle "medical expenses."  However, Claimants admitted to law enforcement that no funds were put to medical care or expenses because "the bills hadn't come in yet."

The Claimants contend that the basis for Dobronich's granting of power of attorney over his affairs and finances, as well as the bequest of all of his assets to the Thibodaux's, is the relationship that developed during Darnay's nursing care of Dobronich over the course of two years. However, there is evidence to the contrary and that Darnay only began caring for Dobronich several months before the transactions at issue.

United States v. $100,641.06 U.S. Currency, Civ. Action No. 13-5566, 2014 WL 6896035, at *1-2 and *7-8 (E.D. La. Dec. 8, 2014) (footnotes omitted).  "A court may take judicial notice of related proceedings and records in cases before the same court."  MacMillan Bloedel Ltd. v. Flintkote Co., 760 F.2d 580, 587 (5th Cir. 1985).

Concerning that argument, the Court concedes that it is unclear who, if anyone, was truly motivated solely by Mr. Dobronich's desires and best interests. However, that is beside the point. The question before the Court is not who in this sordid tale was pure at heart; rather, the Court is constrained to determine only whether petitioner has made a colorable showing that **she** was "actually innocent" in light of "new" evidence.

Regarding that determination, the Court first notes that the foregoing evidence cited by petitioner simply was not "new." Admittedly, the jurisprudence is conflicting on what qualifies as "new" evidence in this context. As the United States Fifth Circuit Court of Appeals has observed:

> The Supreme Court has not explicitly defined what constitutes "new reliable evidence" under the Schlup actual-innocence standard, and there is a circuit split.[FN 1] "This court has yet to weigh in on the circuit split concerning what constitutes 'new' evidence." Fratta v. Davis, 889 F.3d 225, 232 (5th Cir. 2018).
>
> > [FN 1] See Wright [v. Quarterman,] 470 F.3d [581,] 591 [(5th Cir. 2006)] (collecting cases). The disagreement centers on whether "new reliable evidence" for the purpose of the Schlup actual innocence gateway must be newly discovered, previously unavailable evidence, or, instead, evidence that was available but not presented at trial. Compare Osborne v. Purkett, 411 F.3d 911, 920 (8th Cir. 2005) (holding that evidence is "new" only if it was unavailable at trial and could not have been discovered earlier through due diligence), and Amrine v. Bowersox, 238 F.3d 1023, 1028 (8th Cir. 2001) (same), with Riva v. Ficco, 803 F.3d 77, 84 (1st Cir. 2015) (considering newly presented evidence "of opinions from a psychiatric expert that [petitioner] recently retained"), Rivas v. Fischer, 687 F.3d 514, 543 (2d Cir. 2012) (finding that "new evidence" is "evidence not heard by the jury"), Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003) ("All Schlup requires is that the new evidence is reliable and that it was not presented at trial."), and Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003) (holding that "habeas petitioners may pass Schlup's test by offering 'newly presented' evidence of actual innocence").

Hancock v. Davis, 906 F.3d 387, 389-90 (5th Cir. 2018), cert. denied, 139 S.Ct. 2714 (2019). That said, the Fifth Circuit then nevertheless went on to hold:

> Evidence does **not** qualify as "new" under the Schlup actual-innocence standard if "it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." Moore [v. Quarterman, 534 F.3d [454,] 465 [(5th Cir.

2008)]. Consequently, though we have not decided what affirmatively constitutes "new" evidence, **we have explained what does not**.

Id. at 390 (emphasis added).

The aforementioned evidence was obviously known to petitioner – or at least available to her upon reasonable investigation – prior to the time she decided to plead guilty rather than go to trial. Therefore, in this federal Circuit, it would not qualify as "new."

In her reply to the state's response in this proceeding, petitioner strives mightily to identify other evidence which perhaps could qualify as "new." Ultimately, however, she points to nothing more than testimony that was adduced at a civil hearing held on February 24, 2015 (approximately two months **after** she pleaded guilty in her state criminal case). That hearing, which was part of succession proceedings concerning the victim's estate, concerned a "Petition to Annul Probated Testament" filed by petitioner and her husband (i.e. her co-defendant in the state criminal case), in which they challenged the validity of the olographic will the victim executed leaving all his property to his family members. Specifically, in her reply to the state's response in this federal habeas corpus proceeding, petitioner opines:

> The new reliable evidence in support of petitioner's actual innocence claim comes in the form of sworn testimony, taken at a hearing on February 24, 2015, from several witness regarding Mr. Dobronich's mental competence:
>
> a) Forest Dobronich, having had the opportunity to observe Mr. Dobronich on almost a daily basis, testified that, at the time he executed the hand written will on July 18, 2013, and up until his death, Mr. Dobronich was "in good shape mentally" and "competent". R. Doc. No. 1-11, pp. 38-39.
>
> b) Det. Montgomery testified that Mr. Dobronich was mentally oriented in the three interviews he had with him in March and April of 2013. R. Doc. No. 1-11, pp. 62-64.
>
> c) Forest Dobronich completely disavowed the basis of the Garriga report, stating that he disagreed with the characterization of "incompetency and

20

dementia" pertaining to Mr. Dobronich contained within the July 2, 2013 Verrette report that he, through his attorney, filed with the court in the Civil Revocation Action.  R. Doc. No. 1-11, p. 68.

d) George Dobronich, having had the opportunity to observe Mr. Dobronich on a regular basis, testified that, at the time he executed his hand writted [sic] will on July 18, 2013 and up until his death, Mr. Dobronich's seemed mentally alert and oriented.  R. Doc. No. 1-11, p. 78.

e) Ms. Courtney Dobronich, having had the opportunity to observe Mr. Dobronich on almost a daily basis, testified that, at the time he executed the hand written will on July 18, 2013, and up until his death, Mr. Dobronich seemed "all right" most of the time regarding capacity, and "competent". R. Doc. No. 1-11, p. 85.[53]

She further argues that the foregoing hearing testimony "was not available to [her] at the time of her trial,"[54] presumably because that hearing had not yet been held when she pleaded guilty. That, however, is not determinative.  Although that particular civil hearing had not yet been held, the witnesses (Forest Dobronich, Detective Montgomery, George Dobronich, and Courtney Dobronich) were known to her and could have subpoenaed by her for her trial – if she had opted to face such a trial rather than simply plead guilty.  Therefore, the testimony on which she now attempts to rely was still "available" to her (or, using the phrasing from the aforementioned Fifth Circuit quotation, it was "within [her] reach").  Allowing a petitioner to avoid application of the AEDPA's statute of limitations based on nothing more than testimony from witnesses **she willingly opted not to call at trial** is just too facile a tactic to be allowed to succeed.  See Goldblum v. Klem, 510 F.3d 204, 226 n.14 (3d Cir. 2007) ("Evidence is not 'new' if it was available at trial, but a petitioner merely chose not to present it to the jury.  In that situation, the choice not to present the evidence does not open the gateway." (citation and quotation marks omitted)).

---

[53] Rec. Doc. 17, pp. 19-20.
[54] Id. at p. 20.

Granted, petitioner attempts to brush aside that inconvenient fact by suggesting that, if she had subpoenaed the witnesses for her criminal, she "suspects" that they would have told "a much different story"[55] – a euphemistic way of suggesting they would have committed the criminal offense of perjury in order to see that she was convicted.  However, that suggestion is wholly speculative and self-serving.

Lastly, in any event, the evidence cited by petitioner is not of the caliber necessary to support a colorable claim of "actual innocence."  As the United States Fifth Circuit Court of Appeals has explained:

> This exception's demanding standard requires evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.  The standard is seldom met.
>
> An actual-innocence claim is only established when it is shown that, in the light of newly-discovered evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  Therefore, a credible claim must be supported by new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.  Actual innocence is then demonstrated only when the court scrutinizes the likely impact on reasonable jurors of the overall, newly supplemented record to conclude that, in the light of all evidence – both the evidence presented at trial and that newly discovered – no juror, acting reasonably, would have voted to find petitioner guilty beyond a reasonable doubt.

Floyd v. Vannoy, 894 F.3d 143, 154-55 (5th Cir. 2018) (citations, quotation marks, and brackets omitted).

The foregoing evidence cited by petitioner falls far short of that standard.  Even if the jury believed (based on that testimony) that Mr. Dobronich was at times lucid, there was still ample

---

[55] Id.

other evidence that he was an infirm, elderly gentleman suffering from dementia who was exploited by petitioner in order to enrich herself. Given that contrary evidence and the totality of the circumstances, it is nothing short of ludicrous for petitioner to suggest that "**no** juror, acting reasonably, would have voted to find [her] guilty beyond a reasonable doubt" if only the foregoing testimony from the civil successions hearing had been produced at a criminal trial on these charges.

For these reasons, the Court finds that petitioner has failed to present a colorable claim of "actual innocence."

Because petitioner is not entitled to further statutory tolling, and because she has not established that she is eligible for equitable tolling or that she is actually innocent, her federal application for habeas corpus relief had to be filed no later than **May 16, 2016**, in order to be timely under 28 U.S.C. § 2244(d)(1)(A). Her application was not filed until **March 11, 2019**, and, therefore, it was untimely under that provision.

## **Subsection D**

However, the foregoing analysis does not end the Court's consideration of the timeliness issue, because petitioner next argues that 28 U.S.C. § 2244(d)(1)(D) delayed commencement of the statute of limitations with respect to the following **two** of her six claims:[56]

1.     "Ground No. 4: Violation of 5th and 14th Amendments Due Process Clauses: False Assertion By State, During Post Conviction Relief Proceedings, that Its Position Throughout the Criminal Proceedings Had Been that the Purported Victim Was Only Intermittently Incompetent (Incompetent with 'Lucid Intervals')";[57] and

---

[56] See Rec. Doc. 1, p. 15; Rec. Doc. 1-2, p. 45.
[57] Rec. Doc. 1-2, p. 37.

2.      "Ground No. 5: Violation of 5th and 14 Amendments Due Process Clauses: Once

the Question of the Purported Victim's Intermittent Incompetent (Incompetent with

'Lucid Intervals') Was Placed at Issue in Petitioner's Post Conviction Relief

Petition; Petitioner Was Denied Adequate and Meaningful Appellate Review of

those Proceedings by the State's Failure to Produce an Accurate Transcript of Dr.

Garriga's December 16, 2014 Testimony and to Provide the Backup Audio and

Notes of Said Testimony[.]"[58]

She argues that the timeliness of those two claims is governed by Subsection D because

they are premised on factual predicates that were not – and could not, through the exercise of due

diligence, have been – discovered until long after her state criminal judgment became final. That

argument raises two issues which must be addressed.

The first is whether a federal habeas petition's timeliness is even properly considered on a

"claim-by-claim" basis.  On that issue, one scholar has observed:

> Initially, there was some debate over whether a petitioner, who is able to allege a new, timely claim after the post-finality one-year limitations period has expired, should be permitted to include with that claim other claims that, by themselves, would be untimely.  This issue arises most commonly where the petitioner more than one year after finality is able to successfully assert a claim based on a new factual predicate, § 2244(d)(1)(D), or a claim based on a newly-recognizable, retroactive right, § 2244(d)(1)(C).
>      ....
>
> The Third Circuit, in an opinion written by then-judge Samuel Alito, was one of the first courts to hold that commencement of the limitations period is determined on a claim-by-claim basis, not on the application as a whole.  <u>Fielder v. Varner</u>, 379 F.3d 113, 118 (3d Cir. 2004) (prosecutorial misconduct claim untimely when not filed within one year of finality of conviction, notwithstanding the presence of later accruing and timely claim made part of the same federal petition). Later, the Sixth Circuit joined suit, concluding that the limitations period is claim

---

[58] <u>Id.</u> at p. 40.

specific. Bachman v. Bagley, 487 F.3d 979, 983-84 (6th Cir. 2007) (the limitations period on a claim involving a petitioner's designation as a sexual predator begins running once direct appeal of that claim is concluded; the limitations period is not restarted as to other conviction or sentencing claims). Most recently, the First, Ninth, Tenth, and Eleventh Circuits have adopted Fielder's claim-by-claim approach. Capozzi v. U.S., 768 F.3d 32, 33 (1st Cir. 2014), cert. denied, 2015 WL 732245 (U.S. 2015) (per curiam); Zack v. Tucker, 704 F.3d 917 (11th Cir. 2013) (en banc); Prendergast v. Clements, 699 F.3d 1182 (10th Cir. 2012); Mardesich v. Cate, 668 F.3d 1164, 1170 (9th Cir. 2012). The Eleventh Circuit in Zack reversed a prior panel decision, Walker v. Crosby, 341 F.3d 1240, 1245 (11th Cir. 2003) (en banc), that had held that "[t]he statute of limitations in § 2244(d)(1)(D) applies to the application as a whole; individual claims within an application cannot be reviewed separately for timeliness." Emphasizing the reference in § 2244(d)(1) to "an application for a writ of habeas corpus," the court in Walker reasoned that "[t]he statute directs the court to look at whether the *application* is timely, not whether the individual 'claims' within the application are timely." 341 F.3d at 1243 (emphasis added), rev'd, Zack v. Tucker, ___ F.3d ___, 2013 WL 105166 (11th Cir. 2013) (en banc).

Although the Supreme Court has not squarely addressed this issue, it indicated in Pace v. DiGuglielmo, 544 U.S. 408, 416 n.6, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005), that the statute of limitations applies on a claim-by-claim basis, Loomis v. Blades, 2006 WL 2265260, *2 (D. Idaho 2006), an approach consistent with that applied by the Third and Sixth Circuits.

Brian R. Means, Federal Habeas Manual § 9A:8 (May 2021 Update).

The United States Fifth Circuit Court of Appeals has not resolved the issue, but it has noted the use of the claim-by-claim approach by other circuits. See *In re* Young, 789 F.3d 518, 528 n.3 (5th Cir. 2015) ("The Fifth Circuit has not decided whether 28 U.S.C. § 2244(d)(1) applies piecemeal to each claim or to the whole habeas application. Though we do not decide that issue today, it appears that applying the statute of limitations to each claim is consistent with AEDPA and the precedent of other circuits."). Moreover, district courts within this circuit have followed the Fielder approach. See, e.g., Moldonado v. Thaler, 662 F. Supp. 2d 684, 700-01 (S.D. Tex. 2009), aff'd, 625 F. 3d 229 (5th Cir. 2010); see also Granier v. Vannoy, Civ. Action No. 18-901, 2020 WL 7776540, at *4 (M.D. La. Dec. 30, 2020). For the purposes of this decision, the

undersigned will assume that the claim-by-claim approach is valid and that Claims 4 and 5 should be analyzed under 28 U.S.C. § 2244(d)(1)(D), even if petitioner's other four claims are governed (and, for the reasons previously explained, time-barred) by 28 U.S.C. § 2244(d)(1)(A).

The second issue is whether § 2244(d)(1)(D) in fact saves Claims 4 and 5. The state argues that it does not.[59] The undersigned agrees. The reason is two-fold.

First, as noted, Subsection D delays the commencement of the statute of limitations until "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § § 2244(d)(1)(D). The purported factual predicate of Claims 4 and 5 is supposedly the prosecution's awareness of evidence indicating that the victim, despite his general incompetence, experienced lucid intervals. However, the defense obviously knew the prosecution was aware of such evidence even before petitioner pleaded guilty on December 17, 2014, because, on November 10, 2014, the prosecutor sent defense counsel a letter stating:

> The State is hereby providing exculpatory evidence it has received in connection with this case complying with Brady v. Maryland, 371 U.S. 812, 83 S.Ct. 56, 9 L.Ed.2d 54 (1962). I received this document November 7, 2014. Please find the attached copy of a DVD depicting Mr. Sidney Dobronich dictating a will on July 8, 2013. The video was taken by Forest Dobronich.[60]

Second, in any event, Claims 4 and 5 concern ways petitioner's rights were allegedly violated in the state **post-conviction** proceedings. Therefore, even if those claims would otherwise be considered timely under § 2244(d)(1)(D), the claims themselves simply are not cognizable under 28 U.S.C. § 2254. See In re Gentris, 666 F.3d 910, 911 (5th Cir. 2012) ("Infirmities in state

---

[59] Rec. Doc. 11, pp. 12-14.
[60] Rec. Doc. 1-12, p. 30.

postconviction proceedings are not grounds for relief under § 2254."); Duff-Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir. 1992) ("[I]nfirmities in state habeas proceedings do not constitute grounds for federal habeas relief. We look only to the trial and direct appeal." (footnote omitted)); Glenn v. Cain, Civ. Action No. 13-6595, 2014 WL 5040713, at *10 (E.D. La. Sept. 30, 2014).

That presents petitioner with two obstacles, both of which are fatal. First, § 2244(d)(1)(D) simply is not even triggered by inclusion of a non-cognizable claim. See, e.g., Ramey v. Akpore, No. 12 C 7174, 2014 WL 201843, at *3 (N.D. Ill. Jan. 17, 2014); Ware v. Secretary, Department of Corrections, No. 8:11-cv-418, 2011 WL 5525359, at *6 (M.D. Fla. Nov. 14, 2011). Second, even if that were not the case and those claims could be considered timely, they would still fail on the merits because – again – **they simply are not cognizable under § 2254**.

The Court is, of course, aware that petitioner argues that it is too narrow to view these claims solely as challenges to the post-conviction matters. Her argument on that point is extremely convoluted but, as best as this Court can decipher, it goes something like this: (1) Throughout the prosecution, the state's theory of the case was that the victim was wholly incompetent without any lucid intervals during the periods of time relevant to the charges. (2) However, to later defeat petitioner's post-conviction claims, the state changed tactics and expressly disavowed the suggestion that it had ever contended that the victim was incapable of lucid intervals. (3) Although the state's argument prevailed and the post-conviction application was denied, petitioner nevertheless still believes that the tactics **were** changed, and she argues that allowing the state to defeat a bid for post-conviction relief by espousing a theory diametrically opposed to the theory on which the prosecution originally proceeded is fundamentally unfair.

However, this Court need not determine whether that happened or, if it did, whether it was unfair in a constitutional sense.  These proceedings were brought pursuant to **28 U.S.C. § 2254**, and, in proceedings brought under that statute, the federal court "look[s] only to the trial and direct appeal."  <u>Duff-Smith</u>, 973 F.2d at 1182; <u>accord</u> <u>Reneau v. Cockrell</u>, No. 01-50371, 2001 WL 1747637, at *6-7 (5th Cir. Dec. 5, 2001); <u>Morris v. Cain</u>, 186 F.3d 581, 585 n.6 (5th Cir. 1999) ("[W]e must find constitutional error at the trial or direct review level in order to issue the writ."); <u>Hassine v. Zimmerman</u>, 160 F.3d 941, 954 (3d Cir. 1998) ("[T]he federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation.").  The unfairness of which petitioner complains, if it existed at all, first arose **during the post-conviction proceedings**.  As noted, Claim 4 expressly alleges that the "False Assertion" was made by the state "**During Post Conviction Relief Proceedings**." [61]  Claim 5 alleges that "Once the Question of the Purported Victim's Intermittent Incompetent (Incompetent with 'Lucid Intervals') Was Placed at Issue **in Petitioner's Post Conviction Relief Petition**; Petitioner Was Denied Adequate and Meaningful Appellate Review **of those Proceedings** ...."[62]  However, again:  that is immaterial here.  Even if petitioner's rights were blatantly violated in the post-conviction proceedings and the related supervisory proceedings thereafter, that violation simply is not one redressable in proceedings brought pursuant to 28 U.S.C. § 2254.

---

[61] Rec. Doc. 1, p. 37 (emphasis added).
[62] <u>Id.</u> at p. 40 (emphasis added).

## RECOMMENDATION

It is therefore **RECOMMENDED** the federal application for habeas corpus relief filed by Darnay Thibodaux be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[63]

New Orleans, Louisiana, this _____28th_____ day of July, 2021.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[63] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.